

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis LLP
75 Park Plaza
Boston, Massachusetts 02116
Tel 617 367-0025
Fax 617 367-2155
www.jacksonlewis.com

Attorneys at Law

| | |
|---|---|
| ATLANTA, GA | LOS ANGELES, CA | SACRAMENTO, CA |
| BOSTON, MA | MIAMI, FL | SAN FRANCISCO, CA |
| CHICAGO, IL | MINNEAPOLIS, MN | SEATTLE, WA |
| DALLAS, TX | MORRISTOWN, NJ | STAMFORD, CT |
| GREENVILLE, SC | NEW YORK, NY | WASHINGTON, DC REGION |
| HARTFORD, CT | ORLANDO, FL | WHITE PLAINS, NY |
| LONG ISLAND, NY | PITTSBURGH, PA | |

EXHIBIT B

April 13, 2004

**VIA HAND DELIVERY**

Rance A. O'Quinn
Enforcement Supervisor
U.S. Equal Employment Opportunity Commission
John F. Kennedy Federal Building
Government Center
Fourth Floor, Room 475
Boston, MA 02203

Re:    Robert Briddell and
       Saint-Gobain Abrasives, Inc.
       EEOC Number 16C-2003-00467

Dear Mr. O'Quinn:

This letter responds to the allegation of discrimination filed against Saint-Gobain Abrasives, Inc. ("Saint-Gobain" or "the Company") by its former employee, Robert Briddell. Complainant was discharged solely for performance reasons following repeated warnings and progressive discipline. His race was not a factor in his discharge. Complainant has already filed an unfair labor practice charge with the National Labor Relations Board (NLRB) alleging that he was discharged due to his alleged union activity. That charge was dismissed by the NLRB. Complainant simply has not come to grips with the reality that he alone is responsible for the loss of his job.

## I.    BACKGROUND AND COMPANY POLICIES

Saint-Gobain Abrasives, Inc. is among the largest and most well-respected employers in Worcester, Mass. Saint-Gobain and its predecessor, Norton Company, have done business in Worcester for 119 years. The Company engages in the manufacture of industrial abrasive products. Specifically, the Bonded Abrasives business unit is engaged in the manufacturing of grinding wheels and employs in excess of 800 employees at its facility in Worcester.



Attorneys at Law

The Company maintains the following non-discrimination policy:

<u>Equal Employment Opportunity</u>

It is the practice and policy of Norton Company to promote equal opportunity for all employees and applicants in all aspects of employment. The Company will not discriminate on the basis of race, color, religion, ancestry, national origin, gender, age, marital status, veteran status, sex, sexual orientation, or physical, sensory or mental disability or any other protected status. This principle is applied to personnel actions such as hiring, training, promotions, transfers, compensation, layoffs, benefits and treatment on the job for all job classifications.

Complainant was treated at all times in accordance with this policy. The Company also maintains a comprehensive discipline/discharge policy which provides for progressive discipline. (Attachment 1). As the record reflects, Complainant was treated <u>more leniently</u> that the policy required.

## II.     COMPLAINANT'S WORK HISTORY

Complainant was hired in 1985 as a material handler. By 2000, Complainant had held the Band 4 job of truing operator for about one year.[1] On July 30, 2000, he was demoted to a Band 3 mixer job due to continued poor quality work and his refusal to follow the simplest instructions. (As a result, he received a reduction in pay of $0.75, from $17.25 per hour to $16.50 per hour.) (Attachment 2). Complainant declined additional training offered to him by the Company to help him succeed—and thereby stay—in the truing operator position. Complainant refused retraining even after he was spoken to regarding the quality of his work. (Attachment 3).

As a Band 3 mixer, Complainant was responsible for properly measuring and mixing the correct amount and type of raw materials to produce specific products. The instructions Complainant used to perform the mixing operation were set forth on a manufacturing order ("an MO") that accompanied every order throughout the production process. An order that was improperly mixed because either the wrong raw material was included or the incorrect amount of a raw material was used resulted in a wasting of the entire mix or additional unproductive work time by other workers to rework the mix.

Complainant had intermittent bouts of quality problems throughout his tenure. (Attachments 4-14). These issues prompted both formal and informal counseling, as well as more serious corrective measures, including the 2000 demotion. These quality problems continued the following year, escalating in terms of frequency in the latter half of 2001. By that time, Complainant's repeated disregard for Saint-Gobain's attempts to informally counsel him (evidenced by repeated non-written warnings) necessitated more formal measures, i.e., a series of written warnings which culminated in a disciplinary suspension. Significantly, the incidents involving Complainant demonstrate a variety of serious problems, ranging from repeated production-related issues raising serious product concerns to his failure to follow simple, straightforward recordation procedures.

---

[1] The Company's factory jobs are slotted into one of four bands, with Band 4 being the highest.



U.S. Equal Employment Opportunity Commission

April 13, 2004

Page 3

Complainant failed to heed progressively more serious warnings as his performance problems snowballed in the fall of 2001. On October 4, 2001, he received a written warning which included the strong admonition that any further incidents would "[be considered] sufficient cause for [his] immediate termination." (Attachment 15). Despite this serious warning, *less than four days later* Complainant again ignored clear, established documentation procedures. However, instead of terminating Complainant, Saint-Gobain afforded him *yet another* opportunity to correct his actions. As an alternative to discharge, Complainant was given an additional intermediate disciplinary step— *another* warning accompanied by a three-day suspension. (Attachments 16 and 17). Despite this final opportunity, Complainant's performance issues continued, until *two incidents* (i.e., contaminated product) *on the same day* (January 30, 2002) prompted his termination. (Attachments 18 and 19). The facts establish that this repeated refusal to follow established procedures—<u>not</u> his race—caused Complainant's termination on February 7, 2000.

## III.    NATIONAL LABOR RELATIONS BOARD CHARGES

This is not the first forum in which Complainant has alleged that he was the victim of unlawful discrimination. In the fall of 2001, the United Auto Workers Union ("the UAW"), Complainant's bargaining representative, filed an unfair labor practice charge (Case No. 1-CA-39433) with the National Labor Relations Board (NLRB) alleging that Complainant was warned and suspended due to his union activities in violation of the National Labor Relations Act. Following an extensive investigation, the UAW withdrew the charge.[2] Subsequently, the UAW filed a second charge (Case No. 1-CA-39765) alleging that Complainant was discharged due to his union activity. This time, the Regional Director of Region 1 of the NLRB dismissed the charge after her office conducted an extensive investigation. The UAW appealed the dismissal of the charge to the General Counsel of the NLRB in Washington, D.C. The General Counsel of the NLRB, the individual within the NLRB who has final say on the issuance of unfair labor practice complaints, denied the appeal.

## IV.    COMPLAINANT'S PRE-TERMINATION DISCIPLINE

Complainant was not disciplined for each and every instance of poor performance which occurred before the 2001 union activity and his complaints about the Company that he alleges were the triggers for discipline. (See Attachments 4-14). However, in many instances, he did receive discipline or other severe adverse employment action. Certainly, the EEOC cannot find that the substantial leniency shown to Complainant after his alleged union and Company-complaint activity was less impressive than any alleged leniency shown to him before that time.

Complainant had received both a written reminder and a written warning for overweight pans (a basis for his discharge) long before his discharge. On May 6, 1994, he received a written reminder for producing an overweight pan. (Attachment 20). On August 3, 1994, he progressed to a written warning for producing another overweight pan. (Attachment 21). He did not repeat this problem until 2001. In addition, on July 30, 2000, Complainant was demoted from his Band 4 truing operator job to a Band 3 mixer position in part because of quality issues.

---

[2] An unfair labor practice charge is typically withdrawn after the Charging Party is told by the NLRB that it will be dismissed absent withdrawal.

**jackson|lewis**

Attorneys at Law

On September 18, 2001, Complainant was spoken to by his supervisor, Bill Tivnan, regarding Complainant mixing overweight pans. (Attachment 22).[3] On September 20, 2001, Complainant was placed on a written reminder as a result of overweight pans made by him on September 19, 2001. (Attachment 24). Shortly thereafter, on September 21, 2001, Complainant produced five more overweight pans (three were substantially overweight—55, 53, and 52.1 pounds). Although Complainant could have been placed on a written warning at the time, the Company did not do so. On September 24, 2001, Complainant did not sign a manufacturing order. It is a routine, fundamental job requirement for a mixer to sign *every* MO. The Company could have placed Complainant on a written warning for this violation, or this violation in combination with the September 21 overweight pan violation, but it did not. Had the Company placed Complainant on a written warning for the September 21 violations, it could have suspended or terminated him on September 24. However, the Company did not.

Had Complainant not had subsequent performance issues, his disciplinary problems would have ended, and he would not have progressed beyond a written reminder despite the September 21 and 24 incidents, which would have been forgotten. But Complainant *did* have subsequent performance issues on October 2. As a result, on October 4, when Complainant failed to sign another MO and did not use the CONCAM system,[4] he received a written warning.[5] (Attachment 15).

Four days after receiving the written warning, Complainant did not sign off on two more MOs. Rather than terminate him, the Company chose instead to issue him another warning, with a suspension. (Attachments 16 and 17). Had the Saint-Gobain wanted to terminate Complainant it could have seized upon these unsigned MOs as a legitimate reason to do so.

On October 23, 2001, Complainant again did not complete an MO. Had the Company wanted to rid itself of Complainant, it easily could have done so at this time. However, the Company did not further discipline Complainant.

On January 2, 2002, Complainant made a mix in excess of 68 pounds. Once again, instead of receiving more severe discipline, he was merely spoken to by his supervisor, Bill Tivnan, and was told in writing by Human Resources Manager Rick Zeena that his failure to follow the Company's safety and/or quality procedures would "likely" result in the termination of his employment. (Attachment 25). Again, this is hardly the conduct of an employer which is seeking reasons to terminate an employee.

It was not until January 30, 2002—when Complainant made two contaminated mixes—that the Company decided it could not continue to show Complainant leniency. Therefore, on February 7, 2002, Complainant was terminated.

Time and time again, the Company treated Complainant leniently:

---

[3] Filled mix pans cannot exceed 45 pounds. (Attachment 23).
[4] CONCAM is a system put in place to prevent a mixer from confusing material being weighed. The system uses a wand. If the mixer attempts to wand in certain materials and those materials are wrong or the amounts of them are wrong, the CONCAM system will not let the operator proceed.
[5] As would be expected, this warning referenced the September 21 and 24 incidents.

DEF00004

**jackson|lewis**
|Attorneys at Law

- On September 21, 2001, Complainant produced five overweight pans. Although Complainant could have been placed on a written warning at the time, the Company did not do so.

- On September 24, 2001, Complainant did not sign an MO. The Company could have placed Complainant on a written warning for this violation, or this violation in combination with the September 21 overweight pan violation, but it did not.

- Had the Company placed Complainant on a written warning for the September 21 violation, it could have suspended or terminated him on September 24. However, the Company did not do so.

- Four days after receiving a written warning, Complainant did not sign off on two more MOs. Rather than terminate him, the Employer chose instead to issue him another warning, with a suspension.

- On October 23, 2001, Complainant again did not complete an MO. However, the Employer did not further discipline Complainant.

- On January 2, 2002, Complainant made a mix in excess of 68 pounds. Once again, instead of receiving more severe discipline, he was merely spoken to by his supervisor, Bill Tivnan.

Based on this overwhelming evidence of leniency toward Complainant alone, the charge should be dismissed.

## VI.    DISCIPLINE OF OTHER EMPLOYEES

Other employees have been disciplined or terminated because of overweight pans of mix, contamination of mix, or failure to complete manufacturing order slips. The policy of the Company is to remove and destroy written warnings and written reminders after twelve months have elapsed from the date of the warning/reminder. Consequently, the Company cannot provide all the discipline that was meted out because some of it has been destroyed.[6] Nonetheless, sufficient records do exist to dispute Complainant's assertion that he was treated disparately compared to other employees.

Employees other than Complainant have been disciplined for poor work quality, including not completing MOs. However, unlike Complainant, one instance of discipline is invariably enough to correct the behavior. Completing an MO is a simple task. It requires no skill, merely attention: it only requires an employee to write a minimal number of letters or numbers in one or two places on a piece of paper. As an MO audit conducted in Plant 8 (one of three main Abrasives plant in Worcester and the one in which Complainant worked) in March 2002 shows, virtually all (99.24%) of the "sign

---

[6] That problem is particularly exacerbated here where the complaint was filed at the MCAD on November 21, 2002 and not served on Saint-Gobain by the EEOC until March 3, 2004.



offs" on MOs are done correctly. Complainant's unwillingness—"inability" would be a mischaracterization—to enter the characters on the paper is dumbfounding.

It is important to note that the MO proceeds with the product throughout the production process. The MO *must be* completed before a product can be shipped. Consequently, when an incomplete MO is discovered, it is either returned for completion to the person whose responsibility it was to complete the MO or completed by a supervisor. Under this system, an incomplete MO *can* be discovered by an employee and returned to the offending employee to be signed without a supervisor's knowledge. In such a case, no discipline could possibly occur. Conversely, if the supervisor signs the MO, there is supervisor knowledge, and therefore, discipline may be imposed.

The following employees, all of whom (except Asare Agyeman) are white, were disciplined for not signing MOs:

- Kevin Reed - November 29, 2001 (Attachment 26)

- Frank Hanson - December 14, 2001 (Attachment 27)

- Jim Constantine - February 19, 2002 (Attachment 28)

- Tom Patnode - January 31, 2002 (Attachment 29)

- Ron Racca - December 4, 2001 (Attachment 30)

- Asare Agyeman - October 9, 2001 (Attachment 31)

- Russ Johnson - March 29, 2001 (Attachment 32)

The following employees, all of whom (except Kenneth Acquah) are white, were disciplined or terminated for quality, safety or other reasons:

- Written warning given to Larry Stidsen, a long-term, third-generation employee with no previous discipline record for an unsafe act, on March 11, 2002 (Attachment 33)

- Written warnings and termination of Gary Egan, a 23-year employee ostensibly for falsifying data, in 1997 and 1998 (Attachments 34 and 35)

- Written warning given to Kevin Moulton, a 30-year employee on November 10, 2000 for poor quality work (Attachment 36)

- Written warning given to Ray Bull, a long-term employee, on November 10, 2000 for poor quality work (Attachment 37)



- Termination of Joseph Wilson on February 14, 2001 for poor work quality (Attachments 38-40)[7]

- Termination of Francis Zawalich in November, 1997 without progressive discipline for falsifying speed records (Attachment 41)

- Termination of Stephen Gelardi on August 6, 1998 for a no call/no show while on a written warning for failure to report at his scheduled time

- Written reminder given to Kenneth Acquah on June 29, 2000 for a safety violation, followed by a written warning for no call/no show on August 8, 2000

- Termination of Michael Thibault in February 2002 for theft of Company property

In addition, other employees, unlike Complainant, have been terminated without receiving progressive discipline. They included: Nana Asamoah; Daniel Appiah, Kevin Morrissey, James Ward, Ivan Vega, Dale Pope, and Roland Bergeron.

## VII.    COMPLAINANT'S ALLEGATIONS OF DISCRIMINATION

Complainant alleges in Paragraph 3 of his complaint that "[t]here are approximately 40 persons with responsibility to supervise production and maintenance employees in the Bonded and Superabrasives Division. Upon information and belief, all 40 of these individuals are white." Complainant also alleged in Paragraph 2 of his complaint that "[t]here have been no blacks, Latinos or other persons of color promoted or hired to supervise production and maintenance employees since [Saint-Gobain acquired Norton Company]."

Complainant is incorrect on both counts. First, there are only 24 supervisors in the Bonded Abrasives business unit. Furthermore, in June of 2000, Kially Ruiz, a Hispanic male originally from the Dominican Republic, was named as a Department Supervisor. Ruiz was originally hired to work in the Company's Brownsville, Texas facility and transferred to Worcester in June of 2000. (Ruiz resigned his employment at the Company in July of 2002 to pursue his Masters in Business Administration from the University of Texas.)

As alleged in Paragraph 4 of the complaint, Complainant did comment to Company officials on the number of minority supervisors at the Company. However, regarding the allegations in Paragraph 5 of the complaint, the Company lacks any knowledge whether Complainant attended a meeting of the Worcester Commission Against Discrimination or of what he may have said at the meeting. The Company also has no knowledge of what Complainant may have said to co-workers during the UAW organizing campaign about any relationship between union organizing and the civil rights movement, as Complainant alleged in Paragraph 6 of the complaint. The Company acknowledges that Complainant did express his view that minorities were treated unfairly at the Company and denied

---

[7] It is important to note that Mr. Wilson was not shown the same leniency shown to Complainant. Mr. Wilson received a written warning, Thereafter, after having problems with three MOs, he was terminated. Among other acts of leniency, Complainant was afforded an interim, second written warning (with a suspension) before he was terminated.



opportunities for promotion, as alleged in Paragraph 7 of the complaint. However, the Company vigorously disputes Complainant's views.

As Complainant alluded to in Paragraph 8 of the complaint, during the UAW organizing campaign the Company did hold one meeting limited to employees from Africa. The Company did so in order to enhance communications on a topic of critical importance. At a different meeting (not one limited to employees from Africa), Complainant did express his view that holding a separate meeting for employees from Africa was segregation. The Company disputes this assertion, and it also denies that Rick Zeena responded angrily to the statement.

Finally, Complainant alleges in Paragraph 9 of the complaint "[s]oon after the Union campaign ended, I began to get warnings for making mistakes and I was terminated in February 2002 for making mistakes." As noted above, these allegations of discrimination based on Complainant's union activity were rejected in total by the National Labor Relations Board. Further, Complainant was demoted due to quality issues on July 30, 2000, one year before the union organizing campaign purportedly began. In addition, Complainant's allegations that he was treated disparately from other employees who make mixing errors were rebutted adequately above.

## VIII. CONCLUSION

The charge should be dismissed. Complainant was treated leniently, not disparately. Despite the fact that he was a long-term employee, he continued to do poor quality work, repeating errors that most other employees did not make and certainly did not repeat. Complainant's downward slide after years of employment was solely the result of his indifference or refusal to follow instructions and perform relatively routine operations. If the Company wanted to terminate Complainant, it could have done so several times prior to Complainant's final transgression. That it did not speaks volumes about the reason Complainant was suspended and then—terminated—poor work performance.

Very truly yours,

JACKSON LEWIS LLP

Patrick L. Egan

Enclosures
cc:    Robert M. Briddell

DEF00008



## Supervisor's *Personnel Guide*

Hiring, Employment, Termination
Discipline/Discharge

Page 1 of 6
01 MAR 1997
SS  III-20
15 MAR 1994

## STATEMENT OF POLICY

  A. In order to run a company safely and effectively, there must be a reasonable degree of discipline. Discipline is defined as instruction, training, a sense of order, or control of given standards of conduct and operation. It is the intent of this policy to outline the expected response of our employees towards Company regulations and also to outline the proper corrective action occasionally required to maintain adherence to these regulations.

  B. It is the employees responsibility to observe normal regulations necessary for the proper operation of Norton Company. These regulations are based on the Company's expectations that employees:

    1. Be honest in their dealings with the Company, as they can expect the Company to be honest and fair in its dealings with them.

    2. Respect the rights and feelings of fellow employees.

    3. Observe Company's instructions necessary for safe and efficient operations.

  C. Supervisors are responsible for monitoring these regulations in all areas of the Company, including their own specific areas.

  D. Security, Safety, and Personnel are responsible for monitoring and identifying violations of these regulations in all areas of the Company.

  E. The immediate supervisor of any employee is responsible for initiating appropriate action to correct violations by an employee (except in immediate emergency situations where the safety of the employee or other employees is in jeopardy). Such action may include training, counseling, written reminder (which may include a temporary transfer to another job), written warning (which may include a job transfer or a suspension period of to five days) or even a discharge.

## INTENT OF POLICY

  · To prevent a repetition of any acts which hinder safe and efficient operations.
  · To provide a method of educating employees about Company regulations.
  · To correct or prevent problems and not to punish employees.

# SUMMARY

Violations of Company regulations, subject to discipline but not cause for immediate dismissal, require individual study. No volume of rules or Company regulations or department instructions define every situation and/or assure that every supervisor will recognize every situation. For example, a supervisor may not immediately recognize the safety or security problems caused by illegal parking or the morale problem created in other departments by allowing some of their employees to violate regulations such as going without safety glasses or extending break periods. Supervisors should collectively recognize situations which deter safe and efficient operations and are responsible for communication and discipline required to correct those situations.

Supervision should make employees aware of the Company's regulations and expected behavior as often and regularly as possible. This training will be supplemented with additional instruction or information from other departments such as Engineering, Security, Safety, and Personnel. Periodically these departments will issue or provide notices, manufacturing instructions, booklets (You and Norton, Personnel Guide), and training courses to support line managers in conducting their respective operations.

# DISCIPLINE PROCEDURE

A.   **Formal Counsel**
When an employee violates regulations or deviates from expected behavior, the supervisor should formally counsel the employee regarding standards, rules, etc., and the reason for them. Mutual understanding and commitment to alleviate the problem should be achieved in this session. The supervisor should document this session for their records and advise employee of next step if problem is not corrected.

B.   **Written Reminder Form #6831 (See Figure 1)**
When a second or other violation occurs within a 6 month period, counsel employee again and issue this written reminder. This provides written documentation acknowledged by employee. Advise employee of future consequences if the problem is not corrected. Depending on the problem, the Employee Relations Administrator could be involved at this point. Retain written reminder for no longer than twelve months.

DEF00010

DISCIPLINE PROCEDURE (Cont'd)

   C.   **Notice of Warning/Suspension Form #4456 (See Figure 2)**

If the same or other violation occurs again in the subsequent twelve-month period then issue this written warning. The written warning serves as a formal notice to the employee of their violation and that they are on probation. A suspension period of up to 5 days may be included.

   1.   Supervisor completes written warning in the presence of the employee and another supervisor. After careful explanation, request employee to sign the slip to acknowledge their awareness of the situation. If they refuse, note this on the written warning and process in the usual manner.

   2.   Route written warning through all supervisors involved and to the Human Resources representative.

   3.   The written warning will be filed in employee's personnel folder. During written warning period, the employee is not eligible to bid outside of their designated section. Employee is eligible to bid within their section with approval from the supervisor.

   4.   Written warning is in effect for one year from the date of issue. Written warning may be rescinded at any time with the approval of the Manager of the section. After 1 year select one of the following alternatives:

      a.   Withdraw written warning and reinstate employee's eligibility to bid.

      b.   Continue written warning for a period of time as prescribed by the Manager of the section, and notify employee.

      c.   A second violation of any company rule or accepted standard of conduct during written warning period may result in employee discharge.

# QUESTIONS TO ASSIST SUPERVISOR IN DISCIPLINE PROCEDURE

- Are you sure the employee was properly instructed before the problem occurred?

- Do you know who instructed them and when?

- Have you had this or a similar problem with this employee before?  If so, were they instructed or counseled?

- Did you get all the facts straight before you counseled the employee?

- Did you consider all the facts and not pick and choose those that would suit you?

- Did you give the employee a fair chance to explain their side?

- Did you counsel privately so others could not hear?

- Did you hold your temper?

- Did you avoid sarcasm with the employee?

- Were you constructive and specific?

- Do you believe the employee understands and feels you want to help them?

- Was the discipline fair?

- Was the discipline the same you would give to any other employee?

- Does the employee understand clearly what is expected of them in the future?

- Does the employee know what will happen if the problem repeats?

- Did you jot down notes to refresh your memory in the future?

- Did you learn anything which should be explained or communicated to other employees?

- Did you make a note to follow-up?

- Did you follow-up?

## CAUSES OF DISCIPLINE OR DISCHARGE

The discharge of any employee will normally result from continued violation(s) while on a written warning or a willful violation of a regulation that is cause for immediate discharge. The following categorize employee actions which may result in either discipline or immediate discharge.

A.    Cause for Counseling or Discharge
- Absenteeism
- Tardiness
- Carelessness
- Poor Working habits
- Safety violations
- Harassment of other employees
- Not following standard procedures, etc.
- Violation of Code of Ethics

B. Causes for Immediate Discharge
1. **Records**
   - Punching, signing, or falsifying another employee's time card.
   - Falsifying or misrepresenting Company documents such as employment, medical, production or time records for personal gain.
   - Manipulating or falsifying incentive records or failing to turn in incentive records, as instructed, for personal gain.
   - Accepting compensation for work not performed, such as accepting payment for operations not required or eliminating operations required by approved manufacturing instructions, without notifying supervision.

2. **Property**
   - Stealing employee or Company property.
   - Removing Company property without supervision approval.
   - Destruction, defacing, or deliberately misusing employee or Company property. This includes the misuse of safety equipment.

3. **Behavior**
   - Selling illegal narcotics or drugs on Company property. Being found guilty of trafficking in illegal drugs or narcotics. Using or possessing illegal narcotics or drugs on Company property.
   - Bringing intoxicants into a Company building without approval. Use of intoxicants on Company premises between the start and finish of the employee's work day.
   - Bringing or possessing firearms or dangerous weapons on Company property without Security Department approval.
   - Promoting or participating in gambling on Company property. Soliciting or selling tickets, "chances," or merchandise on Company property during non-working hours may be allowed by supervision and Human Resources with prior approval. (See VI-92).
   - Violating Company regulations (which are based on the expectations as outlined on page one of this policy).

DEF00013

# DISCHARGE PROCEDURE

When a supervisor feels an employee should be discharged for cause (and their superior agrees), implement the following procedures.

1. Supervisor writes up a specific listing of the causes for termination and reviews them with their superior.

2. Supervisor discusses the situation with the Manager or Human Resource Manager to ensure the action is consistent and appropriate.

3. Employee is confronted with the charge(s) (in the presence of the supervisor's superior) and is given the opportunity to discuss this with the supervisor. If there is still sufficient cause for discharge, the employee is suspended pending a full review of the case.

4. Supervisor discusses in detail the situation with the Human Resource Manager and the Plant Manager (or their equivalent in the office area) if termination appears appropriate. Termination is implemented if all parties are in agreement. If there is disagreement as to the appropriate decision, the Director of Human Resources and the Divisional Vice President are consulted. If termination is not deemed appropriate, alternative action is implemented.

5. At the time an employee is discharged, the authorized supervisor makes out an Employee Data Form (#6493) and brings it to Human Resources.

6. On the day of discharge, the employee must return to supervisor all Company property such as:
   · Parking stickers
   · Safety glasses (except prescription)
   · Respirators
   · Tools
   · Employee Identification Card
   · Locker key

7. On the day of discharge, payment of any wages due will be made.

8. Supervisor accompanies the discharged employee to Human Resources for an exit interview.

# GENERAL

Refer any questions regarding termination procedures to Human Resources.

# AUTHORITY

Manager, Human Resources

DEF00014

# EMPLOYEE DATA FORM

| Employee Name: Last | First | MI | Employee SSN: | Transaction Effective Date: |
|---|---|---|---|---|
| BRIDDELL | Bob | | 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 | 7/30/2000 |

Check all appropriate transactions and complete both current and new information if applicable. Refer to back of form for all required codes. Missing or incomplete information will result in processing delays. Return all completed copies to Human Resources promptly. Do not write in shaded areas.

| Transaction | Required Information | Current Information | New Information |
|---|---|---|---|
| ☐ New Hire | Business Unit (see back of form) | RGH | RGH |
| ☐ Rehire | Location (see back of form) | WOR | WOR |
| ☐ Reinstate | Operation (see back of form) | MFGLB | MFGLB |
| ☐ Transfer/Reclass. (Enter transfer code below) | Cost Center | 14700002 | 10101002 |
| | Name of Mgr/Supv. | J. LESNANSKY | J. Lesnanski |
| ☑ Salary Change (Enter sal. change code below) | Position Title | MULTI-Skilled Finisher Prod oper 4 | Mixer Prod oper 3 |
| | Security Group (Circle one if applicable) | Cust. Svc.   HR   Finance   MIS | Cust. Svc.   HR   Finance   MIS |
| ☐ Promotion | Status (circle all that apply) | FT   PT   Temp   Summer   Other* *If Other, explain in comments below. | FT   PT   Temp   Summer   Other* *If Other, explain in comments below. |
| ☐ Demotion | Leave Code (see back of form) | | |
| ☐ Status Change | Shift | 03 | 03 |
| ☐ Termination (Enter term code below) | Plant/Bldg/Floor M.Stop/Phone Ext | 120-101 | 120-101 |
| ☐ Organizational Change (Attach announcement) | Pay Band | Band 4 | Band 3 |
| | Base Pay Rate | $17.25 | $16.50 |
| ☐ Other (describe in Comments) | Base Pay Frequency | (Hourly)   Weekly Semimonthly   Monthly | (Hourly)   Weekly Semimonthly   Monthly |
| | Bonus Code (see back of form) | | |

Termination Code: _____   Eligible for Rehire?   Y   N   Agreement Form Signed?   Y   N

Salary Change Code: RRATE   Additional Payments Due Employee?   Y   N

Transfer Code: _____   If Yes, check type: ____ Co.Vac ____ Flex Vac ____ LSD

# days: _____

**Comments, Job Skills, Other Information:**

Bob is being removed from Band 4
Specifically, High Speed Faces for
quality reasons and is being placed
in a Band 3 mixing job.

Cash Advance/Other Due Company?   Y   N

**Time & Attendance:**

Class: _____

Restriction: _____

Home Clock: _____

Loc. Code: _____

**Approvals:**                                         Date:

Originator (Supervisor): _____ 7/27/00

Approved (Manager): _____ 7/28/00

H.R. Manager: _____ 25 July 2000

Data Input: _____ CW 8-1-00

Confirmed - System Review (New Hire, Term, Rate Change): _____ 8/9/00

**HR Use Only:**

| | | |
|---|---|---|
| Job Code: PROP 3 | DOB: | |
| Position Code: PR8313 | Sex: | M   F |
| RepTo Code: | Mar. St: | S   M |
| KH: | Ethnic ID: | |
| PS: | Citizenship: US   Nat   Alien | |
| AC: | W-4: | |
| Tot. Pts: | Other: | |

DEF00015

Medical Dept. Use Only: _____

S.G. ULP 00273

Form 7106   Rev. 1/97

| | |
|---|---|
| **From:** | Deeds, William J. |
| **Sent:** | Monday, July 17, 2000 6:31 AM |
| **To:** | Chanis, Chris P.; Lesnansky, John A. |
| **Cc:** | Zeena, Richard J. |
| **Subject:** | RE: Bob Briddell |

Chris, John and I have spoken to Bob about quality. We explained to Bob that if he continued to produce poor quality work that we would have to look into the possibility of removing him from the hsf job. Bob was given more training than previous operators on the hsf. Bob had the opportunity to receive even more training but he refused, saying that he was capable of running the job. I put copies of some documentation regarding reworks and a recap of a conversation that Bob, John Lesnansky and myself had. I also left the training sheets for you.

There is currently wheels on the rejection platform that have been charged to Bob Briddell. These wheels have been rejected for chips.

Any further information needed please let me know. Bill.


————Original Message————

| | |
|---|---|
| **From:** | Chanis, Chris P. |
| **Sent:** | Saturday, July 15, 2000 9:23 AM |
| **To:** | Lesnansky, John A.; Deeds, William J. |
| **Cc:** | Zeena, Richard J. |
| **Subject:** | Bob Briddell |

Hi.....Can you guys give me your thoughts on Mr. Briddell, and the types of conversations/documentation we've had with him regarding the quality of his work. I know this much-He had a long initial break in period (12 weeks?), then got retrained in Dec 99/Jan00 for quality concerns, was talked to again May00 and declined further retraining. The amount of wheels we've rejected over the years because of his particular facing technique is ridiculous! If all of our documentation is in order I'd like to get him off the facer and offer him one of the open Band 3 mixing jobs on 3rd shift. I believe those bids went up but got no takers . (I'll confirm this with Mike Tivnan Monday). I've given Rick Zeena a heads up on this one, and I'll talk to him on Monday also about the pay issue. Maybe we can wean him off band 4 gradually to make this demotion more acceptable to Bob. I'm not sure if we have that option?? Anyways, get back to on this Sunday night...Chris C.

## Oliver, Thomas H.

| | |
|---|---|
| **From:** | Litwinowich, Steve J. |
| **To:** | Deeds, William J.; Oliver, Thomas H. |
| **Cc:** | Fales, Donald C.; Foley, Bob G.; Viano, Bill F. |
| **Subject:** | RE: POTBALL QUALITY |
| **Date:** | Friday, July 24, 1998 11:45AM |

Well done. Keep this on file. I was concern that bob couldn't do this job. I thought things had been going all right. seems like we still have questions. I assume standard break in for this job is 6 weeks? We're at 8 and the clock is running. I like your approach not signing him off at this point, give him a fair shot with additional training, but willing to step up if it doesn't work. Let me know his status weekly until a decision is reached. Thanks, steve

---------

From: Deeds, William J.
To: Oliver, Thomas H.
Cc: Fales, Donald C.; Litwinowich, Steve J.; Viano, Bill F.
Subject: POTBALL QUALITY
Date: Thursday, July 23, 1998 11:50PM

Tom, Bill and myself spoke to Bob Briddell about the poor quality of facing on the potball check you left for us. We got Scott Christenson involved because he is the one who has been training Bob. Here is run down of how the situation was handled:

1) We explained to Bob that the wheels he faced are unacceptable. Bob was just starting another order which were of poor quality. We checked the wheels to the template and they were not acceptable. We told Bob that he should be using the template on every wheel, making sure it fits. It was quite obvious that he was not using the template. He should do this until he is producing quality product. He then should check the wheels every 10th wheel. THIS IS A MUST!!
2) If he is having a problem he should seek advice from Scott Christenson or the other high speed facer operators. He can also see Bill Viano or myself.
3) Bill Viano has a copy of the check which he will keep. We will keep an eye out for the quality of Bob's work. If this is to continue the situation will be handled.

A couple other note's. We spoke with Scott in regard's to an update on Bob's progress. Scott has trained Bob for 8 + weeks. Scott feels that Bob does a good job when Scott is around him but when left alone Bob seems to be lost. Scott does not feel comfortable in signing Bob off. Bill Viano agrees with Scott's concern. The plan is to have Bob work on his own, monitoring how he does, and then make a decision on whether he is capable of performing the job on his own. Scott has given Bob 8 + weeks of solid training. He has showed him how to do all aspects of the hsf. Scott is an excellent trainer and he trained Bob to the best of his ability. It is now up to Bob.
We also checked some other work which was faced showing poor quality. Don this is for your information.These wheels were done by Steve Capuano. Bill and myself spoke to Steve and showed him the wheels in question. We basically offered him the same advice in regards to checking the potballs with the template.
We will keep you posted on any future happenings. Bill.

DEF00017

## Oliver, Thomas H.

| | |
|---|---|
| **From:** | Litwinowich, Steve J. |
| **To:** | Deeds, William J.; Oliver, Thomas H. |
| **Cc:** | Fales, Donald C.; Foley, Bob G.; Viano, Bill F. |
| **Subject:** | RE: POTBALL QUALITY |
| **Date:** | Friday, July 24, 1998 11:45AM |

Well done. Keep this on file. I was concern that bob couldn't do this job. I thought things had been going all right. seems like we still have questions. I assume standard break in for this job is 6 weeks? We're at 8 and the clock is running. I like your approach not signing him off at this point, give him a fair shot with additional training, but willing to step up if it doesn't work. Let me know his status weekly until a decision is reached. Thanks, steve

---

From: Deeds, William J.
To: Oliver, Thomas H.
Cc: Fales, Donald C.; Litwinowich, Steve J.; Viano, Bill F.
Subject: POTBALL QUALITY
Date: Thursday, July 23, 1998 11:50PM

Tom, Bill and myself spoke to Bob Briddell about the poor quality of facing on the potball check you left for us. We got Scott Christenson involved because he is the one who has been training Bob. Here is run down of how the situation was handled:

1) We explained to Bob that the wheels he faced are unacceptable. Bob was just starting another order which were of poor quality. We checked the wheels to the template and they were not acceptable. We told Bob that he should be using the template on every wheel, making sure it fits. It was quite obvious that he was not using the template. He should do this until he is producing quality product. He then should check the wheels every 10th wheel. THIS IS A MUST!!
2) If he is having a problem he should seek advice from Scott Christenson or the other high speed facer operators. He can also see Bill Viano or myself.
3) Bill Viano has a copy of the check which he will keep. We will keep an eye out for the quality of Bob's work. If this is to continue the situation will be handled.

A couple other note's. We spoke with Scott in regard's to an update on Bob's progress. Scott has trained Bob for 8+ weeks. Scott feels that Bob does a good job when Scott is around him but when left alone Bob seems to be lost. Scott does not feel comfortable in signing Bob off. Bill Viano agrees with Scott's concern. The plan is to have Bob work on his own, monitoring how he does, and then make a decision on whether he is capable of performing the job on his own. Scott has given Bob 8+ weeks of solid training. He has showed him how to do all aspects of the hsf. Scott is an excellent trainer and he trained Bob to the best of his ability. It is now up to Bob.
We also checked some other work which was faced showing poor quality. Don this is for your information.These wheels were done by Steve Capuano. Bill and myself spoke to Steve and showed him the wheels in question. We basically offered him the same advice in regards to checking the potballs with the template.
We will keep you posted on any future happenings. Bill.

S.G. ULP 00355

DEF00018

BOB NEEDS to Correct

These Potholes. Not even close to template

Ron

Had Bob Bridlett do This order over.

B~

S.G. ULP 00358

## Viano, Bill F.

**From:**      Deeds, William J.
**To:**          Viano, Bill F.
**Cc:**          Oliver, Thomas H.
**Subject:**  BOB BRIDDELL
**Date:**       Wednesday, October 14, 1998 8:52PM

Last night (10-13 into 10-14) Bob trued 315 potballs in a 9hr shift. Not only is the production very low but the work he did all has to be reworked. Tom left the check with a good potball and a potball Bob faced. May I suggest we sit down (Tom, Bill, Bill) and come up with some sort of plan as to how we need to deal with this situation. Then we could sit down with Bob and give him some guidelines as to what is expected of him. We need to take care of this ASAP!!!! Thanks, Bill.

S.G. ULP 00360

DEF00020

I spoke To Bob Birdsell on 10-23-98 in The Conf. Dishing
office with Bill Deeds present. We discussed low productivity
I asked Bob if he could increase his productivity To
70 widgets per hr. by The end of Nov.

Bob stated he will do The best The can without
making poor products He stated he doesn't Think That we
give him a number. not fair

If people do not Think his best is good enough
he would like To Talk To Jane Concerro.

S.G. ULP 00361

BILL/BILL,

B. BRIDDELL USED AN ARBOR with a broken thread on the HSF. ALL OF the potballs will require 100% Tapping to correct thread.

Tom

Gave copy To Bob Briddell on 12-21-98

w.Fryonn

S.G. ULP 00362

DEF00022

To Bob Briddell File:                                                                            2/19/99

On 2/18/99 I talked to Bob about two orders of potballs that he had faced the previous night. Both orders had rework card instructions to reface wheels to correct for face variations. These orders were both straight face type wheels. There was variation in the wheels of up to 1/4" from top to bottom. When I showed Bob the variation he made reference to the abrasive being course causing chipping at the end of potball. This is possible but the variation in the wheel was a steady taper along the entire potball, not just at the end. I explained to Bob that he must make more frequent checks of his work throughout the course of the shift.

Tom Oliver

S.G. ULP 00373

## Oliver, Thomas H.

| | |
|---|---|
| From: | Deeds, William J. |
| To: | Oliver, Thomas H. |
| Subject: | RE: briddell |
| Date: | Wednesday, June 10, 1998 10:36PM |

I spoke with Bob about the poor job of facing on these potball he did. He did not have a reason or answer as to why he did such a poor quality job on these wheels. He did mention that he was not checking his work with the square. I explained to him that checking his work every couple of wheels is a must!! I should also mention that to my knowledge this is the only questionable/poor quality product in which Bob was involved with.

Some training updates:
1) Bob had 4 weeks of straight work training. He also did some radius work which he was having trouble.
2) Due to business reasons we pulled Bob away from Scott. Bob then worked on straight work by himself.
3) Scott said that Bob was making normal progress in his first 4 weeks of training.
4) Plan is to have Bob train for 4 more weeks on radius work.
5) Scott will give me daily/weekly updates to how Bob is doing.

Bill.

---------

From: Oliver, Thomas H.
To: Deeds, William J.
Subject: briddell
Date: Thursday, June 04, 1998 8:51AM

<<File Attachment: doc1_.doc>> Bill, Bob did a questionable job of facing potballs. I left the copy of the check on your desk.

Tom

Page 1

S.G. ULP 00383

**Viano, Bill F.**

| | |
|---|---|
| **From:** | Oliver, Thomas H. |
| **To:** | Viano, Bill F. |
| **Date:** | Thursday, March 11, 1999 1:44PM |
| **Priority:** | High |

Billy, we just had another incident of non conforming product from Briddell. There are 300 potballs sitting under the rack at blottering. The 300 wheels are straight faced with at least a 1/16th taper. This is the 3rd incident in the last two day, unacceptable. Let him know that we have no choice but to bring to Steve and Mary's attention for advisement.

Thanks, Tom

S.G. ULP 00388

DEF00025

Viano, Bill F.

| | |
|---|---|
| From: | Oliver, Thomas H. [Thomas.H.Oliver@naa.sgna.com] |
| Sent: | Friday, March 12, 1999 11:42 AM |
| To: | Viano, Bill F. |
| Cc: | Fitzgerald, Mary E.; 'Oliver, Thomas H.' |

| | |
|---|---|
| Importance: | High |

Bill, I spoke to Mary regarding Bob Briddell's recent reworks. We also discussed his eyes and that he told us that he will have them checked out this Thursday. Please stress to him that he must have them checked. If his eyes check out okay them I feel we have no alternative but to remove him from the job.

Thanks, Tom

S.G. ULP 00395

To: Bob Briddell's file
From: John Lesnansky, Core-Line supervisor
Date: July 26, 2000
Subject: Written Reminder


Bob Briddell is being issued a Written Reminder for unacceptable QUALITY performance on the High Speed Facer while working in the core-line truing area.

Along with the Written Reminder for Quality, Bob is hereby and regretfully informed he will no longer be operating the High Speed Facer.

As such, Bob will lose his band four pay band and will be subject to receiving a pay band that accompanies any available job opportunity.

He has been counseled about his unacceptable job performance on the High Speed Facer that has resulted in the costly reworking and rejection of product.

S.G. ULP 00416

CONFIDENTIAL — Notice of Warning/Suspension — FOR ABRASIVES PERSONNEL ONLY

Date: 10/4/01

Name: Robert Bridoell    Business Unit: Worcester    Badge No.: 9381102 / 33

You are hereby reprimanded for the following reason(s):

NOT FOLLOWING PROPER OPERATING PROCEDURES

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____

You will report back to work on _____ .

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

Thomas H. Revi                          Bill Turner / Arthur A. Clark
Department Head                          Supervisor

                    Robert Bridoell
I have read this warning notice REFUSED TO SIGN          Would you like information regarding
                              Employee                   the Employee Assistance Program? _____

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| Noted: | Manager | 10/9/01 SA Steleena Gen. Mgr./Vice Pres. | PB 9 OCT 2001 HR-Manager | Human Resources Dept. |
|--------|---------|------------------------------------------|--------------------------|-----------------------|

FORM 6951  Rev. 10/30/97

S.G. ULP 00250

DEF00028

To Bob Briddell's File
From Jeff Clark & Bill Tivnan
Date 10/4/01
Subject Written Warning


On 9/18 /01 Bob was spoken to about mix excessive mix weight in pans
(safety), During W/E  9/22/01, Jeff Clark was receiving complaints from the
re-screener that mix pan from Bob are over weight, This resulted in a written
reminder on 9/20/01. The written reminder was written up not following
standard procedures. The same day it was reported that there were pans
weighing more than the allowable limits. After reviewing mix documents, it
was discovered Bob Briddell had made the mixes approximately three hours
after he signed the written reminder. (Bob repeated the same Safety
procedure violation.)
 In the past two weeks it has been reported to various Supervisors that Bob
has not been following proper procedures.  Bob has had some quality issues
along with not following proper ISO Standards. He also has not been using
the CON-CAM quality system. Both of these systems have been installed to
improve quality along with traceability.


 Bob has continued to disregard the proper operating procedures of ISO and
CON-CAM. These violations of Company Policy/Procedures are cause for a
Written Warning.
Any further violations of any Company Rules or Accepted Standards of
Conduct during a Written Warning period may result in employee discharge.


Shift Supervisor                                    Department Supervisor

Bill Tivnan                                         Jeff Clark

Bob Refused to sign warning form. # 6951


Witness


S.G. ULP 00251

DEF00029

Date 10/4/01
Summery of Bob Briddell's written warning.

9/18/01 Bill Tivnan talked to Bob about heavy mix pans, Bob's reply was that he would keep an eye on the weight of the mix pans during his shift. During this same week of 9/22/01 I (Jeffrey Clark) received a number of complaints that the mix pans are 10-15 lbs over weight, after checking into whom was the cause, it turned out to be Bob Briddell. The rescreener brought three separate checks to my attention, that were over weight. I inturn talked to the third shift supervisor and explained to him (Bill Tivnan) that we needed to put a stop to this immediately before someone gets hurt. Turns out that Bob was placed on a written reminder in 94 for this same issue that caused a fellow employee a back injury. Bob was placed on another written reminder for not following proper procedures. At this time Bob was handed a safety rule book that states mix pans should not exceed 45lbs. The rules in the safety book were developed by the employee's on 01/00. This issue has been corrected since the written reminder has been applied.

During W/E 10/6/01 another issue with Bob did arise, ISO rules that employee's have to follow. Filling out the routings in the back of the checks. Each operator that performs anything to any Manufacturing order has to fill out the routing on the back of the check. In Bob's case being a mixer he needs to fill out two things (1) fill out the mix slip to account for any materials that are applied to that order. (2) Fill out the routing on the back of the check. The routing is for a tracability purpose, it tell us what time the order was mixed and by whom. Bob was filling out some of the checks he worked on, it turned out that the orders that were not filled out had some type of a problem with the mix. At this point the rescreener should not start his process unless the routing is signed off. As the rescreener finds these checks they need to be signed by a supervisor / groupleader before he can start the rescreening process. As I received these check I traced down the mix slip that pointed out who mixed that order, it turned out to be Bob not following proper procedures, the same reason why he was put on a written reminder. There is a third part of his job that Bob hasn't used, ComCom. Every check a mixer mixes needs to be entered into ComCom, this system will let the mixer know if something is wrong during the mixing process. If anything disagrees between the check entered and the ComCam system it will be highlighted in red and will not let the operator to continue with the process. This system is designed to avoid errors. Because Bob didn't follow these procedures Bob's written reminder was moved up to a written warning.

Bill Tivnan and I informed Bob that he was being moved up to a written warning today (10/4/01). Bob asked to see the proof that he did wrong, we showed it to Bob and could not disagree. Bob did request two witness to be present: Dwight Dano and Moses Rodriguez. Bob was very calm during our discussion but refused to sign the written warning. Both witnesses hesitated to sign after Bob refused, but did after thinking of the reason they were there. Bob requested a copy of the warning and letter to bring to his other boss. (Not sure what he ment, union maybe) Bob left about 5:30 am then returned to the office about 6:00 am to accuse me and Dave Aubin ( the rescreener) of discrimination. My response to Bob was are you accusing me of Discrimination and if he was that he better be able to prove it. This conversation did take place in front of two other employee's Kevin Mcguire and James Bailey. I also informed Bob that he should be careful of what he is saying in front of other people, Bob replied the same to me. I asked Bob if he would like to pursue this, that we have an open door policy and I encourage him to use it. Bob continued to tell me I wasn't is Supervisor and I had no right to pursue this issue, I responded to Bob that while any supervisor is in the building that all employees do report to them. I continued to tell Bob to use the open door policy and see my Supervisor if he disagreed. Bob went home.

Jeffrey Clark
Supervisor Core Mix & Mold
Plt 8 Rough Grinding

S.G. ULP 00252

Name: Robert BRIDDELL    Business Unit: WOR    Date: 10/9/01    Badge No.: _____

You are hereby reprimanded for the following reason(s): (Documentation on routing sign)

Not Following Proper Operating Procedures

This warning is accompanied by a suspension of _____3_____ days beginning _____10/9/01_____ and ending _____10/12/01_____.

You will report back to work on _____10/15/01_____.

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____Thomas H. Olin_____ 10/9/01          _____Bill Town_____
Department Head                              Supervisor

I have read this warning notice X    Bob Briddell Refuses to Sign    ℗  Would you like information regarding the Employee Assistance Program?    Bob Refuses Also ℗
                                          Employee                                                        NO

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| Noted: | _____Thomas H. Olin_____ 10/9/01 | | _____BB_____ 9 Oct 2001 | |
|--------|------------|------------------|----------|-------------------|
|        | Manager    | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |

FORM 6951 Rev. 10/30/97

S.G. ULP 00267

DEF00031

**Subject:**   Written Warning Meeting 9 Oct 2001
Meeting - 9 October 2001 (08:30 p.m.) - Tom Oliver, Bill Tivnan, Bob Briddell & Rick Zeena (RJZ Office)

Bill discussed the two mix slips (check # C210955 & C210348) from the previous evening (10/8) that Bob had not signed off on. Bob admitted that those were his slips and that he is only human and he tries to put out as much as he could and he rushes trying to make mix and he just forgot.

Tom told Bob that we had just addressed the same issue last week. Bill said that we are addressing these issues throughout the plant. Bob said that he made it, was guilty and he didn't do it on purpose. Rick said he is concerned with the repeat occurences of the same issues in a short period of time.

Bob said he is not trying to disregard the policy and that he would have to be crazy to do so. Tom said that is what is so distrubing, the reoccurance - we are trying to correct the behavior. Bob - this here is just an oversight (refer to 10/8 mix slips).

Tom - your written warning last week had no suspension - with these additional violations we are putting you on a 3-day suspension - report back to work on Sunday night - we can't let this go unaddressed. We want to help you correct this behavior

Bob - I'm sorry I made the mistake - I'm glad it is the only mistake I made (not signing slip) - not making a bad mix. I apologize. Brought up issue with Jeff Clark getting involved with his discipline - thinks it is wrong. Tom told Bob that every supervisor has responsibility to adress an issue that needs to be adressed.

Bill - let's have you return to work on Sunday and get back to work.

Tom asked Bob to watch the details of his work.

The meeting ended at 8:52 p.m.

S.G. ULP 00268

To Bob Briddell File:                                                         1/30/02

This morning at 8 am Jeff Clark (Coreline Mix and Mold Supervisor) brought two
manufacturing orders to my attention. Jeff had copies of orders that Bob Bridell had
mixed the shift before. The first order and mix, check # C215612, was contaminated with
black mix. This mix was made by Bob on 3rd shift on 1/30/02. This is a result of Bob
failing to clean the mix bowl and or failing the clean the mix pans. Frank Hanson who
performs the rescreen operation brought this mix to supervisor's attention at 8 am. This
mix could not be saved (screen out contaminates) and had to be discarded and re-made at
a cost of approximately $316 in materials.

The second order was mixed by Bob on 3rd shift on 1/30/02. Bob failed to sign off
the routing step on this order, which is a violation of ISO trace ability procedures. Frank
Hanson who works in rescreening which is the follow up operation to mixing brought this
error to Jeff's attention. Our ISO procedures also state that Frank cannot continue
working on a MO until previous operations have been signed off. This mix was also
found to be contaminated. The department was capable of saving this mix through rework
which is an additional operation resulting in added cost.

Bob Briddell continues to disregard Department procedures. He is currently on a
written warning for violation of department procedures.

_Thomas Holman_
1-30-02

General Supervisor
Plant 8 Mix & Mold

**Bob Briddell – Investigatory Meeting**
31 January 2002 (21:45)
Rick Zeena's Office

Present:
Rick Zeena
Tom Oliver
Bob Briddell
Phil Gustafson (Briddell co-worker/witness)

The purpose of the meeting was to review Bob Briddell's continual mixing errors that have occurred in January. The two mixing errors occurred on January 3, 2002 and January 30, 2002. Each mixing error resulted in lost product, lost production time and great expense.

On January 3, 2002, Bob prepared a mix (#G989544) that was found to be overweight. The weight of the pan was documented on a copy of the Manufacturing Order was 68.9 pounds. The heavy pan was discovered by Frank Hanson (re-screener/mixer) and was weighed by Jeff Clark.

On January 4, 2001, he met with his supervisor, Bill Tivnan for the first time to discuss the overweight mix. Bob said that when he met with Bill Tivnan, Bill did not know about the heavy mix until that evening, since the mix was not identified as overweight until the following (first) shift. Bob said that he later found five mixes of 70+ pounds, but no one wanted to address that, since it did not involve him. At this meeting, Tom Oliver explained that this was mix that was returned from the TMS press to be blended, one scoop per mix with fresh mix. These pans were heavy because they were dumped from 55 gallon drums (not weighed), as such, there was never any intention for these pans to be manually lifted. Finally, I asked Bob if he denied making the heavy mix. He said he couldn't say if he made the mix or not.

At tonight's meeting, Tom Oliver reviewed the two mixes made by Bob on January 30, 2002 (see Tom Oliver note dated 1/30/02 for additional detail). The first mix (check # C215612) was a white mix contaminated by black mix. This is caused by either failing to clean the mixing system or failing to clean the mix pans. This mix had to be scrapped. Bob said that most white mixes come back contaminated and you can't get all the contamination out. Tom disagreed, stating that the operator (mixer) needs to take care to clean out pans and assure that the mixing station is clean.

The second mix (check# C216712) was also contaminated by black mix, but was able to be saved. Tom showed Bob where he had not signed the M.O. and asked

him why he had not done so. Bob said that he forgot to do so. Tom reminded Bob that this is the same issue that had come up in Bob's previous discipline on October 4, 2001, for which he was placed on a written warning and suspended.

Bob believes he tries to satisfy our production needs and also believes he works hard. Bob also said that there are employees on other shifts who do not produce as much as he does. I informed Bob that productivity is important, but it must not come at the cost of poor quality or safety practices.

I informed Bob that his violations of quality/ISO procedures are continual and we have previously counseled on the same issues a number of times. I also told him that these very same errors and quality issues had led to his written warning and suspension.

I informed Bob that he was suspended while I continued the investigation of the matter and that I will review all the documents, supervisor statements and his statements. Bob asked if this meant he would not have to work Sunday evening. I informed him that I probably would not have completed the investigation by then and he should wait until he hears from me. Bob said: "Good, now I can head out of town for the weekend."

*Richard (Rick) J. Zeena*
Human Resources Manager - Bonded Abrasives
Saint-Gobain Abrasives
Phone (508) 795-2163
Fax (508) 795-4009
E-Mail: Richard.J.Zeena@saint-gobain.com
Visit us at: www.sgabrasives.com

*Written Reminder*

Date: *5-6-94*

Name: *Robert Brinnell* Dept.: *Thin Wall. Mix & Mold* Clock No.: *326*

You are being given this written reminder for the following reason(s):

*Not Following Standard Procedures, Performing Unsafe Act, Casing Injury To Another Employee.*

Any further violations of Company Policy/Procedures will be cause for a written warning.

_____
Foreman (Supervisor)

_____
Employee

Noted: _____
Supt./Dept. Head

This written reminder will be retained by the Employee's Supervisor.

LM 566-A

S.G. ULP 00330

DEF00036

**NORTON COMPANY**
*Notice of Warning/Suspension*

**CONFIDENTIAL**

Date: _8/3/94_

Name: _Robert Briddell_    Dept.: _Thin Whl. Mix + Mld_  Clock No.: _0326_

You are hereby reprimanded for the following reason(s):

_Not Following Standard Procedures and Performing An Unsafe Act_
_written reminder issued 5/6/54_

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____.

You will report back to work on _____.

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____          _____
Department Head                                          Supervisor

_Bob - declined to sign_          _CH_

I have read this warning notice _____                    Would you like information regarding    _No._
                                          Employee                 the Employee Assistance Program?

NOTE: Copy should be forwarded directly to Employee Relations Administrator.  Original should be routed as indicated.

| | | R. Foley | _MºFitz..._ |
|---|---|---|---|
| Noted: | Manager | Gen. Mgr./Vice Pres. | HR-Manager | Employment Dept. |

FORM 4456 Rev. 6/92

DEF00037

S.G. ULP 00339

September 18, 2001

I spoke to Bob Briddell tonight about the weight of mix in the pans. I observed him operating the shaker, and the amount of weight in the pan was 43 pounds. I explained to him there have been some mix pans that weighed more than the limit of 45 pounds per pan. He said he would keep an eye on the weight of the pans.

Shift Supervisor

Bill Tivnan

S.G. ULP 00236

## Mixing & Molding Rules

1.  Filled mix pans, or plastic mix buckets, should not be more than 45lbs.

2.  Filled mix pans are to be stacked at a maximum of 5 high.

3.  When banging mix pans do not bring them below your knees or above your shoulders.

4.  Use pusher when removing large wheels from 15 & 17 press in Gang 3.

5.  Do not attempt to get glass off of the top shelves without high rise fork truck training.

6.  Do not leave mix trucks in aisles.

7.  Do not walk away from a press when the turntable is spinning.

8.  No standing on mix trucks.

9.  Do not let go of an empty moving mix truck.

10. Do not put spreaders on the floor.

11. You must wear all PPE'S in mixing and bond batch areas.

13



**NORTON**

*Plant 8*

Safety Rules and Guidelines

SAFETY FIRST

DEF00039

During W/E 9/22/01 I (Jeffrey Clark) have been receiving complaints from the re-screener, that mix pans are exceeding the 45 lbs. The 45 lbs. weight are limits set within our safety rulebook. Our employees set these rules on 01/00. Reefer to to page 13 Mixing & Molding Rules.

The mixer in question is Bob Briddel, his clock number 1102 appears on the the copies of MO's supplied. This problem has been address to Bob in the past, which he was placed on a written reminder for a safety issue. A fellow employee pulled his back from a heavy pan that Bob filled. During this week Bob has mixed three checks that resulted in every mix pan was over weight by 10 – 15 lbs. This action has to stop immediately before another employee suffers an injury.

---

**CONFIDENTIAL**

## NORTON COMPANY
### Written Reminder

Date: _9/20/01_

Name: _Robert Briddell_ Dept. _Case mix & roll_    Clock No.: _938 1102_

You are being given this written reminder for the following reason(s):

_Not following Standard Procedure, Performing unsafe acts, exceeding weight limit of 45 lbs per mix pan._

Any further violations of Company Policy/Procedures will be cause for a written warning.

_Robert M Briddell_
                Employee

Would you like information regarding
the Employee Assistance Program? _____

_William Tinan_
                Supervisor

Noted: _Thomas H Quinn_
            Department Head

This written reminder will be retained by the Employee's Supervisor.

FORM 6831

S.G. ULP 00235



**SAINT-GOBAIN**

**A B R A S I V E S**

January 4, 2002

To:    Robert Briddell
From:  Rick Zeena, HR Manager, Bonded Abrasives

Mr. Briddell:

The purpose of this memo is to review the quality and safety concerns that have occurred over the past few months.

On September 18, 2001, you had a conversation with your supervisor, Bill Tivnan, regarding the weight of the mix in the pans. Bill informed you that there have been some mix pans that weighed more than the limit of 45 pounds. As you are aware, the Plant 8 Safety Rules and Guidelines limits the weight of the mix pans at 45 pounds. As you know from your 1994 discipline for this same incident, filling mix pans to a weight greater than 45 pounds can lead to personal injury.

On September 20, 2001, despite your conversation with Bill Tivnan on September 18, regarding overweight mix pans, you exceeded the 45-pound limit on several mix pans for 3 different orders. As a result, you were placed on a written reminder for not following standard procedures by exceeding the weight limit in the mix pans.

On October 4, 2001, you were placed on a written warning for not following proper operating procedures. This involved not following proper ISO standards by not signing the mix slips and by not using the COM CAM quality system. At this point, you were informed that any further violations of company procedures involving your job could result in your discharge from the company. As you know, our quality systems call for accurate reporting of all manufacturing operations. It is important that all employees follow proper procedures regarding documentation of mix slips, MO routings and COM CAM reporting in order to ensure consistent quality product for our customers.

On October 9, 2001, you were placed on a 3-day suspension and your written warning was extended by five days for not following proper operating procedures by not signing the mix slips once again. At that time, we discussed that you had been counseled the previous week for the same violation.

DEF00041

Upon your return from your suspension, you again failed to sign off on a mix slip on October 18, 2001. Although you were not disciplined, your pattern of failing to not follow company procedure appears to be continuing.

On January 3, 2002, you were notified by Bill Tivnan that the previous evening that you had made a mix that weighed in excess of 68 pounds.

You need to understand the importance of following company procedures with respect to both safety and quality. You have exhibited a pattern of failing to do so, which has resulted in progressive discipline. Please understand that your failure to follow company procedures with respect to safety and/or quality, two areas the company takes quite seriously, or in any other area, will likely result in the termination of your employment.

Sincerely,

Richard J. Zeena
Manager, Human Resources
Saint-Gobain Abrasives

DEF00042

To Kevin Reeds File                    11/29/2001


    Today I explained to Kevin that every MO needs to be signed off after the operation is complete. Yesterday Kevin mixed MO # C214012 for 17 press, and on 11/26/01 he mixed MO # C213074 for 21 press.  Kevin signed off both the mix slips but didn't sign the MO's for being mixed.


Mike Tivnan

To Frank Hansons File                    12/14/2001

Today I explained to Frank that every MO needs to be signed off after the operation is complete. Yesterday Frank rescreened 4 MO's for 12 press. None of the MO's were signed off. The MO numbers are G020242, G024470, G024471, and G020241.

Mike Tivnan

_(signature)_

12/14/2001

DEF00044



C218241

Order Qty:    900    Mold Qty:    900

| Operation Number/ Description | W/C# Mach# Clock# | Actual Date | Qty Good | Qty Bad | Scrap Code |
|---|---|---|---|---|---|

005  SCHEDULE FOR MOLDING - TCP    PLN PPC

    12-1/8 X   0.085 X 1-1/4    BAKE STAMP
    SPEC - 4NZ36/0-VBNA0396    9* AL/TES/5ALX/FC6

    MOLD R SIDES
    MIX AGE - 6 HRS TO 4 DAYS
    1. 12-1/16 X 1-1/4 184HBP GLASS
    1 MIX = 0.790 LBS
    1. 12-1/16 X 2-1/16 184HBP GLASS
    1-LI BUSHING
    MIN. MOLD PRESSURE = 343 TONS REF
    WT THICK RATIO = 9.30 LBS/IN

010  MIX COARSE  *TIME = 3.15    MXI P8102

    MIX DISPENSER

080  MOLD TCOP    TCP P8118

    GOAL = 60.0  HOURS = 15.0

| AVE TK +0.085 +/-.004 | TV +0.004 | BAI 3/16 | WT/TK 9.11 +0.48 |
|---|---|---|---|
| 1 | | .000 | |
| 61 | | .000 | |
| 121 | | .000 | |
| 181 | | .000 | |
| 241 | | | |

100  SEE BAKE STAMP FOR 9* BAKE    9   P8502

    GRID #  H 9    QTY 190    CLAMPED BY 0329
    GRID #  9/9    QTY 40 + 70

10  STRIPPING THIN    TNS P8201

20  IN PROCESS GRADER    C02 P8202

    GOAL =  3000 - HOURS = 0.30

30  REAM DRILL PRESS    C02 P8204

    GOAL =  1935 - HOURS = 0.47

40  FACE DSG CT1214    C02 P8206

DOVER                    NJ

| Manufacturing Order Number  C218241 | Start Date 2/07/02 | Ship Date 3/05/02 |
|---|---|---|



| ASTROCOSMOS METALLURGICAL CINCINNATI OH | Manufacturing Order Number C216859 | Start Date 1/17/02 | Ship Date 2/07/02 |
|---|---|---|---|

1/21/02

66243500458

9 ·Km 1/30

C216859

Order Qty: 150       Mold Qty: 10

Ext GG 37C461-PB25B        Int GG 37C461-PB25B        **21 PRESS**
SO# U06915 001 001         PO# 0105572268
Prod Cat                   EU 06
Dimensions/Description     Wheel Type 01

4 X 1/8 X 3/8
REINFORCED
D SIDES

|  | OD | TK | ID | TV |
|---|---|---|---|---|
| UPPER LIMIT | 4.125(+1/8) | 0.150(+0.020) | +0.010 | .015 |
| LOWER LIMIT | 3.938(-1/16) | 0.120(-0.010) | +0.002 | |
| SOURCE | EUSE-518 | 0000-706 | 0000-534 | |

1/2 5

6

Respect your machine because machines don't hear screams.
MOLD ON T21

| Operation Number/ Description | | W/C# Mach# Clock# | Actual Date | Qty Good | Qty Bad | Scrap Code |
|---|---|---|---|---|---|---|

003 SCHEDULE FOR MIXING            PLN PPC

```
   37C46/1-PB25B                          1 MIXES @  32.57 EA SCR 16 16
   5348    68.78                     5348    46  22.40  4D368    9.38
   4D368   31.22                     TOT ABR     22.40  LPR3     0.94
   GW     2.28                                          CL40    33 CC
   FW     2.28                       FACTORS: .19 LPR3  1.0 CL40
   TOTAL MIX REQD: 31.57(.010)
```

*talked to Tom Ratnoda
about filling out          NOT IP CGM CAM
inspection Boxes           FINS BATCH# 1271
and roughtings
also the importance of ISO Rules.
JC 1/31/02*



05 SCHEDULE FOR MOLDING - T5A    PLN PPC

    6-3/16 X    0.270 X 1-5/8                BAKE STAMP
    SPEC - 3SG100/2-VB467                   75* A(AL)/B/X

    MIX AGE- 0 HRS TO 24 HRS
    MIX = 0.725 LBS

10 MIX FINE *TIME* _____        MF1 P8301 _____ _____ _____ _____ _____

                           MIX DISPENSER _____

30 MOLD #5 PRESS - RECESS       T5A P8111 _____ _____ _____

                            GOAL = .17.0 - HOURS = 1.59

| TK | TV |
|---|---|
| 0.270 | 0.004 |
| +/-.002 | |

   1
  21

00 SEE BAKE STAMP FOR 75* BAKE    75 P8502 _____ _____ _____

    GRID # _____     QTY _____
    GRID # _____     QTY _____

.0 STRIPPING THIN               TNS P8201 _____ _____ _____ _____

0 IN PROCESS-WT/TK(2.63-2.74)   FLU P8202 _____ _____ _____ _____

0 REAM INTERNAL GR (16")        FLU P8210 _____ _____ _____ _____
                           GOAL =  3000 - HOURS = 0.01

0 FACE DSG FLUT                 FLU P8206 _____ _____ _____ _____
                           GOAL =  245 - HOURS = 0.10

0 SIDE DRY 16"  ARTER GR        FLU P8211 _____ _____ _____ _____
                           GOAL = 87.5 - HOURS = 0.29

0 SPECIAL FACE 12" OFF HAND     FLU P8212 _____ _____ _____ _____
                           GOAL = 62.5 - HOURS = 0.40

0 SLOTTING UNIV TOOL GRINDER    FLU P8214 _____ _____ _____ _____
                           GOAL = 47.7 - HOURS = 0.52

                           GOAL = 62.5 - HOURS = 0.40

Order Qty:    600    Mold Qty:    120

| Operation Number/ Description | W/C# | Mach# | Clock# | Actual Date | Qty Good | Qty Bad | Scrap Code |
|---|---|---|---|---|---|---|---|

005 SCHEDULE FOR MOLDING - T20    PLN PPC

    18-1/8 X    0.040 X 0          BAKE STAMP
    SPEC - A60/2-OBNA2            76 AL/TES/5ALX/FC6

    MOLD SMOOTH SIDES
    MIX AGE- 6 HRS TO 4 DAYS
    CORE OUT - EST QUANTITY
    MOLD   120 BLANKS 5 PER BLANK
    1 - 18-1/16 X   0 196 GLASS
    1 MIX =  0.630 LBS
    1 - 18-1/16 X   0 196 GLASS
    WT THICK RATIO = 15.75 LBS/IN

*handwritten:* 10/9/01 Today I spoke to Qssari on how important it is to Sign up for his work for Iso DeS

010 MIX COARSE  *TIME* *(handwritten)*    MX1 P8102  *110? 10/1*

                   MIX DISPENSER *2334  10-2*

080 MOLD #20 PRESS          T20 P8120 _____ _____ _____ _____

                               GOAL =   169 - HOURS = 0.71

| | TK | TV |
|---|---|---|
| | 0.040 | 0.002 |
| | +/-.002 | |
| .1 | | |
| 41 | | |
| 81 | | |

*handwritten: ISO / Qsari*

100 SEE BAKE STAMP FOR 76 BAKE.    76 P8502

    GRID # _____ QTY _____          CLAMPED BY _____
    GRID # _____ QTY _____
110 STRIPPING THIN            TNS P8201 _____ _____ _____ _____

120 CORE OUT              C02 P8224 _____ _____ _____ _____

                               GOAL =   1504 - HOURS = 0.40

130 REAM DRILL PRESS          C02 P8204

                               GOAL =   1935 - HOURS = 0.31

140 AIR CLEAN              C02 P8222
                DEF00048

                               GOAL =   2800 - HOURS = 0.21

150 MARKEM PRESS            C02 P8207

NORTON - ROUGH GRINDING

CHRYSLER CORP
WARREN          MI

| Manufacturing Order Number  C210341 | Start Date | Ship Date |
|---|---|---|

_Written Reminder_

Date: 3-25-2001    Clock No.: _____

Name: Russell Johnson    Dept.: Coat Molding

You are being given this written reminder for the following reason(s):

Not Following Proper Procedure @ Molding (Not Filling Rt Sw.)

Any further violations of Company Policy/Procedures will be cause for a written warning.

Would you like information regarding the Employee Assistance Program?

_____    _____ 3/29/01
Employee                            Supervisor

Noted: _____ 3/29/01
Department Head

This written reminder will be retained by the Employee's Supervisor.

FORM 6830

DEF00049

CONFIDENTIAL

**NORTON COMPANY**
*Notice of Warning/Suspension*

FOR ABRASIVES
PERSONNEL ONLY

Name: _Arthur Stidsen_

Business Unit: _BH_   Badge No.: _____

Date: _3/11/02_

You are hereby reprimanded for the following reason(s):

_Careless Fork truck Driving Resulting in 8,200 lbs of Refractories_

This warning is accompanied by a suspension of _0_ days beginning _____ and ending _____

You will report back to work on _____

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_Ken Addison_
Department Head

_Dave E Mullennix_
Supervisor

I have read this warning notice

_Arthur Stidsen_
Employee

Would you like information regarding
the Employee Assistance Program? _____

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| Noted: | | |
|---|---|---|
| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |

FORM 8851  Rev. 10/23/97

DEF00050

DEF00051

CONFIDENTIAL

**NORTON COMPANY**
*Notice of Warning/Suspension*

**FOR ABRASIVES**
**PERSONNEL ONLY**

Name: _Gail Egan_

RECEIVED
SEP 16 1997
HUMAN RESOURCES

Business Unit: _Line 8 Structures_    Badge No.: _1159_    Date: _9-8-97_

You are hereby reprimanded for the following reason(s):

_Failure to follow instructions on manufacturing document + notifying supervisor of process change._

This warning is accompanied by a suspension of ___ 0 ___ days beginning ___ and ending ___.

You will report back to work on ___.

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_Susan Denon_
Supervisor

_Gail Egan_
Employee

I have read this warning notice

Would you like information regarding
the Employee Assistance Program?

NOTE: Original should be routed as indicated.

| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |
|---|---|---|---|

Noted:

FORM 6951   Rev. 8/96

DEF00052



# INTEROFFICE MEMORANDUM

To: Sonya Simonian

From: Al Cloutier

Subject: Gary Egan          Date August 5, 1998

Gary is currently on a written warning for not following manufacturing procedures. When Gary was issued this written warning he was told that any additional violation of company policy would result in his immediate termination. Gary said he fully understood the policy.

Ford Motor Company has submitted a formal customer complaint on a Cam Wheel order they have recently received.

The complaint is Grade Performance related and the computer records for the press Gary operates were reviewed as this is the press that produced the product and Gary is the only operator we have operating that equipment. The T9A operator is required to enter variable date into a excel spreadsheet to calculate segmental density. During this investigation it was discovered that three manufacturing orders were found to have identical variable data. When Ed Charlton his supervisor reviewed this information with Gary he became very defensive and stated that someone was manipulating the data on the computer to make him look bad. Ed further investigated the situation and found that the original print out attached to the manufacturing check was identical to the information stored on the computer, indicating no manipulation had occurred.

Ed brought the problem to my attention and I reviewed the data and agreed with Ed that Gary had not followed manufacturing instructions. Instead of performing the quality checks on the segments as required it appears that Gary copied existing excel data sheets onto the new manufacturing order. At 8:45 am on Aug 5, 1998 Gary was told by Ed that he would be meeting with me at 9:00 am on the issue to try and clarify what had occurred. Gary told Ed he was leaving and if we wanted him back we could call him with an apology.

I met with Ed, and Sonya Simonian and the decision was made to accept Gary's departure as Leaving Without Notice as he had walked off the job.

With the information we have on the data manipulation and no additional input or clarification from Gary the current decision would have been to terminate his employment from Norton Company for not following proper instruction while on a written warning for the same offense.

Ford Motor Company is a large customer and when manufacturing instructions are not followed the business is placed at risk. We cannot operate a business with employees who choose not to follow instructions.

**CONFIDENTIAL**

**NORTON COMPANY**
*Notice of Warning/Suspension*

**FOR ABRASIVES
PERSONNEL ONLY**

Date: _11-10-00_

Name: _Kevin Moulton_                Business Unit: _Pres._    Badge No.: _605_

You are hereby reprimanded for the following reason(s):

_Intentional deviation from Standard operating procedure_

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____.

You will report back to work on _____ .

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____        _Tom Stafford_____
           Department Head                              Supervisor

I have read this warning notice _Kevin Moulton_    Would you like information regarding
                                        Employee         the Employee Assistance Program? _NO_____

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| | | | |
|---|---|---|---|
| Noted: | Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |

FORM 6951  Rev. 10/30/97

DEF00053

CONFIDENTIAL

**NORTON COMPANY**
*Notice of Warning/Suspension*

FOR ABRASIVES
PERSONNEL ONLY

Date: _11-10-00_

Name: _Raymond Bull_     Business Unit: _Dres._     Badge No.: _602_

You are hereby reprimanded for the following reason(s):

_Intentional deviation from standard operating procedures_

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____.
You will report back to work on _____ .
We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____     _Tom Stafford_
        Department Head             Supervisor

I have read this warning notice _Raymond Bull_     Would you like information regarding     _NO_
                  Employee     the Employee Assistance Program?

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| | | | |
|---|---|---|---|
| Noted: | | | |
| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |

FORM 6951  Rev. 10/30/97

Joe Wilson

2/29/00 — Written Reminder
"Failure to follow Instructions"

5/10/00 — Written Warning
"Failure to Follow Instructions"

7/12/00 — MO # C642120
"Wrong tank number - 100% rejection"

9/15/00 — MO # C651226
"Incorrectly completing MO &
Mix Tank Card"

2/2/01 — MO # C673309
"Wrong tank number - 100% rejection"

2/14/01 — Meeting Joseph Wilson, Dennis D'Greco
& Bob Foley

Joe was terminated today due to
the attached job performance issues.

O'M'Greco
2/14/01

DEF00055

CONFIDENTIAL

NORTON COMPANY
*Notice of Warning/Suspension*

FOR ABRASIVES
PERSONNEL ONLY

Name: _Joseph Wilson_      Business Unit: _Precision_   Badge No.: _____   Date: _5-10-00_

You are hereby reprimanded for the following reason(s): _Failure to follow instructions - Poor Quality_

This warning is accompanied by a suspension of ____ 0 ____ days beginning _____ and ending _____

You will report back to work on _____

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_Alan R. Cordeau_
Supervisor

I have read this warning notice _____
Employee

Would you like information regarding
the Employee Assistance Program? _gave him packet_

NOTE: Original should be routed as indicated.

| Noted: | | | |
|---|---|---|---|
| _Glenda O'Farrow_ | | _Glenn R. Foley_ | |
| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |
| | | 6-8-00 | |

RECEIVED
JUN 1 4 2000
By _____

FORM 8951   Rev. 8/98

DEF00056

CONFIDENTIAL.

**NORTON COMPANY**
*Written Reminder*

Name: _Joseph Wilson_     Dept.: _13100_     Date: _2/29/00_

Clock No.: _1546_

You are being given this written reminder for the following reason(s):

_FAILURE TO FOLLOW INSTRUCTIONS — POOR QUALITY_

_Joseph Wilson_
Employee

_Alan R. Johnson_
Supervisor

Any further violations of Company Policy/Procedures will be cause for a written warning.

☐ Would you like information regarding
the Employee Assistance Program? _____

Noted: _Dennis O'Connor_
Department Head

This written reminder will be retained by the Employee's Supervisor.

DEF00057

FORM 6831

# EMPLOYEE DATA FORM

| Employee Name: Last | First | MI | Employee SSN | Transaction Effective Date: |
|---|---|---|---|---|
| Zawalich | Francis | J | 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 | 11/10/97 |

Check all appropriate transactions and complete both current and new information if applicable. Refer to back of form for all required codes. Missing or incomplete information will result in processing delays. Return all completed copies to Human Resources promptly. Do not write in shaded areas.

| Transaction | Required Information | Current Information | New Information |
|---|---|---|---|
| ☐ New Hire | Business Unit (see back of form) | | RA |
| ☐ Rehire | Location (see back of form) | | WARC, |
| ☐ Reinstate | Operation (see back of form) | | Mfg 16 |
| ☐ Transfer/Reclass. (Enter transfer code below) | Cost Center | | 1.5500 |
| | Name of Mgr/Supv. | | RA Otterson |
| ☐ Salary Change (Enter sal. change code below) | Position Title | | Prod OPR II |
| | Status (circle all that apply) | FT  PT  Temp  Summer  Other* <br>* If Other, explain in comments below. | (FT)  PT  Temp  Summer  Other* <br>If Other, explain in comments below. |
| ☐ Promotion | Leave Code (see back of form) | | |
| ☐ Demotion | Shift | | 1st |
| ☐ Status Change | Plant/Bldg/Floor | | PH 1 |
| ☑ Termination (Enter term code below) | Pay Band | | II |
| ☐ Organizational Change (Attach announcement) | Base Pay Rate | | |
| | Base Pay Frequency (circle one) | Hourly      Weekly <br> Semimonthly    Monthly | Hourly      Weekly <br> Semimonthly    Monthly |
| ☐ Other (describe in Comments) | Bonus Code (see back of form) | | |

Termination Code: ___DIS___    Eligible for Rehire?    Y  (N)

Salary Change Code: _____

Transfer Code: _____

Comments, Job Skills, Other Information:
Personnel Guide III-20-B
- Falsifying Company documents
speed test records

Paid FURVZ, CDS

Agreement Form Signed?    Y    N

Additional Payments Due Employee? (Y)  N

If Yes, check type: ___ Co.Vac  ✓ Flex Vac ___ LSD

# days: _____

Cash Advance/Other Due Company? (Y)  N

Time & Attendance:  2 Hrs Call-In?

Class: _____

Restriction: _____

Home Clock: _____

Loc. Code: _____

Approvals:                                    Date:

Originator (Supervisor):  RA Otterson  11/7/97

Approved (Manager)  Dennis Kahler  11/07/97

HR. Manager  _____  11/7/97

Data Input  _____

Confirmed - System Review  _____
(New Hire, Term, Rate Change)

HR Use Only:

| Job Code: | DOB: |
|---|---|
| Position Code: | Sex:  M  F |
| Rep To Code: | Mar. St:  S  M |
| KH: | Ethnic ID: |
| PS: | Citizenship: US  Nat  Alien |
| AC: | W-4: |
| Tot. Pts: | Other: |

Medical Dept. Use Only:  EF/11/7/97

DEF00058

Form 7105   Rev. 5/96

# MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Suite 601 Boston MA, 02108
(617-727-3990)

## -DISMISSAL and NOTIFICATION of RIGHTS-

DATE: 1-27-03

To: Robert Briddell
    4 Marston Way
    Worcester, MA  01609

Case: Briddell v. Saint Gobain Abrasives
Docket No: C22303960
EEOC No: 16CA300467
Investigator: Erica Gagne

---

Your complaint is dismissed for the following reasons:

[ ]    The facts you allege fail to state a claim under any of the statutes the Commission enforces.

[ ]    Respondent employs less than the required number of employees

[ XX ]    Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]    You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]    The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]    The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ ]    The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ]    Other (briefly state) _____

## -NOTICE of APPEAL-

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. Your appeal of the dismissal must be made in writing by you or your attorney to the appeals clerk of this Commission. (Attention: Alan Cassella, MCAD, 436 Dwight Street, Suite 220, Springfield, MA 01103.)

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

_____        1/21/03

Cynthia A. Tucker                Date
Investigating Commissioner

cc:    Saint Gobain Abrasives, Inc.
        One New Bond Street
        Worcester, MA  01615-0008

DEF00059

## MEMORANDUM

TO:    CASE FILE
CASE NAME: Briddell v. Saint Gobain Abrasives, Inc.
DOCKET NO: 022303960
EEOC NO: 16CA300467
NUMBER OF EMPLOYEES:
INVESTIGATOR:   Erica Gagne

### RE:   RECOMMENDATION FOR DISMISSAL OF COMPLAINT
### DATE:  January 21, 2003

**ISSUE(S) INVESTIGATED:**

On November 22, 2002, Complainant filed a charge that Saint Gobain Abrasives, Inc. terminated Complainant in retaliation for complaining about unlawful discrimination based on Complainant's race (Black), in violation of M.G.L. c.151B §4 (1), (4) and Title VII of the Civil Rights Act of 1964, as amended.

**SUMMARY OF FINDINGS:**

The Commission denies jurisdiction over Complainants claim on the basis that the alleged discriminatory act occurred more than six months prior to filing with this Commission.

Erica Gagne
Investigator

Migdalia Rivera
Supervisor

This form is affected by the Privacy Act of 1974; see Privacy Act Statement before completing.

Case 1:01-cv-40146-FDS    Document 25-3    Filed 09/19/2005    Page 61 of 64

| Massachusetts Commission Against Discrimination | and EEOC |
|---|---|
| (State or local Agency, if any) | |

| NAME (Indicate Mr., Ms., or Mrs.) Mr. Robert M. Bridell | HOME TELEPHONE NO. (Include Area Code) (508) 797-3939 |
|---|---|

| STREET ADDRESS 4 Marston Way, Worcester, MA 01609 | CITY, STATE AND ZIP CODE | COUNTY Worcester |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Saint Gobain Abrasives, Inc. | NO. OF EMPLOYEES/MEMBERS more than 25 | TELEPHONE NUMBER (Include Area Code) (508) 795-5000 |
|---|---|---|

| STREET ADDRESS One New Bond Street    Worcester, MA 01615-0008 | CITY, STATE AND ZIP CODE |
|---|---|

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[XX] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [X] RETALIATION   [ ] OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) February 6, 2002

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

The Particulars of this charge of discrimination are set forth in my complaint number _____ which I filed with the Massachusetts Commission on Human Rights and Opportunities on November 21, 2002 which is attached hereto and incorporated as if fully set forth herein.

RECEIVED

NOV 22 2002

Commission Against Discrimination Springfield Office

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| Date 11-21-0002    Charging Party (Signature) | SIGNATURE OF COMPLAINANT  SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 21-11-2002 |

EEOC FORM 5 (MAR 82)    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# STATEMENT OF ROBERT BRIDDELL

1.  I was hired by the Norton Company in April 1995 as a material handler.  The Norton Company was acquired by Saint Gobain in about 1991, and I remained employed along with the rest of the production and maintenance employees until I was fired on February 6, 2002.  Throughout my employment, I was an hourly production and maintenance worker in the Bonded and Superabrasives Division.

2.  At the time Saint Gobain acquired the Norton Company, a few African-American employees had begun to move into positions involving the supervision of production and maintenance employees in the Bonded and Superabrasives Divisions.  At least three African-Americans, John Vasseur, Cynthia Caruthers Bridell and Ron Texaire, were supervisors.  They left their supervisory positions soon after Saint-Gobain acquired the business.  There have been no blacks, Latinos or other persons of color promoted or hired to supervise production and maintenance employees since then.

3.  Today, there are approximately 40 persons with responsibility to supervise production and maintenance employees in the Bonded and Superabrasives Divisions.  Upon information and belief, all 40 of these individuals are white. These white individuals are responsible for directing a production and maintenance work force which contains about 100 persons of color, including, among others, more than 50 blacks.

4.  On several occasions, I have pointed out to high level management the lack of minorities involved in supervising the production work force.  I have made this point to Stephen Stockman, Vice President for Bonded Abrasives, North America, and Richard Zeena, Human Resources Manager.

5.  During 2000 or 2001, a meeting was held by the Worcester commission against discrimination at the Balmont Street School to talk about race relations issues in the City.  I spoke up about the lack of promotional opportunities for minorities at Saint Gobain.

6.  During the summer of 2001, I became involved in a Union organizing drive in support of the United Automobile Workers.  One of the things that I did to support the Union was to try to explain to the other black workers about the connection between the Union movement and the Civil Rights movement, and that unionizing is a way to ensure that everyone, including minorities, is treated fairly.

7.  During that campaign, which ended with a vote in support of the Union in August, 2002, I spoke with Stockman and Zeena about how minorities were treated unfairly at Saint Gobain and denied opportunities for promotion.

8.     Also during the summer of 2001, the Company held separate meetings for employees from Africa to tell them that the Union was bad. During two of the Company's meetings that I attended, I stood up and said that, by separating the workers from Africa, the Company was practicing segregation, and that we had fought for more than 100 years to end segregation. I made this point to Dennis Baker, Senior Human Resources Manager, in one of those meetings. I also said to Jeff Clark, supervisor, and to Zeena, in conversations in the plant, that I believed that the Company was practicing segregation by separating out the Africans. Zeena became very angry when I made that accusation.

9.     Soon after the Union campaign ended, I began to get warnings for making mistakes, and I was terminated in February 2002 for making mistakes. I do not believe that my work had become worse than it had been for the previous 16 years. The mistakes they disciplined me for involved forgetting to sign paperwork and errors in weighing and mixing. Other employees also make errors in the job, and have not been terminated.

10.     I believe that the Company began to watch my work carefully and to look for reasons to discipline and terminate me because I had spoken up about the discrimination still practiced at Saint Gobain and because I had made the connection between organizing and racial justice.

_Robert M. Briddell_

ROBERT M. BRIDDELL

Date:     _Nov. 21. 0002_

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Saint Gobain Abrasives, Inc.

One New Bond Street
Worcester, MA 01615

Person Filing Charge:          Robert Bridell
This Person (Check One):       ( ) Claims to be aggrieved
                               ( ) Is filing on behalf of
Date of Alleged Violation:     02/06/02
Place of Alleged Violation:    Worcester,
EEOC Charge Number:            16CA300467
MCAD Docket Number:            02SEM03960

---

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY
PROCESS (See Attached Information Sheet For Additional Information)

You are hereby notified that a charge of employment discrimination under
     [ ] Title VII of the Civil Rights Act of 1964
     [ ] The Age Discrimination in Employment Act of 1967 (ADEA)
     [ ] The Americans Disabilities Act (ADA)
Has been received by
[ ]    The EEOC and sent for initial processing to   <u>MCAD</u>
                                                  (FEP Agency)
[ ]    <u>The Mass. Commission Against Discrimination</u>
       (FEP) Agency and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon the expiration of any deferral requirements if this is a Title VII
or ADA Charge) to investigate this charge, EEOC may refrain from beginning an investigation and
await the issuance of the Agency's final findings and orders. These final findings and orders will be given
weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe
that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by
you to the Agency in the course of its proceedings will be considered by the Commission when it
reviews the Agency's final findings and orders. In many instances the Commission will take no further
action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This
likelihood is increased by your active cooperation with the Agency.

[X]   As a party to the charge, you may request that EEOC review the final decision and order of the above
     named Agency. For such a request to be honored, you must notify the Commission in writing within
     15 days of your receipt of the Agency's issuing a final finding and order. If the agency terminates
     its proceedings without issuing a final finding and order, you will be contacted further by the
     Commission. Regardless of whether the Agency or the Commission processes the charge, the
     Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained on the
     second page of this form apply.

<u>For further correspondence on this matter, please use the charge number(s) shown.</u>

[ ]   An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the Commission concurrently
     with the Agency's investigation of the charge.
[X]  Enclosure: Copy of the Charge

---

Basis of Discrimination
( ) Race         ( ) Color        ( ) Sex         ( ) Religion      ( ) National Origin
( ) Age          ( ) Disability     ( ) Retaliation   ( ) Other

---

Circumstances of alleged violation:
    SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

EEOC Charge Number 16CA300467, EEOC Transmittal Letter to Respondent

DEF00064