**DENNIS BAKER**
**July 6, 2005**

EXHIBIT I

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4

5

6    * * * * * * * * * * * * * * *

7    ROBERT BRIDDELL,              *

8              Plaintiff          *

9    v.                           * Civil Action No.:

10                               * 4:04CV40146 (FDS)

11   SAINT GOBAIN ABRASIVES,      *

12             Defendant          *

13   * * * * * * * * * * * * * * *

14

15

16            DEPOSITION OF:  DENNIS BAKER

17           Catuogno Court Reporting

18              446 Main Street

19          Worcester, Massachusetts

20              July 6, 2005

21

22

23           Jessica M. DeSantis

24             Court Reporter

**DENNIS BAKER**
**July 6, 2005**

Page 16

1    and report it.

2          Q.      Do you know if -- strike that.

3          Do you know who was supposed to

4    investigate complaints or concerns about

5    discrimination at Saint Gobain during the period

6    1999 to 2002?

7          A.      No.

8          Q.      Do you know.  Are supervisor's

9    expected to investigate such complaints during

10   that time period?

11         A.      Not necessarily.

12         Q.      Okay.  When you say not necessarily,

13   are they permitted to investigate such

14   complaints?

15         A.      Depends on the circumstances.

16         Q.      Under what circumstance is a

17   supervisor to investigate a complaint of

18   discrimination?

19         A.      I can't answer that.

20         Q.      Are supervisors trained on how to

21   investigate discrimination complaints?

22         A.      Our supervisors are trained.

23         Q.      Are they trained on how to

24   investigate discrimination complaints?

DENNIS BAKER
July 6, 2005

Page 17

1      A.      I personally don't get involved in

2   the particulars of the training.

3      Q.      Okay.  Do you know whether or not

4   supervisors at Saint Gobain during the period

5   1999 to 2002, have been trained to investigate

6   such discrimination complaints?

7      A.      I don't know.

8      Q.      Do you know whether or not Saint

9   Gobain has policies on how to investigate

10  discrimination complaints?

11     A.      We have a supervisor's guide, yes.

12     Q.      Okay.  And do you know whether or

13  not the supervisor's guide has any policies or

14  procedures on how to investigate discrimination

15  complaints?

16     A.      I believe it does comment on certain

17  kinds of procedures.

18     Q.      Is this -- showing you what's been

19  previously marked as Exhibit 2.

20             Is this the supervisor's guide you

21  were talking about?

22     A.      Yes.

23     Q.      Okay.  Can you indicate where in

24  that document, take your time, it indicates how

**DENNIS BAKER**
**July 6, 2005**

Page 22

1    otherwise.

2         A.    Or secondhand knowledge.  I have no

3    knowledge.

4         Q.    Okay.  When an employee complains

5    about discrimination in the work place.  Would

6    you agree that it's important to document any

7    investigation?

8         A.    Depends on the circumstances.

9         Q.    Okay.  Under what circumstance would

10   it not be important to document an investigation

11   of a discrimination complaint?

12            MR. KERMAN:  Objection.

13            MS. KELLY:  You can answer.

14            THE WITNESS:  I can't speculate on

15       that.

16        Q.    (By Ms. Kelly)  Can you think of a

17   single circumstance when it wouldn't be important

18   to document an investigation of a discrimination

19   complaint?

20            MR. KERMAN:  Objection.

21            THE WITNESS:  It depends on the

22       circumstances.

23        Q.    (By Ms. Kelly)  Okay.  Under what

24   circumstances would it be okay, in your opinion,

**DENNIS BAKER**
**July 6, 2005**

Page 23

1   to not document an investigation of a

2   discrimination complaint?

3       A.    I'm not going to answer that

4   question because I can't answer that question the

5   way it's been phrased.

6       Q.    What about the question makes it

7   impossible for you to answer?

8          MR. KERMAN:  Objection.

9          THE WITNESS:  I cannot speculate on

10      what circumstances may exist in which you

11      may not precisely follow our policies.

12       Q.    (By Ms. Kelly)  Okay.  Well, I'm

13   asking for your opinion of any circumstance -- is

14   there any circumstance in which it would be okay

15   not to document a discrimination investigation?

16       A.    I'm not going to give my opinion.

17          MS. KELLY:  Would you instruct the

18      witness to answer.

19          MR. KERMAN:  Well, I'm not

20      instructing him not to answer.  I think

21      it's a speculative question and he's

22      answered it as best as he can.

23          MS. KELLY:  Okay.  You can answer.

24          THE WITNESS:  I'm not going to

**DENNIS BAKER**

**July 6, 2005**

Page 24

1  speculate.

2      Q.      (By Ms. Kelly)  I didn't ask you to

3  speculate.  I asked you to give your opinion.

4          I asked you what circumstances, in

5  your opinion, would it be okay not to document an

6  investigation complaint?

7      A.      That's not my responsibility.

8      Q.      Answer the question, please.

9      A.      I answered it as best that I

10  could.

11      Q.      It's not your responsibility.

12          Can you explain why it's not your

13  responsibility to answer the question?

14      A.      No, it's not my responsibility to

15  speculate on the circumstances under which

16  disciplinary procedure would be followed or not

17  followed.

18      Q.      Okay.  You're a witness here and I'm

19  asking for your opinion.  It is your

20  responsibility to answer these questions to the

21  best of your ability.  To the best of your

22  ability.

23          MR. KERMAN:  I think he is answering

24      to the best of his ability that he's

**DENNIS BAKER**
**July 6, 2005**

Page 25

1        basically saying he can't answer it.

2        Q.        (By Ms. Kelly)  Is it accurate that

3    you can't conceive of a single instance in which

4    it would be okay?

5        A.        No, I'm not saying that I can't

6    conceive of a single instance.

7        Q.        Let me finish the question.

8              Is it your testimony that you cannot

9    conceive, sitting here today, of a single

10   instance where it would not be okay -- strike

11   that.  Start again.

12             Is it your testimony that sitting

13   here today you are unable to conceive of a single

14   instance in which it would be acceptable to not

15   document a discrimination investigation?

16       A.        That's not my answer.

17             MR. KERMAN:  Objection.

18       Q.        (By Ms. Kelly)  That's not your

19   answer.  Okay.

20             Then could you tell me a single

21   instance in which, in your opinion, it would be

22   okay not to document an investigation of a

23   discrimination complaint?

24             MR. KERMAN:  Objection.

**DENNIS BAKER**
**July 6, 2005**

Page 26

1           THE WITNESS:  My answer is that I am

2     not going to speculate on any situation

3     that could ever come up under any

4     circumstance in the future.

5           MS. KELLY:  Would you instruct the

6     witness to answer the question?

7           MR. KERMAN:  I think he's answered

8     the question.

9           MS. KELLY:  No, he's answered that

10    he's refusing to do so.

11          MR. KERMAN:  No, I think he's saying

12    that he can't do so.

13          MS. KELLY:  No.  I asked him if he

14    was unable to do so and he said that that

15    was not accurate.  That he was, in fact,

16    able to do so, but he is refusing to do

17    so.

18          MR. KERMAN:  No, I think he's

19    answering as best he can.

20    Q.     (By Ms. Kelly)  Are you able,

21    sitting here today, to think of a single instance

22    in which it would be acceptable to fail to

23    document an investigation of a discrimination

24    complaint?

**DENNIS BAKER**
**July 6, 2005**

Page 27

1           MR. KERMAN:  Objection.  You can

2      answer if you can.

3           THE WITNESS:  My answer is that the

4      personnel guide is a guide.  That while I

5      may not be able to, here, state a specific

6      instance that I can think of, I will not

7      state that there would not be an instance

8      in which that could occur because I would

9      have to look at the circumstances of the

10     situation when the particular incident were

11     brought to my attention.

12       Q.    (By Ms. Kelly)  My question was

13 really a yes or no question, unless you are

14 unable to answer the question yes or no.

15        Sitting here today, yes or no,

16 unless you are unable to answer it yes or no, are

17 you able to think of a single instance in which

18 it would be acceptable to fail to document an

19 investigation of discrimination complaint?

20       A.    I can't answer it yes or no.

21       Q.    Okay.  Why are you able to answer it

22 yes or no whether or not you can think, today, of

23 an instance?

24       A.    My answer is the answer I gave.

**DENNIS BAKER**
**July 6, 2005**

Page 28

1           MR. KERMAN:  Objection.

2           MS. KELLY:  Okay.  That is not a

3       responsive answer.

4           MR. KERMAN:  Well, That is your

5       opinion that it's not a responsive answer.

6       He said he can't think of an instance.

7       Q.      **(By Ms. Kelly)  Is that your**

8   **testimony?  You can't think of an instance?**

9       A.      But I qualified that.  I qualified

10  that.

11      Q.      **Okay.  But is it your testimony that**

12  **sitting here today you can't think of an**

13  **instance?**

14      A.      Sitting here today I can't think of

15  an instance.

16      Q.      **Thank you.**

17              **Would you agree that it is important**

18  **that any investigation be thorough?**

19          MR. KERMAN:  Objection.

20          MS. KELLY:  You can answer.

21          THE WITNESS:  Depends on the

22      circumstances.  Depends what you mean by

23      thorough.

24          MS. KELLY:  Thorough meaning

DENNIS BAKER
July 6, 2005

Page 36

1    A.    Yes.

2    Q.    And do you have any understanding of

3  what the burden of proof is at Saint Gobain as to

4  whether or not the discrimination policy has been

5  violated?

6    A.    No.

7    Q.    Okay.  Are, to your knowledge, the

8  persons at human resources who investigate

9  discrimination complaints trained on what burden

10  of proof to apply?

11    A.    I don't know.

12    Q.    Okay.  Do you have any understanding

13  of what burden of proof applies in determining

14  whether discrimination has occurred at Saint

15  Gobain?

16    A.    Depends on the circumstances.

17    MR. KERMAN:  Objection.

18    Q.    (By Ms. Kelly)  How does the burden

19  of proof change depending on circumstances?

20    MR. KERMAN:  Objection.

21    MS. KELLY:  You can answer.

22    THE WITNESS:  You look at the

23    circumstances of a situation and you make a

24    determination.  It' not a legal burden of

DENNIS BAKER
July 6, 2005

Page 37

1    proof.

2        Q.      (By Ms. Kelly)  Okay.  And if one

3    person says something happened and one person

4    says it didn't and there are only two witnesses.

5    How do you determine what happened?

6                MR. KERMAN:  Objection.

7                MS. KELLY:  You can answer.

8                THE WITNESS:  You look at all of the

9        circumstances of a situation.

10       Q.      (By Ms. Kelly)  Okay.  If you look

11   at the circumstances of a situation and one

12   person says one thing happened and another says

13   it didn't, how, at Saint Gobain, is the

14   determination made as to whether or not

15   discrimination has occurred?

16               MR. KERMAN:  Objection.

17               THE WITNESS:  It depends on the

18       circumstances.

19       Q.      (By Ms. Kelly)  Okay.  I'm asking

20   you.  Can you explain that?

21       A.      Where did it happen.

22               MR. KERMAN:  Objection.

23               THE WITNESS:  How did they say what

24       they said.  There could be dozens of other

DENNIS BAKER
July 6, 2005

Page 44

1          Do you know whether or not it was an

2    important goal of Saint Gobain in 2000 to 2002,

3    that all employees -- strike that.

4          Do you know whether it was an

5    important goal of Saint Gobain in the period of

6    1998 to 2002, that all employees get an equal

7    opportunity to advance whatever their race?

8          A.    What do you mean by important goal?

9          Q.    Well, forget the term goal for a

10   second.

11          Let's say -- would you understand --

12   strike that.

13          Would you agree that it was

14   important at Saint Gobain that all, during the

15   period of 1998 to 2002, that all employees get an

16   equal opportunity to advance whatever their race?

17          A.    Yes.

18          Q.    What, if anything, did Saint Gobain

19   do during the period of 1998 to 2002, to ensure

20   that all employees got an equal opportunity to

21   advance, whatever their race?

22          A.    I don't know exactly what we did in

23   that particular time frame and whether it

24   overlaps with another time frame.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 45

1        Q.        Okay.    Separating out the time

2    frame.

3                     What is your -- what has Saint

4    Gobain done to ensure that all employees get an

5    equal opportunity to advance?

6        A.        Saint Gobain has spent thousands of

7    dollars on a respectful work place program that

8    all supervisors in the United States were

9    required to attend and participate in over a

10   several -- takes a long time to do every

11   supervisor.  So over a period of time.  I know

12   that was one effort that was made.

13       Q.        Okay.  Any other efforts other than

14   the respectful work place program training?

15       A.        I'm not aware of what was done at

16   any particular location.

17       Q.        Are you aware of anything that was

18   done in any location in North America other than

19   the respectful work place program to ensure that

20   all employees got an equal opportunity to advance

21   whatever their race?

22       A.        No.

23       Q.        Did you have to go through the

24   respectful work place training?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

DENNIS BAKER
July 6, 2005

Page 46

1        A.     Yes.

2        Q.     Was the respectful work place

3 training the document that is covered by 32 that

4 you actually indicated you haven't seen before?

5        A.     No.

6        Q.     You saw something other than that?

7        A.     Yes.

8            MS. KELLY:  Okay.  Is there some

9        reason that hasn't been provided?

10       MR. KERMAN:  I'll check to see if we

11      have something.  This is the document that

12      I was given.

13     Q.    (By Ms. Kelly)  And you're certain

14 you were provided with something other than that

15 training that is covered in Exhibit 32?

16      A.    I saw materials.

17      Q.    That were different than those that

18 have been provided in Exhibit 32?

19      A.    I haven't seen this before.

20      Q.    Okay.  And the materials that you --

21 just so we're clear.

22       The materials that you saw as part

23 of the respectful work place training that you

24 went through are not the materials indicated here

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 49

1       A.      That it focused on respectful work

2   place.  That it involved skits to have people

3   determine how to do various things.  That our

4   legal department was very much involved.  That an

5   outside consultant was used.  That it was

6   conducted at locations throughout the United

7   States.

8       **Q.      What specifically did it involve, if**

9   **you recall, with respect to ensuring equal**

10  **opportunities with respect to promotion and**

11  **hiring?**

12      A.      I can't -- I don't recall any

13  specifics.

14      **Q.      Okay.  During the period of '99 to**

15  **2002, what were the procedures with respect to**

16  **supervisory promotions?**

17              MR. KERMAN:  Could I just have the

18          question again?

19              MS. KELLY:  Sure

20              MR. KERMAN:  What was the

21          procedure --

22      **Q.      (By Ms. Kelly)  -- with respect to**

23  **supervisory promotions from 1999 to 2002?**

24      A.      I don't know.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DENNIS BAKER**
**July 6, 2005**

Page 50

1      Q.      Do you know who had the authority to

2   select?

3      A.      Depends on the location.

4      Q.      In Worcester in the Saint Gobain

5   abrasives division do you know who had the

6   authority to select supervisors?

7      A.      I don't know exactly.

8      Q.      Okay.  Do you know generally?

9      A.      Would have been the operations

10  person in charge.

11     Q.      Okay.  And was it done by seniority?

12  Do you have any understanding of how supervisors

13  were promoted?

14     A.      No.

15     Q.      Was there anything done to ensure

16  equal opportunity in selecting supervisors?

17     A.      I don't know.

18     Q.      Okay.  During the period that you

19  were VP HR of the abrasives division.  Was there

20  anything done to ensure equal opportunities in

21  the selection of supervisors in the abrasives

22  division?

23     A.      I don't know.

24             Do you understand what the abrasives

**DENNIS BAKER**
**July 6, 2005**

Page 51

1  division is?

2       Q.    You can answer my questions.

3       Were supervisors -- was the

4  operations manager trained on how to select

5  employees?

6       A.    I don't know.

7       MR. KERMAN:  Objection.

8       Q.   (By Ms. Kelly)  Okay.  Was anyone

9  trained on how to avoid discrimination in

10  selection of supervisors?

11       MR. KERMAN:  Objection.

12       MS. KELLY:  You can answer.

13       During the period of 1998 to 2002.

14       THE WITNESS:  I don't know.

15       MS. KELLY:  Mm-hmm.

16       Q.   (By Ms. Kelly)  Did the company post

17  openings for supervisors?

18       A.    I don't know.

19       Q.    Were all interested persons allowed

20  to apply for positions of supervisors?

21       A.    I don't know.

22       MR. KERMAN:  Objection.

23       MS. KELLY:  I'm sorry.  What was the

24  objection?

**DENNIS BAKER**
**July 6, 2005**

Page 52

1      MR. KERMAN:  Interested.  I don't --

2    I'm objecting to the form of the question.

3    It's vague and ambiguous.

4      Q.    (By Ms. Kelly)  Did the company keep

5    records of the persons who applied for

6    promotions?

7      A.    I don't know.

8      Q.    Would you agree with me that one way

9    to ensure that discrimination does not occur in

10   the selection of persons for supervisory

11   positions would be to post open positions and

12   allow all interested persons to apply?

13      MR. KERMAN:  Objection.

14      MS. KELLY:  You can answer.

15      THE WITNESS:  No, I wouldn't agree

16   with you.

17      Q.    (By Ms. Kelly)  Can you explain why

18   you wouldn't agree with me?

19      A.    A posting that allows all interested

20   parties to apply, in my mind, is far too broad.

21      Q.    Okay.  Why would it be far too

22   broad?

23      A.    We'd have people in the street

24   applying.

**DENNIS BAKER**
**July 6, 2005**

Page 59

1       of the question.

2               MS. KELLY:  Go ahead.  Do you

3       understand the question?

4               THE WITNESS:  Yeah, I understand the

5       question.  It has to do with exactness.

6       And if something is exactly the same in

7       every regard in every circumstance then,

8       yes.  That's the answer to your question.

9       If everything, everything related to it, is

10      exactly the same.

11          Q.      (By Ms. Kelly)  Okay.  If it is not

12      exactly the same how does Saint Gobain determine

13      that discipline is applied impartially without

14      regard to race?

15          A.      Depends on the circumstance.

16          Q.      No.  I'm asking what Saint Gobain

17      does to ensure that discipline is --

18          A.      And I'm telling you.  It depends on

19      the circumstances.

20          Q.      What efforts did Saint Gobain make,

21      during the period  1998 to 2002, to ensure that

22      discipline was applied impartially without regard

23      to race, if any?

24              MR. KERMAN:  Objection.

**DENNIS BAKER**
**July 6, 2005**

Page 60

1          THE WITNESS:  I wasn't involved in

2      that.

3          Q.     (By Ms. Kelly)  Is it fair to say

4   that you're not aware of any efforts that were

5   made during the period 1998 to 2002, to ensure

6   that discipline was applied impartially without

7   regard to race?

8          MR. KERMAN:  Objection.

9          THE WITNESS:  No, I'm not saying

10      that.

11          Q.     (By Ms. Kelly)  Are you aware of

12   anything that was done by Saint Gobain during the

13   period 1998 to 2002, to ensure that discipline

14   was applied impartially without regard to race?

15          MR. KERMAN:  Objection.

16          MS. KELLY:  You can answer.

17          THE WITNESS:  I'm aware of our

18      policies.

19          Q.     (By Ms. Kelly)  Other than in acting

20   policies.  Okay.  Strike that.

21          Was anything done to ensure the

22   policies were being followed?

23          MR. KERMAN:  Objection.

24          THE WITNESS:  I don't know in any

**DENNIS BAKER**
**July 6, 2005**

Page 61

1          individual circumstance.

2          Q.      (By Ms. Kelly)  Setting aside any

3     individual circumstances.

4               Are you aware of any efforts that

5     were made during the period of 1998 to 2002, to

6     ensure that the policies were being followed?

7          A.     What do you mean by efforts?

8          Q.     Are you aware of anything that was

9     done by Saint Gobain during the period of 1998 to

10    2000, to ensure that the policies regarding

11    impartial discipline without regard to race were

12    being followed?

13               MR. KERMAN:  Objection.  You can

14          answer if you can.

15               THE WITNESS:  We have policies in

16          place and everybody was required to follow

17          those policies to the best of their ability

18          considering the circumstances of the

19          situation that existed.

20          Q.     (By Ms. Kelly)  Okay.  How did Saint

21    Gobain, if you know, ensure that that happened?

22          A.     That was the responsibility of

23    management.

24          Q.     Were you management?

**DENNIS BAKER**
**July 6, 2005**

Page 62

1          A.       That was the responsibility of the

2    operations management in each facility.

3          Q.    ·    Was it the responsibility of all

4    human resources to ensure that the policies

5    regarding the discipline were applied impartially

6    without regard to race?

7          A.       Yes.

8          Q.       Okay.   And you were the vice

9    president of human resources, right, during that

10   time period?

11         A.       Yes.

12         Q.       Okay.   What was done to ensure --

13         A.       I didn't have that responsibility.

14         Q.       Excuse me.   You just said you were

15   -- strike that.

16              What was done by human resources

17   during the period of 1998 to 2002, to ensure that

18   the policies regarding impartial discipline

19   without regard to race were being followed, if

20   anything?

21              MR. KERMAN:   Objection.   You can

22        answer.

23              THE WITNESS:   I didn't have that

24        responsibility.

**DENNIS BAKER**
**July 6, 2005**

Page 63

1    Q.    (By Ms. Kelly)  Whether or not you
2 had the responsibility.  Do you know of anything
3 that was done?
4    A.    Any specific program?
5    Q.    Anything that was done at all.
6    MR. KERMAN:  Objection.
7    MS. KELLY:  You can answer.
8    THE WITNESS:  I can't answer that.
9    Q.    (By Ms. Kelly)  I'm sorry.  Why
10 can't you answer that?  Do you know -- what is
11 impossible to answer?
12    A.    We ensure that our policies were
13 followed in a reasonable manner.
14    Q.    How did you ensure that your
15 policies -- I didn't ask about a reasonable
16 manner.
17         I'm asking.  What, if anything, are
18 you aware of that was done by Saint Gobain
19 between 1998 to 2002, to ensure that policies
20 were being followed with respect to discipline
21 impartially without regard to race?
22    A.    I don't know.
23    Q.    Now, you keep saying it wasn't your
24 responsibility.  What was your responsibility

**DENNIS BAKER**
**July 6, 2005**

Page 64

1    during the period of 1998 to 2002, with respect

2    to human resources at Saint Gobain?

3        A.    My responsibility was a very

4    high-level responsibility.  Strategic human

5    resources, development of executives, recruiting

6    of executives, broad organizational issues, broad

7    benefits policy, broad pension policy, issues

8    related to international items, et cetera.

9        Q.    Okay.  And ensuring that there

10   wasn't discrimination was not one of the broad

11   organizational issues you were tasked with?

12              MR. KERMAN:  Objection.

13              MS. KELLY:  You may answer.

14              THE WITNESS:  Specifically me, no.

15       Q.    (By Ms. Kelly)  Generally you?

16       A.    Generally me, yes.

17       Q.    Okay.  So generally -- since you

18   were tasked generally with the broad

19   organizational issue of avoiding discrimination

20   can you think of anything that was done during

21   1998 to 2002, to ensure that discipline was

22   applied uniformly and impartially without regard

23   to race?

24       A.    If anything was brought to our

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 65

1    attention we investigated it.

2        Q.    Okay.  Anything else?

3        A.    No.

4        Q.    Okay.  Did Saint Gobain keep records

5    of all misconduct and discipline to determine

6    whether or not discipline was applied impartially

7    without regard to race?

8        A.    I don't know.

9        Q.    Okay.  Were supervisors informed of

10   their duty to report any complaints of

11   discrimination with respect to discipline?

12       A.    I don't know.

13       Q.    Would you agree -- okay.

14             What, if anything, did the company

15   do during the period of 1998 to 2002, to ensure

16   that people who complained of discrimination were

17   not retaliated against for having complained, if

18   anything?

19       A.    Depends on the circumstances.

20       Q.    I'm asking what the company did to

21   ensure that?

22       A.    Depends upon the location, the

23   circumstances, the situation, the individuals

24   involved, et cetera.

**DENNIS BAKER**
**July 6, 2005**

Page 66

1    Q.    Okay.

2    A.    And we have a policy and we assume

3  that policy is being followed.

4    Q.    Okay.  Other than assuming that the

5  policy is being followed.  Was there anything

6  else that Saint Gobain did during that period of

7  1998 to 2002, that you're aware of to ensure that

8  persons who complained of discrimination were not

9  retaliated against for having complained?

10              MR. KERMAN:  Objection.

11              MS. KELLY:  You may answer.

12              THE WITNESS:  Anything brought to my

13        attention was thoroughly investigated.

14    Q.    (By Ms. Kelly)  Anything else that

15  you can think of other than assuming and

16  investigating anything personally brought to your

17  attention?

18    A.    I don't have knowledge of individual

19  locations and individual situations.

20    Q.    Okay.

21              MR. KERMAN:  Off the record.  I just

22        want to take a couple-minute break.

23              MS. KELLY:  Certainly.

24              (Break taken)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

1      A.      The answer is no to that question.

2      Q.      Okay.  It's fair to say there are no

3  African American officials --

4      A.      That wasn't your question.

5      Q.      Well, I'm asking a new question.

6              It's fair to say there are no

7  African American officials or managers,

8  correct?

9      A.      Yes.

10     Q.      It's fair to say that in 2003, there

11  were no Hispanic officials or managers; is that

12  correct?

13              MR. KERMAN:  Objection.  Again, the

14         document speaks for itself.

15              MS. KELLY:  Fine.  You can answer.

16              THE WITNESS:  Yes.

17     Q.      (By Ms. Kelly)  Would you say that

18  that indicates a lack of Hispanic and lack of

19  black officers or managers at Saint Gobain given

20  the definition of lack I just read you?

21     A.      I can't answer the question as it's

22  phrased that way because lack of, in this

23  context, has a completely different meaning.

24     Q.      Okay.  What meaning does it have in

**DENNIS BAKER**
**July 6, 2005**

Page 134

1   this context?

2        A.      Lack of has a negative meaning that

3   you didn't do what you needed to do to give

4   employees the opportunity to be in those

5   positions.  There is a process you go through by

6   which you chose supervisors, which includes a

7   number of things.  Their performance.  Their

8   history.  Their dealings with other employees, et

9   cetera, et cetera, et cetera.  Their seniority.

10  All of those things have to be factored in into

11  whether or not you have a lack.

12        Q.      Okay.  What is the process?

13        A.      Just what I said.

14        Q.      I'm sorry?

15        A.      I don't know the specific process.

16        Q.      Okay.  So you don't actually know?

17        A.      I know that all of those factors are

18  considered when choosing supervisors.

19        Q.      How do you know that?

20        A.      Because they are.

21        Q.      How do you know that?  Are you just

22  assuming they are?

23              MR. KERMAN:  Objection.

24              THE WITNESS:  No.  I know that

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**

**July 6, 2005**

Page 135

1    because that's what I do when I choose

2    them.  That's what my supervisors under me

3    do.  That's what we do in this company.

4        Q.    (By Ms. Kelly)  Okay.  Do you know

5    what was done in selecting supervisors in the

6    abrasives department during 1998 to 2002?

7        A.    Do I know firsthand?

8        Q.    Do you know at all?

9        MR. KERMAN:  Let her just finish the

10   question.

11       Q.    (By Ms. Kelly)  You're testifying

12   about how supervisors are selected.

13       Do you know what was done in

14   selecting supervisors?

15       A.    No.

16       Q.    Okay.

17       MR. KERMAN:  Objection.

18       Q.    (By Ms. Kelly)  So when you say

19   lack -- so since you have no idea -- is it fair

20   to say you have no idea whether or not those

21   things were actually considered in selecting

22   supervisors?

23       MR. KERMAN:  Objection.  You can

24   answer.

**CATUOGNO COURT REPORTING SERVICES**

Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 136

1              THE WITNESS:   No.   I answered the

2        question already.

3        Q.      (By Ms. Kelly)   I'm sorry.   What was

4   the answer?

5        A.      I told you what the process is that

6   we go through in selecting supervisors in a

7   general sense.

8        Q.      And then you said --

9        A.      So I have some idea.

10       Q.      Okay.   But you don't know whether or

11   not it was followed between 1998 and 2002, in

12   selecting supervisors in this particular area,

13   correct?

14              MR. KERMAN:   Objection.

15       Q.      (By Ms. Kelly)   You're just

16   assuming?

17              MR. KERMAN:   Objection.

18              THE WITNESS:   I can't tell you in a

19        specific instance that X, Y, and Z exactly

20        was followed.

21       Q.      (By Ms. Kelly)   Okay.   You can't

22   tell me whether supervisors were even trained on

23   how to select someone, right?

24              MR. KERMAN:   Objection.

**DENNIS BAKER**
**July 6, 2005**

Page 137

1        THE WITNESS:  I know what our

2    policies are and I know what we do to

3    follow our policies.

4        Q.     (By Ms. Kelly)  Okay.  What are your

5    policies in selecting supervisors because I think

6    you testified earlier, maybe I'm misunderstanding

7    or misrecollecting, but I thought you testified

8    that you didn't know of any policies in selecting

9    supervisors?

10        MR. KERMAN:  Objection.

11        THE WITNESS:  No, I know in general.

12        Q.     (By Ms. Kelly)  Okay.  Other than

13    your assumption of what should be done.  Okay.

14    Do you have any knowledge of how supervisors were

15    selected in the bond and abrasives --

16        A.     Yes.

17        Q.     Let me finish the question.

18               -- division during 1998 and 2002?

19        A.     Yes.

20        Q.     Do you -- all right.

21               What is it that you know?

22        A.     I know that we follow past

23    practice.

24        Q.     Okay.  What is the past practice in

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DENNIS BAKER**
**July 6, 2005**

Page 138

1  the bond and abrasives division during 1998 to

2  2002?

3      A.      The past practice is that you look

4  at a number of factors -- I don't know every

5  specific factor -- in determining a supervisor.

6  Ability to supervise employees, employee

7  relations abilities, performance, number of years

8  with the company, et cetera, et cetera.  There

9  are a number of factors that are looked at to

10  determine whether someone will make a good

11  supervisor.  And that has been the practice in

12  this company.

13      Q.      Okay.  Well, in that practice what

14  universe of people are you looking at?

15          MR. KERMAN:  Objection.

16      Q.      (By Ms. Kelly)  You're testifying

17  about the past practice.  Who do you look at?

18      A.      Yeah, but it's the practice in the

19  company.

20          MR. KERMAN:  Objection.

21      Q.      (By Ms. Kelly)  Who do you look at

22  in determining who to supervise?  You identified

23  these things, ability to supervise, performance,

24  number of years.

**DENNIS BAKER**
**July 6, 2005**

Page 139

1            How do you select the universe of

2    people you're looking at?

3        A.      I don't understand the question.

4            MR. KERMAN:  Objection.

5        Q.      (By Ms. Kelly)  If you are looking

6    to promote someone to supervisor.  The past

7    practice is of looking at whom to determine who

8    to promote?

9        A.      Mm-hmm.

10       Q.      That's a question.  Whom?  Whom are

11   you looking at in determining who to promote?

12           MR. KERMAN:  Objection.

13           THE WITNESS:  I can't answer that

14       specific question.  I have no direct

15       knowledge.

16       Q.      (By Ms. Kelly)  And you don't know

17   what the past practice is?

18           MR. KERMAN:  Objection.

19           THE WITNESS:  I know what the past

20       practice is as to what I just testified.

21       Q.      (By Ms. Kelly)  Which is that you

22   look at some unidentified group of people and it

23   depends upon some factors which include, but are

24   not limited to the factors you just listed; is

**DENNIS BAKER**
**July 6, 2005**

Page 140

1    that accurate?

2             MR. KERMAN:  Objection.

3        Mischaracterizes his testimony.

4             THE WITNESS:  Yeah, that's not what

5        I said.

6             MS. KELLY:  I'm trying to understand

7        his testimony.

8             THE WITNESS:  I said I don't have

9        any firsthand knowledge of the group of

10       people that is looked at.

11       Q.      (By Ms. Kelly)  Okay.  I'm not

12   asking you for firsthand knowledge.  I'm asking

13   about past practice because that's what you're

14   testifying about.

15            The past practice is what do you

16   look at --

17       A.      I don't know what the past practice

18   is to the specific question that you're asking.

19   I know the past practice to what I answered.

20       Q.      I'm sorry.  I wasn't sure what you

21   were answering.

22            Other than human resource positions,

23   which you know about.  Do you have any idea what

24   the past practice was in selecting supervisors

**DENNIS BAKER**
**July 6, 2005**

Page 141

1    outside of human resource?

2                    MR. KERMAN:  Objection.

3                    THE WITNESS:  I know what I

4        stated.

5        Q.    (By Ms. Kelly)  Which is?

6        A.    Which is that they look at a number

7    of factors in somebody's ability to be a good

8    supervisor.

9        Q.    Okay.  That assumes that you have a

10   person who you are thinking of promoting,

11   correct?

12       A.    No.

13       Q.    Okay.  You have a position.  Okay.

14   And you need to fill it, correct?

15       A.    Presumably.

16       Q.    And the past practice is that you

17   don't post these; is that accurate?

18       A.    I can't answer that with firsthand

19   knowledge.

20       Q.    Okay.  So you don't know what the

21   past practice that you're saying needs to be

22   followed with respect to posting?

23       A.    With respect to posting.

24                   MR. KERMAN:  Objection.

**DENNIS BAKER**

**July 6, 2005**

Page 142

1         THE WITNESS: Exactly.

2     Q.     (By Ms. Kelly) Okay. How do people

3 apply for the position, if they do? What's the

4 past practice with respect to that?

5         MR. KERMAN: I object. Can I just

6     say something?

7         MS. KELLY: No. You can object to

8     the form of the question.

9         MR. KERMAN: I am going to say

10     something. I am going to object.

11         MS. KELLY: No, you are not. You're

12     supposed to object to the form and --

13         MR. KERMAN: I am objecting to the

14     form of the question.

15         MS. KELLY: That's fine. Your

16     objection is so noted.

17         MR. KERMAN: No. No. Just --

18         MS. KELLY: First of all, you're

19     interrupting my question.

20         MR. KERMAN: You specifically said

21     that he's not to answer until we've

22     finished our discussion. The reason I'm

23     objecting --

24         MS. KELLY: No, you interrupted my

**DENNIS BAKER**
**July 6, 2005**

Page 143

1    question.

2            MR. KERMAN:  The reason I'm

3    objecting is because there are hundreds and

4    hundreds and hundreds of positions and to

5    ask him how each one is filled is just

6    absurd and a waste of our time.

7            MS. KELLY:  That's fine, but he's

8    testifying about his knowledge of the past

9    practice.  And I'm allowed to ask him about

10   his knowledge of the past practice.

11           MR. KERMAN:  With respect to

12   thousands of positions?

13           MS. KELLY:  If it's his

14   understanding -- let's put it this way.

15       Q.     (By Ms. Kelly)  Is it your

16   understanding that the past practice is the same

17   for these thousands of positions or does it

18   differ?

19           MR. KERMAN:  Objection.

20           THE WITNESS:  I can't answer that.

21       Q.     (By Ms. Kelly)  What is your

22   understanding?

23       A.     I don't know.

24       Q.     Okay.  Well, then what are you --

**DENNIS BAKER**
**July 6, 2005**

Page 144

1    your testimony about how promotions are done.  If

2    you don't know if the past practice is the same

3    what are you limiting --

4           A.      I know the past practice to the

5    extent that I testified, period.

6           Q.      Which is -- but you don't know if it

7    applied in the bonded and super abrasives

8    division as to all of the supervisory positions;

9    is that accurate?

10          A.      I don't know all the specific

11   positions.

12          Q.      Please let me finish the question.

13                  Do you know of any instance where it

14   was followed between 1998 and 2002, in the bond

15   and super abrasives division?

16          A.      I don't get involved in those

17   matters?

18          Q.      Is that a no, you don't know if it

19   was followed?

20          A.      I don't get involved in those

21   matters.

22          Q.      Is that a no, you don't know?

23                  MR. KERMAN:  Objection.  He's

24          answered.

**DENNIS BAKER**
**July 6, 2005**

Page 145

1          THE WITNESS:   I don't get involved

2      in those matters.

3          Q.      (By Ms. Kelly)  Is that a yes or

4  no?

5          A.      I don't get involved in those

6  matters.

7              MR. KERMAN:  It's clear what his

8      answer is.  If you don't understand it --

9              MS. KELLY:  I don't understand it.

10             THE WITNESS:  Do I know every

11      specific instance?

12         Q.      (By Ms. Kelly)  No.  Do you know any

13  specific instance of how a position was filled in

14  the bonded and super abrasives division between

15  1998, and 2002?

16         A.      Every single --

17         Q.      No.  Any.

18         A.      Every single thing that was done

19  with regard to every single hiring for a

20  supervisor?

21         Q.      No.  That was not my question.

22             My question is.  Do you have any

23  knowledge as to how a position -- as to how any

24  specific position was filled between 1998 and

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 146

1   2002?

2           A.      I have no knowledge other than what

3   I've testified that I have general knowledge of

4   the past practice.

5           Q.      And is your general knowledge of the

6   past practice based on past practice in the

7   bonded and super abrasives division?

8           A.      Beyond bonded and super abrasives.

9           Q.      No.  But including bonded and super

10  abrasives?

11          A.      Including bonded and super

12  abrasives.

13          Q.      So you have specific information of

14  the past practice in the bonded and super

15  abrasives division?

16          A.      What I testified.

17          Q.      Okay.  How do you have that

18  knowledge?

19          A.      Because that's the past practice.

20          Q.      How do you have specific knowledge

21  that that past practice was ever followed in the

22  bonded and super abrasives division?

23          A.      Do I have specific knowledge of any

24  specific instance, no.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DENNIS BAKER**
**July 6, 2005**

Page 192

1   discussing with him the issues about the

2   allegations of racism?

3       A.      No.

4       Q.      What about Mr. Zakaway? (Phonetic)

5       A.      No.  No, I did not discuss it with

6   him.

7       Q.      Do you know who Tom Oliver is?

8       A.      Yes.

9       Q.      Did you have any discussions with

10  him about any of these issues of racism?

11      A.      No.

12      Q.      Okay.  What about Mr. Clark.

13              Do you know who he is?

14      A.      Yeah, he's a supervisor.  I don't

15  know what he supervises, but he's a supervisor.

16      Q.      And just so we're clear.

17              It's accurate that you never

18  investigated any of the accusations of racism

19  yourself; is that correct?

20              MR. KERMAN:  Objection.

21              THE WITNESS:  No, that's not

22      accurate.

23      Q.      (By Ms. Kelly)  Okay.  Which

24  accusations of racism did you personally

**DENNIS BAKER**
**July 6, 2005**

Page 193

1    investigate?

2         A.    I have no recollection.  I mean, in

3    my 26 years there I don't know exactly what I

4    investigated and didn't investigate.

5         Q.    Oh, okay.  I'm sorry.

6               With respect to any allegations at

7    the time of the union campaign involving Mr.

8    Briddell.  Is it accurate to say you never

9    investigated any allegations of discrimination?

10        A.    I personally never investigated

11   anything.

12        Q.    And it's also accurate to say, isn't

13   it, that you never investigated personally any

14   allegations about Mr. Briddell's performance?

15        A.    That's accurate.

16        Q.    And that in determining whether or

17   not the allegations of discrimination or

18   retaliation are accurate, you're relying on

19   information given to you by other people; is that

20   accurate?

21        A.    That's accurate.

22        Q.    Have you looked at any of the

23   documents concerning his discipline?

24        A.    No.