ROBERT M. BRIDDELL
February 15, 2005

Page 167

1      A.      Yes.

2      Q.      **What did he say about that to you?**

3      A.      He made a statement that he got a

4  complaint that some pans were coming out with

5  too much mix in them.

6      Q.      **Did he say who the complaint was**

7  **from?**

8      A.      No.

9      Q.      **Did he say it was from the**

10 **rescreeners or anything like that?**

11     A.      No, I don't recall.  I recall he

12 said he had a complaint from a rescreener, from

13 the supervisor or what.

14     Q.      **What did you say to him?**

15     A.      That to the best of my knowledge

16 the mix was coming out 45 pounds as required.

17     Q.      **Did you ask him who was making the**

18 **complaints that your pans were too heavy?**

19     A.      I don't recall asking.

20     Q.      **Weren't you interested in finding**

21 **out who was making this complaint?**

22     A.      I was interested in finding out,

23 but I mean, I just asked him.

24             MR. MEIKLEJOHN:  You've answered

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 168

1       the question.

2           Q.      (By Mr. Kerman)  So the answer was

3   you were interested, but you didn't ask him,

4   correct?

5           A.      Yeah, I asked him.

6           Q.      You asked him who was making the

7   complaints?

8           A.      No, he asked me about the mixes.  I

9   recall that we talked about it.  And yeah, I

10  guess I asked him how much complaints or who was

11  making.

12          Q.      You don't remember what you said to

13  him?

14          A.      No.

15          Q.      Did he at all watch you that night

16  to see how much your pans were weighing?

17          A.      Yes, I remember that.

18          Q.      What did he say to you?

19          A.      He watched me for over a period of

20  time.  He watched the mixers and so forth and he

21  said that I was satisfied, I was doing my job

22  correctly.

23          Q.      Did he tell you though to be

24  careful not to go over the 45 pounds?

ROBERT M. BRIDDELL
February 15, 2005

Page 169

1     A.     He told me to keep my eye on it and
2  I told him I would.
3     Q.     A couple days after Mr. Tivnan
4  spoke to you, do you recall getting a written
5  reminder from the company?
6     A.     Yeah.
7     Q.     Who met with you to get the written
8  reminder?
9     A.     Who met with me?
10    Q.     Yes, who did you get it from?
11    A.     I got it from Bill Tivnan.
12    Q.     Anyone else?
13    A.     I think after that we had a meeting
14  with Rick Zeena.
15    Q.     When you got the written reminder,
16  was it only Bill Tivnan who gave it to you, or
17  was any other managers present?
18    A.     At the time he gave it to me?
19    Q.     Yes.
20    A.     I don't think, he was the only
21  manager there at the time.
22    Q.     Was anyone else with him when he
23  gave it to you, that's all I'm asking?  If you
24  don't know, you can say you don't know.

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 170

```
 1        A.     I don't know.

 2               MR. KERMAN:  I'd like to have this

 3        marked as Exhibit 7.

 4

 5               (Exhibit 7, 9/20/01 Written

 6               Reminder, marked)

 7

 8        Q.     (By Mr. Kerman)  Let me show you

 9   what's been marked as Exhibit 7 which says

10   Norton Company written reminder and the date is

11   9/20/01 at top.  And at the bottom there's a

12   number 1480.

13               Can you just look at this document,

14   Mr. Briddell, and tell me whether you've seen it

15   before?

16        A.     Yeah, I've seen it.

17        Q.     Is this the written reminder that

18   Mr. Tivnan gave to you on September 20, 2001?

19        A.     Yes.

20        Q.     That's your signature, correct?

21        A.     Yes.

22        Q.     When he gave you this written

23   reminder, did he also show you in the safety

24   book that the pans were not supposed to go over
```

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 173

1    say to him in response?

2        A.    If I recall, I said to him that it

3    was the same thing that we discussed anyway, the

4    written reminder was the same thing that we

5    discussed the night before that.

6        Q.    **Didn't he show you some paperwork**

7    **that your mixes were at least 15 pounds**

8    **overweight?**

9        A.    He showed me that paperwork that

10   said they were 15 pounds overweight and I asked

11   him the mix or something.  He said the mix has

12   been made and processed on the other line.

13       Q.    **He showed you the paperwork,**

14   **correct, that showed that it was 15 pounds**

15   **overweight?**

16       A.    Yeah, this is the same paperwork

17   that.

18       Q.    **I'm not talking about the written**

19   **reminder.  He showed you some actual paperwork**

20   **that listed the pans as being at least 15 pounds**

21   **overweight, correct?**

22       A.    Yeah.

23       Q.    **Do you have any reason to doubt**

24   **that the pans that you made were 15 pounds**

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 176

1  Mr. Briddell, were you given this document or a

2  copy of this document?

3      A.     I guess so, yeah, I guess.

4      Q.     This talks about filled mix pans or

5  plastic mix buckets should not be more than 45

6  pounds, correct?

7      A.     Yes.

8      Q.     When you got the written reminder

9  which has been marked as Exhibit 7, Bill Tivnan

10 showed you some paperwork for these overweight

11 pans, correct, we just discussed that he showed

12 you some of the paperwork, correct?

13     A.     Yes, he did.

14     Q.     Your clock number was on that

15 paperwork, correct?

16     A.     I don't recall.  I don't know.  He

17 showed me some paperwork.  I don't remember

18 today what the paperwork was.

19     Q.     Your clock number was 1102,

20 correct, when you worked at Saint-Gobain?

21     A.     Yeah, 359.

22     Q.     Your clock number was 1102?

23     A.     Yeah.  Well, yeah, I had two.

24            MR. MEIKLEJOHN:  If you recall.

ROBERT M. BRIDDELL
February 15, 2005

Page 178

1        A.      Not that I know.  I don't recall.

2        Q.      You don't remember anyone telling

3   you within a day after you got this written

4   reminder they found some pans that weighed 55,

5   53 and 52.1 pounds?

6        A.      No, it might have happened.  I

7   don't remember.

8        Q.      You don't remember at this point?

9        A.      Yeah, I don't remember.

10              MR. KERMAN:  This will be Exhibit

11       9, I believe.

12

13              (Exhibit 9, 10/4/01 Warning Notice,

14              marked)

15

16       Q.      (By Mr. Kerman)  Mr. Briddell, let me

17   show you what I've marked as Exhibit 9 which for

18   purposes for the record says Norton Company

19   notice of warning slash suspension.  At the

20   bottom there's a number here 1467.  At the top

21   of this document there's a date that says

22   10/4/01, October 4, 2001, do you see that?

23       A.      Yes.

24       Q.      Do you see your name Robert

ROBERT M. BRIDDELL
February 15, 2005

Page 180

1      Q.      At some point do you remember

2   whether it was this warning or not, at some

3   point do you remember getting a warning for not

4   signing the mix slip?

5      A.      I remember getting a warning for

6   not signing the mix slips.

7      Q.      Who was the person that gave you

8   the warning for not signing the mix slip?

9      A.      It had to be Tom, my supervisor.

10     Q.      Who?

11     A.      Tivnan, Tom Tivnan.

12     Q.      Bill Tivnan?

13     A.      Yeah, I'm getting my names mixed

14  up.

15     Q.      What did he say to you about not

16  signing the mix slips?

17     A.      I think he said take my time and

18  sign the mix slips and don't rush and try to

19  make as many mixes and not signing the slips.

20  Try to remember to sign the slips.

21     Q.      Did you ask to see the

22  documentation where the mix slips weren't signed

23  and he showed you the documentation, isn't that

24  right?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 181

1       A.     Probably so, I don't remember.

2       Q.     **But you didn't deny not signing the**

3   **mix slip?**

4       A.     No, I didn't deny.

5       Q.     **You admitted it, correct?**

6       A.     I didn't deny it.

7       Q.     **You didn't deny it?**

8       A.     No.

9       Q.     **Did Mr. Tivnan also speak to you**

10  **about the fact that you weren't using the COM**

11 **CAM system?**

12       A.     Yes.

13       Q.     **What did he say about that?**

14       A.     I wouldn't use the COM CAM and I

15 told him neither were the rest of the mixers in

16 the other lines were using them.

17       Q.     **He told you you weren't using it**

18 **and you didn't deny that, correct?**

19       A.     No.

20       Q.     **You said other mixers weren't using**

21 **it?**

22       A.     Right, the other mixers in the line

23 they weren't using the COM CAM.

24       Q.     **You were on line two, correct?**

ROBERT M. BRIDDELL
February 15, 2005

Page 185

1      A.      No.

2           Q.      Did you later meet with Mr. Clark?

3      A.      Yes.

4           Q.      Over this warning, did you have a

5   meeting with him over this warning?

6      A.      I met with him over that warning.

7   I remember meeting with him.

8           Q.      Do you recall what the issue was

9   that you met with him on what you discussed?

10     A.      Yeah, I just wanted to know what

11  his plan.  He was my supervisor, Clark was not

12  my supervisor.  I just wanted to know the game

13  plan.  That's all.

14          Q.      At some point though didn't Bill

15  Tivnan and Jeff Clark both meet with you in

16  October to discuss your warning, the two of them

17  met with you?

18     A.      And this was all the same time.

19          Q.      It's the three of you meeting

20  together?

21     A.      Yeah.

22          Q.      Did you also ask for some witnesses

23  to be present?

24     A.      Right.

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 186

1    Q.      Who did you ask to be present as

2    witnesses?

3    A.      I don't recall.  I just asked to

4    have union representatives in there with me.

5    Q.      They allowed you to do that,

6    correct?

7    A.      Yeah, I'm quite sure.

8    MR. MEIKLEJOHN:  If you know.

9    THE WITNESS:  I don't remember.

10    Q.      (By Mr. Kerman)  Don't you remember

11    that Dwight Dane and Moses Rodriguez were

12    present at the meeting?

13    A.      Then they were there.

14    MR. KERMAN:  Let me have this

15    marked as Exhibit 10, please?

16

17    (Exhibit 10, 10/4/01 Written

18    Warning, marked)

19

20    Q.      (By Mr. Kerman) Let me show you,

21    Mr. Briddell, what's been marked as Exhibit 10.

22    For purposes of the record is says, to Bob

23    Briddell's file, from Jeff Clark and Bill

24    Tivnan, date October 4 of 2001, subject written

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

ROBERT M. BRIDDELL
February 15, 2005

Page 189

1   written reminder for the overweight pans and in

2   early October you received a written warning

3   which mentioned the overweight pans and also not

4   signing the mix slip and also not using the COM

5   CAM system?

6       A.    It was all one to the best of my

7   knowledge.

8       Q.    They brought up all those subjects,

9   correct?

10      A.    Right.

11      Q.    Did you say anything to Mr. Clark

12  that he and Dave Aubin were discriminating

13  against you?

14      A.    I asked him what the game plan was.

15  I mean, the things that they were saying, I just

16  didn't see it half the time.  I mean, not only

17  that after I leave Dave Aubin and Jeff Clark was

18  going through all the work and they were looking

19  for slips of mine and they were talking to me.

20      Q.    Did you say to Mr. Clark that you

21  felt that he and Dave Aubin were targeting you?

22      A.    Yes, I did.

23      Q.    Did you say why you thought they

24  were targeting?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 190

1      A.     I hadn't done anything to any of

2  them and I was doing my job and I just couldn't

3  understand that they were just pulling the

4  things they were pulling.

5      Q.     **Do you think they were targeting**

6  **you because you were active in the union?**

7      A.     Yes.

8      Q.     **Do you think they were targeting**

9  **you for any reason?**

10     A.     I was active with the union and

11  what I was doing.

12     Q.     **Did you think they were targeting**

13  **you for any other reason?**

14     A.     I think that they were targeting me

15  because of my union activities.

16     Q.     **You said that to Mr. Clark, that**

17  **you felt you were being targeted?**

18     A.     Yes, I did.

19     Q.     **What did he say to you?**

20     A.     I think he said he was going to

21  write it up and send it to Rick Zeena.

22     Q.     **Didn't he tell you that you could**

23  **pursue the open-door policy if you felt he was**

24  **not treating you correct?  Why are you laughing?**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 191

1      A.      Because of the statement that you

2  said about the open-door policy.

3      Q.      **Didn't he mention about the**

4  **open-door policy?**

5      A.      Yes, he did.

6      Q.      **Did you decide to pursue the**

7  **open-door policy?**

8      A.      Prior to that open-door policy is

9  the chain of command.

10      Q.      **Who was the chain of command after**

11  **Mr. Clark and Mr. Tivnan?**

12      A.      I know Mike Tivnan which was my

13  supervisor.  He wouldn't take part in this

14  activities, so why pursue him.

15      Q.      **Who did Bill Tivnan report to?**

16      A.      Mike Tivnan to the best of my

17  knowledge.

18      Q.      **Didn't Tom Oliver fit into this**

19  **picture at some point?**

20      A.      After Mike Tivnan.

21      Q.      **Did you ever try to speak to Tom**

22  **Oliver?**

23      A.      No, because I didn't go the chain

24  of command.

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 192

1      Q.      The chain of command you think was

2   Mike Tivnan?

3      A.      I know the chain of command was

4   Mike Tivnan.

5      Q.      You didn't go to him, correct?

6      A.      No.

7      Q.      After you received this written

8   warning, you didn't go to Rick Zeena to complain

9   about it, did you?

10     A.      No.

11             MR. KERMAN:  Let me have this next

12        document marked as Exhibit 11.

13

14             (Exhibit 11, 10/9/01 Notice of

15             Warning, marked)

16

17     Q.      (By Mr. Kerman)  I show you what's

18   been marked as Exhibit 11 which says, notice of

19   warning slash suspension.  The name is Robert

20   Briddell and the date is October 9, 2001.  And

21   for purposes of the record the bottom number

22   here is 1468.

23             Would you just take a look at this

24   document and read it to yourself, please?

ROBERT M. BRIDDELL
February 15, 2005

Page 193

1      A.    Yes.

2      Q.    Do you recall on October 9, 2001

3  receiving a warning and a three-day suspension

4  from work?

5           Do you see on this document it

6  says, this warning is accompanied by a

7  suspension of three days beginning 10/9/01 and

8  ending 10/12/01?

9      A.    Yeah.

10     Q.    Do you remember getting a warning

11  and a three-day suspension during this time

12  period?

13     A.    Yeah, I remember.

14     Q.    Who met with you to let you know

15  you were getting this suspension?

16     A.    I think this was Charlie

17  Heffelfinger, Rick Zeena.

18     Q.    Wasn't Tom Oliver present in this

19  meeting?

20     A.    He may have been and I think it was

21  a union representative there, Phil.

22     Q.    Phil Gustafson?

23     A.    I think he was there at the time.

24     Q.    You are not sure?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 194

1      A.      If this is when I got suspended,

2  I'm sure.

3      Q.      Weren't you told at this time that

4  you were being suspended that you had not signed

5  two mixing slips from the night before?

6      A.      Yeah.

7      Q.      That's what Mr. Tivnan said, that

8  there are two mixing slips that you had not

9  signed from the night before?

10      A.      Yeah.

11      Q.      Didn't you admit that those were

12  your slips and you were only human and that you

13  were rushing and you forgot to sign them, isn't

14  that what you said to him?

15      A.      Yeah.

16      Q.      You said that you were guilty, but

17  you didn't do it on purpose, isn't that correct?

18      A.      Yes.

19      Q.      You said you apologized for what

20  you had done?

21      A.      Correct.

22      Q.      You said that you're glad that that

23  was the only mistake you had made and that you

24  hadn't made a bad mix?

ROBERT M. BRIDDELL
February 15, 2005

Page 195

1        A.      Right.

2        Q.      Do you recall anything else in

3    which you got the suspension?

4        A.      No, I don't.

5        Q.      The rescreeners that would have

6    gotten your mixes that you prepared let's say on

7    October 8th, those rescreeners wouldn't be

8    coming in until October 9th, 2001, they wouldn't

9    come in until the next day, correct?

10       A.      I guess, I don't know.

11       Q.      As we discussed if you had already

12   gone home at 5:00 a.m. and the rescreeners came

13   come on later in the morning, you are already

14   gone as far as them going back to sign it,

15   correct, or to initial it?

16       A.      Yeah.

17       Q.      When you received this suspension,

18   do you remember anything else that was said at

19   the meeting other than what we've discussed,

20   anything else that you said at the meeting or

21   that Bill Tivnan or Tom Oliver or Rick Zeena

22   said at the meeting?

23       A.      No.

24       Q.      Did you complain at all about the

ROBERT M. BRIDDELL
February 15, 2005

Page 196

1    fact that Jeff Clark was getting involved with

2    your discipline, did you say that that was

3    wrong?

4         A.    I don't recall.

5         Q.    Do you remember Bill Tivnan or Tom

6    Oliver pointing out that these problems with

7    the mix slips had occurred just four days after

8    they had given you a written warning on October

9    4, 2001?

10        A.    It's possible.  I don't recall.

11        Q.    You do recall that your written

12   warning was dated October 4, 2001, correct?

13        A.    I see that, yes.

14        Q.    This incident when you failed to

15   sign two mix slips occurred approximately four

16   or five days after you had just received a

17   written warning, correct?

18        A.    I guess so.

19        Q.    You said that you had been rushing

20   around and had forgotten to do it, correct?

21        A.    I guess I did.

22        Q.    Do you remember a situation after

23   you returned from your suspension someone

24   pointed out to you on October 18, 2001 that you

ROBERT M. BRIDDELL
February 15, 2005

Page 197

1    had failed to sign off on a mix slip again right

2    after you returned from your suspension?

3         A.    No.

4         Q.    You don't remember that?

5         A.    I don't remember.

6         Q.    Did anyone tell you in late October

7    of 2001 that you had made some additional

8    overweight pans?

9              Do you remember anyone telling you

10   that they found additional overweight pans?

11        A.    No.

12        Q.    No?

13        A.    I said no.

14        Q.    Do you remember anyone telling you

15   in early January of 2002 that they found a pan

16   that you had made that weighed 68.9 pounds or 68

17   pounds?

18        A.    I don't remember.  It might have

19   happened.  I don't remember.

20        Q.    Do you remember Bill Tivnan

21   mentioning that you had made a pan that weighed

22   68 pounds and he told you this right after the

23   new year?

24        A.    This is when I was with Jeff Clark,

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 198

1    isn't it?

2        Q.    No, I'm not talking about, I'm

3    talking about after Jeff Clark.  Do you remember

4    Mr. Tivnan mentioning that you had made a pan

5    that weighed 68 pounds?

6        A.    No, he might have.

7             MR. KERMAN:  Can I have that marked

8        as Exhibit 12?

9

10            (Exhibit 12, 1/4/02 Letter,

11            marked)

12

13        Q.    (By Mr. Kerman)  Mr. Briddell, I'll

14    show you what's been marked as Exhibit 12 which

15    is dated January 4, 2002 to Robert Briddell from

16    Rick Zeena and it's a two-page document and at

17    the bottom it says 1151.

18            Can you just take a moment to read

19    this to yourself, please?

20        A.    Yes, I read it.

21        Q.    Do you remember Bill Tivnan giving

22    you a copy of this document that's marked as

23    Exhibit 12?

24        A.    No, I don't remember him giving me,

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 199

1    I remember reading it.

2        Q.    You remember getting it around

3    January 4, 2002?

4        A.    Yeah, right.

5        Q.    On the second page of this Exhibit

6    12, do you see the second paragraph it says, "on

7    January 3, 2002, you were notified by Bill

8    Tivnan that the previous evening that you made a

9    mix that weighed in excess of 68 pounds?"

10       A.    Yeah.

11       Q.    Do you remember that issue coming

12   up with Mr. Tivnan?

13       A.    Yeah.

14       Q.    What did Mr. Tivnan say about that?

15       A.    I don't know what he said.  I

16   remember, but I thought they were the same one

17   the night before, but he had talked to me about

18   it the night before and he came back with the

19   letter.

20       Q.    Mr. Tivnan had spoken to you about

21   the overweight pan the night before?

22       A.    Right.

23       Q.    What did he say to you about it?

24       A.    A message was left for him about me

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 200

1  having an overweight pan.

2        Q.    Of 68 pounds, correct?

3        A.    Right.

4        Q.    What did you say to him when he

5  told you that?

6        A.    I told him I wasn't aware of it.  I

7  wasn't aware of it.

8        Q.    Did you say either to Mr. Tivnan or

9  anyone else that this pan was sitting on a truck

10 out of your control for 12 hours and, therefore,

11 you shouldn't be responsible for it?

12       A.    I might have said that.

13       Q.    Do you remember whether you said

14 that or not?

15       A.    I don't recall it, but I may have.

16       Q.    But you don't recall?

17       A.    I don't recall.

18       Q.    Do you remember anything you said

19 to Mr. Tivnan when he told you that there was a

20 pan that you had made that weighed in excess of

21 68 pounds?

22       A.    No.

23       Q.    Did you deny it?

24       A.    No.

ROBERT M. BRIDDELL
February 15, 2005

Page 201

1       Q.      Did you mention either on January

2   4th or later that you had heard of other trucks

3   of pans that were overweight?

4       A.      Yes.

5       Q.      Tell me what you said about that?

6       A.      Not heard, I found them.

7       Q.      Do you remember when you found

8   them, what date it was or what time?

9       A.      It was approximately around this

10  time, October when this letter here came out.

11      Q.      This letter is dated January 4,

12  2002, so it was around that time?

13      A.      Yes, that was.

14      Q.      Where did you find these trucks?

15      A.      In the holding mixing area.

16      Q.      Did you weigh the pans that were on

17  the truck?

18      A.      I didn't weigh them, but some of

19  the union employees weighed them.

20      Q.      Did you ask the union employees to

21  weigh them?

22      A.      No, I told the night supervisor at

23  that time, I told Dennis Novack and I told him.

24      Q.      Dennis Novack?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 202

1      A.      Yeah.

2      Q.      **Was he active in the union?**

3      A.      No, he was a group leader.

4      Q.      **Tell me what you told him?**

5      A.      I told him I had discovered a pan

6   and I said now, I was getting written up every

7   day or so they were writing me up about putting

8   two or three pounds over in the mix and four

9   trucks sitting over there with 70 pounds or more

10  and nobody said anything.  He in return wrote a

11  letter to Rick Zeena on the same thing and they

12  said they'd investigate.  That's the last I

13  heard.

14     Q.      **How do you know the pans on these**

15  **trucks weighed 70 pounds or more?**

16     A.      Because I was looking for some mix,

17  the operators wanted some mix to finish a mix he

18  had, he needed five or six pounds, so he asked

19  me would I take the mix slip and make up some.

20  I was in the mixing area when I ran upon these

21  trucks, these trucks with 70 pounds or more.

22  And then that was it.  That's when I informed

23  management.

24     Q.      **Do you know these mixes that you**

ROBERT M. BRIDDELL
February 15, 2005

Page 203

1    found that were 70 pounds or more, do you know

2    where they come from?

3            A.     No.

4            Q.     Were you ever told where they had

5    come from?

6            A.     No.

7            Q.     Had you at some point been told

8    that these mixes that you found that were

9    weighing 70 pounds that they had come from the

10   TMS☐ press that had been shut down?

11           A.     No, I know there was a TMS2 press

12   there.

13           Q.     Did you ever hear that it had been

14   shut down?

15           A.     Quite a few times I heard that it

16   had shut down.

17           Q.     These pans that weighed more than

18   70 pounds, are you aware that they were not put

19   together by mixers, but instead were loaded up

20   from 55 gallon drums?

21           A.     No.

22           Q.     Are you denying that or you just

23   don't know?

24           A.     I'm not denying anything.  I don't

ROBERT M. BRIDDELL
February 15, 2005

Page 205

1    the new mix?

2        A.        Yeah, I guess you could.

3        Q.        Do you know whether that was

4    intended to be done with this mix?

5        A.        I don't know.

6        Q.        You have no idea what it was going

7    to be done?

8        A.        No.

9        Q.        You have no idea where it came

10   from?

11       A.        No.

12       Q.        You don't have any indication that

13   any mixers had physically filled up the pans to

14   weigh 70 pounds, correct, you don't know how

15   they got filled up?

16       A.        As a mixer there's no way to take

17   70 pounds and stack them up six high unless you

18   pick them up by yourself and put them on that

19   truck.  That's experience.  I'm talking about

20   this is experience.

21              You have to pick them up by hand,

22   70 pounds and load them and stack them up on the

23   truck.

24       Q.        You don't know how the 70 pounds of

ROBERT M. BRIDDELL
February 15, 2005

Page 206

1    mix got in the pan, correct?  In other words,

2    you don't know whether it was dumped by a big

3    drum or made by a mixer like you, correct?

4         A.    No, I don't know that, but I know

5    it was in the pan.

6         Q.    You don't know how it got into the

7    pan?

8         A.    No, I don't know.

9         Q.    No one ever told you that this mix

10   came in from the TMS press that you found, no

11   one ever told you that?

12        A.    No.

13        Q.    You found these pans that weighed

14   70 pounds, correct?

15        A.    Yeah.

16        Q.    Who did you tell about the fact

17   that you had found this, who did you go to with

18   that information?

19        A.    Dennis Novack, he was the group

20   leader, supervisor, he was the one in charge at

21   the time.

22        Q.    Did you ever speak though to either

23   Bill Tivnan or Tom Oliver or Rick Zeena about

24   what you had found out?

ROBERT M. BRIDDELL
February 15, 2005

Page 209

1     Q.     Did they explain what had happened

2  with those 70-pound pans?

3     A.     This is the first I heard is what

4  you just told me.

5     Q.     At some point though you were

6  informed that they had found in the end of

7  January 2002 some contaminated mix, correct,

8  that you had made, did someone tell you you had

9  made some contaminated mixes?

10    A.     A mix, it was the same night.

11    Q.     Who was the first person that told

12  you that you had made some contaminated mix, who

13  told you about it?

14    A.     I guess it was Charlie

15  Heffelfinger, it had to be him.

16    Q.     Were you called into a meeting to

17  talk about it, is that right?  Were you called

18  into a meeting to talk about the contaminated

19  mix?

20    A.     Yeah, and I was being terminated

21  because of it, yes, of that.

22    Q.     What were you told about the

23  contaminated mixes?  What did the company tell

24  you about it?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 210

1       A.      That I made a mix that was

2    contaminated.

3       Q.      Were you also told that on one of

4    the mixes that you had failed to sign off on the

5    mixing slip as well?

6       A.      I don't recall that.  I just recall

7    the contaminated mix.  I recall that, I don't

8    recall whether signing off or on.

9       Q.      Weren't you, in fact, told that

10   there were two contaminated mixes that they had

11   found?

12      A.      I don't remember if it was one or

13   two.

14      Q.      Haven't you made two white mixes at

15   that particular shift at the end of the shift?

16      A.      Yeah, I had made, yeah, two mixes,

17   two pans.

18      Q.      But it was white?

19      A.      Right, it was white.

20      Q.      Didn't they tell you that one of

21   the contaminated mixes they could save, but the

22   other contaminated mix they couldn't save?

23      A.      I remember them saying that, but I

24   think it was one mix instead of two mixes.  It

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 211

1    was one mix.

2         Q.      But two pans?

3         A.      Yes.

4         Q.      Two pans were contaminated,

5    correct?

6         A.      Yeah.

7         Q.      They were white mix that you were

8    making that night, correct?

9         A.      Yes, that morning.

10        Q.      That morning.  Before you had made

11   that white mix, you had been making black mix,

12   correct?

13        A.      No.

14        Q.      What had you been making?

15        A.      Before I made that white mix, I had

16   cleaned up and I was on my way home and I was

17   informed to come back and make the mix.

18        Q.      On the night that you made these

19   white pans, before you made the white pans,

20   earlier in the evening had you made any black

21   mix pans?

22        A.      On my work shift, yes, I had made

23   mixes with black.

24        Q.      At the end of your work shift, did

ROBERT M. BRIDDELL
February 15, 2005

Page 212

1    you make some white mixes?

2         A.    At the end of my work shift, I

3    cleaned up.

4         Q.    Okay.

5         A.    And I was on my way home and

6    Charlie Heffelfinger stopped me and told me to

7    come back and make the mix.

8         Q.    You stayed and made the mixes, the

9    two white mixes?

10        A.    I mean, I hadn't punched out.

11        Q.    You stayed and made the mixes?

12        A.    Yeah, I had to, I had no choice.

13        Q.    Had you cleaned the machine

14   beforehand?

15        A.    Yes.

16        Q.    So there should have been no black

17   contaminants, correct, if you cleaned them

18   properly?

19        A.    I wouldn't say that, no.

20        Q.    How do you clean the machine?

21        A.    You clean the machine by putting

22   solvent and clean the machine, the machine was

23   clean.

24        Q.    When you clean the machine though

ROBERT M. BRIDDELL
February 15, 2005

Page 213

1    you have to clean the bowls, correct?

2         A.      That is the machine, the bowls.

3         Q.      And the paddle?

4         A.      Yes.

5         Q.      And you clean the screen as well?

6         A.      Right.

7         Q.      You clean the pans, correct?

8         A.      Right.

9         Q.      You can clean the conveyer,

10   correct?

11        A.      Yes.

12        Q.      You had done all of that on that

13   shift?

14        A.      Yes.

15        Q.      When you were asked to make the

16   white mix, the machine and all the equipment

17   were totally clean, correct?

18        A.      To the best of my knowledge.

19        Q.      To the best of your knowledge?

20        A.      Correct, yes.

21        Q.      You made these two mixes?

22        A.      Yes.

23        Q.      You were told they were

24   contaminated?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 214

1       A.      Yes.

2       Q.      **Do you have any explanation why**

3    **they were contaminated?**

4       A.      Yeah, I mean, a lot of times you

5    clean a machine like that and a lot of times

6    like anything else, some of the bond or

7    something gets caught up in the shaker.  And if

8    the bond gets caught up in the shaker.  If it's

9    a white mix, it just gets in there.  It's hard

10   to go from black to white and white to black

11   without getting some type of contamination.

12   It's impossible.

13      Q.      **You and other mixers sometimes in**

14   **the course of a shift have to go from black mix**

15   **to white mix, correct, that happens?**

16      A.      The policy is that you make all

17   your white mixes first and then go to black.

18   That's the standard.

19      Q.      **Isn't it also the practice that if**

20   **you are going to make white mix, that you made**

21   **it towards the end of the shift after you've**

22   **already cleaned the equipment and gotten the**

23   **black stuff off of the equipment?**

24      A.      No, most of it you do it before you

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 216

1    to have some black stuff left in the screen?

2         A.    Sometimes, yes.

3         Q.    How is it any different whether you

4    are making the white mix first or making the

5    white mix later in the shift after you've

6    cleaned the machine?

7         A.    It's not that much different.  The

8    first mix when you come from black to white or

9    vice versa, you are going to have some

10   contaminant in it.  Where like you said the

11   first pan that I made was contaminated and maybe

12   that one couldn't have been saved, but the

13   second one there wasn't that much in it.  That's

14   just it.

15        Q.    When you start off a shift and you

16   make a white mix at the beginning of your shift,

17   you can still have contamination from the night

18   before or the day before?

19        A.    It's possible.

20        Q.    Regardless of when you make the

21   white mix, you have to be sure the machine and

22   the equipment is very clean?

23              Before you make a white mix, you

24   have to be extra special careful to ensure that

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 217

1    you've cleaned the bowls, the paddles and the

2    screens and the conveyer, correct?

3        A.    Yes.

4      * Q.    And that applies whether you are

5    making a white mix at the end of your shift or

6    whether you are making it at the beginning of

7    your shift?

8      * A.    True.

9            MR. KERMAN:  Can we take a short

10       break?

11

12            (A recess was taken 2:34-2:40 p.m.)

13

14            MR. KERMAN:  Back on the record.

15       Can we have the last exchange read back?

16

17            * (Question and answer read)

18

19        Q.    (By Mr. Kerman)  When you make a

20    white mix, Mr. Briddell, when you used to work

21    as a mixer, would you look at the mix to make

22    sure it wasn't contaminated after it was put

23    into the pan or as it was being put into the

24    pan?

ROBERT M. BRIDDELL
February 15, 2005

Page 218

1       A.      Yeah.

2       Q.      You are supposed to visually see if

3   there's contamination?

4       A.      Yeah.

5       Q.      If you see any contamination, what

6   would you do?

7       A.      Probably call your supervisor and

8   show it to him.

9       Q.      Do you know who discovered the

10  contamination on the two white mixes that we are

11  talking about?

12      A.      No.

13      Q.      No?

14      A.      No.

15      Q.      If you are performing a job as a

16  mixer, you should try to discover the

17  contamination before sending the pan along,

18  correct?  You should try to discover the

19  contamination yourself before you send it on the

20  holding area?

21      A.      Yeah.

22      Q.      Do you know who was responsible for

23  discovering the contamination?

24      A.      No.

ROBERT M. BRIDDELL
February 15, 2005

Page 220

```
 1        A.     Right.
 2        Q.     Was anything else discussed at the
 3   termination meeting besides what you've
 4   testified to?
 5        A.     No, if I'd like to appeal with
 6   Steve Litwinowich.
 7        Q.     That you could appeal it?
 8        A.     Yeah.
 9        Q.     Did you appeal it?
10        A.     Yes.
11        Q.     What did you do to appeal it?
12        A.     I just appealed it.
13        Q.     How did you appeal it, did you
14   write a letter?
15        A.     No, I told the lady in charge of
16   Tom Oliver and there was a new plant manager
17   there at that time.  I don't know who he was.  I
18   think he just came in maybe a month or so before
19   or something.  I told them I would like to
20   appeal it and they said okay.
21        Q.     You said some lady you told, what
22   lady did you tell?
23        A.     She was in human resources. I don't
24   know who she was.
```

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 221

1      Q.      Did any kind of appeal happen?

2      A.      Yeah.

3      Q.      Tell me what happened?

4      A.      I don't know, maybe a week or so, I

5   don't know.  Some days later I recall I was told

6   to come to see Rick Zeena.

7      Q.      I'm sorry, who did you see?

8      A.      Not Rick Zeena, Steve Stockman.

9      Q.      Did you go to a meeting with Mr.

10  Stockman?

11     A.      Yes.

12     Q.      Tell me what happened at that

13  meeting?

14     A.      Nothing much.

15     Q.      Tell me what happened?

16     A.      All I recall is that I told him

17  that I was being terminated and that I'd just

18  like to keep my job.  I didn't have a year or so

19  to go before 62.  And that's it.  He made a

20  statement that he would get back to me, but he

21  told me that it's my policy not to overrule my

22  supervisor.  And that was it.

23     Q.      Do you remember anything else that

24  you or Mr. Stockman said that at this meeting?

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 222

```
 1        A.      That was it.
 2        Q.      Was anyone else present besides the
 3   two of you?
 4        A.      Mr. Stockman was there and then he
 5   walked in.
 6        Q.      Mr. Zeena?
 7        A.      Yeah.
 8        Q.      At the time you were planning to
 9   retire at age 62?
10        A.      Oh, yeah.
11        Q.      You only had another year to go?
12        A.      Yes.
13        Q.      Are you aware, Mr. Briddell, of
14   any other mixers at the company who made
15   overweight pans?
16        A.      No, not to my knowledge.
17        Q.      Are you aware of any other mixers
18   at the company who made contaminated mixes?
19        A.      Yeah, I've seen it happen.
20        Q.      You've seen contaminated mixes?
21        A.      Yes.
22        Q.      Did you know who was responsible
23   for making the contaminated mixes?
24        A.      I'm just saying some of the mixers.
```

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 229

1   case it would be a rework.  So where a slip

2   isn't signed, somebody messed it up and bring it

3   back and tell me I had to make another mix for.

4   If you looked at it and sometimes it wouldn't be

5   signed.

6        Q.     You are starting the process over

7   again, it was a rework?

8        A.     Right.

9        Q.     Were you ever in a situation where

10  the process has already started, things are

11  going along smoothly and then someone gets

12  something and it's not signed by the previous

13  person?

14       A.     I was a mixer, I couldn't do that.

15       Q.     You wouldn't see it after it left

16  you?

17       A.     I've seen them, but I had no

18  control over it.

19       Q.     When the rescreener got something

20  that you had mixed and it wasn't signed, it was

21  his job either to get you to sign it or go to

22  the supervisor and let the supervisor know?

23       A.     Yeah.

24       Q.     If you weren't there to ask you to

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 230

```
 1     go and sign it, the logical person to go to was

 2     to tell the supervisor about it, correct?

 3               If a rescreener got something from

 4     you and you hadn't signed off on the mixing slip

 5     and you are not there, the mixer is supposed to

 6     go to the supervisor and let the supervisor know

 7     about the situation, correct?

 8        A.     That's proper procedure.

 9        Q.     That's the proper procedure,

10     correct?

11        A.     Yes.

12        Q.     To your knowledge was that

13     followed?

14               If someone got something that

15     wasn't signed off or by the prior person and the

16     prior person was gone or not working, would they

17     go to their supervisor?

18        A.     Sometimes they wouldn't and

19     sometimes they would.

20        Q.     What would they do if they wouldn't

21     go to the supervisor?

22               MR. MEIKLEJOHN:  Objection to the

23        form.

24               THE WITNESS:  I don't know.
```

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 231

1      Q.      (By Mr. Kerman)  You have no idea,

2  is that right, you don't know what they would

3  do?

4      A.      No.

5      Q.      Do you know of any employee who on

6  at least several occasion failed to sign off on

7  mixing slips?

8      A.      No.

9      Q.      Do you know of any supervisors who

10  were aware of employees who didn't sign mixing

11  slips and overlooked it and did nothing to the

12  employee?

13      A.      I've heard of it.

14      Q.      Who have you heard of it from?

15      A.      I've heard it through the grapevine

16  quite often.

17      Q.      Who told you about that?

18      A.      Other employees have seen it.

19      Q.      What other employees have told you

20  that?

21      A.      You have employees, for example,

22  when I was on pot balls, you have employees when

23  everything starts in mixing down the line and

24  you look at a mix slip and you might have one or

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 232

1    two of these that somewhere up the line somebody

2    didn't sign it.

3         Q.    If someone didn't sign it, you

4    wouldn't know whether the supervisor was aware

5    of that or not?

6         A.    I don't know the supervisor.

7         Q.    Are you aware of any supervisors

8    letting employees fail to sign mix slips and not

9    doing anything about it?

10        A.    No, I'm not aware of it.

11        Q.    You are not aware of supervisors

12   tolerating the procedure of employees not

13   signing mix slips?

14        A.    I can't answer that question.

15        Q.    You are not aware?

16        A.    I can't answer that.  I don't know.

17        Q.    Based on your working in the plant

18   or anything that you've heard while you were

19   working at the plant, do you know of any mixers

20   who during a six-month period made overweight

21   pans, failed to sign off on mixing slips and

22   made contaminated mixes, are you aware of anyone

23   else who did that?

24        A.    I don't know what the other mixers

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 233

1    did.

2         Q.      You don't have any idea of anyone

3    doing those three things within a six-month

4    period?

5              MR. MEIKLEJOHN:  Objection.  It's

6         been asked and answered.

7              MR. KERMAN:  Could I have this

8         marked as Exhibit 13, please?

9

10             (Exhibit 13, MCAD Complaint,

11             marked)

12

13        Q.      (By Mr. Kerman)  Let me show you

14   what's been marked as Exhibit 13 which I'll

15   represent is a copy of the MCAD complaint and

16   then attached is a statement of Robert Briddell.

17             Can you just look at the statement

18   of Robert Briddell for the time being which is

19   the second and third page and tell me whether

20   that's your statement and your signature on the

21   last page of that document?

22        A.      The last page.

23        Q.      Yes.  Is that your signature?

24        A.      Yeah, that's my statement.

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 239

1      Q.      When you worked at Saint-Gobain,

2    were you aware of a Latino supervisor by the

3    name of Kially Ruiz, and that's K-I-A-L-L-Y,

4    R-U-I-Z?

5      A.      Yes, I remember him.

6      Q.      He was a supervisor, correct?

7      A.      Yeah.

8      Q.      And he was Latino, correct?

9      A.      Yes.

10     Q.      He was promoted to a supervisor?

11     A.      No.

12     Q.      What do you mean no?

13     A.      No, N-O.

14     Q.      He's been a supervisor for a period

15    of time at the company?

16     A.      He came from Brownsville to show

17    him how to do the job and boom, he left, he was

18    there for a couple months.

19     Q.      But he was a supervisor, correct?

20     A.      He was a supervisor.

21     Q.      Are you aware of any minorities at

22    the company who were rejected from supervisory

23    jobs that they applied for?

24     A.      I know one, yeah.  Jimmy, what's

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 240

1    his last name, Jim Bailey.

2         Q.      He was black, he applied to be a

3    supervisor?

4         A.      Right.

5         Q.      When was that, do you know?

6         A.      About 1998, '99.

7         Q.      Was he rejected?

8         A.      Yeah.

9         Q.      Do you know who was hired for that

10   job?

11        A.      They didn't.  Yeah, they put

12   someone Caucasian in there.

13        Q.      Do you know the name of the person

14   who got the job?

15        A.      No, I don't.

16        Q.      You don't know whether Bailey was

17   more qualified or less qualified?

18        A.      He was a supervisor at another

19   plant before he came and he put in for the job

20   and him, myself, we talked with Jane, she was

21   the vice president at the time, she was vice

22   president.  And no Afro-Americans being

23   supervision and this man had put in for it and

24   et cetera and we were wondering why they didn't

ROBERT M. BRIDDELL
February 15, 2005

Page 241

1    consider him.

2        Q.      What were you told?

3        A.      We were told at that point they

4    want to give him group leader and he refused to

5    take the group leader.

6        Q.      You don't know who actually got the

7    supervisor job that he bid on, correct?

8        A.      No.

9        Q.      You don't know what the

10   qualifications of that person was?

11       A.      No.

12       Q.      Do you know any other minorities

13   who were rejected for supervisory jobs that they

14   applied for at Saint-Gobain?

15       A.      No, I don't know of any that were

16   rejected, I don't.

17       Q.      Could you look at paragraph number

18   four on the first page?

19              It says, "on several occasions, I

20   have pointed out to high level management the

21   lack of minorities involved in supervising the

22   production work force."

23              It says you've made this point to

24   Steve Stockman and Rick Zeena, when did you

ROBERT M. BRIDDELL
February 15, 2005

Page 242

1    speak to Mr. Stockman about this?

2        A.    I don't know, maybe a couple months

3    or so after he took over Jane's job as vice

4    president.

5        Q.    **When was that, what's the year on**

6    **that?**

7        A.    It had to be the year 2000.

8        Q.    **Around the year 2000?**

9        A.    Yeah, he took a year before.  Yeah,

10   or maybe somewhere in 2000, I guess.  I don't

11   know.  I don't know.

12       Q.    **'99 or 2000?**

13       A.    Yes, that's when he came onboard.

14       Q.    **You spoke to him about the lack of**

15   **minorities is supervision?**

16       A.    I spoke to him as well as the

17   previous vice president and human resources.  I

18   spoke to both of them.

19       Q.    **Who was the previous vice**

20   **president?**

21       A.    Jane and Mary Fitzgerald.

22       Q.    **Mary Fitzpatrick.**

23       A.    Mary Fitzpatrick, yeah.

24       Q.    **Let me ask you about Steve**

ROBERT M. BRIDDELL
February 15, 2005

Page 243

1   Stockman, was this a one-on-one meeting that you

2   had with Stockman?

3        A.    Yes.

4        Q.    Where did it take place?

5        A.    It took place in the work area.  He

6   was just coming onboard, he was going to walk

7   around and ask all the employees what he thought

8   needed to be changed within the system.

9        Q.    He spoke to you?

10       A.    Yeah.

11       Q.    Tell me what you said to him and

12  what he said to you?

13       A.    I thought that it was time there

14  should be some minorities in management.  It's

15  been over 10 years since they got rid of all

16  the Afro-Americans and they haven't replaced

17  any.

18       Q.    When you say all the

19  African-Americans, are you speaking about your

20  wife and John Vasseur?

21       A.    All over Greendale and

22  Northborough.

23       Q.    Besides your wife and John Vasseur,

24  were there any other African-Americans you're

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 244

1    saying that --

2          A.    I speak for all the Afro-Americans

3    they got rid it of.

4          Q.    Do you know of anyone else except

5    Vasseur and your ex-wife that was in supervision

6    that was a minority?

7          A.    Ron Texaire.

8          Q.    Right, but wasn't he still there

9    when Stockman became vice president?

10         A.    Yeah, he was still there.

11         Q.    The only two they got rid of,

12   according to you, were Vasseur and your ex-wife?

13         A.    Yes.

14         Q.    And they both took early retirement

15   packages?

16         A.    Yeah.

17         Q.    What did Mr. Stockman say in

18   response to you?

19         A.    He had just came onboard and he had

20   other things to take care and he'd get back to

21   me later.

22         Q.    Did you ever speak to him again

23   about the lack of minorities in supervising the

24   production work force, was that the only other

ROBERT M. BRIDDELL
February 15, 2005

Page 246

1       A.      No.

2           Q.      Paragraph four says you also spoke

3   to Richard Zeena?

4       A.      Right.

5           Q.      When did you see Mr. Zeena?

6       A.      Somewhere in that same time frame.

7           Q.      How did you happen to speak to Mr.

8   Zeena?

9       A.      One day I was on the line and I

10  don't know, we had a conversation and I spoke to

11  him about the same thing and I also told him

12  that the company was prejudice.

13          Q.      Tell me as best you recall, this

14  was just you and him in the plant on the floor?

15      A.      Right.

16          Q.      Tell me as best you remember what

17  you said to Mr. Zeena and what he said to you in

18  that conversation?

19      A.      That was it.

20          Q.      Tell me what was said, just repeat

21  it for me as best you remember, what you said to

22  him and what he said to you?

23      A.      I don't know what brought the

24  conversation up.  We were there and I really

ROBERT M. BRIDDELL
February 15, 2005

Page 247

1   don't know what I said to him.  That the company

2   was, I thought the company was prejudice because

3   they didn't have a black in supervision and I

4   told him they are prejudice.  He told me to

5   prove it.  And that was it.

6        Q.    You said you thought the company

7   was prejudice because there were no blacks in

8   supervision?

9        A.    In supervision.

10       Q.    What was his response?

11       A.    He just said prove it.

12       Q.    That's all he said?

13       A.    No.

14       Q.    Did you say anything further to

15   him?

16       A.    No.

17       Q.    Did you ever have any further

18   conversations at any time with Mr. Zeena with

19   the lack of minority in supervision?

20       A.    No.

21       Q.    Was this conversation with Mr.

22   Zeena that's referred to in paragraph four, was

23   this before the union organizing drive?

24       A.    It had to be during the organized

ROBERT M. BRIDDELL
February 15, 2005

Page 249

1      A.      No.

2      Q.      To your knowledge, did anyone at

3   Saint-Gobain find out that you had spoken up at

4   this meeting at the Belmont Street School to

5   talk about the lack of opportunity for

6   minorities at Saint-Gobain?

7      A.      I don't think so, no.

8      Q.      To your knowledge no one ever found

9   out that you had spoken up about this topic at

10  the Belmont Street School?

11     A.      No.

12     Q.      You didn't tell anyone that you had

13  done that?

14     A.      No.

15     Q.      Can you read paragraph seven?

16     A.      (Witness complying)

17     Q.      This is during the campaign which

18  ended with a vote in support of the union in

19  August 2002, that should be August of 2001,

20  correct?

21          I think that's a typo.  Shouldn't

22  that be August 2001?

23          MR. MEIKLEJOHN:  I'll stipulate to

24     that, if you want.

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 251

1   union was bad." Do you know where in Africa

2   these employees were from, do you know what

3   country or area they came from?

4       A.    Ghana, they were from Ghana.

5       Q.    Do you know what shift they worked

6   on?

7       A.    First, second, third shift.

8       Q.    They worked on all different

9   shifts?

10      A.    Yes.

11      Q.    How did you find out that the

12  company held separate meetings?

13      A.    One of the Africans told me about

14  it.

15      Q.    Some African employee --

16      A.    One of the Africans, we spoke about

17  it to each other.

18      Q.    He mentioned it to you that he went

19  to a separate meeting?

20      A.    He mentioned to me before they went

21  to the meeting, he mentioned to me about it.

22      Q.    What did he say to about it?

23      A.    That the company was trying to get

24  all the guys from Ghana, he said they wanted to

ROBERT M. BRIDDELL
February 15, 2005

Page 254

1    are going to vote anyway.

2        Q.    Do you know who conducted the

3    meeting for these employees?

4        A.    No.

5        Q.    You don't know what was discussed

6    at the meeting?

7        A.    No.

8        Q.    Did these African employees also go

9    to any other meetings in which there was

10   discussion about the union that the company

11   held?

12       A.    When the company called for

13   employees to go to a meeting, they had to go.

14       Q.    These African employees who went to

15   this meeting, they weren't excluded from other

16   meetings?

17       A.    No, but we were excluded from

18   their's.

19       Q.    You were excluded from their

20   meeting, but these African employees got to go

21   to the regular meetings with the company

22   employees?

23       A.    True.

24       Q.    They just got to go to an

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 255

1    additional meeting, correct?  Instead of going

2    to all the meetings that you and all the white

3    employees went to, they got to go to a second

4    meeting, correct?

5         A.    No, I don't know.

6         Q.    The company held meetings for big

7    groups of employees during the union situation,

8    correct?

9         A.    The company always had one meeting

10   for all employees at all times.  But they had

11   one for the Africans that was unknown.

12        Q.    These African employees also got to

13   go to the regular meeting, correct, that you

14   went to?

15        A.    Yeah.

16        Q.    You were excluded from their

17   meeting, but they weren't excluded from any

18   meetings with white employees, correct?

19        A.    Not to my knowledge, no.

20        Q.    Why did you think this practice

21   was segregation?

22        A.    It was segregated.

23        Q.    In what way?

24        A.    We were all Norton employees and

ROBERT M. BRIDDELL
February 15, 2005

Page 256

1    if Norton called all the employees, they should

2    call all to meet.  Not just the Africans, not

3    just the Jews, not just the Polish, not just the

4    Gentiles, we are all Norton employees and that's

5    the way we should have been treated.  In other

6    words, if you didn't, you were segregated,

7    that's what segregation is to me.

8         Q.     How many meetings were there for

9    these African employees?

10        A.     I have no idea.

11        Q.     Was it more that one?

12        A.     I don't know.

13        Q.     It says that you pointed this out

14   to Dennis Baker, senior human resources manager

15   in some meeting, this is also in paragraph

16   eight?

17        A.     Yes, I did.

18        Q.     Was this a one-or-one meeting or a

19   group meeting?

20        A.     Group meeting.

21        Q.     What did you say to Mr. Baker about

22   this?

23        A.     I said what gave them the authority

24   to segregate the Africans and from all the rest

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 257

1  of the Norton employees.  It took us 150 years

2  to get rid of segregation and they are trying to

3  bring it back in two days.

4        Q.     What did Mr. Baker say in response?

5  I got what you said to Mr. Baker at this

6  meeting.

7               What did Mr. Baker say to you at

8  this meeting?

9        A.     He didn't say anything to me.

10       Q.     You said to Mr. Baker that you

11 fought 150 years to end segregation and it was

12 was wrong for these people from Africa --

13       A.     For segregation.

14       Q.     It was wrong for segregation.  What

15 did he say?

16       A.     He didn't say anything.

17       Q.     He said nothing?

18       A.     No one said anything.  Rick Zeena

19 said a statement.

20       Q.     I'm asking about Mr. Baker?

21       A.     And that was it, no one said

22 anything.

23       Q.     He didn't responsd to you?

24       A.     No.

ROBERT M. BRIDDELL
February 15, 2005

Page 258

1    Q.    It says here in number eight that

2    you also made this point to Jeff Clark, did you

3    speak to Jeff Clark about this segregation

4    meeting?

5    A.    No, I had spoken with him about

6    discrimination early, not about the meeting.

7    Q.    It says, "I also said to Jeff

8    Clark, supervisor, and to Zeena in conversations

9    in the plant, that I believed that the company

10   was practicing segregation by separating out the

11   Africans," do you see that statement?

12   A.    Yes, I did.

13   Q.    Did you speak to Mr. Clark about

14   the special meeting?

15   A.    I didn't speak to him, I didn't

16   speak to him about it.  I mentioned it.  I

17   didn't speak to him about it.

18   Q.    What did you say to him?

19   A.    He didn't say nothing.

20   Q.    What did you say to him?

21   A.    I just said it was unfair, it was

22   wrong.

23   Q.    He didn't say anything?

24   A.    He looked at me like I was --

**ROBERT M. BRIDDELL**
**February 15, 2005**

Page 263

1        I, ELISABETH ZAHARIADIS, a Notary Public

2    in and for the Commonwealth of Massachusetts, do

3    hereby certify that ROBERT M. BRIDDELL appeared

4    before me, satisfactorily identified himself, on

5    the 15th day of February, 2005, at Worcester,

6    Massachusetts, and was by me duly sworn to

7    testify to the truth and nothing but the truth

8    as to his knowledge touching and concerning the

9    matters in controversy in this cause; that he

10   was thereupon examined upon his oath and said

11   examination reduced to writing by me; and that

12   the statement is a true record of the testimony

13   given by the witness, to the best of my

14   knowledge and ability.

15       I, further certify that I am not a

16   relative or employee of counsel/attorney for any

17   of the parties, nor a relative or employee of

18   such parties, nor am I financially interested in

19   the outcome of the action.

20       WITNESS MY HAND this 15th day of March,

21   2005.

22

23   Elisabeth Zahariadis      My Commission expires:

24   Notary Public             October 28, 2005

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

CONFIDENTIAL

## NORTON COMPANY
*Written Reminder*

Name: _Robert Braidell_     Dept.: _Thru Watt Metrymold_     Clock No.: _326_     Date: _3-6-84_

You are being given this written reminder for the following reason(s):

_Not following Standard Procedures, Performing unsafe Act causing injury to Another Employee._

Any further violations of Company Policy/Procedures will be cause for a written warning.

_____
Foreman (Supervisor)

_____
Employee

Noted:
_____
Supt./Dept. Head

This written reminder will be retained by the Employee's Supervisor.

LM 566-A

EXHIBIT
BRAIDELL #2
2/15/05
E7

−1482−



EXHIBIT

BRIDDELL #3
2/15/05        EZ

TO ROBERT BRIDDELL FILE;                          5/6/94


TODAY WE ARE ISSUING BOB A WRITTEN REMINDER FOR NOT FOLLOWING
THE STANDARD PROCEDURES, AND PREFORMING AN UNSAFE ACT CAUSING
INJURY TO ANOTHER EMPLOYEE IN THE MIXING DEPARTMENT. ON
5/5/94 BOB MADE 7 MIXES FOR CHECK NUMBER H645862. THE SCALE
AT THE 2-BOWL AUTOMATICALLY SHUTS OFF WHEN A MIX PAN REACHES
35 POUNDS. UNDER NORMAL CONDITIONS AFTER THE SHAKER STOPS THE
MIX PAN USUALLY ENDS UP WITH AN AVERAGE OF 45 POUNDS IN IT
WHICH IS ACCEPTABLE IN THE MIXING DEPARTMENT .BOB HAD
NEGLETED TO REMOVE THE MIX PAN FROM UNDER THE SHAKER WHICH
ALLOWED AN ADDITIONAL 41.5 POUNDS TO GO INTO THE PAN. THIS
PAN ENDED UP WEIGHING 86.5 POUNDS WHICH IS UNACCEPTABLE
BECAUSE IT CAN CAUSE INJURY. THEREFORE ON 5/5/94 WHILE STEVE
ALLEN WAS RESCREENING HE CAME ACROSS A PAN ON THE BOTTOM OF A
PILE OF 5 THAT WEIGHED 86.5 POUNDS. STEVE WAS UNAWARE THAT
THE PAN HAD WEIGHED 86.5 POUNDS AND WHEN HE LIFTED IT HE FELT
A SHARP PAIN IN HIS BACK. STEVE WAS TREATED AT THE NORTON
CLINIC AND THEN SENT TO ST. VINCENTS HOSPITAL FOR A MORE
THOROUGH EXAMINATION. AS A RESULT STEVE HAS A SEVERE BACK
STRAIN AND IS UNABLE TO RETURN TO WORK UNTIL HIS CONDITION
GETS BETTER.  STEVES NEXT CLINIC VISIT IS MONDAY 5/9/94.
    AT THIS TIME WE ARE ALSO REVIEWING WITH BOB THE NORTON
POLICY ON WHAT IT MEANS TO BE ON A WRITTEN REMINDER AND WHAT
WILL FOLLOW SHOULD ANOTHER INCIDENT OCCUR THAT DOES NOT
COMPLY WITH NORTON COMPANY PROCEDURES.


MICHAEL J. TIVNAN        _Michael J. Tivnan_ ......... 5/6/94

KEVIN MAGUIRE            _Kevin J. Maguire_ 5/6/94

ROBERT BRIDDELL          . . . . . . . . . . . . . . . . . . .


BOB DECLINED to SIGN
_Michael J. Tivnan_

DEF00269

EXHIBIT

BRIDDELL # 4
2/15/05  EZ

CONFIDENTIAL

NORTON COMPANY
Notice of Warning/Suspension

Name: _Robert Briddell_  Dept.: _This was Mishandled_ Clock No.: _0326_  Date: _5/3/94_

You are hereby reprimanded for the following reason(s):

_Not following Standard Procedures and Performing an Unsafe Act_

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____
You will report back to work on _____

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____ Supervisor

_____
Department Head

_Bob Checknick To sign_
_____ Employee

I have read this warning notice

NOTE: Copy should be forwarded directly to Employee Relations Administrator. Original should be routed as indicated.

Would you like information regarding
the Employee Assistance Program?

| Noted: | Manager | Gen. Mgr./Vice Pres. | HR-Manager | Employment Dept. |
|--------|---------|----------------------|------------|------------------|
|        |         |                      |            |                  |

FORM 4450 Rev. 6/82

DEF00262

EXHIBIT

BRIDDELL #5
2/15/05    EZ

8/3/94

TO ROBERT BRIDDELL FILE:

TODAY WE ARE ISSUING BOB A WRITTEN WARNING FOR NOT FOLLOWING
STANDARD OPERATING PROCEDURES, AND PERFORMING AN UNSAFE ACT
IN THE MIXING DEPARTMENT. FRIDAY NIGHT  JULY 29, 1994 BOB
MADE 3 MIXES ON CHECK # E719623. THE SCALE AT THE 2BOWL MIXER
AUTOMATICALLY SHUTS OFF WHEN THE MIX PAN REACHES 35 LBS.
UNDER NORMAL CONDITIONS AFTER THE SHAKER STOPS, THE MIX PAN
USUALLY ENDS  UP WITH AN AVERAGE OF 45 POUNDS IN IT WHICH IS
ACCEPTABLE IN THE MIXING DEPARTMENT. ON SATURDAY MORNING JULY
30, 1994 WHILE STEVE ALLEN WAS  RESCREENING, HE WAS ASIDING A
MIX PAN ( WHICH BOB HAD MIXED) AND NOTICED THAT THE PAN WAS
HEAVIER THAN IT SUPPOSE TO BE. WITH CAUTION, STEVE ALLEN
REMOVED THE PAN OF MIX FROM THE MIX CART WHICH WEIGHED 75.5
POUNDS, AND IS UNACCEPTABLE IN THE MIXING DEPARTMENT.
    AT THIS TIME WE ARE ALSO REVIEWING WITH BOB THE NORTON
POLICY FOR A WRITTEN WARNING. IT HAS BEEN EXPLAINED TO BOB
THAT IF ANOTHER VIOLATION OF NORTON POLICY OCCURRS WITHIN THE
NEXT TWELVE MONTHS MAY RESULT IN TERMINATION.

MICHAEL J. TIVNAN          _[signature]_ 8/3/94

KEVIN MAGUIRE              _[signature]_ 8/3/94

ROBERT BRIDDELL           . . . . . . . . . . . . . . . . . . . .

_Bob Declined to sign_ [signature]

DEF00263



To: Bob Briddell's file
From: John Lesnansky, Core-Line supervisor
Date: July 26, 2000
Subject: Written Reminder

Bob Briddell is being issued a Written Reminder for unacceptable QUALITY performance on the High Speed Facer while working in the core-line truing area.

Along with the Written Reminder for Quality, Bob is hereby and regretfully informed he will no longer be operating the High Speed Facer.

As such, Bob will lose his band four pay band and will be subject to receiving a pay band that accompanies any available job opportunity.

He has been counseled about his unacceptable job performance on the High Speed Facer that has resulted in the costly reworking and rejection of product.

DEF00294



EXHIBIT
_BRIDDELL #7_
_2/15/05_     E2

**CONFIDENTIAL**

### NORTON COMPANY
#### *Written Reminder*

Date: _9/20/01_

Name: _Robert Briddell_  Dept.: _Core mix & roll_  Clock No.: _938 1102_

You are being given this written reminder for the following reason(s):

_Not following Standard Procedures, Performing unsafe acts, exceeding weight limit of 45 lbs per mix pan._

Any further violations of Company Policy/Procedures will be cause for a written warning.

_Robert m Briddell_
        Employee

Would you like information regarding
the Employee Assistance Program? _____

_William Tromen_
        Supervisor

Noted: _Francis H. Quinn_
        Department Head

This written reminder will be retained by the Employee's Supervisor.

FORM 6831

EXHIBIT
BLODDELL #8
2/15/05    EZ

# Mixing & Molding Rules

1. Filled mix pans, or plastic mix buckets, should not be more than 45lbs.

2. Filled mix pans are to be stacked at a maximum of 5 high.

3. When banging mix pans do not bring them below your knees or above your shoulders.

4. Use pusher when removing large wheels from 15 & 17 press in Gang 3.

5. Do not attempt to get glass off of the top shelves without high rise fork truck training.

6. Do not leave mix trucks in aisles.

7. Do not walk away from a press when the turntable is spinning.

8. No standing on mix trucks.

9. Do not let go of an empty moving mix truck.

10. Do not put spreaders on the floor.

11. You must wear all PPE'S in mixing and bond batch areas.

13



NORTON

Plant 8

Safety Rules and Guidelines

SAFETY FIRST

DEF00039

EXHIBIT
BRIDDELL # 9
2/65/05    EZ

CONFIDENTIAL

**NORTON COMPANY**
*Notice of Warning/Suspension*

FOR ABRASIVES
PERSONNEL ONLY

RECEIVED
OCT 15 2001

Name: _Robert Briddell_    Business Unit: _Worcester_    Date: _10/4/01_    Badge No.: 9381/02 / 326

You are hereby reprimanded for the following reason(s):

_Not Following Proper Operating Procedures_

This warning is accompanied by a suspension of _____ days beginning _____ and ending _____

You will report back to work on _____

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_Thomas H Clark_                              _Bill Brown_
Department Head                              Supervisor

Robert Briddell
_Refused To Sign_
Employee

I have read this warning notice                Would you like information regarding
                                               the Employee Assistance Program?

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| Noted: | | | |
|--------|--|--|--|
| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |
| | 10/9/01 | 9 OCT 2001 | |

FORM 6951 Rev. 10/20/97



To Bob Briddell's File
From Jeff Clark & Bill Tivnan
Date 10/4/01
Subject Written Warning


On 9/18 /01 Bob was spoken to about mix excessive mix weight in pans (safety), During W/E 9/22/01, Jeff Clark was receiving complaints from the re-screener that mix pan from Bob are over weight, This resulted in a written reminder on 9/20/01. The written reminder was written up not following standard procedures. The same day it was reported that there were pans weighing more than the allowable limits. After reviewing mix documents, it was discovered Bob Briddell had made the mixes approximately three hours after he signed the written reminder. (Bob repeated the same Safety procedure violation.)

In the past two weeks it has been reported to various Supervisors that Bob has not been following proper procedures. Bob has had some quality issues along with not following proper ISO Standards. He also has not been using the CON-CAM quality system. Both of these systems have been installed to improve quality along with traceability.


Bob has continued to disregard the proper operating procedures of ISO and CON-CAM. These violations of Company Policy/Procedures are cause for a Written Warning.

Any further violations of any Company Rules or Accepted Standards of Conduct during a Written Warning period may result in employee discharge.


Shift Supervisor                                  Department Superyisor

Bill Tivnan                                           Jeff Clark


Bob Refused to sign Warning form. # 6951

Witness


DEF00131

EXHIBIT

BRIDDELL #11
2/15/05  EZ

**CONFIDENTIAL**

RECEIVED
OCT 15 2001

# NORTON COMPANY
*Notice of Warning/Suspension*

FOR ABRASIVES
PERSONNEL ONLY

Name: ROBERT BRIDDELL    Business Unit: WOR    Date: 10/9/01    Badge No.:

You are hereby reprimanded for the following reason(s): (Documentation on Routing, Signing)

Not following Proper Operating Procedures

This warning is accompanied by a suspension of __3__ days beginning 10/9/01 and ending 10/12/01

You will report back to work on 10/15/01

We shall consider any further disciplinary action as sufficient cause for your immediate dismissal.

_____ 10/9/01
Department Head

_____ BLM
Supervisor

I have read this warning notice x BOB BRIDDELL REFUSED to Sign
Employee

BOB REFUSED Also

(PE) Would you like information regarding
the Employee Assistance Program?  NO

NOTE: White copy should be forwarded to Human Resources, yellow copy to supervisor, pink copy to employee.

| Noted: | | | |
|---|---|---|---|
| 10/9/01 | 10/10/01 | Tech 2001 | |
| Manager | Gen. Mgr./Vice Pres. | HR-Manager | Human Resources Dept. |

FORM 6951  Rev. 10/30/97

REDACTED



SAINT-GOBAIN
ABRASIVES



EXHIBIT
BRIDDELL #12
2/15/05    EZ

January 4, 2002

To:    Robert Briddell
From:  Rick Zeena, HR Manager, Bonded Abrasives

Mr. Briddell:

The purpose of this memo is to review the quality and safety concerns that have occurred over the past few months.

On September 18, 2001, you had a conversation with your supervisor, Bill Tivnan, regarding the weight of the mix in the pans. Bill informed you that there have been some mix pans that weighed more than the limit of 45 pounds. As you are aware, the Plant 8 Safety Rules and Guidelines limits the weight of the mix pans at 45 pounds. As you know from your 1994 discipline for this same incident, filling mix pans to a weight greater than 45 pounds can lead to personal injury.

On September 20, 2001, despite your conversation with Bill Tivnan on September 18, regarding overweight mix pans, you exceeded the 45-pound limit on several mix pans for 3 different orders. As a result, you were placed on a written reminder for not following standard procedures by exceeding the weight limit in the mix pans.

On October 4, 2001, you were placed on a written warning for not following proper operating procedures. This involved not following proper ISO standards by not signing the mix slips and by not using the COM CAM quality system. At this point, you were informed that any further violations of company procedures involving your job could result in your discharge from the company. As you know, our quality systems call for accurate reporting of all manufacturing operations. It is important that all employees follow proper procedures regarding documentation of mix slips, MO routings and COM CAM reporting in order to ensure consistent quality product for our customers.

On October 9, 2001, you were placed on a 3-day suspension and your written warning was extended by five days for not following proper operating procedures by not signing the mix slips once again. At that time, we discussed that you had been counseled the previous week for the same violation.

DEF00153

Saint-Gobain Abrasives • One New Bond Street • Box Number 15008 • Worcester, MA 01615-0008
Telephone 508-795-5000 • Fax 508-795-2828

Upon your return from your suspension, you again failed to sign off on a mix slip on October 18, 2001. Although you were not disciplined, your pattern of failing to not follow company procedure appears to be continuing.

On January 3, 2002, you were notified by Bill Tivnan that the previous evening that you had made a mix that weighed in excess of 68 pounds.

You need to understand the importance of following company procedures with respect to both safety and quality. You have exhibited a pattern of failing to do so, which has resulted in progressive discipline. Please understand that your failure to follow company procedures with respect to safety and/or quality, two areas the company takes quite seriously, or in any other area, will likely result in the termination of your employment.

Sincerely,

Richard J. Zeena
Manager, Human Resources
Saint-Gobain Abrasives

DEF00154

FEDERAL LOCAL AGENCY   NOTARY etc (see item 7 on reverse)   P. 05
□ EEOC  16CA300467

## Massachusetts Commission Against Discrimination

*(State or local Agency, if any)*   and EEOC

NAME *(Indicate Mr., Mrs., or Ms.)*
Mr. Robert M. Bridell

STREET ADDRESS | CITY, STATE AND ZIP CODE | HOME TELEPHONE NO. *(Include Area Code)*
4 Marlston Way, Worcester, MA  01609 | | (508) 797-3939

COUNTY
Worcester

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE,
STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

NAME
Saint Gobain Abrasives, Inc.

NO. OF EMPLOYEES/MEMBERS
more than 25

TELEPHONE NUMBER *(Include Area Code)*
(508) 795-5000

STREET ADDRESS | CITY, STATE AND ZIP CODE
One New Bond Street     Worcester, MA  01615-0008

NAME

STREET ADDRESS | TELEPHONE NUMBER *(Include Area Code)*

| CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*
☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION
☐ AGE   ☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ OTHER *(specify)*

DATE MOST RECENT OR CONTINUING
DISCRIMINATION TOOK PLACE
*(Month, day, year)*
February 6, 2002

THE PARTICULARS ARE *(If additional space is needed, attached extra sheet(s))*:

The Particulars of this charge of discrimination are set forth in my complaint
number _____ which I filed with the Massachusetts Commission on Human
Rights and Opportunities on November 21, 2002 which is attached hereto and
incorporated as if fully set forth herein.

**RECEIVED**

NOV 2 2 2002

Commission Against
Discrimination
Springfield Office

☒ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone
number and I will cooperate fully with them in the processing
of my charge in accordance with their procedures.
I declare under penalty of perjury that the foregoing is true
and correct.

NOTARY — When necessary to meet State and Local Requirements)
I swear or affirm that I have read the above charge and that it
is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(Day, month, and year)*
21-11-2002

Date 11-21-2002
EEOC FORM 5  MAR 81

Charging Party *(Signature)*

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

EXHIBIT
BRIDELL #13
2/15/05    EZ

## STATEMENT OF ROBERT BRIDDELL

1.  I was hired by the Norton Company in April 1995 as a material handler. The Norton Company was acquired by Saint Gobain in about 1991, and I remained employed along with the rest of the production and maintenance employees until I was fired on February 6, 2002. Throughout my employment, I was an hourly production and maintenance worker in the Bonded and Superabrasives Division.

2.  At the time Saint Gobain acquired the Norton Company, a few African-American employees had begun to move into positions involving the supervision of production and maintenance employees in the Bonded and Superabrasives Divisions. At least three African-Americans, John Vasseur, Cynthia Caruthers Bridell and Ron Texaire, were supervisors. They left their supervisory positions soon after Saint-Gobain acquired the business. There have been no blacks, Latinos or other persons of color promoted or hired to supervise production and maintenance employees since then.

3.  Today, there are approximately 40 persons with responsibility to supervise production and maintenance employees in the Bonded and Superabrasives Divisions. Upon information and belief, all 40 of these individuals are white. These white individuals are responsible for directing a production and maintenance work force which contains about 100 persons of color, including, among others, more than 50 blacks.

4.  On several occasions, I have pointed out to high level management the lack of minorities involved in supervising the production work force. I have made this point to Stephen Stockman, Vice President for Bonded Abrasives, North America, and Richard Zeena, Human Resources Manager.

5.  During 2000 or 2001, a meeting was held by the Worcester commission against discrimination at the Balmont Street School to talk about race relations issues in the City. I spoke up about the lack of promotional opportunities for minorities at Saint Gobain.

6.  During the summer of 2001, I became involved in a Union organizing drive in support of the United Automobile Workers. One of the things that I did to support the Union was to try to explain to the other black workers about the connection between the Union movement and the Civil Rights movement, and that unionizing is a way to ensure that everyone, including minorities, is treated fairly.

7.  During that campaign, which ended with a vote in support of the Union in August, 2002, I spoke with Stockman and Zeena about how minorities were treated unfairly at Saint Gobain and denied opportunities for promotion.

8.  Also during the summer of 2001, the Company held separate meetings for employees from Africa to tell them that the Union was bad. During two of the Company's meetings that I attended, I stood up and said that, by separating the workers from Africa, the Company was practicing segregation, and that we had fought for more than 100 years to end segregation. I made this point to Dennis Baker, Senior Human Resources Manager, in one of those meetings. I also said to Jeff Clark, supervisor, and to Zeena, in conversations in the plant, that I believed that the Company was practicing segregation by separating out the Africans. Zeena became very angry when I made that accusation.

9.  Soon after the Union campaign ended, I began to get warnings for making mistakes, and I was terminated in February 2002 for making mistakes. I do not believe that my work had become worse than it had been for the previous 16 years. The mistakes they disciplined me for involved forgetting to sign paperwork and errors in weighing and mixing. Other employees also make errors in the job, and have not been terminated.

10. I believe that the Company began to watch my work carefully and to look for reasons to discipline and terminate me because I had spoken up about the discrimination still practiced at Saint Gobain and because I had made the connection between organizing and racial justice.

ROBERT M. BRIDDELL

Date:    Nov. 21. 0002