# EXHIBIT B

Page 267

1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                   NO:   04-40146-FDS

4

5      * * * * * * * * * * * * * * * * * * * * * * * * * * * *

6      ROBERT M. BRIDDELL,                    *

7           Plaintiff,                        *

8      v.                                     *

9      SAINT-GOBAIN ABRASIVES, INC.,          *

10          Defendant.                        *

11     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12

13

14                    DEPOSITION OF:

15          ROBERT M. BRIDDELL (VOLUME II)

16        CATUOGNO COURT REPORTING SERVICES

17                  446 Main Street

18             Worcester, Massachusetts

19          June 3, 2005        9:15 a.m.

20

21

22                    Sonya Lopes

23           Certified Shorthand Reporter

24

ROBERT M. BRIDDELL, VOLUME II
**June 3, 2005**

Page 274

1   that right?

2         A.      Yes.

3         Q.        How would you describe the

4   relationship you had with Mr. Oliver when you

5   were at Saint-Gobain?

6         A.      Good.

7         Q.      Good?

8         A.      Yeah.

9         Q.      Do you feel Mr. Oliver

10  discriminated against you because you were black?

11        A.      No.

12        Q.        You also described -- in the first

13  day of your deposition, Mr. Briddell, we talked

14  somewhat about Mike Tivnan; correct?

15                MR. KERMAN:  T-i-v-n-a-n.

16        Q.      (By Mr. Kerman)  He was your

17  supervisor before you went into the truing job;

18  is that correct?

19        A.      Yes.

20        Q.        And then after you came back to the

21  mixer job in 2000 when you left the truing

22  position, did Mike Tivnan continue to be your

23  supervisor?

24        A.      Yes.

ROBERT M. BRIDDELL, VOLUME II
**June 3, 2005**

Page 286

1      A.      No.

2      Q.      Who was the one who first told you

3   it was contaminated?

4      A.      Rick Zeena.

5      Q.      Rick Zeena?

6      A.      Yeah.

7      Q.      How would you describe your

8   relationship with Mr. Zeena when you were at

9   Saint-Gobain?

10     A.      He was just like the rest of the

11  employees and management, you know.  They were

12  hostile, if that's what you wanted to know.

13     Q.      You feel he was hostile towards

14  you?

15     A.      I think he was hostile towards a

16  lot of employees.

17     Q.      Back and white employees?

18     A.      Yes.

19     Q.      Do you have a -- did you ever feel

20  he was hostile to you because you were black?

21     A.      I don't know.  I made the statement

22  that it was prejudice going on in the plant, and

23  he told me to prove it.  I figured that's hostile

24  right there.  Instead of bring me to human

ROBERT M. BRIDDELL, VOLUME II
June 3, 2005

Page 303

1   meeting against the black.  Whether they were

2   African, they were black.

3       Q.      Just so it's clear, from the first

4   day of your deposition, you referred to a

5   separate meeting that was held for employees from

6   Africa; correct?

7       A.      Right.  Right.

8       Q.      And those employees from Africa

9   also went to the regular meetings that you went

10  to; correct?

11      A.      Yeah.

12      Q.      And you're saying -- do you believe

13  Mr. Baker was responsible for setting up the

14  separate meeting for the African employees?

15      A.      Management responsible.  Who called

16  the shots?  I don't know.

17      Q.      So you don't know whether that was

18  Baker's decision or someone else in management;

19  is that correct?

20      A.      He was the top honcho.  Everything

21  that went down was his decision.

22      Q.      That's your opinion.

23      A.      No.

24      Q.      But --

ROBERT M. BRIDDELL, VOLUME II
**June 3, 2005**

Page 317

1      Q.      Did you ever see employees use a

2  scoop at Saint-Gobain?

3      A.      Yeah.  Scoop bond out of one mix to

4  another mix area.

5      Q.      I'm sorry?

6      A.      Scoop bond out of the --

7      Q.      Why would you use a scoop as

8  opposed to just dumping something into another

9  mix?

10     A.      Because we didn't need that whole

11 container of bond.  So we just take a scoop,

12 scoop what we needed.

13     Q.      And with regard to this overweight

14 TMS pans -- you're familiar with the issue of the

15 overweight TMS pans?

16     A.      Familiar with it how?

17     Q.      Well, what's on Exhibit 15, you're

18 familiar with the fact that there was some pans

19 from the TMS press that were -- weighed 70

20 pounds?

21     A.      I don't know where they were from.

22 I'm familiar with the mix.  Where it came from, I

23 have no idea.

24     Q.      If employees needed to blend the

ROBERT M. BRIDDELL, VOLUME II
June 3, 2005

Page 319

1   4 pounds.  You have to blend it in at least a mix

2   at a time.

3        Q.      But you don't know anything about

4   how the TMS mixes work; correct?

5        A.      Beg your pardon?

6        Q.      You weren't familiar with the TMS

7   press and how the mixes worked; correct?

8        A.      No.

9        Q.      That wasn't your area.  You didn't

10  deal with the TMS press; correct?

11       A.      No more than making mixes.

12       Q.      You didn't deal with the TMS press;

13  correct?

14       A.      No.

15       Q.      Is Mr. Novia still employed at the

16  company?

17       A.      He was when I left.

18       Q.      Since you were terminated, have you

19  ever spoken to Mr. Novia?

20       A.      No.

21              MR. KERMAN:  Let me have this

22         marked as the next exhibit.

23

24              (Exhibit 16, letter, marked)

ROBERT M. BRIDDELL, VOLUME II
June 3, 2005

Page 320

1        Q.        (By Mr. Kerman)  Let me show you,

2    Mr. Briddell, what's been marked as Exhibit 16

3    which is a two-page document.  Again, we received

4    this from your attorneys.  But it is also dated

5    May 6, 2004, from the U.S. Equal Employment

6    Opportunity Commission.  And if you want to just

7    take a minute to review the document to tell me

8    if you've seen it before.

9                Okay.  This document, Exhibit 16

10   from the U.S. Equal Employment Commission, have

11   you seen this before, Mr. Briddell?

12       A.        Yeah.  I think I have, yeah.

13       Q.        And the EEOC investigated your

14   complaint of discrimination, found no evidence of

15   discrimination; is that correct?

16                MR. MEIKLEJOHN:  Objection.

17       Q.        (By Mr. Kerman)  You can answer.

18       A.        I don't know.

19       Q.        But you realize that they ruled

20   against you, correct?

21       A.        I realize they ruled against me.

22       Q.        Now, on the second page of this

23   document, the second paragraph of this on the

24   second page talks about how you went from a --

ROBERT M. BRIDDELL, VOLUME II
**June 3, 2005**

Page 331

1    majority of them can be and have been.

2        Q.    But you don't know who got the job

3    rather than Mr. Bailey; is that correct?

4        A.    No.  I don't know who got it.

5        Q.    And you don't know what

6    Mr. Bailey's seniority was versus the person who

7    got the job; correct?

8        A.    No.

9        Q.    Did you work directly with

10   Mr. Bailey?

11       A.    We worked in the same department.

12       Q.    Were you able to judge his job

13   performance personally?

14       A.    I wasn't able to judge.  Only one I

15   was able to judge was my own.

16       Q.    You couldn't judge Mr. Bailey's job

17   performance; correct?

18       A.    No.  I had no reason to judge his

19   job performance.

20       Q.    Do you know what job Mr. Bailey

21   held when he tried to get this supervisor

22   position?  What job was he in when he bid on the

23   job?

24       A.    I don't recall what the job -- what

ROBERT M. BRIDDELL, VOLUME II
June 3, 2005

Page 332

1    he was doing at the time.

2         Q.      Now, Mr. Briddell, is it your

3    belief that you were disciplined and discharged

4    by the company because they were discriminating

5    against you because you were black?

6         A.      I think it was because of my union

7    activities.

8         Q.      Do you have any belief that any

9    managers at the company retaliated against you

10   because you were complaining about how the

11   company treated black employees?

12        A.      Would you say that again?

13        Q.      Yes.  Do you believe any managers

14   at the company retaliated against you because you

15   complained about the treatment of black

16   employees?

17        A.      I think it -- I think it was my

18   union activities plus my -- I don't I mean my way

19   -- yeah.  My way of thinking.  Yeah.

20        Q.      What do you mean your way of

21   thinking?

22        A.      That I was outspoken about a lot of

23   things that were going on.

24        Q.      And that outspokenness included a

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

ROBERT M. BRIDDELL, VOLUME II
# June 3, 2005

Page 386

1              I, SONYA LOPES, a Notary Public in

2       and for the Commonwealth of Massachusetts, do

3       hereby certify that ROBERT M. BRIDDELL appeared

4       before me, satisfactorily identified himself, on

5       the 3rd day of June, 2005, at the offices of

6       CATUOGNO COURT REPORTING SERVICES, 446 Main

7       Street, Worcester, Massachusetts, and was by me

8       duly sworn to testify to the truth and nothing but

9       the truth as to his knowledge touching and

10      concerning the matters in controversy in this

11      cause; that he was thereupon examined upon his

12      oath and said examination reduced to writing by

13      me; and that the statement is a true record of the

14      testimony given by the witness, to the best of my

15      knowledge and ability.

16              I further certify that I am not a

17      relative or employee of counsel/attorney for

18      any of the parties, nor a relative or employee

19      of such parties, nor am I financially

20      interested in the outcome of the action.

21              WITNESS MY HAND this 9th day of

22      June 2005.

23      Sonya Lopes          My Commission expires:

24      Notary Public        March 31, 2006



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Boston Area Office

John F. Kennedy Federal Building
Government Center
Fourth Floor, Room 475

Anthony Linsk
Federal Investigator
(617) 565-2297
(800) 669-4000
alinsk@eeoc.gov

MAY 5 - 2004

Boston, MA 02203
(617) 565-3200
TTY (617) 565-3204
FAX (617) 565-3196

Mr. Robert Bridell
4 Martston Way
Worcester, MA 01609

Charge Number: 16C-2003-00467
Bridell v. St. Gobain Abrsaives

Dear Mr. Bridell:

The EEOC has concluded its inquiry into your allegations of discrimination. Under the Equal Employment Opportunity Commission's (EEOC) charge prioritization procedures, we focus our resources only on those charges that are most likely to result in findings of violations of the statutes we enforce. In accordance with these procedures, the EEOC has evaluated this charge based on the evidence that you and the Respondent provided. The evidence fails to indicate that a violation of the law occurred and it is not likely that additional investigation will result in our finding of a violation.
You alleged you were discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended. You alleged when the Respondent acquired Norton Company a few African American employees in Supervisory positions left the company. You also alleged that upon belief 40 employees with responsibility to supervise production and maintenance employees in the Bonded and Superabraisives Divisions were White. Furthermore, you alleged that these individuals were responsible for directing a production and maintenance work force which contains about 100 persons of color, including about 50 Black employees. In your charge of discrimination, you claim you pointed this out to management (Vice-President for Bonded Abrasives, North America and Richard Zeena, Human Resources Manager) sometime in 2000.

You also alleged in 2000 or 2001, a meeting was held by the Worcester Commission Against Discrimination in which you spoke about the lack of promotional opportunities for minorities at Saint Gobain Abrasives. Furthermore, in your charge you stated in the Summer of 2001 you became involved in a union organizing drive in support of the United Automobile Workers. You stated one of the things you did was to explain to other Black workers about the connection between the Union Movement and the Civil Rights Movement and that unionizing was a way to ensure that everyone would be treated fairly. During this campaigning which ended with a vote in support of the union in August 2002 (according to your charge) you alleged you spoke with Mr. Stockman and Mr. Zeena about how minorities were treated unfairly and denied opportunities for promotion. Soon after the campaign ended you alleged that you began to get warnings for making mistakes and were terminated in February of 2002 (which you believe to be pretextual). You believe you were held to a higher standard than other employees for complaining about the discrimination in addition to your participating in the union organizing activities.

It should first be noted that you already filed a case with the National Labor Relations Board (NLRB) alleging discharge do to your union activity. This is important to note as the Commission does not have jurisdiction over this issue. Unfortunately, the NLRB dismissed your case with lack of probable cause. With respect to your issues regarding race and retaliation, the Commission does have jurisdiction over these issues and looked at all of the evidence.



EXHIBIT

Briddell 16
04/03/05 JL

It is important to note that a Charging Party has an obligation to meet certain "criteria" when filing a charge of discrimination with respect to race. First, the Charging Party was in a protected group (Black); Second, the Charging Party was qualified for the job at issue and was performing his job at a satisfactory level; Third, the Charging Party was discharged or otherwise disciplined. Lastly, the Charging Party was replaced by someone outside the protected class (however this is not always a required element). When looking first element, you clearly meet the first criteria. You also meet the third criteria. The last criteria is not relevant in this particular case. However, with respect to the second element, the evidence does not support you were performing your job in a satisfactory manner.

The evidence assembled by the Commission indicated that you had began your employment in 1985 as a Material Handler. By 2000, you had held the title of Band 4 job of truing operator for about one year. The Band 4 job is the Respondent highest band within your department. On July 30, 2000 you were demoted to a Band 3 Mixer and received a reduction in pay of $0.75, from $17.25 per hour to $16.50 per hour. The evidence indicated that you declined additional training that was offered to you by the Respondent and thereby essentially opted by default to stay in the truing operator position. This was confirmed by a July 15, 2000 email from Chris Chanis to John Lesnansky, William Deeds and Richard Zeena. In the email you were asked in May 2000 if you wanted further training which you declined. As a Band 3 Mixer, you had intermittent bouts of quality problems during your tenure. These issues prompted formal and informal counseling, as well as more serious corrective measures.

The evidence of record indicated you did not adhere to more serious warnings as your performance started to "snowball" in 2001. On October 4, 2001, you received a written warning which included the strong admonition that any further incidents would "be sufficient cause for immediate termination." Despite this serious warning, less than four days later, you were again warned of ignoring Respondent's procedures. However, the Respondent did not terminate you as it could have as per the last "write-up." The Respondent gave you another opportunity and were given an additional intermediate disciplinary step-another warning accompanied by a three day suspension. Even after this, your performance continued to decline with two more incidents, the more serious being the contamination of product on January 30, 2002. When comparing your discipline to other similarly situated employees, it should be noted that the issue of whether or not you were treated more harshly than other White employees was looked at. The following White employees were disciplined for the same performance issues as you: Kevin Reed, Frank Hanson, Jim Constantine, Tom Patnode, Ron Racca Russ Johnson. Furthermore, the following White employees were terminated for disciplinary reasons: Larry Stidsen, Gary Egan, Kevin Moulton, Joseph Wilson, Francis Zawlich, Stephen Gelardi, and Michael Thibault. In addition, other employees, unlike you have been terminated without receiving progressive discipline.

Give the Respondent's answer to the charge, even though you disagree with it, it is unlikely that the EEOC would find a violation if it invested additional resources. Thus, the investigation has concluded. Your Determination/Notice of Right to Sue in enclosed. The Determination is final. If you wish to pursue this charge, you may file in Federal District Court within ninety (90) days of receipt of the enclosed Notice of Right to Sue. Otherwise, your right to sue will be lost.

Sincerely,

Anthony Linsk
Federal Investigator

# EXHIBIT C

**JAMES BAILEY, VOLUME I**
**July 14, 2005**

ORIGINAL

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4            C.A. No: 4:04 CV 40146 (FDS)

5    **********************************

6    ROBERT BRIDDELL,                    *

7                    Plaintiff          *

8    vs.                                 *

9    SAINT GOBAIN ABRASIVES, INC.,       *

10                   Defendant           *

11   **********************************

12                   VOLUME I

13        DEPOSITION OF:  JAMES BAILEY

14      CATUOGNO COURT REPORTING SERVICES

15              446 Main Street

16          Worcester, Massachusetts

17         July 14, 2005  12:37 p.m.

18

19

20

21              GAYLE OHMAN

22      CERTIFIED SHORTHAND REPORTER

23                #1353S94

24   APPEARANCES:

**JAMES BAILEY, VOLUME I**
**July 14, 2005**

Page 87

1    Q.    It's possible then isn't it that

2    when you got an MO on the first shift that was

3    not signed by a mixer that could have been a

4    third shift mixer who didn't sign it rather than

5    a first shift mixer; is that right?

6    A.    It could have been.

7    Q.    Did you ever have any conversations

8    with anybody about the fact that Mr. Briddell

9    apparently was not signing MO's?

10    MS. KELLY:  Objection to form.  You

11    can answer.

12    THE WITNESS:  I didn't have a

13    conversation with anybody, but rumors had

14    it that Bob wasn't signing checks and that

15    they were going to write him up or

16    something if he didn't stop.

17    Q.    (By Mr. Tully)  So you heard rumors

18    to that effect?

19    A.    Well, there was talk.

20    Q.    Do you recall by whom, who told you

21    that?

22    A.    Regular guys were talking about

23    it.  You hear talk in the locker room, in the

24    lunchroom.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JAMES BAILEY, VOLUME I**
**July 14, 2005**

                                                    Page 88

1        Q.      But you never discussed that

2    directly with Mr. Briddell?

3        A.      With Mr. Briddell -- we had a

4    conversation about that.

5        Q.      When was that?

6        A.      I don't know exactly what day or

7    what year it was, but it was during the time

8    that he was employed there.

9        Q.      How many conversations did you have

10   with him about that issue?

11       A.      Maybe one or two.

12       Q.      What do you recall talking about?

13       A.      We were talking about that a couple

14   of guys were saying he wasn't signing checks,

15   and they called him in the office and they were

16   going to write him up and all this other stuff.

17       Q.      That's what he told you?

18       A.      That's what the conversation was

19   about.

20       Q.      Did Mr. Briddell ever deny that he

21   failed to sign checks?

22              MS. KELLY:  Objection to form.

23              THE WITNESS:  No, he never denied

24       anything.

**JAMES BAILEY, VOLUME I**
**July 14, 2005**

Page 89

1    Q.    (By Mr. Tully)  Did Mr. Briddell

2  tell you who it was that was talking to him

3  about his failure to sign the MO's?

4              MS. KELLY:  Object to the form.

5              THE WITNESS:  Not that I can

6        recall.

7    Q.    (By Mr. Tully)  Do you know today

8  who at Norton or Saint-Gobain has ever spoken to

9  Mr. Briddell about his failure to sign the MO's?

10    A.    No, I don't know who spoke to him

11  about it.  But I heard that there was a couple

12  of guys that would just -- because Mr. Briddell

13  was with the union that there was a couple of

14  guys who wasn't with the union who was just

15  looking for something to do to Mr. Briddell just

16  to get him in trouble.

17              You know, instead of if a guy makes

18  a mistake instead of telling him hey, you made a

19  mistake they would run to the supervisor, and

20  they would say hey, this guy did this, this guy

21  did that.  Then the supervisor would take

22  whatever action he had to take I guess.

23    Q.    Did Mr. Briddell ever say anything

24  to you about why he felt he was being singled

**JAMES BAILEY, VOLUME I**
**July 14, 2005**

Page 103

1    Q.    Sure, absolutely.

2    A.    There was a work list up for

3 volunteers to work on Saturday.  I had put my

4 name down.  And me and another guy was talking

5 and I told him I don't think I want to work

6 Saturday.

7         So I went to the group leader, who

8 was Don Strom, and I talked to Don -- could you

9 take my name off the list because I don't want

10 to be there.  He said I don't think I can do

11 that.  I said why not, everybody else can do it.

12        He said well, let me tell Jeff

13 Clark.  So he goes and tells Jeff Clark.  Jeff

14 Clark comes to me.  I was standing at the time

15 clock waiting to punch out.  He said Jim, you

16 can't take your name off the list because I need

17 you to work Saturday.

18        And I said Jim, why can't I?

19 Everybody else does, why can't I do it?  He said

20 no, you got to be here, and you got to be here

21 Saturday.  I said Jeff, you know, I feel like

22 I'm being discriminated against.  He said what?

23 What did you say?  Come with me, come with me.

24        Goes into the office and I tell

JAMES BAILEY, VOLUME I
July 14, 2005

Page 104

1    Steve Batwinavich exactly what happened, and

2    Steve just tried to calm me down and that was

3    the end of that.

4         Q.    So how was it left between you and

5    Jeff Clark?

6              MS. KELLY:  Objection to form.

7              THE WITNESS:  Jeff -- we shook

8         hands.  He said I didn't know you felt

9         like that and stuff like that.  That was

10        it.

11        Q.    (By Mr. Tully)  After that point in

12   time did you have any other issues with Jeff

13   Clark?

14        A.    Well, there was a time --

15        Q.    Discrimination.

16        A.    No, but there was a time I was

17   working with another kid named Jimmy Ward.  Mr.

18   Ward would come into work intoxicated.  I would

19   tell Mr. Ward look, you're going to hurt

20   somebody, go somewhere -- you should go

21   somewhere and hide until you sober up or

22   something.  He was a white guy.

23              Then he started doing it

24   constantly.  So then I went to Jeff Clark and I

JAMES BAILEY, VOLUME I
July 14, 2005

Page 207

1          I, GAYLE OHMAN, a Notary Public in and for

2     the Commonwealth of Massachusetts, do hereby

3     certify that JAMES BAILEY, appeared before me,

4     satisfactorily identified himself, on the 14th

5     day of July, 2005, who was by me duly sworn to

6     testify to the truth and nothing but the truth

7     as to his knowledge touching and concerning the

8     matters in controversy in this cause; that he

9     was thereupon examined upon his oath and said

10    examination reduced to writing by me; and that

11    the statement is a true record of the testimony

12    given by the witness, to the best of my

13    knowledge and ability.

14          I further certify that I am not a relative

15    or employee of counsel/attorney for any of the

16    parties, nor a relative or employee of such

17    parties, nor am I financially interested in the

18    outcome of the action.

19          WITNESS MY HAND this 20th day of July,

20    2005.

21

22    Gayle Ohman              My Commission expires:

23    Notary Public            October 25, 2007

24

# EXHIBIT D

ORIGINAL

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3             C.A. NO.:  4:04CV40146 (FDS)

4

5

6      ******************************

7      ROBERT BRIDDELL,              *

8         Plaintiff                  *

9         vs.                        *

10     SAINT GOBAIN ABRASIVES, INC., *

11        Defendant                  *

12     ******************************

13

14

15                   VOLUME II

16          DEPOSITION OF:  JAMES BAILEY

17       CATUOGNO COURT REPORTING SERVICES

18               446 Main Street

19            Worcester, Massachusetts

20           January 26, 2006  1:45 p.m.

21

22

23              Kristen M. Edwards

24                Court Reporter

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 5

1      A.      Yes, it has.

2      Q.      **What is your current position?**

3      A.      I am a third shift supervisor.

4      Q.      **How did you get that position?**

5      A.      I wanted the job there.

6      Q.      **When did you bid for that job?**

7      A.      It was in October.  About the

8  beginning of October, they put the bid up.

9      Q.      **When were you told that you would**

10 **receive the job?**

11     A.      Almost the end of December right

12 before Christmas.

13     Q.      **Do you know who else bid for the**

14 **job, if anyone?**

15     A.      No.  There was other people that bid

16 but I don't know everybody's names because they

17 had people from the outside also.  I don't know

18 everybody who bid on it.

19     Q.      **Do you know some people who bid on**

20 **it; do you know the identity of some people who**

21 **bid?**

22     A.      I know one person.  Dennis Drake.

23 He bid on it.

24     Q.      **Do you know what his race is?**

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 6

1    A.    He is Caucasian.

2    Q.    Now, if I correctly recall your

3    testimony from the first day, you were asked by,

4    and tell me if I am getting this wrong, that you

5    were asked by Charlie Hefalfinger to fill in for

6    Lenny Darren at the last job?

7    A.    Yes, I was.

8    Q.    Why would you have to fill in for

9    Lenny; what was his status?

10    MR. TULLY:  Objection.  You can

11    answer.

12    A.    Lenny was going out on disability.

13    Q.    (By Ms. Kelly)  At the time did you

14    ever talk to Lenny about him going out on

15    disability?

16    A.    He would talk about just filling in,

17    you know.  He would tell me he was going out.

18    Q.    Did he tell you anything about

19    whether or not he expected to be back?

20    A.    No.  He didn't say he was expecting

21    to be back.

22    Q.    Did Charlie tell you anything about

23    the pay when he offered you the job?

24    A.    No.  He didn't tell me about the

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 37

1      Q.    You said that at least in that case

2 you did complain or you did suggest you were being

3 treated differently, correct?

4           MS. KELLY:  Object to form.  You can

5      answer.

6      A.    Yes.

7      Q.    (By Mr. Tully)  And in that case,

8 once you made that complaint, you and Mr. Clark

9 did discuss it?

10          MS. KELLY:  Object to the form.

11     A.    Yes.

12     Q.    (By Mr. Tully)  And you and he

13 resolved the issue; is that right?

14     A.    Yes.

15     Q.    Was it resolved to your

16 satisfaction?

17          MS. KELLY:  Object.

18     A.    Yes.

19     Q.    (By Mr. Tully)  On the situation you

20 said with Mr. Ward, is that his name Ward, the one

21 you thought was reporting to work intoxicated?

22     A.    Yes.

23     Q.    The first day of your deposition you

24 said he had done that on numerous occasions,

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 48

1          Did he ever look into whether or not

2    you were being treated differently than other

3    employees who were allowed to take their names

4    off?

5          A.    No, not to my knowledge.

6          Q.    Did you ever discuss why you were

7    being treated differently from other employees who

8    were allowed to take their names off the list?

9          A.    No.

10          Q.    You said in response to questions

11    that it was resolved to your satisfaction.  What

12    was resolved to your satisfaction?

13          A.    That he was aware of how I felt.  I

14    figured that from there forward it probably

15    wouldn't happen again because we talked it out.

16    He said he was sorry that he didn't know I felt

17    like that.  He really needed me to work that day.

18          Q.    Did you end up having to work that

19    day?

20          A.    Yes, I did.

21          Q.    Did the other employees end up

22    having to work that day?

23                MR. TULLY:  Objection.

24          Q.    (By Ms. Kelly)  You can answer.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 51

1          FURTHER EXAMINATION BY MR. TULLY:

2

3          Q.      I want to go back on the issue of

4    your conversation with Mr. Clark.  Ms. Kelly just

5    asked you if the others were permitted to work

6    that day and you said yes.  Can you tell me who

7    the others were you were referring to?

8          A.      No.  It was supposed to be about

9    eight people working, but only four of us came

10   that day.

11         Q.      Do you know the names of any of the

12   four who did not?

13         A.      No, I don't.

14         Q.      Now, after you had this discussion,

15   you said you thought things had been resolved to

16   your satisfaction.  That you assumed that now that

17   Mr. Clark knew how you felt.  That it wouldn't be

18   a problem in the future.  Was it, in fact, ever a

19   problem in the future?

20         A.      Not that I remember with Mr. Clark.

21         Q.      The issue of Mr. Ward drinking, I

22   believe when I asked you if he had ever admitted

23   or when you first testified about him admitting

24   that he drank you did not say though that he ever

**JAMES BAILEY, VOLUME II**
**January 26, 2006**

Page 53

1      I, KRISTEN M. EDWARDS, a Notary Public, do

2   hereby certify that JAMES BAILEY appeared before

3   me, satisfactorily identified themself, on the 26th

4   day of January, 2006 at Catuogno Court Reporting

5   Services, 446 Main Street, Worcester, Massachusetts,

6   and was by me duly sworn to testify to the truth and

7   nothing but the truth as to his knowledge touching

8   and concerning the matters in controversy in this

9   cause; that the deponent was thereupon examined

10   upon his oath, and said examination reduced to

11   writing by me; and that the statement is a true

12   record of the testimony given by the deponent, to

13   the best of my knowledge and ability.

14      I, further certify that I am not a relative

15   or employee of counsel or attorney for any of the

16   parties, nor a relative or employee of such parties,

17   nor financially interested in the outcome of the

18   action.

19      WITNESS MY HAND this 28th day of February,

20   2006.

21

22

23   Kristen M. Edwards          My Commission expires:

24   Notary Public               May 18, 2008

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT E

Case 4:04-cv-40146-FDS    Document 36-4    Filed 04/03/2006    Page 31 of 53

ORIGINAL

Page 1

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3                      Civil Action No.:

4                   4:04 CV 40146 (FDS)

5

6    *********************************

7    ROBERT BRIDDELL,                    *

8                 Plaintiff             *

9    vs.                                 *

10   SAINT-GOBAIN ABRASIVES, INC.,       *

11              Defendant               *

12   *********************************

13        DEPOSITION OF:  CYNTHIA CARRUTHERS

14      CATUOGNO COURT REPORTING SERVICES

15              446 Main Street

16          Worcester, Massachusetts

17          July 14, 2005  9:00 a.m.

18

19

20              GAYLE OHMAN

21      CERTIFIED SHORTHAND REPORTER

22                 #1353S94

23

24

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 24

1        A.        Okay, you're familiar.  I was

2    commercial customer service rep.  And that was

3    it until November of 2001 someone set the place

4    on fire.  That was the end of me working there.

5    I no longer wanted to work full time, and the

6    next thing I did was July last year, 2004.  I

7    started doing volunteer work with Alzheimer's

8    and that's what I do now.

9        Q.        **Who is that with?**

10       A.        Age Center of Worcester, 799 West

11   Boylston Street.  That's the headquarters.

12       Q.        **Miss Carruthers, how long did you**

13   **work at Norton/Saint-Gobain?**

14       A.        Total would have been 17 years; the

15   total.  Started there in -- went there in '61 --

16   I think it was 61 -- got pregnant, left, and

17   didn't go back until I think it was '70 -- I

18   think '74.  And in the meantime I worked at a

19   bank, Worcester County National, but -- yeah, so

20   it was a total of 17.  I don't know if '74 to 91

21   I don't know how many years that is right not.

22       Q.        **Pretty close.**

23            MS. KELLY:  Seventeen years.

24       Q.        **(By Mr. Tully)**  So I was going to

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 29

1      Q.      I was going to ask you if you can

2   tell me the circumstances of why you left

3   Norton's/Saint-Gobain, what happened?

4      A.      That was it.  Oh, well, five years

5   on reception.  Mind you I was a foreman and all

6   this and that and used to doing a lot, and took

7   that to me like a sabbatical being a

8   receptionist having a lot of fun, meeting a lot

9   of people.  After five years you kind of burn

10  out anyway, and being that we weren't the

11  marriage wasn't going that great I thought maybe

12  if I retired and, you know, spent time at home.

13  So...

14     Q.      Did the company have some sort of

15  early retirement program?

16     A.      Yeah, they gave me the -- yup, tin

17  parachute they call it.  Yup, yup.

18     Q.      Looking for the gold, got the tin

19  right?

20     A.      Yup.  I was able to get out of

21  there because they changed my -- you made me

22  remember -- instead of reception the person at

23  that desk would have to be a secretary as well

24  so that would be that word processing and all

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 38

1   employment at Norton Saint-Gobain, Miss

2   Carruthers, did you ever complain to anybody

3   there internally that you felt that you in any

4   way had been treated unfairly or discriminated

5   against?

6           MS. KELLY:  Objection to form.  You

7       can answer.

8           THE WITNESS:  No.

9       Q.      (By Mr. Tully)  Did you ever feel

10  that way?

11          MS. KELLY:  Object to form.  You

12      can answer.

13          THE WITNESS:  No.

14      Q.      (By Mr. Tully)  Are you aware that

15  your ex-husband, Mr. Briddell, is suing the

16  company for race discrimination?

17      A.      Yes.

18      Q.      Leaving your ex-husband to the side

19  for a moment, are you aware of any other

20  employees or former employees of Norton who

21  complained either formally or informally of race

22  discrimination?

23          MS. KELLY:  Objection to form.  You

24      can answer.

CYNTHIA CARRUTHERS
July 14, 2005

Page 39

1              THE WITNESS:  No.

2        Q.      (By Mr. Tully)  During the period

3    of time that you worked at the company did you

4    ever observe any conduct that you thought was

5    racially insensitive?

6              MS. KELLY:  Object to the form.

7        You can answer.

8              THE WITNESS:  No.

9        Q.      (By Mr. Tully)  When did you first

10   learn that Mr. Briddell was complaining about

11   what he thought was discrimination?

12             MS. KELLY:  Objection to form.

13             THE WITNESS:  Off the top of my

14        head, and I don't know what year it was or

15        anything, he had applied for a job.  I

16        think he was tired of mixing or wanted a

17        change, and this job that he wanted they

18        -- they, whoever they are, the powers to

19        be -- told him he had to take a math test.

20        And as far as I know no one ever had to

21        take a test when they applied for whatever

22        the job was, which I can't remember at

23        this time.  And that's the first time I

24        heard, you know, about probably because he

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 56

1      Q.      Do you recall when that was?

2      A.      No.  I do not have a date, no.

3      Q.      Do you recall what he told you?

4      A.      Yeah.  I think they let him go --

5    it had something to do with coupons maybe, or,

6    again, the way the work was done, something

7    about the mixing which in talking with him just

8    hearing his side it sounded kind of like they

9    just wanted to get rid of you because you're a

10   big mouth for the union.

11             But I can't really remember now.

12   Something to do with the way he was doing

13   something with the coupons or whatever.

14      Q.      And had your ex-husband, Mr.

15   Briddell, been a vocal supporter of the union to

16   your knowledge?

17             MS. KELLY:  Objection to form.  You

18        can answer.

19             THE WITNESS:  Yes.

20      Q.      (By Mr. Tully)  Did you know any

21   one else at Norton or Saint-Gobain who did the

22   same job that Mr. Briddell did?

23      A.      Know 'em to speak to but not like

24   no, he knows me and we know each other to speak

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 75

1    seeing that blacks were not -- you know,

2    maybe I'm blind to things, maybe I see

3    things through rose colored glass because

4    I never experienced it.

5         But he's out there, and yeah, Ron

6    Texeira was the only higher level black or

7    person of color.  The numbers; so based on

8    the numbers I would say there's a certain

9    amount -- there's discrimination

10    everywhere no matter where you go either

11    women or black.  We run against it, it's

12    there, it's alive and it's well.  So I

13    would tend to more believe it than not

14    believe it.

15         I don't know what else to say other

16    than that, the numbers speak for

17    themselves.

18    **Q.    (By Mr. Tully)  Did you ever**

19 **observe any conduct directed to Mr. Briddell**

20 **that you thought was discrimination?**

21         MS. KELLY:  Objection, asked and

22    answered.  You can answer it again.

23         THE WITNESS:  No.

24    **Q.    (By Mr. Tully)  And then in terms**

**CYNTHIA CARRUTHERS**
**July 14, 2005**

Page 78

1       I, GAYLE OHMAN, a Notary Public in and for

2   the Commonwealth of Massachusetts, do hereby

3   certify that CYNTHIA CARRUTHERS appeared before

4   me, satisfactorily identified herself, on the

5   14th day of July, 2005, and was by me duly sworn

6   to testify to the truth and nothing but the

7   truth as to her knowledge touching and

8   concerning the matters in controversy in this

9   cause; that he was thereupon examined upon her

10  oath and said examination reduced to writing by

11  me; and that the statement is a true record of

12  the testimony given by the witness, to the best

13  of my knowledge and ability.

14       I further certify that I am not a relative

15  or employee of counsel/attorney for any of the

16  parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19       WITNESS MY HAND this 11th day of August,

20  2005.

21  *Gayle Ohman*

22  Gayle Ohman              My Commission expires:

23  Notary Public            October 25, 2007

24

# EXHIBIT F

**ERIC LEBEAU**
**July 21, 2005**

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                        Civil Action No.:

4                        4:04 CV 40146 (FDS)

5

6      * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

7      ROBERT BRIDDELL,                        *

8                        Plaintiff             *

9      vs.                                     *

10     SAINT-GOBAIN ABRASIVES, INC.,           *

11                      Defendant              *

12     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

13          DEPOSITION OF:  ERIC LEBEAU

14        CATUOGNO COURT REPORTING SERVICES

15                446 Main Street

16            Worcester, Massachusetts

17          July 21, 2005  11:20 a.m.

18

19

20

21                GAYLE OHMAN

22        CERTIFIED SHORTHAND REPORTER

23                #1353S94

24

ERIC LEBEAU
July 21, 2005

Page 18

1    issues?

2                    MS. KELLY:  Object to the form.

3                    THE WITNESS:  No.

4        Q.      (By Mr. Tully)  Did you hear about

5    any other issues with Mr. Briddell's performance

6    other than the heavy pans?

7        A.      No.

8        Q.      Do you have any recollection of

9    Mr. Briddell ever complaining about unfair

10   treatment, him being treated unfairly?

11       A.      No.

12       Q.      Mr. Briddell ever say to you that

13   he felt he was being discriminated against

14   because of his race?

15       A.      No.

16       Q.      Did you ever hear Mr. Briddell make

17   that claim to anybody in the facility?

18       A.      No.

19       Q.      Did you observe any conduct

20   directed to Mr. Briddell that you felt was

21   discriminatory on the basis of his race?

22                    MS. KELLY:  Objection to form.

23       Q.      (By Mr. Tully)  You have to answer

24   audibly.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**ERIC LEBEAU**
**July 21, 2005**

Page 19

1          A.      No.

2          Q.      How about any other employees, did

3    you ever observe anything in the workplace that

4    you felt was racially insensitive, or racially

5    discriminatory?

6               MS. KELLY:   Objection to form.  You

7          can answer.

8               THE WITNESS:  Not with like

9          supervision with employee, but employees

10         with employees, yeah, it goes on.

11         Q.      (By Mr. Tully)  What is it you

12   recall observing?

13         A.      Just language, you know, derogatory

14   statements.

15         Q.      But not by supervisors; correct?

16         A.      No, not by supervisors, no.

17         Q.      On those occasions where you may

18   have heard derogatory statements they made did

19   you alert any member of management?

20         A.      No.

21         Q.      And Mr. Briddell never brought

22   anything like that to your attention did he?

23              MS. KELLY:   Objection to form.

24              THE WITNESS:  No, because like

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**ERIC LEBEAU**
**July 21, 2005**

Page 35

1    limit where it was common sense to simply scoop

2    some out; is that correct?

3        A.    Correct.

4        Q.    What are you talking about?  Is

5    that something on your line?

6        A.    No, that's like I said that would

7    be throughout the whole plant, you know, in the

8    mixing department.

9        Q.    So in the mixing department should

10   somebody have been able to tell just by looking

11   at the pan if it was over the weight limit

12   substantially?

13       A.    You should be able to.

14       Q.    So, for example, anything in the 60

15   to 70-pound range you should be able to tell by

16   looking at the pan; correct?

17       A.    Absolutely.

18       Q.    Now, to the extent that you may

19   have had some excess mix in a pan you said that

20   you might not put 5 pounds of mix in a separate

21   pan; right?

22       A.    Correct.

23       Q.    What happened to that excess?

24       A.    It goes in with the one that had 45

ERIC LEBEAU
July 21, 2005

Page 55

1        I, GAYLE OHMAN, a Notary Public in and for

2    the Commonwealth of Massachusetts, do hereby

3    certify that ERIC LEBEAU, appeared before me,

4    satisfactorily identified himself, on the 21st

5    day of July, 2005, who was by me duly sworn to

6    testify to the truth and nothing but the truth

7    as to his knowledge touching and concerning the

8    matters in controversy in this cause; that he

9    was thereupon examined upon his oath and said

10   examination reduced to writing by me; and that

11   the statement is a true record of the testimony

12   given by the witness, to the best of my

13   knowledge and ability.

14       I further certify that I am not a relative

15   or employee of counsel/attorney for any of the

16   parties, nor a relative or employee of such

17   parties, nor am I financially interested in the

18   outcome of the action.

19       WITNESS MY HAND this 14th day of August,

20   2005.

21

22   Gayle Ohman                My Commission expires:

23   Notary Public              October 25, 2007

24

# EXHIBIT G



Page 1

1         UNITED STATES DISTRICT COURT

2         DISTRICT OF MASSACHUSETTS

3                    Civil Action No.:

4                    4:04 CV 40146 (FDS)

5

6     **********************************

7     ROBERT BRIDDELL,                    *

8                    Plaintiff            *

9     vs.                                 *

10    SAINT-GOBAIN ABRASIVES, INC.,       *

11                   Defendant            *

12    **********************************

13

14         DEPOSITION OF:  JOSEPH MCTERNAN

15    CATUOGNO COURT REPORTING SERVICES

16              446 Main Street

17         Worcester, Massachusetts

18         July 21, 2005  1:00 p.m.

19

20

21              GAYLE OHMAN

22    CERTIFIED SHORTHAND REPORTER

23              #1353S94

24

**JOSEPH MCTERNAN**
**July 21, 2005**

Page 13

1   might be going on and stuff at meetings and

2   stuff.  I told him I thought it was unfair.

3        Q.    **What is it you asked him about?**

4        A.    Well, how it was going, and what

5   steps are they doing and stuff.

6        Q.    **And what did he tell you?**

7        A.    He was telling me he was going

8   through a bunch of different -- it was a church

9   thing, and then a couple of letters, like,

10  organizations.  I can't remember what they were.

11       Q.    **During this period that you and Mr.**

12  **Briddell were both employed by Saint-Gobain did**

13  **he at any time before the end of his employment**

14  **come to you with issues where he said he felt he**

15  **was being discriminated against because of his**

16  **race?**

17       A.    No.

18       Q.    **Did you ever hear Mr. Briddell**

19  **complain about race discrimination to anybody in**

20  **the facility?**

21       A.    I don't remember, it's over three

22  years.

23       Q.    **I'm just asking what you remember**

24  **today.**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH MCTERNAN**
**July 21, 2005**

Page 14

1        A.       No, I don't remember.

2        Q.       Do you have any recollection of any

3    other employee complaining about race

4    discrimination while you were working at

5    Saint-Gobain?

6        A.       No, not that I can remember.

7        Q.       Have you ever attended any meetings

8    where the issue of race discrimination at

9    Saint-Gobain was discussed?

10        A.       No.

11        Q.       Have you observed anything that

12    would lead you to believe that Mr. Briddell was

13    in any way either discriminated against or

14    treated differently because of his race at

15    Saint-Gobain?

16              MS. KELLY:  Object to form.  You

17        can answer.

18        Q.       (By Mr. Tully)  You can answer.

19        A.       That I seen him?

20        Q.       Did you observe anything in the

21    workplace at Saint-Gobain directed to Mr.

22    Briddell that you thought was discriminatory?

23        A.       Personally standing there

24    watching?

JOSEPH MCTERNAN
July 21, 2005

Page 15

1      Q.      Yes.

2      A.      No.

3      Q.      So you have no personal knowledge

4   of anything that happened to Mr. Briddell that

5   you felt was unfair because of his race?

6              MS. KELLY:  Object to form.  You

7        can answer.

8              THE WITNESS:   That I thought was

9        unfair?

10     Q.      (By Mr. Tully)  Because of his

11  race, he was treated differently because of his

12  race.  I'm just focusing strictly on his race.

13             MS. KELLY:  Objection to form.  You

14        can answer.

15             THE WITNESS:  No, I can't

16        specifically say.

17     Q.      (By Mr. Tully)  As part of your job

18  did you in any way supervise Mr. Briddell?

19     A.      No.

20     Q.      Did you at any point in time work

21  on the same line?

22     A.      No.  Wait a minute, yeah, I -- I

23  didn't work on the same line but I went over to

24  small wheel molding for a month or so when I

**JOSEPH MCTERNAN**
**July 21, 2005**

Page 27

1          THE WITNESS:  No.  No, I can't.

2      Q.     (By Mr. Tully)  Now, when you and

3   Mr. Briddell were talking about the fact that

4   you thought his discipline was unfair, did

5   either one of you suggest that he was being

6   treated unfairly because of his race?

7          MS. KELLY:  Object to the form.

8      You can answer.

9          THE WITNESS:  I specifically don't

10     remember him stating that, no.

11     Q.     (By Mr. Tully)  Did he offer any

12  reasons as to why he felt he was being treated

13  unfairly?

14         MS. KELLY:  Object to form.  You

15     can answer.

16         THE WITNESS:  I didn't really get

17     into the specifics of why he was being

18     treated unfair.  I was just a little upset

19     the reason why they were going after him;

20     it was the overweight pans and tickets.

21     Q.     (By Mr. Tully)  Okay.  I apologize

22  if I asked you this earlier, but are you aware

23  of any employee in the facility at Saint-Gobain

24  complaining about race discrimination?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH MCTERNAN**
**July 21, 2005**

Page 45

1    my supervisor, and that's the way he told me to

2    handle it, not to make an issue of it.

3            Q.      Okay.  Do you know why Mr. Briddell

4    was terminated?

5                    MS. KELLY:  Object to form.  You

6            can answer.

7                    THE WITNESS:  Specifics, no.

8            Generalization, yes.

9            Q.      (By Mr. Kelly)  What generalized

10   information do you have?

11           A.      The overweight pans, the tickets

12   not being in the pan.  And now that I read this

13   the contamination in the pans I do start to

14   remember that after we went over it.

15           Q.      In your experience did the mixers

16   have any responsibility for visually inspecting

17   a pan before it was sent up to the next stage of

18   the process to see if there was any evidence of

19   contamination?

20           A.      Yes, everybody through the line is

21   supposed to make sure.  That's everybody's job

22   to make a good product.

23           Q.      Now on Page 2 of your affidavit

24   where you say I do not know of any employee who

JOSEPH MCTERNAN
July 21, 2005

Page 46

1   has been disciplined for contaminating a mix of

2   ingredients, sort of the bottom third here?

3        A.    Yes.

4        Q.    Do you have any personal knowledge

5   as to whether anybody has been disciplined for

6   contaminating the mix?

7        A.    Do I have me, myself?  No.  In the

8   company I'm pretty sure someone has been

9   disciplined.

10       Q.    You heard that other people have

11  been disciplined for contaminating a mix?

12            MS. KELLY:  Object to the form. You

13       can answer.

14            THE WITNESS:  That they have?  Not

15       in Plant 8, no.

16       Q.    (By Mr. Tully)  In any other plant?

17       A.    Plant 7, yes.

18       Q.    How many people do you know or do

19  you believe?

20       A.    I have no idea, I just know that

21  contamination -- contamination is just a thing

22  with the job.  You get contamination, so many

23  different places you get the contamination from.

24       Q.    In a document prepared by Mr.

**JOSEPH MCTERNAN**
**July 21, 2005**

Page 57

1    I, GAYLE OHMAN, a Notary Public in and for

2    the Commonwealth of Massachusetts, do hereby

3    certify that JOSEPH MCTERNAN, appeared before

4    me, satisfactorily identified himself, on the

5    21st day of July, 2005, who was by me duly sworn

6    to testify to the truth and nothing but the

7    truth as to his knowledge touching and

8    concerning the matters in controversy in this

9    cause; that he was thereupon examined upon his

10   oath and said examination reduced to writing by

11   me; and that the statement is a true record of

12   the testimony given by the witness, to the best

13   of my knowledge and ability.

14       I further certify that I am not a relative

15   or employee of counsel/attorney for any of the

16   parties, nor a relative or employee of such

17   parties, nor am I financially interested in the

18   outcome of the action.

19       WITNESS MY HAND this 15th day of August,

20   2005.

21

22   Gayle Ohman                My Commission expires:

23   Notary Public              October 25, 2007

24