# EXHIBIT H

**PHILIP GUSTAFSON**
**July 21, 2005**

ORIGINAL

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                         Civil Action No.:

4                         4:04 CV 40146 (FDS)

5

6    **********************************

7    ROBERT BRIDDELL,                    *

8                    Plaintiff          *

9    vs.                                 *

10   SAINT-GOBAIN ABRASIVES, INC.,       *

11                   Defendant           *

12   **********************************

13

14        DEPOSITION OF:  PHILIP GUSTAFSON

15     CATUOGNO COURT REPORTING SERVICES

16              446 Main Street

17          Worcester, Massachusetts

18         July 21, 2005  9:00 a.m.

19

20

21                GAYLE OHMAN

22     CERTIFIED SHORTHAND REPORTER

23                #1353S94

24

**PHILIP GUSTAFSON**
**July 21, 2005**

Page 22

1    know.

2        Q.      (By Mr. Tully)  So then it would

3    not always be possible to simply go back to the

4    person who did the mix?

5        A.      Right.  That's why you go to the

6    supervisor.  If they're not there you go to the

7    supervisor and they sign off the operation.  It

8    was a -- I think it was an ISO thing that we go

9    through periods of intense ISO-ness, and then we

10    go through periods of not so intense ISO-ness.

11        Q.      Did you have any further discussion

12    with Mr. Viarno about any of those tickets that

13    you gave him?

14        A.      No.  He did mention -- he mentioned

15    he had some around 25 or 30 MO's that weren't

16    signed, the various operations, various

17    departments.  I know I had the kiln prep if I'm

18    sending wheels down the line sometimes you fill

19    out everything but you don't sign the check.

20              You know, you're supposed to fill

21    out your TV, the thickness, all these different

22    things, and when you're done with the check you

23    sign it off.  I mean, it happens.  It's not --

24    it doesn't happen a lot, but it does happen.

PHILIP GUSTAFSON
July 21, 2005

Page 25

1        A.      Right.

2        Q.      **Was that everybody as far as you**

3   **remember?**

4        A.      Yeah.

5        Q.      **Tell me what you recall being**

6   **discussed.**

7        A.      That's why I knew -- the only thing

8   I knew prior to the meeting was that Bob had a

9   problem with signing checks up, signing MO's

10  off, and in the meeting they also brought up

11  weights of pans of abrasives, and contamination

12  in abrasives.

13       Q.      **What was discussed specifically**

14  **about the MO's during that meeting?**

15       A.      They said -- I don't know, they

16  found quite a few checks that were mixed by Bob

17  that weren't signed.  I remember leaving the

18  meeting and telling Bob you got to sign your

19  checks for crying out loud, sign the checks.

20  But, you know, I don't know.

21       Q.      **At that meeting did Mr. Briddell**

22  **deny that he had failed to sign checks, or did**

23  **he acknowledge that?**

24              MS. KELLY:  Object to form.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**PHILIP GUSTAFSON**
**July 21, 2005**

Page 29

1   anything he didn't sign, I didn't see anything

2   he did sign so...

3       Q.      Do you recall if Mr. Briddell said

4   anything specifically about the MO issue at that

5   meeting?

6       A.      I don't recall.  I don't recall.

7       Q.      Was there any issue or was the

8   topic of race discrimination raised at any point

9   in time during that meeting?

10      A.      No.

11      Q.      Now, let's go to the pan weight

12  issue.  You said that was the second thing

13  discussed during that meeting; is that right?

14      A.      Uh-huh.

15      Q.      What was the issue with the pans

16  that you recall?

17      A.      I guess they were too heavy, too

18  much weight in them.

19      Q.      And as part of your job did you

20  have any responsibility for measuring pans or

21  filling pans?

22      A.      No.

23      Q.      Did you know what the rules or

24  expectations were about pan size or pan weight?

PHILIP GUSTAFSON
July 21, 2005

Page 45

1   any explanation as to why he felt that way?

2              MS. KELLY:  Object to the form.

3              THE WITNESS:  No, I don't think so.

4         Q.     (By Mr. Tully)  Did he ever tell

5   you that he felt he was being treated

6   differently because of his race?

7         A.     No, I don't think so.

8         Q.     Did he ever tell you he felt he was

9   being treated differently because of his support

10  of the union?

11        A.     Yeah.  Yeah, he did mention that.

12        Q.     What do you recall him telling you

13  about that?

14        A.     He said he thinks they're picking

15  on him because he was a pretty strong union

16  supporter.  That may be true or not true, I

17  don't know.

18        Q.     Do you have any opinion about that

19  issue about whether or not he was being treated

20  differently because of his union activity?

21             MS. KELLY:  Object to the form.

22        You can answer.

23             THE WITNESS:  The only thing I can

24        really say about that is there have been

PHILIP GUSTAFSON
July 21, 2005

Page 48

1    really experienced with Bob was that

2    meeting.  I mean, quick conversations here

3    and there, how are you doing, what's up or

4    whatever, but...

5        Q.    (By Mr. Tully)  At any point in

6    time did you provide anybody with the company

7    with a list of names of persons who had failed

8    to sign MO's?

9        A.    No.

10       Q.    Did you ever provide a copy of an

11   MO and identify the person who failed to sign it

12   by name?

13       A.    No.

14       Q.    Do you have any reason to believe

15   that Mr. Briddell's discipline, whatever

16   discipline he may have received at Saint-Gobain,

17   had anything to do with his race?

18            MS. KELLY:  Object to the form.

19       Answer.

20            THE WITNESS:  I have -- I don't

21       know.  I don't think so, but who knows.

22       Q.    (By Mr. Tully)  Are you aware of

23   any employee -- do you know of any employee who

24   you believe was treated more favorable than Mr.

PHILIP GUSTAFSON
July 21, 2005

Page 49

1  Briddell, someone who made the same type of

2  errors who was treated more favorably?

3          MS. KELLY:  Objection to form.  You

4      can answer.

5          THE WITNESS:  I don't know.  I

6      don't know anybody else -- I don't know.

7      I mean, I don't know how many -- everybody

8      forgets to sign checks.  The frequency I

9      don't know how many checks Bob forgot to

10     sign.  I don't know if it was two a week

11     or five a week or two a day or five a

12     day.  I don't know.

13         Q.    (By Mr. Tully)  Is there anything,

14  Mr. Gustafson, like, did you make any notes or

15  anything of conversations you might have had

16  with Mr. Briddell?

17         A.    No.

18         Q.    Do you recall any conversations

19  generally about race being an issue at Plant 8?

20         A.    No.

21         Q.    How about company wide, were there

22  issues of race generally within the company that

23  you were aware of?

24         MS. KELLY:  Object to the form.

PHILIP GUSTAFSON
July 21, 2005

Page 50

1      You can answer.

2                THE WITNESS:  I don't think so.

3          Q.      (By Mr. Tully)  Are you aware of

4    any other employee raising concerns about

5    minority representation in the workplace at

6    Saint-Gobain?

7                MS. KELLY:  Object to the form.

8          You can answer.

9                THE WITNESS:  No.

10         Q.      (By Mr. Tully)  So if Miss Kelly

11   were to ask you questions about complaints that

12   may or may not have been raised at Saint-Gobain

13   you're not in a position today to have any

14   knowledge of that, are you?

15               MS. KELLY:  Objection to the form

16         of the question.

17               THE WITNESS:  No.

18         Q.      (By Mr. Tully)  So if she were to

19   suggest that something happened you're not in a

20   position to say whether or not that actually did

21   happen; isn't that right?

22               MS. KELLY:  Objection to the form.

23         You can answer.

24               THE WITNESS:  I believe not.  I

**PHILIP GUSTAFSON**
**July 21, 2005**

Page 51

1      mean, I haven't heard anything about

2      racial discrimination through the whole

3      time I've been there.  I can't recall.

4          Q.     (By Mr. Tully)  All right.  I was

5  hoping -- I wanted to mark one exhibit.

6

7      (Exhibit Number 1, Affidavit, marked)

8

9          MS. KELLY:  I just want the record

10      to reflect that in the copy of the

11      documents that Attorney Tully is marking

12      he's apparently removing the last couple

13      of pages of the document which is

14      apparently I was requesting to see copies

15      of those if they were part of the original

16      document.

17          MR. TULLY:  Well, Miss Kelly, you

18      have absolutely no right to insist upon

19      that, number one.  And number two, if you

20      want to mark a different document that you

21      think is more complete than the one I'm

22      marking you certainly feel free to do

23      that.

24          MS. KELLY:  Are these documents

PHILIP GUSTAFSON
July 21, 2005

Page 70

1    to page 2 for a minute on this particular

2    affidavit.

3         A.    That's a lot quicker than I would

4    have read it.

5         Q.    Seven lines up from the bottom I

6    believe that reads I do not know of any employee

7    who has not been disciplined or spoken to who

8    may have been responsible for the contamination

9    of mixes; is that correct?

10        A.    Uh-huh.

11        Q.    Is that a yes?

12        A.    Yeah.  It's a serious problem you

13   can't, you know, have it.

14        Q.    And just to go back to some of the

15   names that were listed here.  I think the first

16   reference to is on page three, a Joe Givner?

17        A.    Uh-huh.

18        Q.    Is that right?  Steve Polakes?

19        A.    Yup.

20        Q.    Dick Waide?

21        A.    Yeah.

22        Q.    And those three individuals, did

23   they all work on the third shift?

24        A.    They did, yes.

PHILIP GUSTAFSON
July 21, 2005

Page 93

1      I, GAYLE OHMAN, a Notary Public in and for

2  the Commonwealth of Massachusetts, do hereby

3  certify that PHILIP GUSTAFSON, appeared before

4  me, satisfactorily identified himself, on the

5  21st day of July, 2005, who was by me duly sworn

6  to testify to the truth and nothing but the

7  truth as to his knowledge touching and

8  concerning the matters in controversy in this

9  cause; that he was thereupon examined upon his

10  oath and said examination reduced to writing by

11  me; and that the statement is a true record of

12  the testimony given by the witness, to the best

13  of my knowledge and ability.

14      I further certify that I am not a relative

15  or employee of counsel/attorney for any of the

16  parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19      WITNESS MY HAND this 15th day of August,

20  2005.

21

22  Gayle Ohman            My Commission expires:

23  Notary Public          October 25, 2007

24

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT I

**MICHAEL TIVNAN**
**June 14, 2005**

COPY

Page 1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3

4    _____

5  ROBERT BRIDDELL                    *

6        Plaintiff,                   *

7  V.                                 *

8  SAINT GOBAIN ABRASIVES, INC.       *

9        Defendants.                  *

10   _____         *

11

12

13

14        DEPOSITION OF:  MICHAEL TIVNAN

15     CATUOGNO COURT REPORTING SERVICES

16             446 Main Street

17        Worcester, Massachusetts

18       June 14, 2005      10:15 a.m.

19

20

21             Sonya Lopes

22        Certified Shorthand Reporter

23

24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL TIVNAN**
**June 14, 2005**

Page 30

1      Q.      Did the machine get programmed for

2    a specific weight?

3      A.      Yes.

4      Q.      And what was that weight?

5      A.      Around 35 pounds.

6      Q.      And after the machine -- and then

7    how would the weight go from 35 to 45?

8      A.      The machine does not stop on a

9    dime.  It will continue residual.  Okay?  And the

10   product will continue to fall through the

11   screens, the sifting and add more weight to the

12   bucket, the pan.

13     Q.      And is it -- okay.  So the machine,

14   even though when it's supposed to shut, it will

15   continue to work for a little bit.  Is there a

16   period of time where it would normally stop after

17   --

18             MR. KERMAN:  Objection.

19             THE WITNESS:  Yeah.

20     Q.      (By Ms. Kelly)  Do you understand

21   the question?  It's not a clear question.  The

22   way I've heard it described is that it shakes out

23   a certain amount of product even after it's

24   supposed to stop.  Is that accurate?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

MICHAEL TIVNAN
June 14, 2005

Page 31

1      A.      Yes.

2      Q.      For how long would it shake out

3  product, generally?

4      A.      After it would shut off?

5      Q.      After it was supposed to shut off.

6      A.      Seconds.

7      Q.      And during that seconds, it would

8  deposit somewhere between 0 and 10, generally,

9  pounds of product?

10     A.      It could.

11     Q.      Under what circumstances would it

12  deposit more than that, if at all?

13              MR. KERMAN:  More than 0 to 10?

14              MS. KELLY:  Yes.  Pounds of

15         product.

16              MR. KERMAN:  Do you understand the

17         question?

18              THE WITNESS:  Yes.  How would more

19         product get into the pan.  Right?

20     Q.      (By Ms. Kelly)  Yes.

21     A.      If the wrong screen was used, if

22  the scale didn't tear out properly.

23     Q.      Would it be fair to say it could

24  also be misprogrammed?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

MICHAEL TIVNAN
June 14, 2005

Page 45

1    operation.

2        Q.    And what was the next operation?

3        A.    Rescreen.

4        Q.    So is it -- would you say verbally

5    through the next operation every screener would

6    tell you?

7        A.    Yes.

8        Q.    Was there any other manner in which

9    a supervisor would find out that a mix was

10   overweight other than a rescreener bringing it to

11   your attention?

12       A.    No.  Because would be no reason for

13   -- no.

14       Q.    Okay.

15       A.    No.

16       Q.    You mentioned MOs earlier.  What

17   does that stand for?

18       A.    Manufacturing order.

19       Q.    Thank you.  The manufacturing

20   orders would have the mixer's operator number on

21   it.  Is that accurate?

22       A.    Yes.

23       Q.    And based on the manufacturing

24   operator's number, you could look at the MO and

**MICHAEL TIVNAN**
**June 14, 2005**

Page 46

1    -- sorry.  Strike that.

2                    You could look at an MO and

3    determine who had created the mix; correct?

4            A.        Correct.

5            Q.        If you look at the personnel file

6    document I gave you a few minutes ago.  And let

7    me draw your attention to 1442 on the bottom

8    page.  And based on this, indicates 199 -- it

9    indicates '94 on the first page.  Is it your best

10   understanding that this would be Mr. Briddell's

11   evaluation for calendar year 1993?

12                    MR. KERMAN:  Objection.

13                    THE WITNESS:  Yes.

14           Q.        (By Ms. Kelly)  Looking at the

15   following page, and if you take -- want to take a

16   minute and read through it.  I understand this is

17   not an evaluation you created.  Okay.  Have you

18   had a chance to read through it?

19           A.        Uh-huh.

20           Q.        I understand this was not an

21   evaluation you created, but you did indicate

22   earlier you would go back and look at employee's

23   evaluations periodically.  Based on what's in

24   here, would you say that Mr. Briddell's

MICHAEL TIVNAN
June 14, 2005

Page 52

1  properly -- and I'm sorry, this just is not my

2  skill set -- how would an operator, a mixer, know

3  that?

4       A.    Visual.

5       Q.    When you say visual, what do you

6  mean?

7       A.    Pans can only hold so much.  It's

8  like half a glass of water would be 45 pounds.

9  Full glass would be double that.  So it's a

10 visual.

11      Q.    So the mixer could notice that the

12 pan looked over full?

13      A.    Yes.

14      Q.    Or that the pan was overflowing,

15 obviously.

16      A.    Yeah.

17      Q.    That would be something you would

18 expect them to notice.  Other than that, would

19 there be another way that the mixer could know

20 that the scale was not tearing out properly?

21      A.    No.  It would be a visual.

22      Q.    Okay.

23      A.    Visual.  You could --

24      Q.    Go ahead.

**MICHAEL TIVNAN**
**June 14, 2005**

Page 86

```
 1              MR. KERMAN:  Objection.  Could you

 2       rephrase the question?

 3              THE WITNESS:  Pardon?

 4       Q.      (By Ms. Kelly)  You can answer.

 5       A.      I'm sure.

 6       Q.      The mixes are different colors

 7  sometimes.  Is that accurate?

 8       A.      Yes.

 9       Q.      There are black mixes and white

10  mixes.

11       A.      Yes.

12       Q.      Was it the general practice to do a

13  specific color first?

14       A.      Used to be.

15       Q.      And when you say used to be, what

16  was -- when did it change?  Do you know?

17       A.      20 years ago.

18       Q.      And 20 years ago, what was the

19  practice?

20       A.      White mixes first.

21       Q.      And why was that?

22       A.      Contamination reasons.

23       Q.      And when you say for contamination

24  reasons, what do you mean?
```

**MICHAEL TIVNAN**
**June 14, 2005**

Page 87

1      A.      So the white wouldn't blend in with

2    the black, the black wouldn't mix in with the

3    white.  Since then, there's better procedure.

4            **Q.      What's the better procedure?**

5      A.      New mixing machines came in place.

6            **Q.      Under the new mixing machines, did**

7    **there continue to be a practice of doing white**

8    **mixes first?**

9      A.      It's hard to answer because they

10   have mix age limits.  Some mixes have to be mixed

11   right out of the bowl and right to the machine.

12   So whenever the molding operator was ready, he

13   would say okay, make this mix.

14            So it would be -- it could be after

15   the yellow mixes or after the white mixes when

16   he'd have to go in there to make them.  So that

17   procedure, no.  It wasn't followed a hundred

18   percent.

19            **Q.      Hundred percent.  Okay.  Was there**

20   **a general practice if possible of doing the white**

21   **mixes first?**

22      A.      Yeah.  General practice is a good

23   word.

24            **Q.      And that was because even with the**

**MICHAEL TIVNAN**
**June 14, 2005**

Page 88

1   new machines, there was sometimes problems with

2   contamination if you did a black mix then did a

3   white mix.

4        A.      Yes.

5        Q.      And now with the new machines,

6   quote, unquote -- the new machines which are now

7   probably 25 years old -- but the newer machines,

8   how would a mixer ensure -- try to ensure that

9   there was no contamination?

10       A.      If he had to make them a black mix

11  after making a white mix or vice versa, he's to

12  ensure that his machine's cleaned out properly.

13  He has to take the extra time to clean the

14  machine out, to make sure that other -- the next

15  mix -- whether it be black or white --

16       Q.      When you say clean it out properly,

17  what were the steps the mixer would have to go

18  through to make sure that there wouldn't be

19  contamination when you are going from a black to

20  white or vice versa?

21       A.      Wash the pans, soap, water; air

22  hose; clean the machine.

23       Q.      How long did a cleaning, sort of a

24  thorough enough cleaning, to keep that kind of

**MICHAEL TIVNAN**
**June 14, 2005**

Page 105

1          MR. KERMAN:  Back on the record.

2      Just have a couple of questions.

3

4

5      EXAMINATION BY MR. KERMAN:

6

7          Q.      Mr. Tivnan, let me show you

8  Exhibit 6, which was previously introduced.  It's

9  a written reminder to Mr. Briddell involving an

10  overweight pan.  Then also let me show you

11  Exhibit 7, which is a written warning for an

12  overweight pan.

13              In your view, was Mr. Briddell at

14  fault in making these overweight pans?  And, if

15  so, why do you think that he was responsible or at

16  fault for making these overweight pans?

17              MS. KELLY:  Object to the form.

18      Q.      (By Mr. Kerman)  You can answer.

19      A.      Even though we have the scale which

20  checks off at 45, I mean, each operator has to

21  make a visual inspection.  It can be quite

22  obvious with 45 pounds versus 80 some odd pounds.

23      Q.      Now, you also were asked whether

24  you ever gave any written warnings for people not

**MICHAEL TIVNAN**
**June 14, 2005**

Page 109

1            I, SONYA LOPES, a Notary Public in

2   and for the Commonwealth of Massachusetts, do

3   hereby certify that MICHAEL TIVNAN appeared before

4   me, satisfactorily identified himself, on the 14th

5   day of June, 2005, at the offices of CATUOGNO

6   COURT REPORTING SERVICES, 446 Main Street,

7   Worcester, Massachusetts, and was by me duly sworn

8   to testify to the truth and nothing but the truth

9   as to his knowledge touching and concerning the

10  matters in controversy in this cause; that he was

11  thereupon examined upon his oath and said

12  examination reduced to writing by me; and that the

13  statement is a true record of the testimony given

14  by the witness, to the best of my knowledge and

15  ability.

16            I further certify that I am not a

17  relative or employee of counsel/attorney for

18  any of the parties, nor a relative or employee

19  of such parties, nor am I financially

20  interested in the outcome of the action.

21            WITNESS MY HAND this 26th day of

22  June 2005.

23  Sonya Lopes              My Commission expires:

24  Notary Public            March 31, 2006

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT J



**WILLIAM TIVNAN**
**June 14, 2005**

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4      _____

5   ROBERT BRIDDELL                    *

6       Plaintiff,                     *

7   V.                                 *

8   SAINT GOBAIN ABRASIVES, INC.       *

9       Defendants.                    *

10     _____        *

11

12

13

14        DEPOSITION OF:  WILLIAM TIVNAN

15     CATUOGNO COURT REPORTING SERVICES

16            446 Main Street

17        Worcester, Massachusetts

18        June 14, 2005        1:55 p.m.

19

20

21            Sonya Lopes

22      Certified Shorthand Reporter

23

24

**WILLIAM TIVNAN**
**June 14, 2005**

Page 8

1    shift.

2         Q.      How long have you held this

3    position?

4         A.      Second shift has been probably

5    about a month.

6         Q.      And as the shift supervisor, how

7    long have you held that?

8         A.      For second shift, one month.  Third

9    shift?

10        Q.      Yes.

11        A.      Fall of 1999.

12        Q.      And since the fall of 1999, have

13   you had group leaders reporting directly to you?

14        A.      Yes, I have.

15        Q.      And during the period of 2000/2001,

16   who were those group leaders?

17        A.      I'm not positive.  But I believe it

18   was Bill Deets in the finishing department,

19   Dennis Mulvia core molding, Jake Coram large

20   wheel molding.

21        Q.      Now, I'm sorry.  You said you've

22   been a supervisor since fall of 1999.  What was

23   your position before then?

24        A.      Press operator.

WILLIAM TIVNAN
June 14, 2005

Page 31

1    Let me ask an easier question.  Do you recall

2    Mr. Briddell being disciplined for overweight

3    pans?

4         A.      Yes.

5         Q.      Who determined that the pans were

6    overweight?

7         A.      Who determined?

8         Q.      Yes.

9         A.      I don't understand the question.

10        Q.      Who weighed the pans?

11        A.      I did myself.

12        Q.      And did you consider that

13   information in disciplining him?

14        A.      Yes.

15   *    Q.      Did you create a document indicating

16   the weight of those pans?

17        A.      Yes.

18   *    Q.      Can you tell me where that is in

19   Exhibit 3?

20        A.      I'm in the process.  Question was

21   was I aware of the mixed pans?

22        Q.      No.  The question was --

23        A.      Was I present?

24        Q.      -- are all the documents contained

WILLIAM TIVNAN
June 14, 2005

Page 37

1    Sometimes we start a product before.

2        Q.        Presumably, it was within 18 hours

3    that someone weighed --

4        A.        By looking at the slip, yes.  It

5    was within 16 hours.

6        Q.        16 hours.  Okay.  All right.  If

7    you look at 1474, has a series of numbers in the

8    upper left-hand corner as well that you pointed

9    out.

10       A.        Yes.

11       Q.        Do you know who wrote those

12   numbers?

13       A.        If I remember correctly, I was

14   present with Jeff Clark wrote those.

15       Q.        Who weighed the pans?

16       A.        Jeff Clark.

17       Q.        Were you present when he weighed

18   the pans?

19       A.        Yes.

20       Q.        And what date was that?

21       A.        On 9/19 on that -- 1474 Jeff Clark

22   had a note on the bottom right-hand corner.

23       Q.        If you look at the following page,

24   this says in the upper right-hand corner --

**WILLIAM TIVNAN**
**June 14, 2005**

Page 38

1    A.    Start date.

2    Q.    -- No. C208642.

3    A.    Check number, yes.  MO number, yes.

4    Q.    Is that on 1475?

5    A.    Did not print out, no.

6    Q.    So how do you know that 1475 and

7    1474 are the same document or refer to the same

8    thing?

9    A.    I'm assuming they are.  What I'm

10   going with there would be the specifications on

11   the mix on the first page, 1474, 5NZC441R5B,

12   dash, X348.  That is also on page 1475 as

13   specification size, the code there.

14   Q.    And the mix dispenser on this is

15   also 1104 --

16   A.    Yes.

17   Q.    -- if you look at 1476.  Can you

18   tell me who wrote these?

19   A.    I believe it would be Jeff also.

20   Q.    Were you -- do you know who weighed

21   them?

22   A.    I would say Jeff, and I was present

23   also.  I remember a list.  That's why I recall

24   these long lists.  It was done on a yellow piece

**WILLIAM TIVNAN**
**June 14, 2005**

Page 90

1    absolutely clear --

2        A.        This written reminder is referring

3    to these three checks, I'm assuming.

4        Q.        **Your best recollection based on the**

5    **documents and your independent recollection of**

6    **events --**

7        A.        Yes.

8        Q.        **-- is that 14 -- the documents 1472**

9    **through 1477 which are all --**

10       A.        Copies of manufacturing orders.

11   Correct.

12       Q.        **-- copies of manufacturing orders**

13   **of mixes that were created on 9/19 --**

14       A.        Correct.

15       Q.        **-- resulted in you on 9/20 giving**

16   **this written reminder; is that correct?**

17       A.        Correct.

18       Q.        **All right.  Did you do any**

19   **investigation as to --**

20                 MR. KERMAN:  Let her finish the

21       question.

22       Q.        **(By Ms. Kelly)  -- as to what had**

23   **occurred prior to giving the written warning,**

24   **that you can recall?**

**WILLIAM TIVNAN**
**June 14, 2005**

Page 91

1          MR. KERMAN:   Referring to the

2     written reminder?

3          MS. KELLY:   Referring to the

4     written reminder here.

5     Q.      (By Ms. Kelly)  Prior to 9/2001,

6     when you gave this written reminder, did you do

7     any investigation?

8     A.      As I mentioned earlier, I know I

9     was present when we weighed those mix pans with

10    Jeff.

11    Q.      And did you talk to Mr. Briddell?

12    A.      About?

13    Q.      Did you talk to mister --

14    A.      That's what the written reminder

15    is.

16    Q.      Did you talk to Mr. Briddell as

17    part of your investigation prior to writing the

18    written reminder?

19    A.      As -- well, I talked to him on the

20    18th as that document, that conversation will --

21    Q.      But that wasn't part of your

22    investigation of what happened on the 19th, was

23    it?

24    A.      Say it again.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**WILLIAM TIVNAN**
**June 14, 2005**

Page 125

1    does it.

2         Q.         Or so Mr. Aubin, for example, could

3    run it back to Mr. Briddell and ask him to sign

4    it before he started.  And you would consider

5    that to be a screw-up but not something you would

6    discipline an employee for.  Is that accurate?

7                   MR. KERMAN:  Objection.

8         Q.         (By Ms. Kelly)  You can answer.

9         A.         That would be kind of difficult

10   because Mr. Briddell and Mr. Aubin worked

11   different shifts.  Bob would already be home when

12   Mr. Aubin would be doing the process.

13        Q.         Who was the rescreener who worked

14   on Mr. Briddell's shift?

15        A.         We had a few.

16        Q.         All right.  So if --

17        A.         Bob made -- major workload was

18   making mix for first shift not third.  We make

19   the mix for the following shift.  Bob would very

20   rarely make mix for the shift that he were

21   working on.

22        Q.         But in any event, if an employee

23   ran it back, you would consider it a screw-up but

24   not something you would discipline the employee

**WILLIAM TIVNAN**
**June 14, 2005**

Page 130

1        I, SONYA LOPES, a Notary Public in

2   and for the Commonwealth of Massachusetts, do

3   hereby certify that WILLIAM TIVNAN appeared before

4   me, satisfactorily identified himself, on the 14th

5   day of June, 2005, at the offices of CATUOGNO

6   COURT REPORTING SERVICES, 446 Main Street,

7   Worcester, Massachusetts, and was by me duly sworn

8   to testify to the truth and nothing but the truth

9   as to his knowledge touching and concerning the

10   matters in controversy in this cause; that he was

11   thereupon examined upon his oath and said

12   examination reduced to writing by me; and that the

13   statement is a true record of the testimony given

14   by the witness, to the best of my knowledge and

15   ability.

16        I further certify that I am not a

17   relative or employee of counsel/attorney for

18   any of the parties, nor a relative or employee

19   of such parties, nor am I financially

20   interested in the outcome of the action.

21        WITNESS MY HAND this 26th day of

22   June 2005.

23   Sonya Lopes                    My Commission expires:

24   Notary Public               March 31, 2006

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT K



**WILLIAM TIVNAN**
**July 13, 2005**

1

             UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS

                      Civil Action No.:

                      4:04 CV 40146 (FDS)


*********************************

ROBERT BRIDDELL,                    *

                Plaintiff           *

vs.                                 *

SAINT-GOBAIN ABRASIVES, INC.,       *

                Defendant           *

*********************************

              VOLUME II

       DEPOSITION OF:  WILLIAM TIVNAN

     CATUOGNO COURT REPORTING SERVICES

            446 Main Street

       Worcester, Massachusetts

       July 13, 2005  10:00 a.m.




              GAYLE OHMAN

       CERTIFIED SHORTHAND REPORTER

              #1353S94

**WILLIAM TIVNAN**
**July 13, 2005**

63

1  know exactly.

2      Q.      Well, I'm asking you about your

3  memory.

4      A.      Memory.  I can't pinpoint exactly.

5  I know on occasion I did weigh, and on occasion

6  I was present when somebody else weighed.

7      Q.      So just so the testimony is

8  absolutely clear, and you need to let me finish

9  the question.  I know you know where I'm going

10  with this.  The specific pans that are

11  referenced in this objection, your memory is

12  that you were either there and weighed them

13  yourself, or you were there and watched someone

14  else weigh them; is that accurate?

15      A.      Correct.

16      Q.      But because there was a number of

17  different issues of overweight you can't recall

18  whether you were just there watching or you

19  did it yourself; is that accurate?

20      A.      Correct.  I didn't sign saying I

21  did or did not do it myself or was present.  I

22  didn't write down visually watched someone do

23  it, or personally did it myself.

24      Q.      But your memory is that it was one

WILLIAM TIVNAN
July 13, 2005

72

1          (Exhibit Number 53, Manufacturing order,

2          marked)

3

4      Q.     (By Ms. Kelly)   I apologize if

5  asked you this before, but I've taken a number

6  of depositions.   There was a practice as I

7  understand it, and correct me if you believe I'm

8  incorrect, of MO's having to be signed before

9  the next person in the process could begin their

10  process; is that accurate?

11      A.     **Yes, that's the ISO standards.**

12      Q.     And I think if the person was

13  available on the same shift or -- strike that.

14          If someone failed to sign off on an

15  MO and was available it was permissible for the

16  next employee to prior to starting the process

17  to go back and get a signature; is that

18  accurate?

19      A.     **Correct.**

20      Q.     If the individual was not available

21  for some reason, the process was for the next

22  person prior to beginning their process to bring

23  it to a group leader or supervisor; is that

24  accurate?

WILLIAM TIVNAN
July 13, 2005

73

1    A.    Correct.

2    Q.    And the group leader or supervisor

3  would sign in the individual in the spot where

4  the previous individual should have signed; is

5  that accurate?

6    A.    Correct.  **Basically to waive the**

7  **operation saying it's completed and it's okay.**

8    Q.    So, for example, if Mr. Briddell

9  failed to sign off where he was supposed to in

10 the mix slip and someone brought it to your

11 attention where he was supposed to sign off you

12 would put your initials; is that accurate?  Or

13 written something?

14   A.    **If there was -- depending on the**

15 **time.  If somebody brought it to me and Bob was**

16 **still there I would just bring it to Bob.**

17   Q.    If someone brought it to you and

18 Bob was not there?

19   A.    **Then I would sign, correct.**

20   Q.    You would sign in this section that

21 he was supposed to sign?

22   A.    Correct.

23   Q.    So I show you Exhibit 53.  And I

24 understand you were not involved in this so I'm

WILLIAM TIVNAN
July 13, 2005

78

1    came up after that were overweight pans, ISO,

2    and CON-CAM?

3            A.      Say again?

4            Q.      This states -- I'm just -- that the

5    issues that came up after the written reminder

6    on 9/20 were overweight pans, quality issues,

7    ISO, and CON-CAM?

8            A.      Yes.

9            Q.      And you said you believed you were

10   involved in investigating the overweight pans?

11           A.      Correct.

12           Q.      And is it your testimony that you

13   either weighed them yourself or observed them

14   being weighed?

15           A.      Correct.

16           Q.      And the times -- and I understand

17   you can't recall whether or not you weighed them

18   yourself or observed them being weighed.  When

19   you observed them being weighed who weighed

20   them?

21           A.      Frank Hanson.

22           Q.      And does he work the same shift as

23   you?

24           A.      No.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

WILLIAM TIVNAN
July 13, 2005

79

1      Q.      So this would have to have been
2  prior to your shift starting?
3      A.      No, ending.  Frank Hanson is first
4  shift.
5      Q.      Right.  But I thought first shift
6  came on when you were leaving?
7      A.      Frank as a rescreener/group leader
8  he would come in an hour before his shift.  So
9  he would show up at five o'clock, four, five,
10 somewhere in that vicinity.
11     Q.      All right.
12     A.      So it would have been sometime at
13 the end of third shift, beginning of first
14 shift?
15     A.      Correct.
16     Q.      And did anyone else weigh them
17 besides Mr. Hanson that you observed?
18     A.      It might have been me.
19     Q.      But it was either you or Mr.
20 Hanson?
21     A.      Yes.
22     Q.      And how was it that Mr. Hanson
23 happened to be weighing them, did you instruct
24 him to?

WILLIAM TIVNAN
July 13, 2005

80

1      A.      He probably brought it to my

2  attention at that time.

3      Q.      So was he there when you weighed

4  them if you recall?

5      A.      Yeah, depending if I either weighed

6  them or he weighed them.  If he weighed them I

7  was there.  If I weighed them was he a witness

8  to me weighing them?  Most likely, yes.

9      Q.      Was Mr. Clark present?

10     A.      I don't know.

11     Q.      So your best recollection is that

12 the overweight pans were brought to your

13 attention by Mr. Hanson?

14     A.      I remember correctly when I was

15 weighing and he was weighing I was present or he

16 was present.

17     Q.      Okay.  And the reason that he was

18 involved at all was because he brought them to

19 your attention; is that accurate?

20     A.      That or if I remember correctly his

21 title at that time he was a group leader for

22 mixing for first shift.  I don't remember

23 exactly.  I know he is now.  Was he then?  I

24 don't know.

WILLIAM TIVNAN
July 13, 2005

105

1    orders.  Mix slips would be signed,

2    manufacturing order would not.  Operator would

3    sign them.  In this case Bob would sign the mix

4    slips saying he made the check but would not

5    sign the manufacturing order that goes through

6    the plant, which is Exhibit 53.

7              Check manufacturing order and a mix

8    slip is a different slip.  Mix slip would go

9    towards the office, this would stay with the mix

10   and go through the plant.

11        Q.    I'm sorry, you lost me.

12        A.    On Exhibit 53, for example, is a

13   copy of a part of a check.  It is probably three

14   or four more pages attached to this.  But the

15   mix slip is a different slip, the recipe card

16   basically.  The recipe -- the operator, and in

17   this case Bob, would make the mix following the

18   recipe card and sign the recipe card.

19             The recipe card would go in one

20   direction, the manufacturing order would stay

21   with the mix.

22        Q.    Okay.  And so when you said you

23   investigated what did you do?

24        A.    I went through the pile of mix

WILLIAM TIVNAN
July 13, 2005

129

1    the order.

2              The manufacturing order and the mix

3    slip are separated.  The mixer takes the mix

4    slip, does the operation, puts the mix slip in

5    one box -- puts the mix slip in one box which is

6    going to be turned into the office, the mix

7    manufacturing order goes with the mix.

8        Q.     Okay.  So --

9        A.     You got me?

10       Q.     Yeah, I do.  So let me ask you a

11   question.  With respect to the investigation you

12   did as to Mr. Briddell's purported failure to

13   follow ISO procedures, since you didn't check

14   the information at the end of the shift how did

15   you know what to investigate?

16       A.     Again, like I said earlier I don't

17   make it standard practice to check every mix to

18   make sure it was all signed off.  To investigate

19   the next operator, rescreener, whoever the case

20   may have been will bring the slip to me and say

21   it wasn't signed.  So now I would take the

22   manufacturing order and go through the mix

23   slips.

24       Q.     Is that your testimony about what

**WILLIAM TIVNAN**
**July 13, 2005**

200

1    from.  It came from TMS.

2         Q.    What does that mean?

3         A.    TMS is a press that -- the hop is

4    designed to take 55 gallon drums of mix,

5    approximately 400 pounds in a mix in a drum, and

6    the drum is dumped into the hopper conveyor all

7    at once.  And on occasion if at the end of the

8    shift there's still mix left in the hopper what

9    they do is they either drain it, put it into a

10   pan, or if the mix is getting too old they drain

11   it off the hopper and put it into a pan.

12              If there's no scale at that machine

13   they just open it up until it's filled, close

14   it, put another panel on top of it, open it up,

15   fill, open, keep going.

16        Q.    And what happens to those pans?

17        A.    They send it back down to the

18   mixing area to blend with the next mix to be

19   made.

20        Q.    So the mixers have to use this in

21   the next mix?

22        A.    Yeah, pieces of it, like 2 percent,

23   3 percent depending on the weight of the mix.

24        Q.    How do they use it?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA Lawrence, MA  Providence, RI**

**WILLIAM TIVNAN**
**July 13, 2005**

201

1          A.       See you have a 200 mix you use 40,

2    50 pounds.

3          Q.       Was anyone if you know disciplined

4    for this?

5                   MR. KERMAN:   Objection.

6                   THE WITNESS:  No, it's a standard

7          procedure.  Do it all the time.

8          Q.       (By Ms. Kelly)  Even though it's

9    over 70 pounds?

10         A.       They don't lift the pans.

11         Q.       Who doesn't lift the pans?

12         A.       Nobody.

13         Q.       The mixers don't have to lift those

14   pans?

15         A.       No, they have scoops, they can

16   scoop into the pan.  They manually scoop out

17   approximately 10 to 15 pounds.  That's the

18   proper procedure.

19         Q.       This indicates whoever has to blend

20   this mix he's going to have to hump these pans

21   over.

22         A.       You can ask anybody, we don't lift

23   70 pounds.

24         Q.       Did you do anything when Mr. Novia

WILLIAM TIVNAN
July 13, 2005

202

```
 1    told you --
 2         A.    I probably told him -- I don't
 3    remember.  I didn't document or anything.  I
 4    probably told him we don't lift them.  Everybody
 5    over there knows you just use a scoop.  You use
 6    a scoop with bond.
 7              When we have a 2000 pound bag of
 8    grain and we can't put it in the hopper we wheel
 9    it down to the press.  It doesn't mean the
10    operators can lift 2000 pounds to put it in
11    there, he's going to scoop out what he wants.
12         Q.    Mr. Novia was a group leader?
13         A.    Yes.
14         Q.    And responsible for mixing; right?
15         A.    Not responsible.  He's as me, we
16    were --
17         Q.    Right, I understand he's not the
18    only person, but he's one of the people
19    responsible, and he was suggesting people have
20    to lift it.
21              MR. KERMAN:  Objection.
22              THE WITNESS:  That's what it looks
23         like.
24         Q.    (By Ms. Kelly)  When you say that
```

WILLIAM TIVNAN
July 13, 2005

204

1       A.      You can identify if a pan is going

2   to be heavy or not by looking at the pan.  The

3   pan is approximately 2 feet by 2 1/2 feet wide.

4   If it's got dirt that's over 6 inches you're not

5   going to try to lift it up.

6               Obviously you're going to try to

7   lift up one corner to see if it's too heavy.  If

8   it is either you're going to get help to move it

9   or you're not going to move it at all, you're

10  just going to scoop it out by hand.

11      Q.      And that's true for the rescreeners

12  as well; right?

13      A.      That's -- what do you mean?

14      Q.      That's true for the rescreeners as

15  well?

16      A.      Absolutely.

17      Q.      They wouldn't lift --

18      A.      They wouldn't lift 60, 70, 80

19  pounds.

20      Q.      Because they could tell by looking

21  at it how heavy it was?

22      A.      They should be able to, yes.

23      Q.      Do you know if you used the wrong

24  size screen --

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA Lawrence, MA  Providence, RI

**WILLIAM TIVNAN**
**July 13, 2005**

231

1      I, GAYLE OHMAN, a Notary Public in and for

2   the Commonwealth of Massachusetts, do hereby

3   certify that WILLIAM TIVNAN, appeared before me,

4   satisfactorily identified himself, on the 13th

5   day of July, 2005, who was by me duly sworn to

6   testify to the truth and nothing but the truth

7   as to his knowledge touching and concerning the

8   matters in controversy in this cause; that he

9   was thereupon examined upon his oath and said

10  examination reduced to writing by me; and that

11  the statement is a true record of the testimony

12  given by the witness, to the best of my

13  knowledge and ability.

14      I further certify that I am not a relative

15  or employee of counsel/attorney for any of the

16  parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19      WITNESS MY HAND this 4th day of August,

20  2005.

21

22  Gayle Ohman           My Commission expires:

23  Notary Public         October 25, 2007

24

# EXHIBIT L

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4    ********************************

5    ROBERT BRIDDELL,

6                  Plaintiff

7    vs.                            CA NO. 4:04CV40146

8    SAINT-GOBAIN ABRASIVES, INC.,

9                  Defendant

10   ********************************

11

12

13

14

15            DEPOSITION OF: THOMAS OLIVER

16            CATUOGNO COURT REPORTING

17                446 Main Street

18            Worcester, Massachusetts

19        July 19, 2005          9:10 a.m.

20

21

22              Darlene M. Coppola

23         Registered Professional Reporter

24          Certified Professional Reporter

**THOMAS OLIVER**
**July 19, 2005**

Page 56

1    at Saint-Gobain?

2        A Yes, I am.

3        Q What is your position?

4        A Today I'm general supervisor for

5    Plant 8.

6        Q How long have you had that

7    position?

8        A I've been in that position for

9    three years, give or take a little.

10       Q Prior to that, what position did

11   you have?

12       A I was general supervisor for

13   Plant 8, mix and mold.

14       Q If you -- drawing your attention

15   to the exhibit notice, there are document

16   requests.

17               MR. KERMAN:  What are you

18          referring to?

19               MS. KELLY:  I'm referring to the

20          July --

21               MR. KERMAN:  Exhibit 70?

22               MS. KELLY:  Exhibit 70, yes.

23       Q I would draw your attention to

24   starting at paragraph 7 on page 4; seven,

**THOMAS OLIVER**
**July 19, 2005**

Page 59

1          Q How would that be created?

2          A That's a hand slip that's filled

3     out.

4          Q By whom?

5          A The mixer, and turned into

6     inventory control.

7          Q If a mix has to be thrown out --

8     later in the system as I understand it, a mix

9     may be found to be contaminated after it's

10    left the mixing department; is that accurate?

11         A That's accurate, yes.

12         Q Is there any document that has

13    to be created when that -- the mix is later

14    found to be contaminated and thrown away?

15         A It would go back to that -- the

16    mix would be remixed, which would create that

17    non-disciplinary document issuing more raw

18    materials to that production order.

19         Q Would there be a slip when it

20    has to be remixed?

21         A Yes.

22         Q What would that look like?

23         A It would be a manual form.  It's

24    a mix slip, but a manual form created by a

**THOMAS OLIVER**
**July 19, 2005**

Page 60

1    supervisor or production control.   Basically

2    just it's a recipe for the mix.

3         Q But when you do a remix, what

4    would the supervisor have to do?

5         A He would take the original MO

6    and it has a criteria for the mixing and he

7    would recreate a mix.

8         Q So he would have to create a

9    second mix slip?

10        A Yes.

11        Q Would that be attached to the

12   first mix slip and sent back to mixing?

13        A That would be attached to the

14   production order with the travel letter.

15        Q The MO?

16        A The MO, yes.

17                   MS. KELLY:  I know some of the

18           jargon, but not all of it.

19        Q So that if a mix was

20   contaminated and had to be thrown away --

21        A Yes.

22        Q -- couldn't be saved?

23        A         Yes.

24        Q -- the supervisor or a

**THOMAS OLIVER**
**July 19, 2005**

Page 61

1    supervisor would create a second mix slip?

2        A Yes.

3        Q Attach it to the MO?

4        A Yes.

5        Q And send it back?

6        A Yes.

7        Q If a mix slip was contaminated

8    but was able to be saved --

9        A Okay.

10       Q -- would any documents be

11   created at that point other than disciplinary

12   documents?

13       A No.

14       Q Do they create rejection cards

15   when a mix slip is contaminated and has to be

16   thrown out?

17               MR. KERMAN:  I think you're

18           saying mix when you used the word slip

19           a couple of times.

20               MS. KELLY:  I'm sorry.

21       Q When a mix must be thrown away

22   because it's contaminated, is a rejection

23   card created?

24       A I couldn't answer that

**THOMAS OLIVER**
**July 19, 2005**

                                                    Page 206

1        Q  I just want to show you what's

2    been -- I want to show you Exhibit 73, the

3    next to the last page of Exhibit 73, which is

4    DEF 01103 and you see an e-mail from you to

5    Rick Zeena dated February 11, 2002?

6        A  Uh-huh, yes, I do.

7        Q  And is there a list on that

8    e-mail of other employees counseled for not

9    documenting MO's correctly?

10       A  Yes, that's the list that I

11   would have created.

12       Q  And again, from what records did

13   you go through at the time in order to come

14   up with the list that's listed on DEF 01103?

15       A  That would have been from

16   reviewing personnel files located in the

17   Plant 8.

18              MR. KERMAN:  I have no further

19          questions.

20              MS. KELLY:  Obviously, I'm going

21          to have some questions.

22

23

24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**THOMAS OLIVER**
**July 19, 2005**

Page 237

CERTIFICATION

1

2      I, Darlene Coppola, a Notary Public, do

3  hereby certify that THOMAS OLIVER came before me

4  on the 19th day of August, 2005 in Worcester,

5  Massachusetts, and was by me duly sworn to

6  testify to the truth and nothing but the truth

7  as to his knowledge touching and concerning the

8  matters in controversy in this cause; that he

9  was thereupon examined upon his oath and said

10  examination reduced to writing by me; and that

11  the statement is a true record of the testimony

12  given by the witness, to the best of my

13  knowledge and ability.

14      I further certify that I am not a relative

15  or employee of counsel/attorney for any of the

16  parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19  WITNESS MY HAND THIS 16th day of August,

20  2005.

21  *Darlene M. Coppola*

22  DARLENE M. COPPOLA

23  NOTARY PUBLIC

24  REGISTERED PROFESSIONAL REPORTER

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# jackson | lewis
Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

| Jackson Lewis LLP | ATLANTA, GA | LOS ANGELES, CA | RALEIGH-DURHAM, NC |
| 75 Park Plaza | BOSTON, MA | MIAMI, FL | SACRAMENTO, CA |
| Boston, Massachusetts 02116 | CHICAGO, IL | MINNEAPOLIS, MN | SAN FRANCISCO, CA |
| | DALLAS, TX | MORRISTOWN, NJ | SEATTLE, WA |
| Tel 617 367-0025 | GREENVILLE, SC | NEW YORK, NY | STAMFORD, CT |
| Fax 617 367-2155 | HARTFORD, CT | ORLANDO, FL | WASHINGTON, DC REGION |
| www.jacksonlewis.com | LONG ISLAND, NY | PITTSBURGH, PA | WHITE PLAINS, NY |



EXHIBIT
# 73
7/19/05

July 18, 2005

**VIA FACSIMILE AND FIRST-CLASS MAIL**

Mary E. Kelly
Livingston, Adler, Pulda, Meiklejohn & Kelly P.C.
557 Prospect Avenue
Hartford, CT 06105-2922

Re:    Briddell v. Saint Gobain Abrasives, Inc.
       U.S.D.C. No. 04-40146-FDS

Dear Mary:

Enclosed please find bates-numbered documents DEF01089-DEF01104, which are produced in connection with the Responses of Defendant, Saint-Gobain Abrasives, Inc., to Plaintiff Robert Briddell's Requests for Production. Please note that documents bates-numbered DEF01090-97 are being produced pursuant to the terms in your proposed Stipulation and Order of Confidentiality and with the understanding that these documents will not be shared with Union personnel.

Thank you.

Very truly yours,

JACKSON LEWIS LLP

David J. Kerman

DJK/asr
Enclosures



**SAINT-GOBAIN
CORPORATION**

# CONFIDENTIAL

## INTEROFFICE MEMO

To/Location **See Below**

From/Location **Catherine Ferrante - SGC**

Date **January 30, 1998**

Telephone **610-341-7804**

Subject

Fax **610-341-7981**

### LEGAL ASPECTS OF HR TRAINING - PILOT

To:  Hank Carter - Vetrotex-RXW
Maribeth Chitwood - Vetrotex-RXW
Bruce Parker - Vetrotex-RXW
Guy Smith - Vetrotex-RXW
Lloyd Vu - Vetrotex-RXW

Richard Brinkerhoff - SGC-SVF
Ken Warshaw - SGC-SVF
Mary Chantry - SGC-SVF
Jim Harkins - SGC-SVF

Ray Cole - Bayform-Cadiz

Charlene Giles - BFG-SBF
Larry Nave - BFG-Marion
Tom Sorbie - BFG-Millville

Mike Collitti - CertainTeed-SVF
Robert Cole - CertainTeed-SVF
Mike Hoft - CertainTeed-BRM
Judy Moore - CertainTeed-SVF
Nick O'Buck - CertainTeed-SVF

Bob Foley - Abrasives-SWR
Tom Oliver - Abrasives-SWR
Frederick Villoutriex - Abrasives-Troy
Ron Bickley - Abrasives-Philadelphia

Russ Milholland - SGIC - SWR
David Shum - SGIC-Northboro
Patti Titko - SGIC - Stow
Christine Keller - Bicron-Newbury
Ron Smithson - SGIC - Louisville

cc:  S. Carr - SGC - SVF

Thank you for agreeing to participate in our pilot of the Legal Aspects of HR training program planned for SGC businesses in North America in 1998 and 1999. To confirm, the meeting will be held at Saint-Gobain Corporation's headquarters in Valley Forge, Pennsylvania on Tuesday, February 10 (for those traveling to Valley Forge for the first time, the sign at the front of the complex reads "CertainTeed Corporation").

The pilot will be conducted by Anderson-davis, Inc. We will begin at 9:00 a.m. and conclude approximately 3:00 p.m in the Ardmore Room (basement of building 3). The program itself is four hours. We will then spend about an hour together without the trainers to get feedback from you on the content of the program, the effectiveness of the trainers, etc.

For your review and information, I am enclosing a copy of the Program Overview, biographies of the trainers, and directions to our facility. I look forward to seeing you all.

# MANAGING A RESPECTFUL WORKPLACE
## Program Overview
### Four Hour Management Program

Training methodology includes trainer mini lectures and dramatization, skill building activities, group discussions/questions and answers, and training videos.

| | |
|---|---|
| 15 Minutes | Introduction, program's objectives and *third party stereotyping/subtle harassment dramatization. |
| 20 Minutes | *Workplace Behavior Assessment |
| 5 Minutes | *Unacceptable Behavior (List of behaviors Saint Gobain identifies as unacceptable) |
| 3 Minutes | Terminology |

**CONFIDENTIAL**

- State Fair Employment Agency
- Protected Class
- Discrimination
- Hostile Work Environment
- Racial/Sexual Harassment
- Quid Pro Quo
- Sex-Based Harassment
- Sexual Orientation
- EEOC
- Defamation

20 Minutes    *Respect vs. Harassment* (Video) "How to Recognize & Prevent Harassment"

Overview of Video Scenarios - Types of Harassment Dramatized

1. Stereotyping
   Subtle Sexual Harassment
   Derogatory Comments about Native Americans and Hispanics

2. Racial Harassment
   Disrespectful Joking

3. Emotionally Abusive Boss
   Religious Harassment
   Coworker Sabotaging a Peer's work

4. Age Harassment

5. Male to Male Harassment (Not Homosexual)

6. Females Making Derogatory Comments about Men
   Stereotyping

Note: 5 and 6 Include Examples of Third Party Harassment

*This activity/print material will be customized to address Saint Gobain's specific training objectives/workplace situations.

DEF01091

7. Rumors
   Sexual Orientation
   Sexual Harassment - Verbal and Physical

Note: *Respect vs. Harassment* includes a brief overview of the
        legal basis of harassment

5 Minutes   Five Step Method - How to Identify Subtle Sexual Harassment When
            No Complaint

5 Minutes   Summary of the awareness section

10 Minutes  Legal overview — basis of fair employment laws, management's liabilities
            and mistakes

10 Minutes  Break

55 Minutes  *Jack Code's Nightmare* (Video)

5 Minutes   The trainer will review participant manual post video test and assign the
            participants the tasks of:

            1. Identifying behavior that creates problems and/or liability.
            2. Identify how to properly manage that situation.

            Situations addressed in video identify a potential violations of:

            • National Labor Relations Act
            • Implied Contract
            • Title VII Civil Rights Act
            • Age Discrimination in Employment Act
            • Fair Labor Standards Act
            • Sex Harassment
            • Occupational Safety and Health Act
            • Pre-Employment Inquiries
            • Equal Pay Act
            • Defamation
            • Family Medical Leave Act

            Note: A post video test will be given

20 Minutes  Saint Gobain — Review expectations of management, clarify their
            responsibilities, and review its discrimination/harassment policies and complaint
            procedure.

25 Minutes  Key points of receiving discrimination/harassment complaints, how to avoid
            mistakes, and critique of trainer dramatization.

20 Minutes  *The Healing Process* (Video) and brief review of the workbook.

30 Minutes  Intervention — A skill building activity that teaches management personnel how
            to stop subtle harassment/discrimination that they see when there is no complaint

3 Minutes   Summary & Critique

CONFIDENTIAL

## Appendices In Management Workbook
### Legal Overview

Each of these laws/acts will include the legal basis, who it applies to, and its enforcement agency.

- Age Discrimination in Employment Act
- Americans with Disabilities Act
- Equal Pay Act
- Fair Labor Standards Act
- Family Medical Leave Act
- National Labor Relations Act
- Occupational Safety and Health Act
- Pre-Employment Inquiries
- Sex Harassment
- Title VII of the 1964 Civil Rights Act, as amended in 1972 and 1991



# STEPHEN F. ANDERSON
## BIOGRAPHICAL INFORMATION

**CONFIDENTIAL**

## Training Experience

Established Anderson-davis, Inc. in 1980 and was one of the first trainers and consultants to design and deliver sexual harassment training (September 1980), investigators training (Summer 1986) and healing process since 1988. Stephen designed and delivered a one day sexual harassment investigation training program in the fall of 1988. This nationally offered seminar was endorsed by The Bureau of National Affairs, Inc.

Mr. Anderson has designed and instructed training programs since 1972 for over 120,000 employees in the public, private and academic sectors on the topics of equal employment opportunity, sexual harassment, communications, cultural diversity, effective speaking, gender issues in today's workplaces and effective supervision.

## Expert Witness

Since 1986 Mr. Anderson has been retained as an expert witness by attorneys litigating sexual harassment and sex discrimination court cases.

## Video Training Programs written and produced by Stephen F. Anderson

Mr. Anderson wrote two of the most widely used sexual harassment video-based training programs in the United States and Canada: *Intent vs. Impact* (available in Spanish) and *Myths vs. Facts (available in Spanish and French)*. These training programs are distributed by BNA Communications, Inc. to employers in the United States, Canada, Puerto Rico and Mexico. Each is a two-set, stand alone sexual harassment video tape training program. *Respect vs. Harassment* is a five module training program that will be distributed July 1997 by BNA Communications, Inc.

## Resource Materials written by Stephen F. Anderson

Stephen wrote *How to Effectively Manage Sexual Harassment Investigations*, a 300 page resource manual, published in 1988 (revised in 1992) and distributed by BNA Communications, Inc.

## Media

Mr. Anderson has been featured on *News Station, Tokyo, Japan*, ABC New's *20/20, Good Morning America, The Oprah Winfrey Show* and *Headlines on Trial*. Stephen has been featured in the *New York Times*, the *Los Angeles Daily News, Dallas Times-Herald, U.S. News and World Report* and *Working Woman* magazine.

## Education

Mr. Anderson has a degree in Psychology and a Masters in Personnel Administration.

## SHRM Presentations

Stephen has been a member of SHRM since 1992. He has presented at the Texas state SHRM conference in October 1994, the Kern County (Bakersfield, California) SHRM in September 1995, the Santa Clara Valley Chapter of SHRM in September 1994 and the Colorado Human Resource Association state conference in October 1993.

## Consulting

Since 1986 Mr. Anderson has consulted with companies to heal the workplace impacted by harassment/discrimination complaints, provides one-on-one coaching and review of harassment policies and complaint procedures.

# BIOGRAPHIES

**Bruce Koranski** has over fifteen years of training experience in the areas of cultural diversity, the cultural aspect of international business, and staff development. Mr. Koranski taught for thirteen years at the University of Denver. He currently works with several major corporations across the United States developing and providing training. Mr. Koranski has a B.A. in economics, a teaching certificate in history, and an M.A. in Curriculum Instruction/Cognate in International Studies from the University of Denver.

**Herbert L. Martin** has over 12 years experience as a psychologist, consultant, and trainer. He has developed and conducted training programs on cultural diversity, sexual harassment, healing the workplace, stress management, smoking cessation, and performance enhancement since 1986. Dr. Martin received his B.A. in Psychology and his Ph.D. in Clinical Psychology.

**Kay Krohne, Ed.D, MBA** is a proven leader in both the military and private sectors, with more than 20 years experience. Sought out as an expert by attorneys, universities, and national television network programs such as *Nightline* and *Prime Time Live*. Dr. Krohne is a noted author, consultant, professor and professional speaker.

**Lynne Eisaguirre** helps people solve employee relations problems through training and consulting. Her 18 years as an attorney has included the practice of employment, litigation, arbitration for the American Arbitration Association, teaching as a law professor at the University of Denver Law School and founding and managing a public company. Author of *Sexual Harassment: A Reference Handbook* (ABC-CLIO) she is currently writing a diversity issues book, and serving as a member of the Board of Editorial Contributors for the *Rocky Mountain News*.

**Erik Brown** is a Junior Associate with Anderson-davis, Inc. Since 1996 he has specialized in providing and delivering sexual and racial harassment training to clients in the public and private sector. He is currently working on a bachelors degree in business.



CONFIDENTIAL

<u>DIRECTIONS TO SAINT-GOBAIN</u>

<u>VALLEY FORGE AND BLUE BELL, PA</u>

**1. FROM: PHILADELPHIA INTERNATIONAL AIRPORT TO SAINT-GOBAIN, VALLEY FORGE, PA**

  A.  Exit airport, follow signs 95 South Delaware

  B.  Continue on 95 S. to Exit #7 - I-476 North Plymouth Meeting

  C.  Follow I-476 North to Exit #6 - Interstate I-76 West (To Valley Forge)

  D.  Take Exit #25B from Interstate I-76 on the ramp designated U.S. 202 South ( West Chester)

  E.  Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights and over bridge. SAINT-GOBAIN is the  first complex on the left-side of the road  (Three white brick buildings with cathedral type windows.)

<u>Alternate Route During Rush Hour From Philadelphia International Airport to Saint-Gobain, Valley Forge, PA</u>

  A.  Follow A & B above.

  B.  Follow I-476 North to Exit #5 - St. David's Villanova Rt. 30.

  C.  At bottom of exit ramp turn left - Lancaster Ave. - Rt. 30

  D.  Continue on Lancaster Ave., go through 10 traffic lights - turn right - Old Eagle School Road

  E.  Continue on Old Eagle School Rd. - do not go through fourth traffic light

  F.  SAINT-GOBAIN parking lot entrance will be on your right before the fourth traffic light

**2. FROM: NEW YORK**

  A.  New Jersey Turnpike South to Pennsylvania Turnpike - Exit #6 - proceed West on Penna. Turnpike - exit at Interchange #24 ( Valley Forge)

  B.  Before toll booths stay to your right - after paying toll - take Exit #25 - Valley Forge - first exit after toll booths

  C.  Stay in second lane - proceed to second traffic light - turn left on Guthrie Road - follow to dead end

  D.  Turn right, cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road  (Three white brick buildings with cathedral type windows.)

**3. FROM: CENTER CITY PHILADELPHIA**

  A.  Follow signs to Schuylkill Expressway West, Route #76

  B.  Continue on Expressway past City Line Avenue Exit - follow signs for Valley Forge

  C.  Take Exit 25B from Expressway on the ramp designated U.S. 202 South - West Chester

  D.  Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights, cross over bridge (Swedesford Road) SAINT-GOBAIN is the first  complex on the left-side of the road  (Three white brick buildings with cathedral type windows.)

**4. FROM: CHESTER - WILMINGTON AREA**

  A.  Route 202 North to Warner Road Exit

  B.  Left at stop sign on exit ramp

  C.  Cross over bridge, left at light cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road  (Three white brick buildings with cathedral type windows.)

**5. FROM: CAMDEN, NEW JERSEY**

  A.  Follow signs to Benjamin Franklin Bridge - proceed across bridge to Vine Street

  B.  Follow Signs to Schuylkill Expressway West, Route #76

  C.  Continue on Expressway past City Line Avenue Exit - follow signs for Valley Forge

  D.  Take Exit 25B from Expressway on the ramp designated U.S. 202 South - West Chester

  E.  Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights, cross over bridge (Swedesford Road)  SAINT-GOBAIN is the first complex on the left-side of the road (Three white brick buildings with cathedral type windows.)

CONFIDENTIAL

See Next Page

DIRECTIONS TO SAINT-GOBAIN

VALLEY FORGE AND BLUE BELL, PA

**1. FROM: PHILADELPHIA INTERNATIONAL AIRPORT TO SAINT-GOBAIN, VALLEY FORGE, PA**

A. Exit airport, follow signs 95 South Delaware

B. Continue on 95 S. to Exit 67 - I-476 North Plymouth Meeting

C. Follow I-476 North to Exit #6 - Interstate I-76 West (To Valley Forge)

D. Take Exit #25B from Interstate I-76 on the ramp designated U.S. 202 South ( West Chester)

E. Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights and over bridge. SAINT-GOBAIN is the first complex on the left-side of the road (Three white brick buildings with cathedral type windows).

Alternate Route During Rush Hour From Philadelphia International Airport to Saint-Gobain, Valley Forge, PA

A. Follow A & B above.

B. Follow I-476 North to Exit #5 - St. David's Villanova Rt. 30.

C. At bottom of exit ramp turn left - Lancaster Ave. - Rt. 30

D. Continue on Lancaster Ave., go through 10 traffic lights - turn right - Old Eagle School Road

E. Continue on Old Eagle School Rd. - do not go through fourth traffic light

F. SAINT-GOBAIN parking lot entrance will be on your right before the fourth traffic light

**2. FROM: NEW YORK**

A. New Jersey Turnpike South to Pennsylvania Turnpike - Exit #6 - proceed West on Penna. Turnpike - exit at Interchange #24 ( Valley Forge)

B. Before toll booths stay to your right - after paying toll - take Exit #25 - Valley Forge - first exit after toll booths

C. Stay in second lane - proceed to second traffic light - turn left on Guthrie Road - follow to dead end

D. Turn right, cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road (Three white brick buildings with cathedral type windows).

**3. FROM: CENTER CITY PHILADELPHIA**

A. Follow signs to Schuylkill Expressway West, Route #76

B. Continue on Expressway past City Line Avenue Exit - follow signs for Valley Forge

C. Take Exit 25B from Expressway on the ramp designated U.S. 202 South - West Chester

D. Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights, cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road. (Three white brick buildings with cathedral type windows.)

**4. FROM: CHESTER - WILMINGTON AREA**

A. Route 202 North to Warner Road Exit

B. Left at stop sign on exit ramp

C. Cross over bridge, left at light cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road (Three white brick buildings with cathedral type windows.)

**5. FROM: CAMDEN, NEW JERSEY**

A. Follow signs to Benjamin Franklin Bridge - proceed across bridge to Vine Street

B. Follow signs to Schuylkill Expressway West, Route #76

C. Continue on Expressway past City Line Avenue Exit - follow signs for Valley Forge

D. Take Exit 25B from Expressway on the ramp designated U.S. 202 South - West Chester

E. Look for the overhead sign for Warner Road. Take this ramp - continue for approximately one-half mile past two traffic lights, cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road (Three white brick buildings with cathedral type windows.)

Page 2.

**6. FROM: HARRISBURG, PA**
    A.  Take Pennsylvania Turnpike to interchange #24, Valley Forge
    B.  Before toll booths stay to your right - after paying toll - take Exit #25 - Valley Forge - first exit after toll booths
    C.  Stay in second lane - proceed to second traffic light - turn left on Guthrie Road - follow to dead end
    D.  Turn right - cross over bridge (Swedesford Road) SAINT-GOBAIN is the first complex on the left-side of the road
        (Three white brick buildings with cathedral type windows.)

**7. FROM: PHILADELPHIA INTERNATIONAL AIRPORT TO BLUE BELL**
    A.  Exit airport - follow signs to 95 South Delaware
    B.  Continue on 95 South to Exit #7 - 476 North Plymouth Meeting
    C.  Exit #9 Plymouth Meeting - Exit to Plymouth Road - end of ramp turn left
    D.  At second traffic light turn right on Germantown Pike
    E.  At fourth traffic light turn right on Walton Road
    F.  At second traffic light turn left on Township Line Road
    G.  Second traffic light turn right on Union Meeting Road - follow this road until you pass the first traffic light - after the light
        1400 UNION MEETING will be on the right.

**8. FROM: PENNSYLVANIA TURNPIKE TO BLUE BELL**
    A.  Exit #25 Norristown
    B.  After paying tolls - follow sign to Plymouth Road
    C.  At traffic light at end of ramp - make a left
    D.  Go to next traffic light - turn right on Germantown Pike
    E.  At fourth traffic light turn right on Walton Road
    F.  At second traffic light turn left on Township Line Road
    G.  Second traffic light turn right on Union Meeting Road - follow this road until you pass the first traffic light - after the light
        1400 UNION MEETING will be on the right.

**9. FROM: VALLEY FORGE TO BLUE BELL**
    A.  Exit parking lot to Swedesford Road - turn right - follow to first traffic light
    B.  At traffic light turn right - follow signs for 202 North Turnpike first right - at bottom of ramp keep to right - Schuylkill Expressway (Rt. 76)
        East Philadelphia
    C.  Follow Expressway to Rt. 476 North
    D.  Exit #9 Plymouth Meeting - Exit to Plymouth Road - end of ramp turn left
    E.  At second traffic light turn right on Germantown Pike
    F.  At fourth traffic light turn right on Walton Road
    G.  At second traffic light turn left on Township Line Road
    H.  Second traffic light turn right on Union Meeting Road - follow this road until you pass the first traffic light - after the light
        1400 UNION MEETING will be on the right.

**10. FROM: VALLEY FORGE TO PHILADELPHIA AIRPORT**
    A.  Exit parking lot to Swedesford Road - turn right - follow to second traffic light
    B.  At traffic light turn right - follow signs for 202 North Turnpike first right - at bottom of ramp keep to right - Schuylkill Expressway (Rt. 76)
        East Philadelphia
    C.  Follow Expressway to Rt. 476 South Chester
    D.  Exit 476 to 95 North Philadelphia
    E.  Follow 95 North - follow signs to Philadelphia Airport

May, 1997
SYS\COMMON\ADMIN\FACIL\DIRECT.DOC

**CONFIDENTIAL**

From:             FitzGerald, Mary E.
Sent:             Saturday, March 09, 2002 12:48 PM
To:               Zeena, Richard J.
Subject:        FW: Bob Briddell

Rick,

I found this amongst my files, not sure this matters and whether there was a copy in his file.

Mary

-----Original Message-----
From: Viano, Bill F.
Sent: Thursday, December 17, 1998 12:32 AM
To: Fitzgerald, Mary E.; Oliver, Thomas H.
Cc: Litwinowich, Steve J.; Viano, Bill F.
Subject: RE:Bob Briddell


Tom and I sat down with Bob and explained it was not fair to review him at this time seeing he has been in mixing for about 10 to 12 weeks, Tom explained that we will revisit a review on March 1st in the mean time he should try to increase productivity and reduce reworks.Little by little your productivity should improve and if you need any help with any product Bill Viano will take the time to see you get this training.I must say Tom did most of the talking and did very well.I thought it went better than expected.Bob was satisfied with the above, I will file. thanks
------------
From: Oliver, Thomas H.
To: Viano, Bill F.
Date: Wednesday, December 16, 1998 7:10AM

Don't forget to let Mary know how well you did with Bob.

1

DEF01098

**From:**     Oliver, Thomas H.
**Sent:**     Tuesday, February 05, 2002 7:03 AM
**To:**       Zeena, Richard J.
**Subject:**  FW: mix pans
Past email that speaks to Bob's issue with those other heavy pans. Tom

——Original Message———
**From:**     Tivnan, Mike J.
**Sent:**     Monday, February 04, 2002 7:38 AM
**To:**       Oliver, Thomas H.
**Subject:**  FW: mix pans

Is this what you are looking for? Mike

——Original Message——
**From:**     Tivnan, Mike J.
**Sent:**     Tuesday, January 08, 2002 9:52 AM
**To:**       Oliver, Thomas H.
**Subject:**  RE: mix pans

Tom,
        I understood to be that Bob weighed up the mix pans that were returned from the TMS
press. This mix was taken from drums and put into mix pans last week. This mix will be blended
in with new mix which will be one scoop per mix. Therefore there should be no need for someone
to lift a pan that may exceed 45 pounds per pan. Mike

        ——Original Message——
        **From:**     Oliver, Thomas H.
        **Sent:**     Tuesday, January 08, 2002 7:51 AM
        **To:**       Tivnan, Mike J.; Clark, Jeff A.
        **Cc:**       Zeena, Richard J.
        **Subject:**  FW: mix pans

        Is this contrary to the account of the incident that heard Monday Morning? Tom

        ———Original Message——
        **From:**     Tivnan, Bill V.
        **Sent:**     Tuesday, January 08, 2002 5:00 AM
        **To:**       Oliver, Thomas H.
        **Subject:**  mix pans

        Tom,
            I spoke with Bob tonight about the weight of the mix pans. He said that he
        weighed up one pan from each truck (3) pans total.
        Bill

DEF01099

**From:**      Tivnan, Bill V.
**Sent:**      Friday, January 04, 2002 6:00 AM
**To:**      Zeena, Richard J.; Zaklow, Sheldon I.; Oliver, Thomas H.
**Cc:**      Clark, Jeff A.
**Subject:**      RE: Bob Briddell

 Bob spoke to me again before he left today, He was asking about retirement. He said he will be 61 in May,

He said he was seriously thinking about retiring, before something happens. He said he was getting tired of the B-S.

 Just giving  you a heads up- I don't know how much the info is worth or if he has said it before, it's the first time I heard it.
Bill

From:           Tivnan, Bill V.
Sent:           Friday, January 04, 2002 12:49 AM
To:             Zeena, Richard J.; Zaklow, Sheldon I.; Oliver, Thomas H.
Cc:             Clark, Jeff A.
Subject:        RE: Bob Briddell

      I brought this matter to Bob Briddell just a few moments ago. I explained to him what had happened
the previous day, (how it was reported that there was a mix pan that exceeded our weight limit.) The
weight of the pan was documented on a copy of the Manufacturing Order (G989544) was 68.9 pounds.
The weight was initialed by "JC" Jeff Clark.
Bob immediately said that this was not possible, that there was no way he would have put that much in the pan.
He had asked me who had reported it, but told him I didn't know who had reported it.
 Bob told me that he wanted to speak to Rick Zeena about this matter as soon as possible. He would like to see him tomorrow
morning. I told Bob that I would leave a telephone message for Rick. I called him from the phone at the mixing station to attempt to
set up a rough time frame. Bob than told me while I was on thew phone that he wanted a union representative present during this
meeting. I hung up the phone and than Bob said to me that he will wait at home by the telephone for him to call, and he wanted us to set up a meeting
with a representative. I told Bob that we don't have a representative for the union, he said that he knows we do. I than told him that this is something
 that he would have to coordinate. He said he would take care of this. I will leave this copy of the MO in the Core Mold Office with either Jeff Clark or with Mike Tivnan in the morning.
 Bill

    —–Original Message––––
From:           Zeena, Richard J.
Sent:           Thursday, January 03, 2002 4:13 PM
To:             Zaklow, Sheldon I.; Oliver, Thomas H.
Cc:             Clark, Jeff A.; Tivnan, Bill V.
Subject:        RE: Bob Briddell

With date correction...
<< File: Memo 3 January 2002 approved TJS.doc >>

    —–Original Message––––
From:           Zeena, Richard J.
Sent:           Thursday, January 03, 2002 4:08 PM
To:             Zaklow, Sheldon L; Oliver, Thomas H.
Cc:             Clark, Jeff A.; Tivnan, Bill V.
Subject:        Bob Briddell

I have spoken to Bill Tivnan this afternoon and am dropping a hard copy of this
attached letter off for Bill to give to Bob Briddell this evening after he speaks to
Bob about last night's heavy (68.9 lb.) mix pan. Should any further incident
occur involving Mr. Briddell, I would like to be notified immediately. I
apologize for the delay in giving Mr. Briddell this letter. Unfortunately, my
procrastination has resulted in a poor reflection that we take with regards to
safety and quality in the Plant.

Let's hope that this finally serves as a wake-up call for Mr. Briddell.  If it does not, it will put is in a better position to act accordingly.

<< File: Memo 3 January 2002 approved TJS.doc >>

*Richard (Rick) J. Zeena*
Human Resources Manager - Bonded Abrasives
Saint-Gobain Abrasives
Phone (508) 795-2163
Fax (508) 795-4009
E-Mail: Richard.J.Zeena@saint-gobain.com
Visit us at www.sgabrasives.com

**From:**       Zeena, Richard J.
**Sent:**        Monday, February 11, 2002 9:23 AM
**To:**          Stockman, Steve A.
**Subject:**    FW: RECENT ISSUES

**Importance:**   High
Steve,

Here are some examples, re: Briddell

-----Original Message-----
**From:**       Oliver, Thomas H.
**Sent:**        Monday, February 11, 2002 8:28 AM
**To:**          Zeena, Richard J.
**Subject:**    RECENT ISSUES

All of the below have been counseled on not documenting mo's correctly. The difference between these individuals and Mr. Briddell is that there behavior was corrected and to date there has been no reoccurrences.
Frank Hanson-
Russ Johnson
Dwight Dano
Dennis Novia
Kevin Reed
Franklin Aboagye
Tom Patnode
Ron Racca
Walter Ahl
Asari Agyeman
Jeff Gonyea
Mark Haynes
Jose Rodriquez
Ken Tyre
Sam Wiredu

A recent quality counseling was given to Ralph Parker.

*Tom Oliver*
*General Supervisor*
*Plant 8 Mix, Mold and Ovens*
*(508) 795 - 2331*
*(508) 864 - 5906 (cell)*



| | |
|---|---|
| **From:** | Zeena, Richard J. |
| **Sent:** | Thursday, January 03, 2002 4:08 PM |
| **To:** | Zaklow, Sheldon I.; Oliver, Thomas H. |
| **Cc:** | Clark, Jeff A.; Tivnan, Bill V. |
| **Subject:** | Bob Briddell |

I have spoken to Bill Tivnan this afternoon and am dropping a hard copy of this attached letter off for Bill to give to Bob Briddell this evening after he speaks to Bob about last night's heavy (68.9 lb.) mix pan. Should any further incident occur involving Mr. Briddell, I would like to be notified immediately. I apologize for the delay in giving Mr. Briddell this letter. Unfortunately, my procrastination has resulted in a poor reflection that we take with regards to safety and quality in the Plant.

Let's hope that this finally serves as a wake-up call for Mr. Briddell. If it does not, it will put is in a better position to act accordingly.



Memo 3 January
2002 approved T...,

*Richard (Rick) J. Zeena*
Human Resources Manager - Bonded Abrasives
Saint-Gobain Abrasives
Phone (508) 795-2163
Fax (508) 795-4009
E-Mail: Richard.J.Zeena@saint-gobain.com
Visit us at www.sgabrasives.com

# EXHIBIT M

**THOMAS OLIVER, VOLUME II**
**January 30, 2006**

Page 1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3

4                C.A. No. 04-CV-40146-FDS

5

6    **********************************

7    ROBERT BRIDDELL,                    *

8                    Plaintiff          *

9    vs.                                 *

10   SAINT GOBAIN ABRASIVES, INC.        *

11                   Defendant           *

12   **********************************

13             VOLUME II

14      DEPOSITION OF:  THOMAS OLIVER

15    CATUOGNO COURT REPORTING SERVICES

16           446 Main Street

17        Worcester, Massachusetts

18      January 30, 2006  2:50 p.m.

19

20

21

22           GAYLE OHMAN

23     CERTIFIED SHORTHAND REPORTER

24             #1353S94

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

THOMAS OLIVER, VOLUME II
January 30, 2006

Page 49

1    explain.   Refreshing your recollection it's a

2    term lawyers use, and it means that having

3    looked at it now I remember something I didn't

4    remember.

5         A.    I do remember the warning.   Not

6    following proper operating procedures doesn't --

7    my memory doesn't recall exactly what the

8    operating procedures were.   I can speculate, but

9    I don't want to do that.

10        Q.    Okay.   Turn to the next page now.

11   Read just the next page and let me know if that

12   refreshes your recollection at all.

13        A.    Okay.

14        Q.    Having read this does this refresh

15   your recollection so you now have an independent

16   memory of what occurred?

17        A.    Yes.

18        Q.    So having looked at these first two

19   pages of Exhibit 18 what do you recall about the

20   reasons that Mr. Briddell was given a written

21   warning?

22        A.    Shortly after -- well, okay, we did

23   the 9/22.   So he had mixed weight issues around

24   9/18 and week ending 9/22 which gave him a

**THOMAS OLIVER, VOLUME II**
**January 30, 2006**

Page 50

1    written reminder.  Okay.  The same day more mix

2    pans weighing more than the allowable limits

3    were reported.  So that would be one instance.

4             After reviewing it was discovered

5    Bob Briddell had made the mixes approximately

6    three hours after he signed the written reminder

7    so it appears to me that the written reminder

8    had no effect on changing improper procedures.

9             Then in the past two weeks -- this

10   is dated 10/4/01 -- reported to various

11   supervisors that Bob had not been following the

12   proper procedure, and is not filling out the

13   routing steps to my recollection.  Quality

14   issues also been not using the COM-CAM quality

15   system.  So...

16        Q.    **So what were the reasons?**

17        A.    Number one being three hours after

18   given a written reminder he had more heavy pans

19   along with not filling out proper routings.  And

20   just about COM-CAM in here as I testified

21   earlier that was just a vehicle -- in my

22   understanding a vehicle to identify that it was

23   Bob, if he didn't sign the routings supervision

24   went deeper into the system.

**THOMAS OLIVER, VOLUME II**
**January 30, 2006**

Page 109

1          I, GAYLE OHMAN, a Notary Public in and for

2     the Commonwealth of Massachusetts, do hereby

3     certify that THOMAS OLIVER, appeared before me,

4     satisfactorily identified himself, on the 30th

5     day of January, 2006, who was by me duly sworn

6     to testify to the truth and nothing but the

7     truth as to his knowledge touching and

8     concerning the matters in controversy in this

9     cause; that he was thereupon examined upon his

10    oath and said examination reduced to writing by

11    me; and that the statement is a true record of

12    the testimony given by the witness, to the best

13    of my knowledge and ability.

14         I further certify that I am not a relative

15    or employee of counsel/attorney for any of the

16    parties, nor a relative or employee of such

17    parties, nor am I financially interested in the

18    outcome of the action.

19         WITNESS MY HAND this 28th day of February,

20    2006.

21

22    Gayle Ohman                    My Commission expires:

23    Notary Public                  October 25, 2007

24