# EXHIBIT O

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**



Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4                    C.A. No. 04-CV-40146-FDS

5

6      **********************************

7      ROBERT BRIDDELL,                    *

8                        Plaintiff         *

9      Vs.                                 *

10     SAINT GOBAIN ABRASIVES, INC.        *

11                       Defendant         *

12     **********************************

13

14                      VOLUME III

15          DEPOSITION OF:  THOMAS OLIVER

16        CATUOGNO COURT REPORTING SERVICES

17                 446 Main Street

18            Worcester, Massachusetts

19          January 31, 2006  8:40 a.m.

20

21

22                   GAYLE OHMAN

23        CERTIFIED SHORTHAND REPORTER

24                   #1353S94

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 4

1          (Deposition commenced at 8:40 a.m.)

2

3      THOMAS OLIVER, Deponent, having been duly

4   sworn, deposes and states as follows:

5

6      EXAMINATION BY MS. KELLY:

7

8      **Q.     Okay, Mr. Oliver, we talked a**

9   **little -- probably a great deal yesterday about**

10  **heavy mixes.  Can you tell me what a mixer can**

11  **do that would result in a heavy mix?**

12      A.     Two things come to mind.  One

13  being use a rock screen, if it's all the mixes

14  that grid size associated with them.  Associated

15  with the grid size is a certain size screen.

16          If you use a screen that's too

17  large it can just go right through, and the

18  scales are programmed to shut off at 45 pounds,

19  or actually a little bit before so a little bit

20  of runoff will get into the 45 pounds or under.

21  If they use a larger mesh screen there's going

22  to be more of that runoff.  So that's one way.

23          Another way is taking the mix

24  that's what we call mix balls that are left in

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 5

1    the screen and scooping them into the pan that

2    already has 45 pounds in it.

3         Q.      Anything else that a mixer can do

4    that will result in a heavy pan?

5         A.      One other thing I can possibly

6    think of if the last pan, the last mix coming

7    through the system was 3, 4, 5 pounds in the pan

8    instead of using up an extra pan for 5 pounds

9    they might dump it into the previous one.  But I

10   can't think of anything else.

11        Q.      So if you used the wrong abrasive

12   or the wrong bond it wouldn't make a heavy pan?

13        A.      No.

14        Q.      And if you use the wrong amount of

15   liquid would that make a heavy pan?

16        A.      No.

17        Q.      If you used the wrong screen?

18        A.      Yes.

19        Q.      Okay, you used a screen that was

20   too large would you have problems with the mix?

21        A.      Not from the mix -- not from the

22   two bowl itself because once again you got to go

23   through a screener operation, it would get

24   rescreened again.  So if the sizing was wrong it

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 83

1     or a black employee?

2              MS. KELLY:   Objection to the form,

3         beyond the scope.

4         Q.      (By Mr. Kerman)   You can answer.

5         A.      That employee, the one that I was

6     confused with was white.

7         Q.      You were asked some questions with

8     regard to Mr. Briddell making contaminated

9     mixes; is that correct?

10        A.      That's correct.

11        Q.      What is your definition of a

12    contaminated mix as a manager at Saint Gobain?

13             MS. KELLY:   Object to form, asked

14        and answered.

15        Q.      (By Mr. Kerman)   You can answer.

16        A.      How I would view a contaminated mix

17    would be a mix that had a foreign -- something

18    in it that wasn't part of the mix slip.  Well,

19    something that didn't belong in the mix.

20        Q.      Have other Saint Gobain employee's

21    to your understanding and knowledge been

22    disciplined for poor quality mixes that were not

23    contaminated mixes?

24        A.      Yes.

THOMAS OLIVER, VOLUME III
January 31, 2006

Page 85

1              MR. KERMAN:  Well, I'm simply

2         letting you know that you're not going to

3         know what my strategy is.

4         Q.      (By Mr. Kerman)  Just so the record

5    is clear, Mr. Oliver, with regard to the

6    disciplinary action of Mr. Briddell that

7    involved contaminated mixes, could you identify

8    from your perspective as the manager involved in

9    that disciplinary action the facts and

10   circumstances that led to Mr. Briddell being

11   disciplined in connection with the contaminated

12   mixes?

13        A.      Yes.

14        Q.      Please do.

15        A.      Yes, I can.  There were two

16   contaminated mixes that Bob did, one of which

17   Bob was signed up for on the MO, the other in

18   which he hadn't.  One of the mixes we tried to

19   salvage, save it; we couldn't.

20              The second mix one that he didn't

21   sign up for we tried to save it, we couldn't get

22   the contaminants out of that mix.

23        Q.      Did you have any conversation at

24   the time with Mr. Briddell shortly after the

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 86

1   contaminated mixes about the basis for why you

2   were disciplining him in connection with those

3   incidents?

4               MS. KELLY:  Object to the form.

5        Q.    (By Mr. Kerman)  You can answer.

6        A.    Conversation it was myself, Mr.

7   Briddell, Mr. Zeena when I was talking to Bobby

8   about the contaminated mixes, and we talked to

9   him about the procedure and so on and so forth.

10              I also explained to him that he

11  also didn't sign off on an MO which was one of

12  those contaminated mixes.

13       Q.    And what did you say to Mr.

14  Briddell with respect to him not signing off on

15  the MO with regard to one of those contaminated

16  mixes?

17       A.    I just reiterated to him that this

18  is once again a repeat offense and something

19  he's been counseled for in the past.

20       Q.    And with regard to the contaminated

21  mix situation, based on your knowledge of the

22  situation would it be any defense for Mr.

23  Briddell in connection with that incident to say

24  that he was directed by a supervisor to make

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 87

1    those mixes at the end of the shift as opposed

2    to the beginning of the shift?

3                MS. KELLY:   Object to the form,

4          asked and answered.

5          Q.     (By Mr. Kerman)   You can answer.

6          A.     As a trained mixer Bob knows that

7    when making fine mixes or different colored

8    mixes, white versus black, single most important

9    thing is that the equipment is clean, both the

10   mix bowls and the mix pans that you use.

11               What time during the shift -- I

12   mean, we say at the beginning and the end of the

13   shift because operationally those are the times

14   when the bowls are clean, it's either because

15   the off going shift has cleaned the bowls or the

16   oncoming shift is taking clean equipment.

17               So it's preferable, but in any

18   event if it can't happen that way then as a

19   trained mixer the bowls have to be cleaned and

20   the pans have to be cleaned.

21         Q.    You've been asked on a number of

22   occasions -- there's been reference on a number

23   of occasions during your examination that

24   Mr. Briddell accused at some point Jeff Clark

THOMAS OLIVER, VOLUME III
January 31, 2006

Page 90

1          MR. KERMAN:  You did ask about

2     other investigations he made about

3     overweight pans.

4          MS. KELLY:  Okay, I'm sorry.  Other

5     than the ones of Mr. Briddell, I'm sorry.

6          Q.     (By Mr. Kerman)  With respect to

7     the allegations that Mr. Briddell and/or his

8     coworkers discovered a truck load of pans

9     weighing over 70 pounds did you review the facts

10    or conduct an investigation in connection with

11    that allegation?

12         A.     Yes, I did.

13         Q.     And what were the facts or result

14    of your investigation in connection with that

15    allegation of Mr. Briddell and his coworkers?

16         A.     Those heavy mix pans that were on

17    that truck were from the TMS press.  TMS is an

18    automated press.  The mix is delivered to that

19    press in large mix sacks, they're not mix pans.

20    I believe they hold anywhere from 500 to a

21    thousand pounds, I can't say for sure.

22              There was an issue with the mix.  I

23    believe it was dry, I can't say for sure, but we

24    had to dump the mix out of the system, out of

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

1    the TMS system.

2              The system itself is large hoppers

3    with automatic equipment that we use to dump the

4    mix hoppers into the mix pans.  There's no scale

5    attached to that dumping device so this mix was

6    dumped into the mix pans and put on a truck,

7    returned to the mixing area with explicit

8    instructions to hand scoop I believe it was two

9    scoops or maybe a pan, but to scoop the mixes

10   from the mix truck and scoop it and blend it

11   back into a new mix.  There was never an

12   intention to lift these pans.

13       Q.      You had previously testified that

14   the overweight pans of Mr. Briddell presented a

15   safety issue; is that correct?

16       A.      That is correct.

17       Q.      Did the truck load of overweight

18   pans that Mr. Briddell or his coworkers

19   discovered also present a safety issue in your

20   mind?

21              MS. KELLY:  Objection, you can

22          answer.

23       Q.      (By Mr. Kerman)  You can answer.

24       A.      No.

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 92

1          Q.       Why is that?

2          A.       Because there was instructions

3    which I confirmed to Mr. Clark there was the

4    expectation and I believe it was noted on the

5    trucks or on the mix slips, but it was noted

6    that this mix was to be blended with new mix

7    hand scooping.

8          Q.       Just one minute.  You were also

9    asked whether or not you ever checked during the

10   fall of 2001 whether or not the scales were

11   properly calibrated or properly recording the

12   weight of the pans; is that correct?

13                  MS. KELLY:  Object to the form.

14                  THE WITNESS:  I do recall it, yes.

15         Q.       (By Mr. Kerman)  Is there any

16   reason why you did not check to see whether or

17   not improper calibration of scales was causing

18   the problem of Mr. Briddell's overweight pans?

19                  MS. KELLY:  Object to the form,

20             asked and answered.  You can answer.

21                  THE WITNESS:  All the scales are

22             on a calibration system so I know they're

23             checked.

24         Q.       (By Mr. Kerman)  Did you ever

**THOMAS OLIVER, VOLUME III**
**January 31, 2006**

Page 98

1      A.      Yes.

2      Q.      How did you learn that there were

3   explicit instructions to hand scoop?

4      A.      Jeff Clark.

5      Q.      Did you see the explicit

6   instructions to hand scoop?

7      A.      I believe it was after the fact so

8   I didn't see it, no.

9      Q.      Did anyone ever confirm to you

10  other than Mr. Clark that there were explicit

11  instructions to hand scoop?

12     A.      I can't recall.

13     Q.      Did Mr. Clark tell you it was

14  written on the truck?

15     A.      What I remember from Mr. Clark is

16  that the off shifts were notified as well as

17  first shift.  The form of that notification I

18  don't know if it was written on the truck or a

19  note, I don't know that.

20     Q.      But if it wasn't on the truck is it

21  a possibility someone would have listed?

22     A.      It's possible, but I believe this

23  mix was designated for -- it was to be blended

24  hand scooped, and I don't know the form.

THOMAS OLIVER, VOLUME III
**January 31, 2006**

Page 104

1    I, GAYLE OHMAN, a Notary Public in and for

2  the Commonwealth of Massachusetts, do hereby

3  certify that THOMAS OLIVER, appeared before me,

4  satisfactorily identified himself, on the 31st

5  day of January, 2006, who was by me duly sworn

6  to testify to the truth and nothing but the

7  truth as to his knowledge touching and

8  concerning the matters in controversy in this

9  cause; that he was thereupon examined upon his

10  oath and said examination reduced to writing by

11  me; and that the statement is a true record of

12  the testimony given by the witness, to the best

13  of my knowledge and ability.

14    I further certify that I am not a relative

15  or employee of counsel/attorney for any of the

16  parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19    WITNESS MY HAND this 28th day of February,

20  2006.

21

22  Gayle Ohman            My Commission expires:

23  Notary Public          October 25, 2007

24

# EXHIBIT P

**JEFFREY A. CLARK**
**July 8, 2005**

Page 1

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3        Civil Action No.: 4:04 CV40146 (FDS)

4

5    *******************************

6    ROBERT M. BRIDDELL,              *

7               Plaintiff            *

8    vs.                              *

9    SAINT-GOBAIN ABRASIVES, INC.,    *

10              Defendants            *

11   *******************************

12

13

14

15      DEPOSITION OF:  JEFFREY A. CLARK

16    CATUOGNO COURT REPORTING SERVICES

17           446 Main Street

18        Worcester, Massachusetts

19       July 8, 2005      9:02 a.m.

20

21

22

23        Elisabeth Zahariadis

24     Certified Shorthand Reporter

JEFFREY A. CLARK
July 8, 2005

Page 16

1    Q.    Where do you work?

2    A.    Saint-Gobain Abrasives.

3    Q.    How long have you been employed

4    there?

5    A.    25 years.

6    Q.    What's your current position?

7    A.    Supervisor of core mix and mold.

8    Q.    How long have you been the

9    supervisor of core mix and mold?

10   A.    Six years now.

11   Q.    What position did you have before

12   that?

13   A.    Group leader.

14   Q.    Was that also in the core mix and

15   mold area?

16   A.    Yes, it was.

17   Q.    How long were you a group leader?

18   A.    Five years.

19   Q.    What position did you have before

20   that?

21   A.    Molder.

22   Q.    And obviously I would assume it's

23   in the core mix and mold area?

24   A.    Yes, it was.

JEFFREY A. CLARK
July 8, 2005

Page 22

1  did you have any responsibility for applying the

2  personnel policies of Saint-Gobain into other

3  employees?

4      A.    No.

5      Q.      You became a supervisor in

6  approximately 1999?

7      A.    That's correct.

8      Q.      Do you remember when in 1999 you

9  became a supervisor?

10     A.    I think it was somewhere in the

11  neighborhood of June, it was in June.

12     Q.      Did you receive any training when

13  you became a supervisor?

14     A.    I received the training during my

15  group leader period.

16     Q.      What training did you receive

17  during your group leader period?

18     A.    I attended supervisor institute at

19  the University of New Hampshire.

20     Q.      How long a program was that?

21     A.    It lasted a course of four weeks,

22  but it was every other week for a week at a

23  time.

24     Q.      So it was essentially a two-week

JEFFREY A. CLARK
July 8, 2005

Page 35

1      Q.      You are going to have to forgive

2    me, I don't know very much about the mix and

3    mold areas.  Are there different band level jobs

4    in that area?

5      A.      Yes, there are.

6      Q.      As I understand it, these are

7    salary bands, is that accurate?

8      A.      Say that again?

9      Q.      These are in bands, each position

10   is given a band?

11     A.      Well, majority of the jobs are one

12   level of band.  We do have different levels

13   below that and above that.

14     Q.      What's the band that contains the

15   majority of jobs?

16     A.      Band three.

17     Q.      Would movement from band three or

18   to band four be considered a promotion?

19     A.      Not a promotion, no.

20     Q.      What's it considered?

21     A.      You have your group leader as a

22   band four, that could somewhat be a promotion.

23   In a molding position to a higher molding

24   position, that's just a job change.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JEFFREY A. CLARK
July 8, 2005

Page 79

1    what the date actually was.  I think most of

2    this took place in 2001.

3         Q.    Is it fair to say that you didn't

4    have any concerns prior to his return, is that

5    fair to say.

6         A.    Yes, that's fair to say.

7         Q.    After he returned, how soon after

8    he returned did you begin to have concerns about

9    his performance?

10        A.    As soon as I started receiving

11   complaints of heavy mix pans.

12        Q.    That's the first concern that you

13   would recall having complaints heavy mix pans?

14        A.    Yes.

15        Q.    Who did you receive that complaint

16   from?

17        A.    My rescreeners on days.

18        Q.    Who specifically do you recall

19   receiving complaints from?

20        A.    Frank Hanson, Dave Aubin, Jamie

21   Gilotti.

22        Q.    Do you recall the who first

23   expressed concerns?

24        A.    No, I don't.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 80

1    Q.    When the first rescreener, whoever

2  that might have been, expressed concerns, what

3  do you do?

4    A.    I investigated his complaint.

5    Q.    How did you investigate his

6  complaint?

7    A.    I went out and actually looked at

8  the situation.

9    Q.    What did you do in terms of looking

10 at the situation?

11   A.    The complaint was about heavy mix

12 pans.  I looked at the mix pans, weighed them up

13 and confirmed that they were heavy.

14   Q.    Could you visibly tell by looking

15 at them that they were heavy or were you

16 required to weigh them?

17   A.    You can tell visually when you're

18 lifting the cover of the pan.

19   Q.    You personally weighed them?

20   A.    Yes, I did.

21   Q.    What did you do with that

22 information?

23   A.    I wrote it down.

24   Q.    What do you with it?

**JEFFREY A. CLARK**
**July 8, 2005**

Page 81

1       A.      Passed it on to Billy Tivnan, the

2    third shift supervisor.

3       Q.      Did you have any discussions with

4    Mr. Tivnan?

5       A.      I asked him to ask Bob to be

6    careful about what he was doing because it's a

7    safety issue.

8       Q.      Any other discussion?

9       A.      No, that was it.

10       Q.      Did you visually inspect the rest

11    of the mix pans that other mixers had made at

12    that time?

13       A.      No.

14       Q.      Did you weigh the mix pans that

15    other mixers had made at that time?

16       A.      Only as I received complaints.

17       Q.      At that time had you received

18    complaints other than Mr. Briddell?

19       A.      No.

20       Q.      The only mix pans you weighed were

21    Mr. Briddell's?

22       A.      Those were the complaint pans.

23       Q.      What was the next thing that

24    occurred with respect to Mr. Briddell's

**JEFFREY A. CLARK**
**July 8, 2005**

Page 82

1  performance that you recall after you spoke to

2  Mr. Tivnan?

3        A.      After I spoke to Mr. Tivnan?

4        Q.      Yes, you gave the information to

5  Mr. Tivnan and spoke to him and I'm asking the

6  next thing that happened that you recall?

7        A.      We went back and informed Bob that

8  he was passing on heavy mix pans.

9        Q.      How do you know that?

10        A.      Confirmation from Billy.

11        Q.      The next thing that happened with

12  respect to you is that Mr. Tivnan came back and

13  told you that?

14        A.      Yeah.

15        Q.      What do you recall him telling you?

16        A.      Just that he hadn't talk to him.

17        Q.      Anything else?

18        A.      No, that's it.

19        Q.      What was the next thing that

20  occurred?

21        A.      The problem continued.

22        Q.      What was the next thing that

23  occurred that you recall?

24        A.      Not only was it heavy mix pans, it

**JEFFREY A. CLARK**
**July 8, 2005**

Page 83

1    turned into not filling out routings on checks.

2        Q.    What's the next thing you can

3    recall after Mr. Tivnan came back and talked to

4    Mr. Briddell?

5        A.    He basically said that he informed

6    him and he could take care of it.

7        Q.    What's the next thing that occurred

8    with respect to Mr. Briddell's performance that

9    you were involved in?

10       A.    Again, heavy mix pans and not

11   filling out routing checks.

12       Q.    How did you learn about these

13   issues?

14       A.    Same routine, rescreeners.

15       Q.    Do you recall what rescreeners they

16   were?

17       A.    Same ones.

18       Q.    Do you recall who came up to you

19   with the second complaint?

20       A.    No.

21       Q.    What did you do when you got the

22   second complaint?

23       A.    Same thing I did the first time.

24       Q.    You went back and visually

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 84

1    inspected and weighed them?

2        A.    Yes.

3        Q.    Was anyone present when you did

4    that?

5        A.    Rescreeners.

6        Q.    You don't recall who that was?

7        A.    Well, during that time it was

8    basically two guys that rescreened the majority

9    of the time it was Frank and Dave.  It could

10   have been either one of them during the early

11   stages of this.

12       Q.    When you received the second

13   complaint you went back and weighed them again

14   in front of Frank or Dave and no one else was

15   present?

16       A.    Right, that's correct.

17       Q.    Did you do the same thing, you

18   wrote down the weights?

19       A.    Wrote down the weights, yes.

20       Q.    What did you do?

21       A.    Passed them off to Billy and asked

22   him to talk to Bob again.

23       Q.    Did you work the same shift as Mr.

24   Tivnan?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 85

1    A.    No.

2    Q.    Was there any overlap between your

3    shift and his shift?

4    A.    There's overlap every day.

5    Q.    When was the overlap between your

6    shift and Mr. Tivnan's shift?

7    A.    At the end of third shift and me

8    coming in on days.

9    Q.    What time was that roughly?

10   A.    Bill left at 6:00 and I came in at

11   6:00?

12   Q.    So there was --

13   A.    Communication.

14   Q.    -- a few moments where you would

15   pass off the relevant information to the next

16   supervisor?

17   A.    Yes.

18   Q.    As best you can recall and please

19   tell me if I'm restating it.  Either Mr. Hanson

20   or Mr. Aubin came to you with a second

21   complaint, you went and weighed the mixes in

22   front of the rescreener and then when the shift

23   change came up you provided that information to

24   Mr. Tivnan?

**JEFFREY A. CLARK**
**July 8, 2005**

Page 87

1      A.      It turned into both.

2      Q.      **Do you recall what the next thing**

3 **was?**

4      A.      Both at the same time.

5      Q.      **Who brought that in?**

6      A.      Frank Hanson.

7      Q.      **What did Mr. Hanson have to say?**

8      A.      He came to see me and informed me

9 that he had heavy mix pans and also didn't sign

10 routings on checks.

11     Q.      **The routings on checks is what's**

12 **called MOs?**

13     A.      Yes.

14     Q.      **What did you do when Mr. Hanson**

15 **said that?**

16     A.      First I had to find out who mixed

17 them.

18     Q.      **How do you do that?**

19     A.      I took the check, copy of that

20 check or that MO and I had to trace the check

21 number to the mix slip.d  Once I found out the

22 mix slip, then I found out Bob had signed that

23 mix slip with his clock number.

24     Q.      **Then what did you do?**

JEFFREY A. CLARK
July 8, 2005

Page 88

1    A.    I went back to Bill again.

2    Q.    **Did you go back and weigh the**

3    **mixes?**

4    A.    Yes, I knew what the weights were

5    because I weighed them right then and then I had

6    to find the information.

7    Q.    **Did you weigh them in front of**

8    **anybody?**

9    A.    Frank Hanson.

10   Q    **Anyone else present?**

11   A.    No.

12   Q.    **You went back to Mr. Tivnan, what**

13   **happened next, what did you tell Mr. Tivnan?**

14   A.    I informed him again and I wanted

15   to say I sent an e-mail out stating at that it

16   had to stop before somebody got hurt again.

17   Q.    **What else, did you speak to Mr.**

18   **Tivnan, too?**

19   A.    I spoke to him, yes.

20   Q.    **What do you recall telling Mr.**

21   **Tivnan?**

22   A.    Eventually that it had to stop.

23   Q.    **What did he say to you, if**

24   **anything?**

JEFFREY A. CLARK
July 8, 2005

Page 90

1              If an employee failed to sign off

2     on an MO and it went to the next step, is it

3     accurate that the next employee was not supposed

4     to do anything until it was signed?

5          A.     That's correct.

6          Q.     Is it accurate to say that the

7     employee in the next step was permitted to go

8     back and get a signature?

9          A.     Yes.

10         Q.     Would you have to be notified of

11    that?

12         A.     Either myself or a group leader.

13         Q.     Would have to be told if they

14    weren't getting a signature?

15         A.     They would have to get a signature

16    from one of the two.

17         Q.     If Mr. Briddell were still in the

18    plant and -- let me do a different thing.

19               After rescreening, what's the next

20    step?

21         A.     Molding.

22         Q.     Does that happen on the same shift?

23         A.     As a rescreener?

24         Q.     Yes.

JEFFREY A. CLARK
July 8, 2005

Page 91

1    A.    Yes.

2    Q.    If the molder found that a

3  rescreener had failed to sign off, could the

4  molder just run it back and get the molder to

5  sign it?

6    A.    They could.

7    Q.    Did you have to be informed of

8  that?

9    A.    Not all the time, no.

10    Q.    If a molder failed to sign off on

11  an MO -- sorry.

12          If the rescreener failed to sign

13  off on an MO and the molder brought it back to

14  them, the rescreener wouldn't be disciplined, is

15  that accurate?

16    A.    If I had known about it, then I

17  would take care of the issue.

18    Q.    You didn't require that the molder

19  or rescreeners tell you about it so that you

20  could take care of the issue, is that accurate?

21    A.    They were trained to not start

22  their process until things were signed off.  If

23  that rescreener or mixer whoever the case may be

24  and these guys went back one step and ask them

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 105

1       answer.

2               THE WITNESS:  Every pan is a

3       documentation.

4           Q.      (By Ms. Kelly)  Do you have any

5   recollection of what the next specific event

6   was?

7           A.      It's communication back to Bob and

8   notes to file.  That's it.  You have that

9   information.

10          Q.      I'm asking you for your current

11  recollection?

12              MR. KERMAN:  If you don't remember

13      the next event, you can say you don't

14      remember.

15              THE WITNESS:  I don't remember.

16          Q.      (By Ms. Kelly)  You have no

17  independent recollection outside of the notes?

18          A.      No.

19          Q.      You say that there were heavy pans

20  and documentation and we got to the quality

21  issue, on the documentation.  Again, how did you

22  learn of the documentation issue?

23          A.      Rescreener.

24          Q.      Is it fair to say that all of the

JEFFREY A. CLARK
July 8, 2005

                                                    Page 106

1    documentation issues you learned solely through

2    rescreeners?

3          A.    Yes.

4          Q.    Is it fair to say you don't have

5    any recollection here today which rescreeners

6    other than it was Mr. Hanson or Mr. Aubin?

7          A.    Mr. Hanson's job is to rescreen.

8    He works on days, that's his job.  Most of this

9    stuff came through him.

10          Q.    Do you recall which specific

11    complaints came through Mr. Aubin and which ones

12    came through Mr. Hanson?

13          A.    No.

14          Q.    Would you have documentation as to

15    which complaints came from Mr. Hanson and which

16    came from Mr. Aubin?

17          A.    It should be clear in there.

18          Q.    It should be?

19          A.    It should be clear in there.

20          Q.    Clear in there?

21          A.    In the documentation.

22          Q.    The document would show --

23          A.    It should.

24          Q.    You said Mr. Hanson was a

**JEFFREY A. CLARK**
**July 8, 2005**

Page 107

1    rescreener on days, what was Mr. Aubin's job?

2         A.    He's a mixer on day shift.  The job

3    is entailed to be rescreeners, mixer.  Primary

4    job is mixer.

5         Q.    Most of the rescreening on day

6    shift was done by Mr. Hanson?

7         A.    That's correct.

8         Q.    Mr. Aubin was occasionally

9    involved?

10        A.    Yes.

11        Q.    So based on the amount of

12   rescreening that Mr. Aubin was required to do,

13   you would presume most of the complaints came

14   from Mr. Hanson?

15        A.    Yes.

16        Q.    You have no current recollection

17   outside of what the documents might show as to

18   who complained about what or how many times, is

19   that fair to say?

20        A.    Yes.

21        Q.    The rescreener also had to sign off

22   on the document, correct?

23        A.    Yes.

24        Q.    And a failure to do that would

JEFFREY A. CLARK
July 8, 2005

Page 111

1   back of the check instead of using the system.

2        Q.        **If you took the mix slip off the**

3   **back of the check, would you to have program**

4   **that into the mixer?**

5        A.        The scales should just weigh it the

6   same way.  The same information that's on the

7   mix slip is the same information that would be

8   in COM CAN.  Just read the check and make the

9   mix.

10       Q.        **Does the mixer, does the COM CAN**

11  **system run the mixer?**

12                 MR. KERMAN:  Objection.

13                 THE WITNESS:  Not the mixer, no.

14       Q.        **(By Ms. Kelly)  What does the COM**

15  **CAN system do, if anything?**

16       A.        It's a system that controls

17  inventory.  It prevents you from overweighing

18  and putting the wrong ingredients into the mix.

19       Q.        **How does it prevent you from**

20  **overweighing?**

21       A.        The system itself like I just

22  mentioned.  If you exceed a weight, it would

23  stop.  You log the order into the system, you

24  get an X amount of weights for different types

**JEFFREY A. CLARK**
**July 8, 2005**

Page 112

1    of abrasives and bonds.  If you exceed any of

2    those, a red light will shine up on the screen

3    and tell you that you exceeded or you selected

4    the wrong material.

5         Q.    But it doesn't run the mixer?

6         A.    No.

7         Q.    Is it a separate computer?

8         A.    There's no computer in the mixer.

9         Q.    Is it a separate system than the

10   mixer?

11        A.    Yes.

12        Q.    Is it connected to the mixer at

13   all?

14        A.    No.

15        Q.    So it in fact would not stop you

16   from making a bad mix, it would simply flash a

17   red light?

18             MR. KERMAN:  Objection.

19             THE WITNESS:  If the check was

20        logged into the system, it worked inside

21        with the scale.

22        Q.    (By Ms. Kelly)  I thought you said

23   it was connected to the mixer?

24        A.    It's not.  The mixer is a whole

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 117

1    COM CAN, it gives you a mixing recipe.  That's

2    what the settings are.

3         Q.    The COM CAN automatically mixes it

4    according to that mix recipe or does the person

5    doing the mixing have to program it in or add it

6    themselves?

7         A.    When you bar code that into the

8    system, it gives the recipe into the system,

9    it's up to the mixer to get those ingredients.

10        Q.    And put them in the right amounts?

11        A.    Right.

12        Q.    The only thing that the COM CAN

13   system does, as I understand your testimony and

14   correct me if I'm getting it wrong because

15   obviously I've never seen the machine, it

16   identifies the recipe?

17        A.    Yes.

18        Q.    And then it has a light if you

19   exceed the weight on the grain scale?

20        A.    Yes.

21        Q.    Is there a scale at the end of the

22   mixer?  Let me ask you a better question.

23             So it's all mixed up, the grain,

24   the bond, the various liquids are all added,

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JEFFREY A. CLARK
July 8, 2005

Page 155

1    same, they all weigh the same.

2        Q.      During the whole process with the

3    heavy pans, did you ever investigate whether

4    there was a problem with the scale?

5        A.      Yes.

6        Q.      When did you first do that?

7        A.      It was shortly after the first one

8    that was weighed.

9        Q.      How did you determine that?

10       A.      Just check it by throwing weight on

11   it.

12       Q.      What did you do?

13       A.      Put weight on it.  The scales are

14   calibrated on a monthly basis, they are checked.

15       Q.      Is there documentation of the

16   check?

17       A.      There's a sticker on the scale

18   itself that says, yes, the scale is in good

19   shape.

20       Q.      Is documentation of that kept by

21   the company?

22       A.      I believe in the scale department,

23   yes.

24       Q.      So there'd be a scale department

**JEFFREY A. CLARK**
**July 8, 2005**

Page 156

1    showing whether and when Mr. Briddell's scale

2    was calibrated?

3         A.    I'm not sure.

4         Q.    Did you check?

5         A.    No, I didn't.

6         Q.    At some point you are now recalling

7    in your investigation of the first heavy pan you

8    went and looked at the scale?

9         A.    I weighed the pan that was in

10   question on the scale in rescreen.

11        Q.    You were able to see that the pan

12   was heavy?

13        A.    Yes.

14        Q.    Were you able to see if there was a

15   problem with the scale at the end of Mr.

16   Briddell's mixer.

17        A.    We could take a mix off the

18   rescreen scale and compare it to the one that's

19   on the end of the bowl.

20        Q.    Did you do that?

21        A.    Yes.

22        Q.    When did you do that?

23        A.    Right at the beginning of this

24   whole thing.

**JEFFREY A. CLARK**
**July 8, 2005**

Page 204

```
 1    confused.
 2              What did you do in order to
 3    investigate the cause of the heavy mixes?
 4              MR. KERMAN:  Objection.
 5              THE WITNESS:  Do I keep answering
 6         these after an objection?
 7              MR. KERMAN:  Well, it's two or
 8         three questions that needed clarification.
 9         If you don't understand it because she does
10         change the question in midstream, ask her
11         to rephrase the question.
12              MS. KELLY:  I would object to that
13         characterization, but again, and I've told
14         you several times, if you don't understand
15         the question, please let me know.
16              THE WITNESS:  It's not that I
17         don't understand the question, I'm trying
18         to give you my answer.  As this is going
19         on, it's brought to my attention that a
20         courser screen is being used.
21         Q.    (By Ms. Kelly)  How many times was
22    it brought to your attention?
23         A.    Once.
24         Q.    Who brought it to your attention?
```

JEFFREY A. CLARK
July 8, 2005

Page 205

1        A.      The day shift mixer.

2        Q.      Mr. Aubin?

3        A.      Could have been him or Kevin Reed.

4    They are both mixers on the day shift.  It

5    depends who came in to work on that bowl at the

6    time.

7        Q.      It's your testimony that the screen

8    was left, Mr. Briddell left, correct?

9        A.      That's correct.

10       Q.      I think you testified the screen's

11   left there on the machine?

12       A.      One of these particular days and it

13   had to be this order that was brought to my

14   attention that there was an eight screen in

15   there, not a 12.  That's it.

16       Q.      How would the mixer know that the

17   eight screen had been used on this order as

18   opposed to a different order?

19       A.      He wouldn't.

20       Q.      You don't know if the improper

21   screen was used on this mix, right?

22               MR. KERMAN:  Objection.

23               THE WITNESS:  No.  Let's look at

24       the time when it was mixed, 2:00 a.m.  I'm

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JEFFREY A. CLARK
July 8, 2005

Page 209

1                To the best of your recollection,

2    you couldn't -- strike that.

3                I think you testified and please

4    correct me if I got it wrong that when the

5    rescreeners first brought issues of overweight

6    mixes to you prior to going to Mr. Tivnan, you

7    did weigh them, I think you said you checked it

8    against the scale?

9        A.    Yes.

10       Q.    Created the documentation and gave

11   that to Mr. Tivnan, did you give that to Mr.

12   Tivnan?

13       A.    Anything that I dealt with in the

14   morning, I would forward off to Bill Tivnan,

15   yes.

16       Q.    As best as your recollection you

17   created a record of the overweight pans that

18   existed prior to September 18th and gave them to

19   Mr. Tivnan?

20       A.    Whatever the date, I mean, I don't

21   remember the exact date when this whole thing

22   started.  As I got the information during the

23   day, then I would talk to Bill the following

24   day.

JEFFREY A. CLARK
July 8, 2005

Page 212

1    first page of this document?

2         A.    Yes.

3         Q.    Is that your handwriting?

4         A.    Those would be the three that I

5    weighed out.

6         Q.    You weighed them in the presence of

7    a rescreener and no one else, is that accurate?

8         A.    Say that again?

9         Q.    It's accurate that you weighed this

10   in the presence of rescreener and no one else?

11        A.    Yes.

12        Q.    If you look at the next two pages,

13   this indicates that this was on September 19th

14   at 2:45 a.m.

15             MR. KERMAN:  Which page are you

16        referring to?

17             MS. KELLY:  The last page.

18             THE WITNESS:  919.

19        Q.    (By Ms. Kelly)  That was mix

20   dispenser 1104, that's Mr. Aubin?

21        A.    That's Mr. Aubin.

22             MS. KELLY:  Mark this.

23

24             (Exhibit 43, Documents, marked)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JEFFREY A. CLARK**
**July 8, 2005**

Page 234

1          the question to the extent that it

2          mischaracterizes the testimony, you can

3          answer.

4          **Q.      (By Mr. Kerman)   Just answer why**

5     **that was not a concern of yours?**

6          A.      It wasn't a concern of mine, one, I

7     was doing my own investigation on any of that

8     stuff and dealing with the mix pan issue here.

9     I got no impression there was a racial thing

10    going on here at all.  If there's was, even

11    though I was disciplined for it in the past, it

12    had nothing really to do with this situation.

13    If I got the impression that there was, I would

14    have definitely done research on that to find

15    out the reasons.

16         **Q.      How much did you actually rely on**

17    **what Mr. Aubin told you in disciplining Mr.**

18    **Briddell, how much did you rely specifically on**

19    **Mr. Aubin in deciding whether Mr. Briddell**

20    **should get a warning or not?**

21              MS. KELLY:  Objection to the form

22         of the question.

23         **Q.      (By Mr. Kerman)   You can answer.**

24         A.      On these mix pans?

**JEFFREY A. CLARK**
**July 8, 2005**

Page 235

1     Q.    Yes.

2     A.    I didn't rely on him at all.  All

3  he was doing was giving me information.  I went

4  back and did the work to find out who was really

5  at fault, it turned out to be Bob.

6     Q.    Let me show you Exhibit 18 which is

7  a written warning that Mr. Briddell received

8  October 4th of 2001.  The second page of that

9  document, Exhibit 18 which says 963 at the

10  bottom, is a memo again dated October 4th, 2001

11  referring to some issue that occurred in

12  September of 2001, correct, and you've signed

13  that memo?

14     A.    Yes.

15     MS. KELLY:  Objection.  It's been

16    asked and answered.

17     MR. KERMAN:  I'm just laying this

18    as a foundation.

19     Q.    (By Mr. Kerman)  You testified

20  earlier that at the time that you learned -- you

21  testified earlier that you recall there being

22  three problems regarding Mr. Briddell's

23  performance that basically were occurring

24  simultaneously, the overweight pans, not signing

**JEFFREY A. CLARK**
**July 8, 2005**

Page 289

1    I, ELISABETH ZAHARIADIS, a Notary Public

2  in and for the Commonwealth of Massachusetts, do

3  hereby certify that JEFFREY A. CLARK appeared

4  before me, satisfactorily identified himself, on

5  the 8th day of July, 2005, at Worcester,

6  Massachusetts, and was by me duly sworn to

7  testify to the truth and nothing but the truth

8  as to his knowledge touching and concerning the

9  matters in controversy in this cause; that he

10  was thereupon examined upon his oath and said

11  examination reduced to writing by me; and that

12  the statement is a true record of the testimony

13  given by the witness, to the best of my

14  knowledge and ability.

15    I, further certify that I am not a

16  relative or employee of counsel/attorney for any

17  of the parties, nor a relative or employee of

18  such parties, nor am I financially interested in

19  the outcome of the action.

20    WITNESS MY HAND this 29th day of July,

21  2005.

22  *Elisabeth Zahariadis*

23  Elisabeth Zahariadis    My Commission expires:

24  Notary Public    October 28, 2005

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# EXHIBIT Q

**STEPHEN A. STOCKMAN**
**July 8, 2005**



Page 1

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3        Civil Action No.:  4:04 CV40146 (FDS)

4

5    *******************************

6    ROBERT M. BRIDDELL,              *

7              Plaintiff             *

8    vs.                             *

9    SAINT-GOBAIN ABRASIVES, INC.,   *

10             Defendants            *

11   *******************************

12

13

14

15        DEPOSITION OF:  STEPHEN A. STOCKMAN

16        CATUOGNO COURT REPORTING SERVICES

17               446 Main Street

18          Worcester, Massachusetts

19          July 8, 2005     3:00 p.m.

20

21

22

23            Elisabeth Zahariadis

24         Certified Shorthand Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**STEPHEN A. STOCKMAN**
**July 8, 2005**

Page 6

1      A.      Since March 1st of this year.

2      Q.      **Where were you employed prior to**

3   **that?**

4      A.      I was employed in Worcester.

5      Q.      **And what position did you have?**

6      A.      I was the vice president of the

7   bond and abrasives business in North America and

8   site manager of Greendale.

9      Q.      **How long did you hold that**

10  **position?**

11     A.      Since January of 2001.

12     Q.      **Prior to January of 2001, what**

13  **position did you hold?**

14     A.      I was vice president of sales and

15  marketing for Saint-Gobain Abrasives.

16     Q.      **How long did you hold that**

17  **position?**

18     A.      That position I held for

19  approximately three years.

20     Q.      **Prior to that?**

21     A.      Prior to that I was general manager

22  of thin wheels and surface finishing products

23  for Saint-Gobain.

24     Q.      **How long did you hold that**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**STEPHEN A. STOCKMAN**
**July 8, 2005**

Page 70

1    being terminated.

2        Q.    **What did he say in that meeting?**

3        A.    In that meeting he was asking

4    essentially as I recall to appeal the decision

5    that had been made.  I recall that I

6    acknowledged or committed to do that.

7        Q.    **Did he indicate that he felt that**

8    **the decision might have been tainted by**

9    **discriminatory animus?**

10       A.    I don't recall the details of that

11   conversation.

12       Q.    **It's possible he did?**

13             MR. KERMAN:  Objection.

14       Q.    **(By Ms. Kelly)  You can answer.**

15       A.    A lot of things are possible,

16   that's one.

17       Q.    **Did you investigate to determine**

18   **whether or not the determination was tainted by**

19   **discriminatory animus?**

20             MR. KERMAN:  Objection.

21       Q.    **(By Ms. Kelly)  You can answer.**

22       A.    I did, as I committed to him, I did

23   go back re-review the details of his termination

24   and concluded that his termination was well

**STEPHEN A. STOCKMAN**
**July 8, 2005**

Page 71

1   founded.

2        Q.      What exactly did you do in

3   reviewing the details of his termination?

4        A.      I spoke to the individuals that

5   once again would have been the same individuals

6   as I mentioned for the other case, Sheldon

7   Zaklow, Tom Oliver and Rick Zeena.

8        Q.      Anything else you did other than

9   talk to those three individuals?

10       A.      I recall vaguely that the record of

11  performance was shown to me and the details of

12  the various infractions.

13       Q.      Did you determine whether or not

14  Mr. Briddell was treated differently than any

15  other employee?

16       A.      I made an attempt to understand

17  exactly whether his discipline was in line with

18  others.

19       Q.      What did you do in order to make

20  that attempt?

21       A.      I don't recall specifically.

22       Q.      Do you recall generally?

23       A.      Not really, no, because I described

24  in the meeting with the three individuals and a

**STEPHEN A. STOCKMAN**
**July 8, 2005**

Page 107

1

2                    (A recess was taken)

3

4              MS. KELLY:  On the record.

5         Q.      (By Ms. Kelly)  Did the company

6    have separate meetings during the union campaign

7    for employees who were from Africa?

8         A.      I believe there was one meeting

9    that was held for our employees from Ghana.

10        Q.      Why was that separate from other

11   employees?

12        A.      First of all, let me explain that

13   they were not excluded from the general meeting.

14   They attended all meetings, but there was a

15   concern that was expressed by a supervisor or

16   that was brought to my attention that some, not

17   all of the employees from Ghana, their English

18   was not as proficient as others and that there

19   were some points being lost in the larger

20   meetings.

21              So the separate meeting, to my

22   knowledge, one separate meeting was held.

23        Q.      Who are the supervisors that

24   brought that concern to you?

STEPHEN A. STOCKMAN
July 8, 2005

Page 114

1       I, ELISABETH ZAHARIADIS, a Notary Public

2   in and for the Commonwealth of Massachusetts, do

3   hereby certify that STEPHEN A. STOCKMAN appeared

4   before me, satisfactorily identified himself, on

5   the 8th day of July, 2005, at Worcester,

6   Massachusetts, and was by me duly sworn to

7   testify to the truth and nothing but the truth

8   as to his knowledge touching and concerning the

9   matters in controversy in this cause; that he

10  was thereupon examined upon his oath and said

11  examination reduced to writing by me; and that

12  the statement is a true record of the testimony

13  given by the witness, to the best of my

14  knowledge and ability.

15      I, further certify that I am not a

16  relative or employee of counsel/attorney for any

17  of the parties, nor a relative or employee of

18  such parties, nor am I financially interested in

19  the outcome of the action.

20      WITNESS MY HAND this 29th day of July,

21  2005.

22  

23  Elisabeth Zahariadis    My Commission expires:

24  Notary Public                 October 28, 2005

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**