# EXHIBIT R



**MARY FITZGERALD**
**September 30, 2005**

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                  NO:  04-40146-FDS

4

5     *****************************

6     ROBERT M. BRIDDELL,                *

7          Plaintiff,                    *

8     v.                                 *

9     SAINT-GOBAIN ABRASIVES, INC.,      *

10         Defendant.                    *

11    *****************************

12

13

14                 DEPOSITION OF:

15               MARY FITZGERALD

16            30(B)(6) FOR SAINT-GOBAIN

17       CATUOGNO COURT REPORTING SERVICES

18               446 Main Street

19            Worcester, Massachusetts

20       September 30, 2005      9:15 a.m.

21

22

23                 Sonya Lopes

24           Certified Shorthand Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MARY FITZGERALD**
**September 30, 2005**

Page 68

1    that you took in investigating this complaint?

2        A.        I may have spoken to other people

3    of their knowledge of the situation, but I don't

4    recall who specifically.

5        Q.        Did you do anything else in

6    investigating the complaint that you can recall

7    right now?

8        A.        No, not that I can recall.

9        Q.        Did you come to a conclusion as a

10   result of your investigation?

11       A.        Yes.

12       Q.        What was the conclusion you came

13   to?

14       A.        That Dave had indeed called Jose

15   that, called him an F-ing spic.

16       Q.        And what was the next step that you

17   took after you made that determination?

18       A.        Discussed it with the supervisors

19   on their -- the disciplinary process.

20       Q.        And what was the decision made

21   about -- who made the decision about the

22   disciplinary process?

23       A.        Supervisors are the ones that

24   discipline the individuals.  However, they get

MARY FITZGERALD
September 30, 2005

Page 70

1      Q.      -- it wasn't necessary to follow

2   the strict progressive disciplinary steps.  Is

3   that accurate?

4      A.      Correct.

5      Q.      Mr. Aubin could have been subject

6   to any level of discipline that the company

7   thought was appropriate because of the nature of

8   the allegation against him that you found to be

9   valid.  Is that accurate?

10     A.      Correct.

11     Q.      Did you have a recommendation of

12  the level of discipline that should be imposed

13  for this particular conduct?

14     A.      Yes.

15     Q.      What was your recommendation?

16     A.      A written warning.

17     Q.      Did anyone -- did you have -- who

18  did you have discussions about the appropriate

19  level of discipline for Mr. Aubin?  Do you

20  recall?

21     A.      I don't recall specifically.

22     Q.      Would you have -- let me --

23             MS. KELLY:  Why don't we mark this.

24

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**MARY FITZGERALD**
**September 30, 2005**

Page 93

1    version of events.  Is that accurate?

2         A.       Yes.

3         Q.       Mr. Aubin indicated that they

4    exchanged words but he did not make the ethnic

5    slur; correct?

6         A.       Correct.

7         Q.       Mr. Aubin also denied that or --

8    strike that.

9                  Did Mr. Aubin indicate that

10   Mr. Rosato had said yes that he would make the

11   mix?

12                  MR. KERMAN:  Objection.

13                  MS. KELLY:  What's the objection?

14          It's the second line.  Dave tells me that

15          he asked Jose if he would make the mix 05

16          as he had other ones to make and Jose said

17          yes.

18         Q.       (By Ms. Kelly)  Do you recall

19   Mr. Aubin told you Mr. Rosato had agreed to make

20   the mix?

21         A.       Yes.

22         Q.       Fair to say?  Did you reach a

23   conclusion as to whether or not Mr. Aubin was

24   credible?

**MARY FITZGERALD**
**September 30, 2005**

Page 101

1          I, SONYA LOPES, a Notary Public in

2    and for the Commonwealth of Massachusetts, do

3    hereby certify that MARY FITZGERALD appeared

4    before me, satisfactorily identified himself, on

5    the 30th day of September, 2005, at the offices of

6    CATUOGNO COURT REPORTING SERVICES, 446 Main

7    Street, Worcester, Massachusetts, and was by me

8    duly sworn to testify to the truth and nothing but

9    the truth as to her knowledge touching and

10   concerning the matters in controversy in this

11   cause; that she was thereupon examined upon her

12   oath and said examination reduced to writing by

13   me; and that the statement is a true record of the

14   testimony given by the witness, to the best of my

15   knowledge and ability.

16          I further certify that I am not a

17   relative or employee of counsel/attorney for

18   any of the parties, nor a relative or employee

19   of such parties, nor am I financially

20   interested in the outcome of the action.

21          WITNESS MY HAND this 5th day of

22   October 2005.

23   Sonya Lopes                    My Commission expires:

24   Notary Public                  March 31, 2006

# EXHIBIT S

Case 4:04-cv-40146-FDS    Document 36-16    Filed 04/03/2006    Page 8 of 21

COPY

Page 1

1          UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3       Civil Action No. 4:04 CV 40146(FDS)

4

5  * * * * * * * * * * * * * * *

6  ROBERT BRIDDELL,                    *

7                     Plaintiff   *

8  vs.                               *

9                                    *

10  SAINT GOBAIN ABRASIVES, INC.   *

11                   Defendant   *

12  * * * * * * * * * * * * * * *

13

14               VOLUME III

15       DEPOSITION OF:  RICHARD ZEENA

16        CATUOGNO COURT REPORTING

17            446 Main Street

18       Worcester, Massachusetts

19          February 9, 2006

20

21

22          Tacy A. Malandrinos

23            Court Reporter

24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**RICHARD ZEENA, VOLUME III**
**February 9, 2006**

Page 92

1              I felt was warranting a step of

2              discipline.  I relied upon my vast

3              knowledge of the operations of the plant

4              and of the division, and of other forms of

5              discipline and how they related and how I

6              felt the proposed discipline was in line

7              with other circumstances.

8          Q.     (By Mr. Kerman)  And by other

9     circumstances, you are referring as to how other

10    employees had been treated?

11              MS. KELLY:  Object to the form.

12              MR. KERMAN:  You can answer.

13              THE WITNESS:  Yes, how other

14              employees were treated for other similar

15              forms of acts that warranted discipline.

16          Q.     (By Mr. Kerman)  Previously you

17    were asked some questions relating to Walter Ahl

18    and also an employee by the name of Pasquale

19    Gaimari.  Do you recall on your last week's

20    deposition you were asked some questions in

21    regard to their disciplines and treatment?

22          A.     Yes.

23          Q.     Can you describe for me what, if

24    anything, was different in terms of the

RICHARD ZEENA, VOLUME III
February 9, 2006

Page 93

1    circumstances at the company at the time that

2    Mr. Ahl and Mr. Gaimari were being disciplined

3    compared to the circumstances in effect when Mr.

4    Briddell was being disciplined?

5            MS. KELLY:  Objection to the form.

6        You can answer.

7            THE WITNESS:  At the time of the

8        discipline for Gaimari and Ahl, which I

9        believe is 2003, 2004, UAW was recognized

10       and in place as the exclusive bargaining

11       agent for the employee.  Every level of

12       discipline that the company wished to

13       impose was discussed and negotiated

14       with the union representative, as opposed

15       to at the time of Mr. Briddell's

16       discipline in late '01 and early '02, the

17       union had not been recognized.

18            So the process and the

19       circumstances of administering discipline

20       and the give and take of negotiations like

21       Gaimari and Ahl was not in place.

22            In addition, the circumstances

23       involving Mr. Ahl and some of his medical

24       conditions including depression and

RICHARD ZEENA, VOLUME III
February 9, 2006

Page 94

1          cancer, we felt had some weighing in on

2          his job performance, and that was also

3          taken into consideration for the

4          discipline that was imposed.

5          **Q.     (By Mr. Kerman)  And with regard to**

6     **the involvement of the union as you described in**

7     **the negotiations of the disciplinary action, did**

8     **that have, based on your experience, any impact**

9     **on the severity of the discipline imposed**

10    **compared to the severity of discipline imposed**

11    **before the union was involved in the negotiation**

12    **of disciplinary action?**

13              MS. KELLY:  Objection to the form.

14          You can answer.

15              THE WITNESS:  Yes.  I would say in

16          the circumstances of Ahl and Gaimari in

17          addition to all negotiated discipline with

18          the union, the process was slowed down or

19          the union would present obstacles or

20          hurtles to the company's proposed

21          discipline, and the company had to weigh

22          all of its options to determine whether or

23          not to implement with or without agreement

24          in order to avoid future grievance or

RICHARD ZEENA, VOLUME III
February 9, 2006

Page 95

1          arbitration down the road over the

2          discipline.

3          Q.      (By Mr. Kerman)  Now you were

4     asked some questions with regard to the role of

5     human resources with regard to the filling of

6     job positions.  You were asked some questions

7     about that earlier in the day, is that correct?

8               MS. KELLY:  Objection to the form.

9          You can answer.

10              THE WITNESS:  Yes.

11         Q.      (By Mr. Kerman)  And have you

12    personally been involved as human resource

13    manager in reviewing proposed filling of job

14    vacancies?

15         A.      Yes.

16         Q.      And as an HR manager involved in

17    that process, do you attempt to do anything to

18    ensure that minority candidates, whether it be

19    race or other characteristics, are not

20    discriminated against in that process?

21              MS. KELLY:  Objection.  Can you

22         identify the time period?

23         Q.      (By Mr. Kerman)  During the time

24    period that you have been in human resource

RICHARD ZEENA, VOLUME III
February 9, 2006

Page 102

1      discrimination.

2          Q.      (By Mr. Kerman)   If Mr. Briddell

3      had made a statement that he had been denied a

4      supervisory position based on his race, or if he

5      alleged that another employee had been denied a

6      supervisory position based on race, do you

7      believe the company would have had an obligation

8      to investigate that?

9          A.      Yes.

10         Q.      Now you were also asked some

11     questions about Mr. Briddell alleging at a

12     meeting that the company had engaged in

13     segregation regarding a meeting it held for

14     certain African employees.  Do you recall that?

15             MS. KELLY:  Object to the form.

16         You can answer.

17             THE WITNESS:  Yes.

18         Q.      (By Mr. Kerman)   Can you tell me

19     what your understanding was concerning why the

20     company conducted a meeting for certain African

21     employees?

22         A.      This was a meeting that was held in

23     addition to the meeting for the general

24     population about the upcoming union vote.  There

**RICHARD ZEENA, VOLUME III**
**February 9, 2006**

Page 103

1    was some concern about language barriers that

2    these employees from Ghana had.  And we wanted

3    to give them an opportunity in a way that was

4    not stigmatizing but in a smaller group where

5    they could have more interaction with their

6    supervisor to hear the company's point of view

7    regarding the upcoming election, and give them

8    an opportunity in a smaller form to exchange

9    questions and answers.

10        **Q.     You testified that you did not ask**

11   **Mr. Briddell why he viewed it as a form of**

12   **segregation.  Why did you not ask Mr. Briddell**

13   **the basis for his belief?**

14             MS. KELLY:  Object to the form.

15        You can answer.

16             MR. KERMAN:  You can answer.

17             THE WITNESS:  Again, I felt that

18        Mr. Briddell was making a statement during

19        this meeting about his opinion.

20        **Q.     (By Mr. Kerman)  Well, based on his**

21   **statement that this was a form of segregation,**

22   **did you feel that you had any duty to**

23   **investigate the matter where an employee alleges**

24   **there is segregation going on at the company?**

**RICHARD ZEENA, VOLUME III**
**February 9, 2006**

Page 143

1    I, TACY A. MALANDRINOS, a Notary Public in

2    and for the Commonwealth of Massachusetts, do

3    hereby certify that RICHARD ZEENA appeared

4    before me and satisfactorily identified himself

5    on February 9, 2006 at the offices of CATUOGNO

6    COURT REPORTING, 446 Main Street, Worcester,

7    Massachusetts, and was by me duly sworn to

8    testify to the truth and nothing but the truth

9    as to his knowledge touching and concerning the

10   matters in controversy in this cause; that he

11   was thereupon examined upon his oath and said

12   examination reduced to writing by me; and that

13   the statement is a true record of the testimony

14   given by the witness, to the best of my

15   knowledge and ability.

16    I further certify that I am not a relative

17   or employee of counsel/attorney for any of the

18   parties, nor a relative or employee of such

19   parties, nor am I financially interested in the

20   outcome of the action.

21   WITNESS MY HAND this 3rd day of March 2006.

22

23   Tacy A. Malandrinos        My Commission expires:

24   Notary Public              June 9, 2006

# EXHIBIT T

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT BRIDDELL,

     Plaintiff,

v.

SAINT GOBAIN ABRASIVES, INC.,        Civil Action No.: 04-40146-FDS

     Defendant.

**SUPPLEMENTAL RESPONSES OF DEFENDANT, SAINT-GOBAIN
ABRASIVES, INC., TO PLAINTIFF ROBERT BRIDDELL'S
FIRST SET OF INTERROGATORIES**

Defendant, Saint-Gobain Abrasives, Inc. ("Defendant" or "Saint-Gobain"), hereby supplements its responses to Plaintiff's First Set of Interrogatories (the "First Set") as follows:

**SPECIFIC OBJECTIONS**

1.    Saint-Gobain objects to the First Set's instructions regarding supplementary answers. Saint-Gobain states that it will supplement its discovery responses in accordance with Fed. R. Civ. P. 26(e).

2.    Saint-Gobain objects to the First Set's definition of "Complaint." Saint-Gobain will construe "Complaint" to mean the Complaint filed in civil action number 04-40146-FDS with the United States District Court, District of Massachusetts.

3.    Saint-Gobain objects to the First Set's definition of "Defendant." Saint-Gobain will construe "Defendant" to mean Saint-Gobain Abrasives, Inc., and its predecessors, related corporate entities, employees, agents, representatives and any other persons acting or purporting to act on its behalf, including, but not limited to its attorneys.

discrimination and retaliation, and states that whenever Plaintiff brought workplace concerns to its attention, Defendant made good faith efforts to address concerns in a fair and appropriate manner.

Eighth Affirmative Defense – Plaintiff's attempt to obtain relief against Defendant is barred because the adverse actions about which Plaintiff complains were prompted by Plaintiff's own job performance deficiencies and conduct/attitude.

Defendant states that the management personnel employed by St. Gobain who have relevant information regarding the affirmative defenses asserted by Defendant include Richard Zeena, William Tivnan, Jeffrey Clark, Thomas Oliver and Stephen Stockman. Answering further, Saint-Gobain refers Plaintiff to documents previously produced in connection with the Initial Disclosures of Defendant.

**INTERROGATORY NO. 6**

Please describe the decision to terminate the plaintiff, including identifying each person involved in the decision, each and every basis for the decision and please describe all communications concerning the decision. Please identify any and all documents which relate to this answer.

**SUPPLEMENTAL ANSWER NO. 6**

Saint-Gobain hereby supplements its response to Interrogatory No. 6 as follows:

Saint-Gobain objects to this interrogatory on the grounds that it is vague and to the extent it seeks privileged information protected by the work product doctrine and the attorney-client privilege. Without waiving these objections, Saint-Gobain refers Plaintiff to documents previously produced in connection with the Initial Disclosures of Defendant. Further responding, Defendant states that Plaintiff demonstrated numerous

performance problems, including, without limitation, frequently exceeding the weight limit for mix in his pans, frequently failing to sign off on manufacturing orders and slips, failing to use the COMCAN system appropriately, and producing contaminated mixes.

Further responding, Defendant states that Thomas Oliver contacted Richard Zeena on numerous occasions when Plaintiff exceeded the weight limit for mix in his pans, failed to properly complete mixing slips and manufacturing records, and produced contaminated mixes, and he expressed his opinion that Plaintiff's employment should be terminated because of his numerous and continuing performance problems. Further responding, Jeffrey Clark contacted Richard Zeena regarding Plaintiff's performance problems, including Plaintiff's poor attitude, his frequent exceeding of the weight limit for mix in his pans, and his repeated failure to abide by Saint-Gobain's standards with respect to completing mixing slips and manufacturing records. Plaintiff worked the shift prior to Mr. Clark's shift, and on numerous occasions Mr. Clark was forced to take action to remedy Plaintiff's mistakes from the prior shift. In one instance, Jeffrey Clark asked Richard Zeena why Defendant was not taking more aggressive action to address Plaintiff's numerous performance problems.

Further responding, Saint-Gobain states that Thomas Oliver, Jeffrey Clark, Richard Zeena, and plant manager Sheldon Zaklow had a series of meetings to discuss Plaintiff's performance deficiencies and to determine appropriate discipline. Further responding, William Tivnan spoke with Richard Zeena, Thomas Oliver, and Jeffrey Clark on several occasions regarding Plaintiff's numerous performance deficiencies. As a result of these meetings and conversations, Defendant concluded that the termination of Plaintiff's employment was appropriate because Plaintiff's performance deficiencies

7

persisted despite receiving numerous verbal and written counselings and warnings, and

Plaintiff exhibited a continuing unwillingness and/or inability to comply with

management's legitimate performance expectations. Further responding, Saint-Gobain

will produce Thomas Oliver's notes from Plaintiff's termination meeting.

## INTERROGATORY NO. 7

Please identify all individuals who have performed any of the duties formerly

performed by the plaintiff in the position he held at the time of his termination

including his or her name, title, last known address and telephone number, rate of pay

prior employment expenses and qualifications for the position. Please identify any

documents which relate to the answer.

## SUPPLEMENTAL ANSWER NO. 7

Saint-Gobain hereby supplements its response to Interrogatory No. 7 as follows:

Saint-Gobain objects to this interrogatory on the grounds that it is vague,

overbroad, unduly burdensome, and seeks information which is neither relevant or

material to this action, nor likely to lead to the discovery of admissible evidence. Saint-

Gobain further objects to this interrogatory on the ground that it constitutes an

unreasonable interference with the privacy rights of individuals who are not parties to this

action. Without waiving these objections, Saint-Gobain states that the following

employees have held the same position that Plaintiff held at the time of his termination

from employment: Kenneth Acquah, Walter Ahl, David Aubin, Eric Baning, Nathan

Benson, Jason Bullock, James Cicero, Jesus Cruz, William Gambaccini, Jamie Gelardi,

Frank Hanson, Marc Haynes, George Koduah, Charles Morse, Jr., Frederico Pires, Kevin

Reed, and Richard Wade.   Further responding, Saint-Gobain will produce these

Then came Richard J. Zeena, as a duly-authorized representative of Saint-Gobain Abrasives, Inc., and stated under the pains and penalties of perjury on this 7th day of April, 2005, that the foregoing answers represent the answers of Saint-Gobain Abrasives, Inc. and are true based upon personal knowledge or true to the best of his information and belief if compiled by others.

_____
Richard J. Zeena
Human Resources Manager


As to objections,
SAINT-GOBAIN ABRASIVES, INC.,
By its attorneys,

_____
David J. Kerman, BBO #269370
Amanda S. Rosenfeld, BBO #654101
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated:  April 7, 2005

## CERTIFICATE OF SERVICE

A copy of the above document was served this 7th day of April, 2005, by overnight delivery, postage prepaid, to attorneys for the Plaintiff, Darragh K. Kasakoff, Seder & Chandler, 339 Main Street, Worcester, MA 01808, and Thomas W. Meiklejohn, Esq., Livingston, Adler, Pulda, Meiklejohn & Kelly P.C., 557 Prospect Avenue, Hartford, CT 06105-2922.

_____
Jackson Lewis LLP

11