UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT BRIDDELL | CIVIL ACTION NO. 4:04 CV 40146 (FDS) |
| Plaintiff | |
| v. | |
| SAINT GOBAIN ABRASIVES, INC. | |
| Defendants | May 9, 2006 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUMMARY JUDGEMENT**

**I.     INTRODUCTION**

This case arises out of the termination of long term employee, Robert Briddell, (hereinafter "the plaintiff" or "Briddell") by defendant Saint Gobain Abrasives, Inc. ("hereinafter "the defendant"). The plaintiff contends that he was scrutinized and ultimately terminated because of his race and in retaliation for his complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, and 42 U.S.C. §1981. The defendant moves for summary judgment as to all counts. This motion must be denied because the defendant has ignored critical facts, misstated others, relied on disputed facts and viewed the record evidence in the light most favorable to itself.[1]

**II.     THE LEGAL STANDARD**

Summary judgment may be granted only if the moving party is able to show that, "there is no genuine issue as to any material fact," and that it is, "entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).   The moving party bears the initial burden of proving that no factual

---

[1] This case involves a hundred and fifty disputed material facts. These facts are described in detail in the *Plaintiff's 56.1 Statement*, and are merely referenced and/or summarized below.

issues exist. Mesnick v. General Electric Co., 950 F.2d. 816, 822 (1st Cir. 1991). In assessing the record, the court must resolve all ambiguities and draw all inferences in the light most favorable to the non-moving party. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir.1997). While summary judgement may be granted where the non moving party, "rests on conclusory allegations, improbable inferences and unsupported speculation", it should be denied where reasonable persons could differ in their responses to the questions raised on the basis of the evidence presented. See: Smith v. Stratus Computer, Inc., 40 F.3d. 11, 13 (1st Cit. 1994). Moreover, summary judgement must be sparingly used in discrimination cases, where intent and state of mind are at issue. Bilodeau v. Mega Indus., 50 F.Supp.2d 27, 46 (D.Me.1999).

### III. A Reasonable Jury Could Conclude that the Defendant Terminated the Plaintiff Because of His Race

The plaintiff's claims of race discrimination under Title VII, 42 U.S.C. § 2000 and 42 U.S.C. §1981, are governed by the familiar three step burden shifting analysis adopted by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). First, the plaintiff must prove by the preponderance of the evidence the *prima facie* case: (1) he belonged to a protected class; (2) he was performing his job at a level that rules out the possibility that he was fired for job performance; (3) he suffered an adverse job action by his employer; and (4) he was replaced by someone outside of the protected class. Keisling v. SER-Jobs for Progress, Inc., 19. F.3d. 755, 760 (1st Cir. 1994) This initial burden has been described as "not onerous", and "easily made". Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003).

If the plaintiff makes out a *prima facie* case, a presumption arises that the employer unlawfully discriminated, and the burden shifts to the defendant to proffer evidence of a

2

nondiscriminatory reason for the adverse employment action. If the defendant does not introduce such evidence, the plaintiff is entitled to judgment as a matter of law. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-510, 113 S.Ct. 2742 (1993). However, if the employer does introduce such evidence, the burden returns to the plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products Co., 530 U.S. 133, 143 (2000); Straughn v. Delta Airlines Inc., 250 F.3d. 23, 34 (1st Cir. 2001).

The ultimate question is whether a reasonable trier of fact, viewing the evidence in the light most favorable to the plaintiff, could conclude that the plaintiff's termination was motivated at least in part by prohibited discrimination. See: Koseris, 331 F.3d. at 213. However, the fact that the employer's explanation for its decision is unworthy of belief constitutes "circumstantial evidence that is probative of intentional discrimination...." Reeves, 530 U.S. at 147-148. Although such evidence of pretext does not compel a finding of discrimination, evidence that the employer's explanation is pretextual, considered together with the evidence that makes up the plaintiff's *prima facie* case, will normally be sufficient to preclude judgment for the defendant as a matter of law. Id. In such cases summary judgement may be granted only if,

> the record conclusively revealed some other non-discriminatory reason for the employer's decision [or] the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontradicted evidence that no discrimination had occurred.

Reeves, 530 U.S. at 148; Kosereis, 331 F.3d. at 215-216.

As a preliminary matter, the defendant suggests that the motion for summary judgement must be granted because the plaintiff's deposition testimony and conduct make clear that he does

3

not believe that he was the victim of race discrimination or retaliation. In making this claim the defendant relies on the timing of the plaintiff's EEOC charge, the fact that he did not complain of discrimination to co-workers McTernan, LeBeau, or Gustafson, and the fact that at one point in his deposition, the plaintiff testified that he was retaliated against for his union activities.

However, the fact that the plaintiff did not file a discrimination charge until after the National Labor Relations Board (NLRB) dismissed the unfair labor practice charges filed by the union does not suggest that the plaintiff did not believe that he had been discriminated and retaliated against.[2] A reasonable trier of fact could certainly find that the plaintiff's conduct in waiting to see if the union's efforts to get him reinstated were successful before bringing litigation, was not an admission that he lacked a good faith belief in his claims.

Nor would the fact that the plaintiff may not have complained of race discrimination to co-workers McTernan, LeBeau or Gustafson, justify a finding that he does not believe that he was discriminated against.[3] All three testified that they did not work directly with the plaintiff or interact with him at work. (Id. at ¶145) Thus, the defendant has shown only that three employees who rarely interacted with the plaintiff were not recipients of his confidences.[4]

---

[2] The defendant has introduced the dismissal letters from the NLRB and EEOC in this case. However, these conclusory findings, unaccompanied by the investigative file, "tend[] to be more prejudicial than probative". Patten v. Wal-Mart Stores Inc., 300 F.3d. 21 (1st Cir. 2002) Moreover, neither the NLRB nor the EEOC were provided with the evidence currently available, and the parties were not provided with the opportunity to cross-examine the critical witnesses. (See Ex. B) Thus, these findings should be granted no weight in this Court's determination.

[3] McTernan actually testified that he could not recall if he ever heard Briddell complain about race discrimination. (See *Plaintiff's 56.1 Statement* at ¶143)

[4] The defendant also notes that McTernan, Gustafson, and LeBeau testified that they did not observe any discriminatory treatment of the plaintiff. (Id. at ¶145) Again, since these employees rarely interacted with the plaintiff at work this is hardly surprising.

However, African American employee James Bailey testified that at the time Briddell was being disciplined and discharged he told Bailey that he thought he was being discriminated against because of his race. (Id. at ¶147) Cynthia Carruthers similarly testified that Briddell told her that he believed that he was being discriminated against because of his race. (Id. at ¶146) The defendant's notes of the plaintiff's termination meeting also state that the plaintiff announced his intention of contacting the NAACP about his termination. (Baker Dep. Ex. 36 p.1046) While the plaintiff may not have told the world that he was being discriminated against because of his race, there is clearly sufficient evidence of his belief to require a denial of summary judgement.

Finally, while the plaintiff did say during his deposition that he believed he was retaliated against because of his union activity, he also said that he believed that Human Resources Manager Richard Zeena singled him out because he was black, and that first shift supervisor Jeff Clark may have been singling him out and inspecting his work more closely because of his race.[5] (Id. at ¶142-143)  In this case, the claims of claims of discrimination, retaliation and anti-union animus are related.  The plaintiff supported the union because of his belief that the defendant discriminated against minority employees- including himself.  (Id. at ¶27)  In supporting the union he raised issues of discrimination on the basis of race.  (Id. at ¶¶28, 30)  If you remove the defendant's blinkered view of the evidence, it is apparent that the plaintiff believes- and has always believed- that his termination was based on these three intertwined factors. Consequently, the defendant's claim that the plaintiff has essentially conceded that he was not the victim of discrimination, must be rejected.

---

[5] The plaintiff has also provided an affidavit unambiguously stating that he believes that his discipline and discharge were motivated by his race and protected activity, as well as by his union activity. (Ex. A).

It is undisputed that the plaintiff is African American. It is similarly undisputed that the plaintiff suffered an adverse action in that he was terminated, and that his duties were assigned to similarly qualified white employees. The defendant, however, contends that the plaintiff cannot make out a prima facie case, claiming that he was not, "qualified" in the sense that he was performing his job at a level that rules out the possibility that he was fired for poor performance. According to the defendant, a jury viewing the evidence would have to conclude that the plaintiff had recurrent and serious performance problems, which rendered him unfit for employment. In making this claim, the defendant ignores both the legal standard and the evidence.

In plaintiff's burden in showing "qualification" for the purpose of making out a prima facie case, is *de minimis*. Iorio v. Aramark Servicemaster, 2005 WL 3728715 (D. Mass. 2005). The plaintiff is not required to rebut the evidence of poor performance relied upon by the defendant in claiming that the termination was for a non-discriminatory reason.[6] See: Keisling, 19 F.3d. at 760-761; Benoit v. Technical Manufacturing Corp., 331 F.3d. 166 at f.n. 2 (1st Cir. 2003). Unless the position has been changed, the fact that the plaintiff was, "hired initially indicates that he had the basic qualifications for the job", Loeb v. Textron, Inc. 600 F.2d. 1003 at f.n. 10 (1st Cir. 1979), and a history of favorable employment reviews is generally sufficient under such circumstances to generate a genuine issue of fact. Woodman v. Haemonetics Corp., 51 F.3d. 1087, 1092 (1st Cir. 1995)(citations omitted); Keisling, 19 F.3d. at 760-761; Woods v. Friction Mfg. Inc., 30 F.3d. 255, 261 (1st Cir. 1994); Smith v. Stratus Computer Inc., 40 F.3d. 11, 13 (1st Cir. 1994); Mulero Rodriguez v. Ponte Inc., 891 F. Supp. 680-684 (D.P.R. 1995); Nakai

---

[6] Requiring a plaintiff to overcome this evidence would, "belie the assertion of the Supreme Court that establishing a prima face case is not onerous". Keisling, 19 F.3d. at 761.

v. Wickes Lumbar Co., 906 F. Supp. 698 (D.Me. 1995)

The plaintiff was seventeen year employee with a history of satisfactory performance evaluations.[7] In fact, there is no evidence that he ever received an unsatisfactory evaluation, and supervisor Bill Tivnan, admitted that Briddell was overall a good mixer in 2000. (Id. at ¶22) For the purpose of the prima facie case, this is sufficient. Keisling, 19 F.3d. at 760 (noting that long experience with the company will support an inference that the performance was adequate, even when the evidence does not extend all of the way to discharge).

Moreover, the defendant's claim that the plaintiff had performance problems in late 2001 and 2002 involve issues of disputed fact. The defendant contends that the plaintiff: (1) repeatedly violated safety rules by exceeding the defendant's 45 lb weight limit for mix pans; (2) repeatedly failed to sign manufacturing orders (MO's); and (3) created contaminated mixes. (Def's Mem. at 6) However, a reasonable trier of fact could find that the plaintiff did not create the heavy mixes, repeatedly fail to sign the MO's or create a contaminated mix.[8]

---

[7] While he was occasionally disciplined, the plaintiff's evaluations during the years 1992-1999 indicate that he was generally a satisfactorily employee. (Id. at ¶¶11,12,19) For 2000, his evaluation identifies him as a satisfactory employee with respect to safety, co-operation, productivity, attendance and tardiness. (Id. at ¶22) While the evaluation notes that he needs improvement with respect to quality, these quality problems involved performance at a higher level position, and cannot justify a finding that he could not meet the performance requirements as a mixer. (Id.) Indeed, production manager Thomas Oliver admitted that a failure to succeed in a higher level position would not be held against an employee in other positions. (Id. at ¶21)

[8] The plaintiff has denied creating pans that exceeded the 45 lb weight limit. (Id. at ¶¶49, 53, 76, 86) The plaintiff admitted to creating the mix which the defendant claims was contaminated. (Id. at ¶95) However, to the best of his knowledge, the mix was not contaminated when it left his work area. (Id.) The plaintiff did admit to failing to sign two MO's on one occasion. (Id. at ¶81) With respect to other allegations of failing to sign MO's the plaintiff- who signed 25 or more per night- simply cannot recall. (Ex. A) However, if the plaintiff had failed to fill out MO's on these other occasions, as the defendant claims, the defendant would have MO's with a supervisor's initials where the plaintiff should have signed. (Id. at ¶¶76,86,93) No such

The plaintiff has also produced evidence that the defendant did not treat the exceeding of the 45 lb weight limit, the failure to sign MOs and/or the creation of contaminated mixes as problems warranting discipline. As is explained in the *Plaintiff's 56.1 Statement*, the defendant was aware that other employees created heavy and contaminated mixes and was also aware that other employees frequently failed to sign MO's. (Id. at ¶¶40-46, 77, 82, 87, 89. 97, 100-104, 108-109, 111-117, 130-132) The defendant, however, did not bother to investigate these violations, or discipline the persons responsible. (Id.) Since the defendant did not regularly enforce these policies, a reasonable trier of fact could find that violations of the policies would not constitute a failure to meet the defendant's legitimate expectations. Given this evidence, it is clear that the plaintiff has made out a prima facie case.[9] See: Nakai, 906 F. Supp. at 703-704.

---

documents have been produced.

Moreover, as is explained below and in the *Plaintiff's 56.1 Statement*, the defendant's evidence concerning the allegations of poor performance, and the defendant's subsequent investigation into these alleged violations are simply not credible. (Id. at ¶¶47-75, 81, 86-90, 93-95, 98) Critical documents are missing. Critical witnesses have not been identified. Other witnesses contradict one another and/or the disciplinary documents. The decision makers cannot agree on who reported the alleged misconduct, who investigated, what was done in the course of the investigation, who made the decisions with respect to the discipline or even the factors that led to the discipline. A reasonable trier of fact could, therefore, conclude that the claims of poor performance are pretextual.

[9] In claiming otherwise the defendant relies on Menard v. First Security Services Inc., 848 F.2d. 281, (1st Cir. 1988). This reliance is misplaced. In that case, it was undisputed that the two of the defendant's major customers had problems while Menard was in charge of their accounts. Id. at 185. Menard did not contest the customers assessment of the problems. Instead he sought to produce evidence that the problems were not related to any poor performance on his part. Id. Unfortunately, the only evidence he produced was an affidavit from a supervisor who admittedly did not have knowledge of the extent of the problems, and an evaluation created prior to the problems having begun. Id. at 286. In addition, unlike the plaintiff Menard was a relatively new employee who did not have many years of positive performance evaluations. Thus, Menard, 848 F.2d. 281, is inapposite.

See Also: Iorio, 2005 WL 3728715 at *14, Woodman, 51 F.3d. at 1092; Douglas v. J.C. Penney Inc. CV 03-30265 (MAP) (D. Mass. 2006).

The defendant has also met its burden of articulating a non-discriminatory reason for the plaintiff's termination- arguing that the plaintiff repeatedly failed to comply with its policies concerning the weight limits on pans and the signing of MO's, and had quality issues with respect to the contamination mixes. Therefore, the question for this Court is whether a reasonable trier of fact, viewing the evidence and drawing all inferences in the plaintiff's favor, could find that this stated reason is a pretext for discrimination. Clearly this question must be answered in the affirmative.

In claiming that its motion for summary judgement must be granted, the defendant points out that there is no evidence that any of the supervisors involved in the plaintiff's discipline made racially discriminatory comments. (See Def's Mem. at 9) While true, this is hardly surprising. "[S]moking gun" evidence such as an outright admission by an employer is "rarely found in today's sophisticated employment world". Hodgens v. General Dynamics Corp., 144 F.3d 151, 171 n. 8 (1st Cir.1998). It is because few supervisors will be so foolish as to make racially discriminatory comments in the presence of members of a protected class, that the plaintiff may use circumstantial evidence to demonstrate the existence of the discriminatory intent. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, (1977). Thus, the plaintiff's failure to produce evidence of discriminatory comments is not dispositive.

The defendant also notes that the plaintiff's belief that he was treated unfairly is not enough. This again is true. However, the plaintiff has produced far more than his belief. (Id. at ¶¶1-3, 5) In the present case, the defendant had detailed disciplinary policies that were to be

applied consistently. These were not followed in the plaintiff's case. (Id.) He was not given a formal counsel- the first step of progressive discipline for all non-wilful violations. (Id. at ¶¶2, 48) Instead, he was started at the second step of discipline. In addition, throughout the disciplinary process, the defendant admittedly did not follow its normal policy of ensuring that the discipline was fair and was consistent with the discipline that would be given to any other employee.[10] (Id. at ¶¶59, 77, 80, 82, 98, 100, 106) In fact, the plaintiff was disciplined despite the defendant's knowledge that the discipline he was receiving was **not** the same as had been given to other employees.[11] See: Village of Arlington Heights, 429 US at 266-67 ( noting that a failure to follow normal policies and practices is circumstantial evidence of discrimination).

A plaintiff can also establish, "pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir.2000). As the First Circuit Court of Appeals has explained, "[t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts". Loeb, 600 F.2d at 1012 n. 6.

The defendant's explanation of the purported performance issues and mistakes which allegedly caused the plaintiff's termination is implausible, inconsistent, questionable and incoherent. Critical witnesses, like the rescreeners who allegedly reported the policy violations,

---

[10] A jury could also find that the defendant failed to follow the policy of leaving the initiation of discipline to the plaintiff's supervisor and the policy of asking the plaintiff for his side of the story before disciplining him. (Id. at ¶¶1,3)

[11] In terminating the plaintiff, the defendant also apparently considered performance problems as far back as 1994, and a demotion from a higher level job in 2000, despite policies that state that discipline is not to be considered or even retained after a year. (Id. at ¶4)

cannot be specifically identified.[12] (Id. at ¶¶50, 54, 56, 64, 68, 71, 88) Critical documents, like the MO's that were supposedly signed by a supervisor after the plaintiff allegedly forgot, and the report which allegedly would show that the plaintiff was not using the Con-Cam system have never been produced. (Id. at ¶¶50, 75, 83, 96)

In addition, some of the documents produced by the defendant actually suggest that the claims of poor performance are false. Several of the documents which Clark allegedly copied after a rescreener told him about Briddell's heavy pans, and on which he either wrote the purported weights of the pans or to which he attached a slip showing the purported weights- had already been signed by the mix dispenser or rescreener. (Id. at ¶¶57, 75) It is undisputed that a rescreener only signs these documents after he has begun the rescreening process- which consists of dumping all of the mix pans. (Id.) Obviously Clark could not have weighed the pans at this point.[13] (Id.)

The defendant's witnesses also repeatedly contradict one another and/or the disciplinary documents about what occurred, who reported the purported problems, who investigated the

---

[12] This failure is critically important. Between September and February the defendant repeatedly weighed Briddell's pans to see if they were heavy but did not weigh the pans of any of his white co-workers to see if they were heavy. (Id. at ¶104). According to the defendant, Briddell was treated differently than his similarly situated co-workers not for racist or retaliatory reasons, but because the rescreeners complained only about him. Given the defendant's inability to identify the specific rescreener[s] who complained on each occasion, and the defendant's failure to produce testimony from any of the rescreeners, a reasonable trier of fact could clearly disbelieve this claim.

[13] Another document, relied on by at least some of the defendant's witnesses simply does not show a failure by the plaintiff to sign an MO. (Id. at ¶63) It shows that Clark initialed the MO in the spot where a rescreener should have signed, not where the mixer should have signed. (Id.)

purported problems, who made the decisions, and who had input.[14] (Supra at f.n. 8) The defendant's witnesses cannot even agree on the bases for the discipline and termination, or even on which violation[s] would subject an employee to discipline[15]. (Id.) Based on the inconsistencies, contradictions and implausibility of the defendant's version of events, set out in detail in *Plaintiff's 56.1 Statement,* a jury could easily conclude that the defendant's stated reasons for terminating the plaintiff are pretextual.

A plaintiff may also prove that his discharge was a pretext for discrimination by showing that similarly situated white employees were treated more favorably.   Pagano v. Frank, 983 F.2d 343, 348 (1st Cir.1993)  Such a showing has been described as  one of "[t]he most probative means of establishing that the plaintiff's termination was a pretext for discrimination." Id.  To make such a showing, a plaintiff must typically point to another person, "similarly situated to him

---

[14] The testimony of Jeff Clark, the individual who was allegedly involved in discovering and/or investigating every allegation of poor performance is particularly lacking in credibility. His testimony as to every event is contradicted by either the disciplinary documents or the other witnesses. (Id. at ¶¶ 47-51, 54-58, 62, 64-71, 73-75, 84, 93-94)  He testified, for example, that on one occasion while investigating to see if a contaminated mix might have been caused by the plaintiff having used the wrong bond, he found that the plaintiff had not used the defendant's Con-Cam system. (Id. at ¶65)  However, it is undisputed that the contaminated mix occurred several months **after** Clark checked the Con-Cam system to see if the plaintiff was logged in. (Id. at ¶¶64-69)  In an attempt to salvage this testimony- and after meeting with defendant's counsel- Clark claimed that he must have looked in the Con-Cam system to investigate some other quality issue. (Id. at ¶70)  Not only is this new memory questionable, it is also still inconsistent with the explanation given by the defendant's other witnesses.  Production manager Thomas Oliver testified that it would not be a normal practice to look in the Con-Cam system in investigating a quality issue, and claimed that Clark had previously told him that he had looked in the system to see who had failed to sign an MO. (Id. at ¶73)

[15] For example, Richard Zeena and Thomas Oliver made the decision to give the plaintiff a written warning.   (Id. at ¶72)    According to Zeena (and some of the documents) one of the reasons for the warning was an alleged failure to use the Con-Cam system in making a mix. (Id.) According to Oliver that was **not** one of the reasons, and a failure to use the system would not subject an employee to discipline. (Id.)

12

in all relevant respects," who was "treated differently by the employer." <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 20 (1st Cir.1999). However, similarly situated in all relevant respects does not mean that the comparator must be a "perfect replica". <u>Id.</u> Instead, the comparator must be sufficiently similar that, "a prudent person, looking objectively at the incidents, would think them **roughly equivalent** and the protagonists similarly situated." <u>Id.</u> (emphasis added)

The plaintiff has produced substantial evidence that similarly situated white employees were not disciplined for exceeding the 45 lb weight limit, for failing to sign MO's, or for contaminating mixes. White employees Reed, Aubin, and LeBeau were not disciplined when they made contaminated mixes.[16] (<u>Id.</u> at ¶¶130-132) White employees, including LeBeau and McTernan were not disciplined for exceeding the 45lb. weight limit. (<u>Id.</u> at ¶¶40, 46, 103) White employees Ahl, Gustafson, LeBeau and Reed were not disciplined in the same manner as the plaintiff for failing to sign MO's.[17] (<u>Id.</u> at ¶¶107, 108, 114-116).

---

[16] The defendant contends that there is no evidence that management had knowledge of these other contaminated mixes. (Def's Mem. at 12) This is simply incorrect. LeBeau testified that his group leader knew that he had contaminated a mix. (<u>Id.</u> at ¶131) Tivnan knew of contamination by Aubin. (<u>Id.</u> at ¶¶131-132) Tivan, Oliver, Clark and Zeena all admitted that they knew of contaminated mixes. (<u>Id.</u> at ¶102)

[17] When the plaintiff failed to sign an MO, he was immediately given formal discipline, and was moved up a step in the progressive discipline process. However, white employees Gustafson and LeBeau testified that when they failed to sign, their supervisors gave them- at most- a verbal warning. (<u>Id.</u> at ¶¶ 114-115) Walter Ahl was given three verbal warnings before being counseled -even though he was already receiving progressive discipline. (<u>Id.</u> at ¶124) Perhaps most tellingly Jeff Clark testified that when an employee told him that white employee Kevin Reed was failing to sign MO's, he did not immediately investigate and discipline Reed for the violations. (<u>Id.</u> at ¶114) He allowed Reed to fail to sign off on two more occasions without discipline. (<u>Id.</u>) When Reed was again derelict, Clark gave him only a verbal warning. (<u>Id.</u>) Thus, Reed was given a verbal warning after having failed to sign MO's on at least four occasions.

The defendant claims that numerous white employees were disciplined for failing to sign MO's. (<u>Id.</u> at ¶¶118-124, 128-129) It appears that the defendant did discipline a number of