The plaintiff has also produced substantial evidence that similarly situated white employees Aubin, Ahl, and Gaimari were treated far more leniently than the plaintiff, even when they engaged in more serious misconduct or engaged in a greater number of instances of policy violations.[18] (Id. at ¶¶105, 124-128, 138)   The defendant, citing Rodriguez- Cuervos v. Wal-Mart Stores, Inc., 181 F.3d. 15, 21 (1st Cir 1999), claims that Ahl,[19] Aubin,[20] and Gaimari cannot be considered to be relevant comparators unless they had the same supervisor as the plaintiff, worked

---

white employees for failing to sign MO's after the plaintiff complained in October 2001 that he was being discriminated against by Clark. (Id.)   However, the defendant has not identified a single document showing that a white employee was disciplined prior to the plaintiff having complained - solely for failing to sign off an MO. (Id.)   As is explained in detail in the *Plaintiff's 56.1 Statement,* every white employee identified by the defendant as having been disciplined for having failed to sign an MO prior to October 2001, had either frequently failed to sign, or had a performance or quality issue in addition to the failure to sign. (Id. )   In fact, the only employee who was disciplined solely for a failure to sign an MO was African American. (Id. at ¶129)

[18] Employees Morse and Wilson were also treated more leniently. (Id. at ¶¶134-137) The defendant currently claims that Wilson is black. However, Oliver has testified otherwise, and the defendant claimed that Wilson was white in it's submissions to the EEOC. (Id. at ¶140)

[19] The defendant also claims that Ahl is not a relevant comparator because there has been no showing that his performance deficiencies were similar to the plaintiff's. Ahl's violations, like the plaintiff's, were non-wilful, and were therefore subject to progressive discipline. (Id. at ¶¶124-128) Moreover, between 1997 and 2003, Ahl failed to sign MO's, failed to clean his machine resulting in contamination and the loss of product, and had numerous quality issues. (Id.) Thus, a reasonable trier of fact could find that Ahl was sufficiently similar.

[20] The defendant contends that Aubin is not a relevant comparator because he did not engage in repeated violations of the same policy, as the plaintiff allegedly did. Abuin's records show otherwise. (Id. at ¶ 105)   Moreover, the discipline policies do not treat repeated violations of the same policy more harshly than repeated violations of different policies. (Id. at ¶¶2-4) There is no evidence that the defendant treated repeated violations of the same policy more harshly. When Ahl and Wilson had repeated violations, the defendant did not apply more serious discipline. (Id. at ¶¶124-128, 134-136)   When Gaimari had a series of repeated violations, including repeated safety violations, he was not even moved up to the next step of progressive discipline. (Id. at ¶138)   A reasonable trier of fact could accordingly find that the fact that the plaintiff had repeated violations was not a factor that would make a difference.

in the same business unit, and were disciplined at the same time for the same conduct.  (Def's Mem. at 10. 12-15)  Rodriguez- Cuervos, 181 F.3d. at 21-22, does not so hold.   In fact, the Court in Rodriguez- Cuervos made clear that the plaintiff need only show that he and the comparator, "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment".  Id., (citations omitted).[21]

Ahl, Aubin, and Gaimari were  subject to the exact same rules, regulations and progressive discipline policies as the plaintiff.  (Id. at ¶¶ 1-5)  The defendant required that its policies  be applied consistently- whoever the supervisor, and whatever the work area .  (Id.)  Thus, the fact that each may have had  a different supervisor or worked in a slightly different area does not render them unfit as comparators.  Nor would  the exact date of the discipline matter since there is no evidence that  the rules and regulations or disciplinary policies or practices changed  during this time period.[22]  While Zeena  did claim that after 2002, the existence of the union and the possibility of unfair labor practice charges made the defendant more cautious,  he admitted that the defendant had dealt with the union and had been concerned about unfair practices charges with respect to the plaintiff as well.  (Id. at ¶139)   Consequently, a reasonable trier of fact could find

_____

[21]  In Rodriguez- Cuervos, 181 F3d. 21, the Court found that the fact that the plaintiff and the comparator had not been subject to the same standards without differentiation when their performance was evaluated by  different supervisors, in different stores at different times.   In doing so the Court noted that  the supervisor who had positively rated the comparator had also previously positively rated the plaintiff.   The court explained that under such circumstances the comparison of the two employees established only, "different opinions of different evaluators under different circumstances".  Id.

[22]  The plaintiff does agree that Ahl's medical conditions in 2003 and 2004 could be a mitigating circumstance.   For this reason, the plaintiff relies on Ahl's discipline only though 2002.

15

that Ahl, Aubin, and Gaimari were white employees who were similarly situated to the plaintiff. A reasonable trier of fact could also find that the plaintiff was treated more harshly than these similarly situated white employees.[23]

Moreover, this is not a case in which the jury could conclude that the defendant honestly, but mistakenly, believed that the plaintiff's performance warranted termination. It is undisputed that when the defendant was disciplining the plaintiff for having allegedly created overweight pans, the defendant was aware that overweight pans could have been caused by factors outside of the plaintiff's control. (Id. at ¶¶38-40, 43-45) The defendant was also aware that the prohibition on exceeding the 45lb weight limit on pans was not being enforced against other employees.[24] (Id. at ¶¶43-45, 89,103) In fact, during the discipline process, the plaintiff and Phillip Gustafson told the defendant that the overweight pans might have been caused by another employee, and reported that other employees who were exceeding the weight limit on pans, were not being disciplined.[25]

---

[23] The details of the more lenient treatment of these and other white employees is set out in detail in the *Plaintiff's 56.1 Statement.*

[24]

A.   As is explained in detail in the *Plaintiff's 56.1 Statement,* mixers and rescreeners regularly exceeded the weight limit. (Id. at ¶¶38-40, 43-45, 89, 103) Gustafson testified that this failure to comply was open and known to supervisors- pointing out that employees would often write the word "heavy" on these overweight mixes. (Id.)  He explained that no action was taken against the employees who made these heavy pans. (Id. ) White employee Joseph McTernan testified that he regularly made mixes that weighed over 60 lbs. and was not disciplined.  (Id.)

[25] The plaintiff also gave Zeena a document created by leadperson Dennis Novia, complaining about a truck full of mixes that each weighed over 70 lbs. (Id. at ¶89)  The defendant never weighed these mixes or disciplined any employee for creating them. (Id.)  The defendant claims that employees knew that these pans were supposed to be scooped out and not lifted. (Id.)  However, a reasonable jury could find this claim to be untrue.  The plaintiff has explained that mix pans were never hand-scooped, and the document itself states that Novia and the other employees were concerned about the safety of having to "hump" these overweight pans.

(Id. at ¶87)   Despite this knowledge the defendant did not investigate the cause of the

overweight pans[26], to weigh the mix pans of the plaintiff's co-workers, or take any action to see if

the plaintiff's discipline was consistent with the discipline of other employees.

At the time that the plaintiff was being disciplined, the defendant was similarly aware that

other employees were not being disciplined when they failed to sign MO's.[27]   (Id. at ¶¶42, 107,

109, 111-117)   In fact it is undisputed that the defendant actually told it's employees not to bring

violations of this policy to the attention of management.[28]   (Id. at ¶42)   Employees, instead, were

told to handle it themselves by getting the previous employee to sign.[29]   (Id.)   When the plaintiff

_____

(Id.)

[26]   Clark did create one document indicating that one set of overweight pans was based on the plaintiff using the wrong size screen.   (Id. at ¶56)   However, this document reveals the pretextual nature of the defendant's claims of poor performance.   As is explained in detail in the *Plaintiff's 56.1 Statement*, Clark could not have reasonably come to the conclusion that the plaintiff had used the wrong screen based on the information he had.   (Id. at ¶56)

[27]   There is substantial evidence indicating that a failure to sign an MO was a common occurrence.   (Id. at ¶¶42, 107, 109, 111-117)   James Bailey, for example, testified that at the time Briddell was being disciplined he was finding 8-10 unsigned MO's per day.   (Id. at ¶109)   He further testified that he brought these to the defendant's attention to prove that the plaintiff was being held to higher standards than his co-workers.   (Id.)

[28] The defendant claims that white employees were not disciplined for failing to sign MO's because these employees "escaped detection" when "sympathetic co-workers" gave them a second opportunity to sign the MO.   (Def's Mem. at 10-11)   This version of events is not supported by the record evidence.   Virtually every witness explained that there was no attempt at detection, but rather that the defendant told its employees not to bother to inform anyone of violations of the policy requiring the signing of MO's.   (Id. at ¶¶ 42, 107)

[29]   The defendant claims that the usual practice could not be followed in the plaintiff's case because his failure to sign was not discovered until after he had left for the day.   (Id. at ¶ 110)   However, there is absolutely no evidence to support this conjecture.   Mixer/rescreener David Aubin came in three hours before Briddell left for the day.   (Id.)   He could have brought any unsigned MO's to Briddell in accordance with the usual practice.   (Id.)

and Gustafson reported that other employees who failed to sign MO's were not being disciplined, the defendant disciplined the plaintiff anyway.[30]  (Id. at 93, 100)  The defendant made no effort to investigate whether the plaintiff was being held to different standards with respect to any alleged failure to fill MO's.[31]

Finally, at the time that the plaintiff was terminated the defendant knew that other employees had made contaminated mixes but had not been disciplined for having done so.[32]     (Id. at ¶¶102, 130-132)  The plaintiff and Gustafson complained that the plaintiff was being held to different standards. with respect to the contaminated mix. [33]  (Id. at ¶¶98, 102) On the day that the plaintiff was terminated,  Zeena was explicitly told that this was true. (Id. at ¶102) However, the defendant declined further investigation, and instead terminated the plaintiff.

Consequently, it is clear that at the time that the plaintiff was being terminated, the defendant  knew that other employees were violating the same rules but took no action to

---

[30]After the plaintiff complained of discrimination, the defendant did write up a handful of other  employees for failing to sign MO's.  However, as was explained above, the evidence shows that in the three years prior his complaint, no white employee was disciplined for failing to sign MO's without first being given several verbal warnings, unless there were concomitant violations.

[31]     Even when a repeated failure was brought to the attention of supervision, the defendant did not immediately subject the employee to formal progressive discipline - as was done in the plaintiff's case.  White employees LeBeau and Gustafson were only given verbal warnings, and Clark gave Reed a verbal warning after multiple violations.  The plaintiff's supervisor,  Bill Tivnan conceded that his normal practice- even  if an employee were to violate the policy "every day" was to give the employee only a verbal warning.  (Id. at ¶132)

[32]  The defendant also admittedly made no effort to determine whether or not employees other than the plaintiff were using the Con-Cam system.  (Id. at ¶106)

[33]  This was clearly true.  When plaintiff's supervisor, Bill Tivnan learned that white employee David Aubin contaminated a mix, he  did not discipline Aubin for having done so.  (Id. at ¶132)

18

investigate and/or discipline these employees.   A reasonable trier of fact could find that the defendant's conduct in  terminating a long term employee with many years of satisfactory evaluations, for policy violations which were tolerated when engaged in by other, employees, is compelling evidence that the claim of poor performance is a pretext.   Che v. Massachusetts Bay Transportation Authority, 342 F.3d. 31, 39, (1st Cir. 2003)( finding it  striking that  other employees were not disciplined for the same alleged violation of policy);  Cumpiano v.  Banco Santander Puerto Rico , 902 F.2d. 148, 158 (1st. Cir. 1990)(finding "glaring" pretext where management knew of violations of rules for more than five years but took no action to enforce them, and explaining that "sudden concern.... after so long a period of acquiescence was to say the least suspicious"); Benoit, 331 F.3d. at  174, (granting summary judgement and explaining, "[n]or has [the plaintiff] established that TMC failed to fire other employees despite habitual or  frequent absences...);  Gibbons v. H. Burnley IV, 737 F. Supp. 1217, 1222 (D. Maine 1990)(noting that  no investigation ensued when defendant learned of potential violations by other employees).

The defendant  argues that the evidence of pretext is insufficient to withstand a motion for summary judgement, and that the plaintiff must introduce additional evidence that his race was a motivating factor.  This again ignores the legal standard to be applied.   Since the plaintiff has made out a prima facie case, and has introduced evidence that the defendant's stated reason for discharging the plaintiff is unworthy of credence, summary judgement may be granted only if the evidence of pretext is weak and there is, "strong independent evidence that no discrimination occurred".  Reeves, 530 U.S. at 147-148.    Here there is clearly more than weak evidence of pretext.  A long-term  employee with consistently good evaluations was terminated despite substantial  evidence that the defendant knew that he was being held to different standards than his

co-workers.  The defendant  has failed to offer a consistent or coherent explanation of the events

giving rise to the plaintiff's discipline and discharge, there is evidence that white employees were

treated more favorably and there is  ample evidence of mendacity. [34]  Moreover, despite policies

requiring that discipline be enforced consistently, it was not until **after** the plaintiff was terminated

that the defendant gathered evidence of the discipline of other employees- not to determine if the

plaintiff was being treated fairly but in order to justify the termination.        Nor is this a case in

which there is strong independent evidence that no discrimination occurred.   In fact, the record

contains substantial evidence of a general atmosphere of race discrimination.[35]   When African

American employee James Bailey tried for a promotion to a higher level position, he was denied

the position despite the fact that he had the greatest seniority- allegedly because  he lacked the

education for the position.  (Id. at ¶14)   However, the white employee who interviewed Bailey

and who later offered the position to another white employee, never even asked about Bailey's

education.  (Id.)   The  plaintiff and black employee Addo Aikens were denied promotions to

better paid positions because of allegations that they lacked the "basic skills" and/or intellectual

capacity to do the job.[36]  (Id. at¶¶ 2-13)   Black employees from Ghana were required to attend a

---

[34] Indeed, the inconsistencies between the documents and the testimony of Clark, Oliver,
Tivnan and Zeena confirm Abraham Lincoln's observation that, "no man has a good enough
memory to make a successful liar".

[35]While "proof of a general atmosphere of discrimination is not the equivalent of proof of
discrimination against an individual," it may be one indication that the reasons given for the
employment action at issue were "implicitly influenced" by the fact that the plaintiff was of a given
race, age, sex or religion. Sweeney v. Trustees of Keene State College, 604 F.2d 106, 113 (1st
Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

[36] The plaintiff only received the job after suggesting, in the presence of several
supervisors, that he would be contacting the NAACP.   (Id. at¶16)

separate, segregated meeting because of the defendant's belief that they would not be capable of understanding what occurred in the regular meetings. (Id. at ¶29)   A jury could find that this pattern of assuming - without evidence- that black employees were less intellectually capable than their white counterparts, reflects an institutional stereotype or bias against black and/or African American employees.[37]   See: Thomas v. Eastman Kodak Co., 183 F.3d. 38, 59(1st Cir. 1999).

In addition it is undisputed that there was a complete absence of African American or Black supervisors, managers, and officers, and almost no minority employees in such roles.   (Id. at ¶¶9-10)   When African American employees, like Bailey and Briddell complained that they believed that this was the result of racism, the defendant's response was to tell Briddell, "prove it".   (Id. at ¶¶23-25) Dennis Baker, the Vice President of Human Resources, made the defendant's views on the advancement of minority employees perfectly clear.   He testified that he did not see the small number of minorities in supervisory roles as a "lack", explaining that whether or not an absence of people of color in supervisory positions is a "lack", "depends upon whether the standard is that there **should be** more".   (Id. at ¶148) (emphasis added)

_____

[37] The jury could also find that the defendant's response to complaints of racism reflects condonation or encouragement of discrimination.   When Briddell and Bailey complained about prejudice with respect to promotions, their claims were never investigated. (Id. at ¶¶23-25) When the plaintiff claimed that he had been initially denied a promotion due to racism, it was not investigated.   (Id. at ¶ 16)   When Briddell complained of being offended by a co-workers display of the confederate flag, the defendant did not investigate to see if it was being displayed for a racist purpose, and instead criticized Briddell- explaining that unless, "someone is saying or doing something that is **truly racial**, [Briddell] should not just assume everything is racially motivated". (Id. at ¶17)(emphasis added)

When the defendant had no choice but to concede that racist activity had taken place- such as when employee David Aubin referred to a Hispanic co-worker as a "fucking spic", and then bragged openly about having done so to a number of co-workers, the defendant did not discipline the supervisor who took no action after receiving the complaint, and effectively hid the discipline–placing in a sealed envelope because of its "sensitivity".   (Id. at ¶18)

21

While this evidence of racism would not, alone, be sufficient to justify the denial of the defendant's motion for summary judgement, the Court is not to look at each item of evidence in "splendid isolation"  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir.1991)  Instead, it must look at the total package of proof offered by the plaintiff, and  determine whether this package of proof, viewed the light most favorable to the plaintiff, could lead a reasonable trier of fact to conclude that the stated reason was a pretext for discrimination.  Olivera v. Nestle Puerto Rico, Inc., 922 F.2d 43, 49-50 (1st Cir.1990).  It is clear that in this case a reasonable trier of fact could so find.   For all the reasons set out above, and in the *Plaintiff's FRCP 56.1 Statement*, the plaintiff respectfully requests that defendant's motion for summary judgement with respect to the claims of race discrimination under Title VII and 42 USC §1981 be denied.

## IV.    A Reasonable Jury Could Conclude that the Defendant Terminated  the Plaintiff Because of His Complaints of Discrimination

The plaintiff has also claimed that he was scrutinized and discharged in retaliation for his opposition to discrimination.[38]  In order to establish a *prima facie* case of retaliation,  the plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action after or contemporaneous with such activity; and (3) there exists  a causal link between the protected activity and the adverse job action.  Che v. Massachusetts Bay Transportation Authority, 342 F.3d. 31, 38 (1st. Cir. 2003);  Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir.1994).

The defendant apparently concedes that the plaintiff's August 2001 complaints about race

---

[38]  The defendant correctly notes that only the discharge is timely.  However, it is black letter law that, "time barred acts may be used to support timely filed claims".  Luciano v. Coca-Cola Enterprises, Inc., 307 F. Supp. 2d. 308, 319 (1st Cir. 2005); US Airlines Inc. v. Evans, 431 US 553, 555 n.4. (1977).   Thus, the Court may consider the timing of the defendant's discipline of the plaintiff in determining the defendant's motive for terminating the plaintiff.

22

discrimination and segregation constitute protected activity[39], that his termination is an adverse employment action, and that it occurred after his protected activity. (Def's Mem. at 18) The defendant contends, however, that the plaintiff cannot establish a causal connection between the protected activity and the discharge because he was not terminated until six months after he complained.   "Temporal proximity is but one method or proving retaliation". Che, 342 F.3d. at 38.  Changes in how the employer treats the employee after the protected conduct can also establish the causal connection, as can disparate treatment of the employee after the protected conduct.  Id..  See Also Paquin v. MBNA Marketing Systems,  233 F. Supp. 2d. 58, 65 (D. Maine 2002) (citations omitted).

In the present case, the plaintiff has shown a close temporal connection with the start of the adverse treatment against him.   See: Nakai v. Wickes Lumber Co., 906 F. Supp. 698, 706 (D. Maine 1995) (finding sufficient connection where plaintiff was put on new performance standards one  day after her protected activity, and these standards resulted in discharge four months later); See Also: Calero-Cerezo v. United States Department of Justice, 355 F.3d. 6,  (1st Cir. 2004) One month after the plaintiff complained of discrimination, the defendant began to subject him  to progressive discipline, building a paper record against him which resulted in his termination five months later.  This is sufficient  to satisfy the "very close" requirement. See:  Bajana v. Potter, 396 F. Supp.2d. 78, 88 (D, Puerto Rico, 2005);  Nakai, 906 F. Supp. at 706.

In addition, the plaintiff has both shown a change in how he was treated after complaining of discrimination, and that he was subjected to disparate treatment after he complained.   His work was suddenly subjected to much closer scrutiny.   He was suddenly held to different standards than his co-workers and was disciplined for conduct that the defendant  tolerated in employees

---

[39]  Indeed, the plaintiff would be hard pressed to dispute this.   The plaintiff complained about the defendant's failure to promote black employees and accused the defendant of segregation.  (Id. at ¶¶ 28, 32)   In doing so, the plaintiff specifically referenced the Civil Rights Movement and the history of  segregating African Americans.

who had not engaged in protected activity.    This is clearly sufficient to give rise to an inference that a causal connection exists between the plaintiff's protected activity and his termination.

In fact, in <u>Che v.  v. Massachusetts Bay Transportation Authority</u>, 342 F.3d. at 39, the First Circuit found a causal connection, explaining

> [p]erhaps most striking is the fact that there is documentary and testimonial evidence that, unlike Che, other employees were not disciplined for writing in the assignment block.   Multiple witnesses testified that they wrote on the assignment block themselves or saw other chief inspectors write on the  assignment  block, but were not disciplined.

<u>Id.</u>   In the present case, like <u>Che</u>, the plaintiff has produced substantial evidence that other employees- who had not complained of discrimination - created heavy pans, failed to sign MO's and created contaminated mixes, but were not disciplined.   Thus, he has clearly made out a prima facie case of retaliation.

The defendant also claims that there is no evidence of pretext with respect to the retaliation claim.   This is not the case.    The fact that the plaintiff was disciplined for conduct that was accepted from other employees is striking evidence of pretext. <u>Id.</u>    As was explained in detail above and in the *Plaintiff's 56.1 Statement*, the plaintiff has also shown that in disciplining him the defendant did not follow its own policies, that the allegations of poor performance are riddled with contradictions, missing evidence and evidence of mendacity,  that the defendant knew that the plaintiff might not be guilty of misconduct but never investigated to determine the cause of the problems before disciplining the plaintiff, and that the defendant knew that the plaintiff was being disciplined for violations of policies which other employees were permitted to freely  violate.[40]

Zeena who felt passionately about winning the union campaign, became  visibly angry when the plaintiff  complained about the defendant's practice of race discrimination in promotions and the segregation of black employees.   (<u>Id.</u> at ¶¶26, 30) Zeena was soon involved in a  five

---

[40] As was explained supra,  Ahl, Morse, Johnson, Gaimari and Aubin, none of whom complained of discrimination, were treated more favorably than the plaintiff.  The defendant has also identified  Koduah, Wiredu and Wilson,  none of whom complained of discrimination, as employees who were treated more favorably than the plaintiff. (Def's Mem. at 15).

month sequence of discipline of the plaintiff, culminating with the plaintiff's discharge by Zeena for reasons that a reasonable trier of fact could clearly find to be pretextual. This evidence, viewed in the light most favorable to the plaintiff, would clearly permit a reasonable jury to find that the defendant discharged the plaintiff in retaliation for his protected activity in violation of Title VII. See: <u>Nakai</u>, 906 F. Supp. at 706. There is also substantial evidence that the plaintiff was treated differently than similarly situated employees who had not complained of discrimination with respect to the application of progressive discipline. For all of these reasons, and those set forth in *Plaintiff's 56.1 Statement,* the defendant's Motion For Summary Judgement as to the plaintiff's claim of retaliation in violation of Title VII, must be denied.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Plaintiff, Robert Briddell, respectfully requests that the Court deny the Defendant's Motion for Summary Judgment as to all counts.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF

By:    _____
Mary E. Kelly ct# 07419
Livingston, Adler, Pulda,
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone:(860) 233-9821
Fax: (860) 232-7818
E-mail: mekelly@lapm.org

## CERTIFICATE OF SERVICE

This is to certify that on May 9, 2006 a copy of the foregoing Plaintiff's Memorandum in Opposition to Summary Judgement was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Mary E. Kelly
Livingston, Adler, Pulda
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105
Phone: (860) 233-9821
Fax: (860) 232-7818
E-mail: mekelly@lapm.org