## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT BRIDDELL | : | CIVIL ACTION NO. |
| | : | 4:04 CV 40146 (FDS) |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| SAINT GOBAIN ABRASIVES, INC. | : | |
| | : | |
| Defendants | : | May 9, 2006 |

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT
## IN SUPPORT OF MEMORANDUM OPPOSING SUMMARY JUDGMENT

The plaintiff, Robert Briddell provides the following statement of material facts in dispute, pursuant to Local Rule 56.1.

### I.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    The defendant has detailed written policies concerning discipline.  (M. Tivnan Dep. Ex. 2 pp. 151-156; M. Tivnan p. 6[1])  One of the purposes of these policies is to ensure that discipline is consistently applied. (W. Tivnan 1 p. 16) Under the policies, the immediate supervisor of the employee is usually responsible for initiating  discipline.  (M. Tivnan Dep. Ex. 2 p. 151)

2.    According to these policies, progressive discipline is generally to be applied for non-wilful violations of company policy.  (M. Tivnan Dep. Ex. 2  pp. 152-153,155;  W. Tivnan 1 p. 27;

---

[1]  References to deposition testimony will be made by citing the name of the deponent and the page  number of the transcript, i.e. (M. Tivnan  p.____).  If there is more than one volume, the volume number will also be noted.  References to the affidavits of Meiklejohn,  and Briddell will be made by citing the name of the affiant and paragraph of the affidavit, i.e. "Briddell  ¶ ___).  References to deposition exhibits will be identified by the name of the deponent and the exhibit number and, if relevant, the page, i.e. "M. Tivnan Dep. Ex. ___   pp. ____".

Zaklow p. 50;  Oliver 1 pp. 30-31)    The first step of the progressive discipline process is  a

formal counsel, which  must be documented. (M. Tivnan Dep Ex. 2 p. 152;   W. Tivnan 1 p. 17)

 If a second or other violation occurs within six months, the employee may be issued  a written

reminder.  (M. Tivnan Dep. 2 p. 52)   If another violation occurs within 12 months of the

reminder, the employee can receive a written warning.  (Id. p. 153)   A violation while on a

written warning can result in suspension or termination.  (Id. p. 153)  Prior to termination an

employee may also be given a last chance agreement.    (Zeena 1 pp. 130-131)

3.        Before disciplining an employee, a supervisor must ask a series of questions-  including

whether the discipline is fair, whether the supervisor has gotten employee's version of the events,

whether all facts have been considered, and whether the discipline is the same that would be

given to any other employee.   (M. Tivnan Dep. Ex. 2 p. 154; W. Tivnan  2 pp. 24-29; Zeena 1 p.

13)

4.        Discipline  is "in effect" for only six months to one year, unless extended, and is not to be

retained after the year. (M. Tivnan Dep. Ex. 2 pp.152-153)  Some supervisors have retained

discipline  for over a year.    (Zeena 1  pp. 29-30) However,  if retained, discipline is no longer

considered to be active after a year, and is not to be considered in applying the steps of the

progressive discipline process.   (Oliver 1 p. 28; Zeena 1 p. 122; M. Tivnan p. 19)

5.        The defendant's policies and practices with respect to discipline are the same throughout

Plant 8- regardless of the specific area in which the employee works.    (M. Tivnan p. 16; Zeena 2

p. 30; Clark pp. 67-68)  In  order to ensure that discipline is applied consistently and uniformly, a

Human Resources official must authorize  all discipline above the formal  counsel level.   (Zeena

1 pp. 98-102, 139-142; Clark pp. 67-68)   In determining whether or not discipline is being

applied consistently and uniformly, the defendant is to consider the level of discipline applied to employees whose circumstances are "similar", even if they are not identical. (Zeena 1 p. 120)

6.    The defendant has policies governing the selection process for promotions. Non-supervisory, group leader and first line supervisory positions are to be filled based on ability, seniority and physical capacity to perform the essential functions. (Clark pp. 36-37; M. Tivnan Dep. Ex. 2 pp. 176-181; Zeena 3 pp. 4-6) Before filling a position, the supervisor is required to consult with the EEO/ Affirmative Action Co-ordinator or designated human resources official, to ensure that eligible members of affected minority groups have been appropriately reviewed and considered. (M. Tivnan Dep. Ex. 2 pp. 179) However, the defendant did not review the race of applicants to ensure that minority groups were considered. (Zeena 3 pp 15-16)

7.    The plaintiff, Robert Briddell, was hired by the Norton Company in April 1985 as a material handler in the Bonded Abrasives Division of Plant 8. (M. Tivnan Dep. Ex. 3 p. 1433) In 1987 he was promoted to the position of mixer. (Briddell Aff. ¶3).

8.    In 1990, the defendant merged with Norton and became the plaintiff's employer. (Briddell Aff. ¶ 4) At the time of the merger there were several African American employees in supervisory positions. (Briddell Aff. ¶ 5) These supervisors left after the defendant took over, and were replaced by white employees. (Id.) Briddell was told by one of these supervisors, John Vasseur, that he was being forced out and discriminated against by the defendant. (Id.)

9.    At no time after the defendant took over were any African American or black employees promoted to supervisory positions in Plant 8.[2] (Briddell Aff. ¶ 6)

_____

[2] The defendant employs both African American employees, and black employees from Ghana.

3

10.     In 1999, the defendant had 174 officers and managers in their Worcester facility, none were black. (Baker Dep. Ex. 36 pp. 1034, 1042) In 2000 there were 169 officers and managers in the Worcester facility, none of whom were black. (Id. pp. 1040,1042)   In 2001 there were 159 officers and managers, none of whom were black. (Id.)   In 2002 there were 172 officers and managers, none of whom were black. (Id.)    In 2003 there were 149 and in 2004 there were 128, none of whom none were black. (Id. at 1042, 1044)

11.     The defendant creates evaluations of its employees which are to be objective and complete, and must note any serious performance problems.   (Oliver 1 pp 61-62)  From 1990, when the defendant became his employer, through 1998, the plaintiff worked primarily as a third shift mixer.    (Briddell 1 pp. 81-82; 141)   The plaintiff received evaluations from the defendant for his performance as a mixer for years 1992 through 1998. (M. Tivan Dep. Ex. 4;  M. Tivnan Dep. Ex. 3 pp. 142-147, 150-151, 153-154)   These evaluations rate him overall as satisfactory. (Id.; M. Tivnan pp. 34-36; 38, 46-48; 53-57)   In fact, the 1998 evaluation rated him as exceptional with respect to attitude, quality and tardiness, and good with respect to productivity, skill, safety and attendance.  (M. Tivnan Dep. Ex. 3 pp. 1433-1454)

12.     In February 1998, Briddell applied for a Band 4 job in the truing department.  (Oliver 30b6 1 p. 177; Zaklow Dep. Ex. 49)  Briddell was the most senior bidder for the position. (Oliver at 30b6 1 p. 181; Zacklow Dep. Ex. 49).   Production Supervisor Thomas Oliver was responsible for selecting the person for this position. (Oliver 1 pp. 56-57) Oliver believed that Briddell had been a satisfactory employee as a mixer. (Oliver 1 p. 55)   Oliver first told Briddell that he would receive the position, but then told him that he would receive the position only if he took and passed a "basic skills" test.  (Briddell 1 p. 125; Oliver 30b6 1 pp. 186-187)

4

13.    The defendant gave a literacy and math test to prospective employees. (Zeena 3 pp. 49;52) The defendant has only required an employee to retake this basic skills test or used performance on the initial test to deny an employee advancement in the case of the plaintiff and Addo Aikens. (Zeena 3 pp. 49, 53-54) Aikens is black. (Zeena 3 p. 54) When Aikens was denied advancement based on this test, he complained that the defendant was discriminating against him based on his race. (Zeena 3 pp. 55-59) The defendant never investigated whether the use of the basic skills test was discriminatory with respect to Aikens. (Zeena 3 pp. 59-60)

14.    African American employee James Bailey was denied a group leader position, allegedly because he lacked the education. (Bailey 1 pp. 136-138, 144-146; Bailey 2 pp. 12-13) However, the white employee who made the decision to deny him the job did not know his education and during his interview for the position never asked any questions about his education. (Id.) The position was then given to a white employee who had less seniority than Bailey. (Id.)

15.    When Briddell was told that he would not receive the Band 4 job unless he took a "basic skills" test he complained to Oliver that he felt that the decisions was discriminatory. (Oliver 30b6 1 p. 188; Zaklow Dep. Ex. 49) Briddell complained that, "he deserved the chance to see if he could do the job just like any other man. He said that upper management looked for a reason not to give him this job. He stated that he ha[d] lived through racism and oppression all of his life and that this was not right." (Zaklow Dep. Ex. 49)

16.    After complaining to Oliver, Briddell then went into an office where several other white supervisors were present. (Briddell 1 pp. 30-36) Within earshot of these supervisors, Briddell contacted his wife and spoke to her about contacting the NAACP. (Id.) The next day

5

he was told he would be given the position without taking the test. (Id.) The defendant never investigated his complaint of discrimination. (Oliver 30b6 1 pp. 195-196)

17.    In May 1999, after the plaintiff had received the Band 4 job, the plaintiff complained that a co-worker was wearing a confederate flag bandanna which he found offensive and racist. (Fitzgerald Dep. Ex. 80) Supervisor Kevin Deeds reported the concern to human resources. (Fitzgerald p. 33; Fitztgerald Dep. Ex. 80)    Deeds confirmed that the co-worker was wearing a bandanna and explained that he himself displayed confederate flag symbols. (Fitzgerald pp. 33-34)    The defendant was aware that the confederate flag was sometimes used as a symbol of racial separation and oppression, that an employee might be displaying it because of this symbolism, and that African American employees like the plaintiff could find it offensive because of this symbolism.  (Fitzgerald pp. 38- 40) The human resources official investigating the complaint testified that the defendant would not permit an employee to wear such an item with a racial purpose, but explained that she, "didn't feel that [she] needed to find out if it was racial or not". (Fitzgerald pp. 43-44)    Instead, Fitzgerald informed Deeds that the plaintiff needed to realize that unless, "someone is saying or doing something that is **truly racial**, [Briddell] should not just assume everything is racially motivated".  (Fitzgerald Dep. Ex. 80)(emphasis added)

18.    In September 1999, one of the plaintiff's co-workers, David Aubin, called a Hispanic employee a "fucking spic", bragged about having done so to his co-workers, and then lied about it to the defendant during the investigation. (Fitzgerald pp. 65-68; 82-87, 93-94)  The Hispanic employee complained about Aubin, and also complained that when he reported Aubin's racist slur to his supervisor, the supervisor repeatedly ignored his complaint . (Id.) The defendant did

6

not take any action against the supervisor who had ignored and condoned the racism. (Id.)
Aubin was given a written warning. (Fitzgerald p. 75; M. Tivnan Dep. Ex. 10) However, the
defendant kept this discipline in a sealed envelope because of its "sensitivity". (Oliver 30b6 2
at pp. 94-95)

19.    In March 1999, the plaintiff received a merit increase for his performance in the new job.
(M. Tivnan Dep. Ex. 3 p. 1455)  In June 1999 he was evaluated as a good employee in every
area in his new position. (M. Tivnan Dep. Ex. 3 pp. 1456-1459)  The plaintiff was reviewed
again for May 1999 through December 1999.  (M. Tivnan Dep. Ex. 3 pp. 1461-1464)  He was
again rated as good in every area.    (Id.) Oliver, who created this review, stated that Briddell
was doing a satisfactory job, and  that the  quality of his work was good.  (Oliver 1 pp. 62-68)

20.    Employees sometimes have difficulty performing  a  higher level position, and are offered
another position. (Oliver 1 pp. 83-84)   The failure to succeed at a higher level job is not held
against the employee. (Oliver 1 pp. 83-84)

21.    In July 2000, the defendant decided that the plaintiff was not succeeding at the  Band 4
job, and returned him to his  mixing position. (M. Tivnan Dep. Ex. 3 at p. 1465)   The plaintiff
did not think that the demotion was warranted, but did not complain. (Briddell 1 pp. 131-137)

22.    For calendar year 2000, the plaintiff's overall evaluation rating was "good".  (M. Tivnan
Dep. Ex. 9)  The evaluation also rated his productivity, skill, attendance, tardiness,  safety, and
co-operation as good. (Id.) This  evaluation identified him as  needing improvement with respect
to quality, explaining  that, "Bob has had some quality issues while working in the finishing
department." (Id.)   Supervisor William Tivnan could not recall any  problems with Briddell's
quality as a mixer during 2000, and explained that Briddell 's performance as a mixer was good.

7

(W. Tivnan 1 pp. 45-46, 49)

23.    In January 2001, the plaintiff met Steven Stockman, the Vice President of the Bond  and

Abrasive Business in North America. (Briddell 1 pp. 241-244; Stockman pp. 15-16)    Briddell

told Stockman  that he felt that there was racial discrimination at Saint Gobain because of the

lack of minorities in supervisory positions. (Briddell 1 pp. 241-244; Stockman pp. 15-16)

Stockman promised to get back to him.  (Briddell 1 pp. 244-245; Stockman p. 20)

24.    Briddell also told Richard Zeena,  the Human Resources Manager for Plant 8, that the

company was prejudiced because they had no blacks in supervision.  (Briddell 1 pp. 246-247)

Zeena's response was,  "prove it".  (Briddell 1 pp. 246-247)

25.    African American employee James Bailey complained about the lack of African

American employees in supervisory roles.    When he complained to Stockman, Stockman

promised to get back to him.  (Bailey p. 201)  Stockman failed to do so.  (Id.)  Bailey also

spoke to plant manager Sheldon Zaklow  about  the lack of minorities in management, and asked

when the defendant would become more diverse. (Bailey 1 pp. 199-200; Bailey 2 pp. 28-30)

Zaklow said he would get back to him, but never did.  (Id.) However,  Zaklow came up to Bailey

on a later occasion and asked him  if he ever had an "intelligent conversation".  (Id.)

26.    During 2001, a union organizing drive took place at Saint Gobain involving the United

Auto Workers attempts to unionize the manufacturing employees.  (Briddell Aff. ¶ 9; Zeena 1

pp. 50-51; Baker p. 67)  Stockman, Zaklow, Zeena, and Dennis Baker, the Vice President of

Human Resources felt passionately about not having a union. (Zeena 1 pp. 50-51)

27.    The plaintiff was a vocal supporter of the union, in large part because he felt that there

was a  relationship between the Civil Rights Movement and the labor movement.  (Briddell Aff.

¶9-10)   He believed that the defendant was discriminating against minority employees, including himself, on the basis of race, and that a union would help end this discrimination. (Id.)

28.    In August 2001, the Company held a series of meetings to discourage employees from supporting the union. (Baker pp. 67-68; Zeena 1 pp. 39-40)  Zeena, Stockman and Baker were present.  (Zeena 1 pp. 39-40; Baker pp. 67-68; Stockman pp. 62-63)  Baker gave a presentation, and Stockman spoke about the defendant's position that the union was not necessary.  (Baker pp. 67-68;  Zeena 1 p. 49)  The plaintiff spoke up and disagreed with Stockman.   He explained that the defendant did not promote sufficient numbers of African American employees,and suggested that the defendant was engaging in discrimination.    (Answer at ¶ 28)

29.    At approximately the same time, the defendant  held a separate meeting about the union for  employees from  Ghana, all of whom were black.  (Briddell Aff. ¶10; Zeena 1 pp. 67-73) The defendant claims that they held this separate meeting because these black employees might be unable to understand what was happening in the other meetings. (Id.; Stockman pp. 107-108)

30.    At a meeting in front of Zeena, Baker and Stockman,  the plaintiff stated that holding this separate meeting was  racist and inappropriate, and was analogous to the practice of segregating African Americans before the Civil Rights Movement. (Answer ¶30; Briddell 1 pp. 256-260 Zeena 1 pp. 67-69; 77; Zeena 3 pp. 62-63 Gustafson pp. 85-86; W. Tivnan p. 56;  Briddell Aff. ¶10)  He accused the Defendant of trying to undo what had taken the Civil Rights Movement one hundred years to attain.  (Briddell 1 pp. 256-257)  Zeena became very angry when he made allegations about the defendant  practicing segregation. (Briddell 1 p. 260)

31.    Briddell also told first shift supervisor Jeff Clark that holding such a segregated meeting was unfair. (Briddell 1 pp. 258-259)

9

32.    No action was taken to investigate these complaints, to determine if the lack of minority supervisors was the result of racism, or to determine whether the assumption that black employees from Ghana could not understand what was going on at larger meetings was racist. (Zeena 1 pp. 78-79; Zeena 3 pp. 62-63)

33.    Briddell's complaints became a topic of conversation in the plant. (W. Tivnan 1 pp. 54-55, 58-59; Clark pp. 70-71)

34.    Approximately one month after he made these complaints, Briddell began to be accused of performance problems. The first issue involved allegations that the plaintiff exceeded a 45 lb weight limit for mix pans. (Answer at ¶ 32)

35.    When a mixer started his shift he was given a stack of approximately 25 manufacturing orders (MO's ) and corresponding mix slips. (Oliver 3 pp 11-12; W. Tivnan 2 p. 105; Briddell Aff. ¶14) Each mix slip and MO has a specific recipe. (Oliver 3 pp.11 -12; W. Tivnan 2 p. 105) Each MO can result in the creation of 5-6 or more pans of mix. (Oliver 3 p. 12) The defendant used a computerized inventory system to control the materials to be used in a mix. (Clark 1 pp. 108,111; W. Tivnan 2 p. 13; M. Tivnan p. 58) This system, called Con-Cam, was supposed to be programmed with the recipes for the various mixes. (M. Tivnan pp. 14-15, 58) The recipe for the mix was also located on the mix slips. (W. Tivnan 2 p. 15; Clark p. 111) To make a mix, the mixer would scan the mix slip using the Con-Cam system. (W. Tivnan 2 p. 15; M. Tivnan p. 58) The mixer would then roll a cart containing a mix bowl and scale to the appropriate grain or abrasive tank. (W. Tivnan 2 pp. 14-17) If the mixer approached the correct tank for a given mix, the scale on the cart would go on. (W. Tivnan 2 pp. 14-17) However, if the mixer approached the wrong tank, the scale would not go on. (W. Tivnan 1 pp. 14-17; Clark

10

pp. 109-112)    A second scale that worked in the same manner was used for the bond that was

used in the mix.  (W. Tivnan 2 p. 17)   Sometimes the Con-Cam system did not work or did not

recognize the recipe on the mix slip. (W. Tivnan 2 pp. 18-19)   In those circumstances, the

mixer was expected to weigh out the correct bond, grain and/or abrasive by hand. (W. Tivnan 2

p. 19)

36.      After the mixer gathered the correct bond, grain and/or abrasive, the mixer would dump

these dry ingredients into his mix machine and add the wet ingredients.  (Clark 1 p. 113)   The

mix machine would then mix the product, and shake it through a screen into a series of pans.

(W. Tivnan 2 pp. 20-21; M. Tivnan pp. 28-29)   The mix machine was programmed to deposit a

set amount of mix into each pan.  (M. Tivnan p. 30)    Mixers like the plaintiff had no

involvement in the programming of the machine. (M. Tivnan pp. 31-32; Briddell 1 p. 114)

37.     The machine did not shut off immediately after depositing the programmed amount of

mix into a pan.  (M. Tivnan pp. 30-31) Instead, it would continue to shake out product into the

pan. (M. Tivnan pp. 30-31) Generally this was less than 10 pounds.  (M. Tivnan pp. 30-31)

38.     If the mixer used the wrong size screen, the machine was not programmed correctly, the

scale was not working properly, or the scale on the machine did not reset itself to "0" after every

mix, the extra amount of mix deposited in the pan could cause a pan to exceed the 45 pound

weight limit in the defendant's written policies.  (M. Tivnan pp. 30-33) The failure of the scale

to reset properly is referred to as, "not tearing out".  (M. Tivnan pp. 30-33)

39.      A mixer can not tell if a machine is not programmed correctly or if it is not tearing out

properly unless a pan appears too full. (M. Tivnan pp. 51-53)    A rescreener or mixer can not

tell by looking at a pan that it weighs a few pounds over the 45 pound limit. (M. Tivnan p. 53)

11

In addition, because some mixes use very dense and heavy ingredients, a mix could be very overweight but not look as though it weighed over 45 lbs.  (Gustafson pp. 35-36)

40.     Sometimes when a mix was made,  the last pan of mix would weigh only 5-10 pounds.  (LeBeau pp. 35-36)    The normal practice under such circumstances was for the mixer to add this mix to one of the previous mix pans, rather than  put  5-10 pounds of mix in an a pan. (LeBeau pp. 35-36)

41.     After the mixer completes the mix, he is to fill out the MO, using his employee number to  indicate that he made the mix.  (M. Tivnan pp.  45-46) At the end of the shift the mixer turns all of the mix slips in to the production office. (W. Tivnan 2 p. 129)   The MO, however, is supposed to stay with the mix pans.   (Id.;  M. Tivnan p. 84)    These mix pans are placed on a mix truck to dry or  "set".  Some need to set for only a short time, while others need to set for several days.  (Clark p. 153)    During this period they simply wait in a holding area.  (Clark p. 153)   After they set, the pans are taken to rescreening or molding.  (M. Tivnan p. 84; W. Tivnan 2 p. 75)

42.     The employee performing the next step in the production process is not supposed to begin  if the MO has not been filled out for the previous process.  (Briddell 1 pp. 229-231) While the process could not go forward without a signature, the  defendant did not require or even expect its supervisors to discipline employees who failed to fill out MO's.  (M.Tivnan pp. 85-86) While employees were  told that they were required to  report violations of certain of the defendant's policies, they were not told to report a failure or even a repeated failure to sign an MO.  (Oliver 2 pp. 73-76)   Instead, they were told that if they found an unsigned MO, they should bring it back to the previous employee and get the signature.  (M. Tivnan pp. 84-85; W.

12

Tivnan 1 pp. 123- 124; Oliver 2 p. 75; M. Tivnan Dep. Ex. 12 at p. 368)  As Joseph McTernan

explained employees were supposed to, "handle it and don't make an issue of it". (McTernan pp.

44-45)

43.    The defendant recycles mix. (Clark p. 226)  Mixers sometimes put recycled  mix,

referred  to as mix balls, into pans that are waiting in the holding area.  (Clark pp. 226; 229-230)

A mixer, rescreener or molder  might put this extra mix in another mixer's pan.  (Clark pp. 229-

230; Oliver 3 pp. 4-5;  Briddell 1 pp. 122-125)   The defendant was aware of this common

practice. (Clark pp. 229-230; Oliver 3 pp. 4-5;  Briddell 1 pp. 122-125)

44.  The defendant sometimes had a shortage of available mix pans. (Gustafson pp. 23-25; 32-33)

 While a mix was in the waiting area, another mixer who needed  a pan might dump the mix from

a pan into other waiting pans in order to empty a pan for his own use.  (Id. pp. 23-25; 32-33)

This was an accepted practice, that employee Phillip Gustafson observed "dozens of times".  (Id.

pp. 32-34) The defendant's supervisors and group leaders were aware of the practice. (Id. pp. 77-

78)

45.    Because of the recycled mix, and the dumping of mix into other waiting pans to

make a  pan available, mix pans that weighed under 45 pounds when a mixer left them in the

holding  area could up weighing substantially more by the time they reached rescreening. (See:

¶¶ 43-44).

46.    It was not unusual for mix pans to exceed the 45 lb  written requirement, and  employees

 were not generally disciplined for exceeding these weight limits.  (Gustafson pp. 67-71, 90-91;

LeBeau pp. 43-44) Eric LeBeau, a white mixer,  testified that he and the other mixers generally

created pans that were over 45 pounds. (LeBeau pp. 43-44) LeBeau  testified that he was not

disciplined when he exceeded the weight limits. (LeBeau pp. 43-44)  White employee Joseph

McTernan stated that he had received heavy pans from. "every rescreener in the place".

(McTernan pp. 24-25)   McTernan  explained that on many occasions he had mix pans that

weighed  over 60 lbs. (M. Tivnan Dep. 12 p. 369)  White employee Phillip Gustafson testified

that he saw heavy pans, "all of the time".  (Gustafson pp. 83-83)  He specifically recalled

receiving heavy pans from co-workers Adusi and Ammasine.  (Gustafson p. 83)    Gustafson

explained that the practice was so common that some employees began marking mixes with the

term "heavy". (Gustafson pp  67-71, 90-91)  Gustafson explained that  supervisors would have

seen such markings, and were, therefore,  aware that the weight limit on pans was being

exceeded.  (Gustafson pp. 71, 90-91)  While he could not recall any supervisor telling

employees that it was okay to exceed the written weight limits, Gustafson explained that

exceeding the limits was,   "just one of those generally acceptable things". (Gustafson p. 91)

47.    The defendant contends that it issued the plaintiff a formal counsel on September 18th for

having  exceeding the 45 lb. weight limit for mix pans.  (Answer at ¶32)  However, the

plaintiff's supervisor Bill Tivnan denied that this document was a formal counsel. (W. Tivnan

Dep. Ex. 14;  W. Tivnan 1 pp. 76-76, 78; 86-88).

48.    Tivnan explained that  on or about the 18th someone spoke to him about allegedly

overweight pans. (W. Tivnan Dep. Ex. 14;  W. Tivnan 1 pp. 74-79) Tivnan  observed Briddell

working and saw him complying with all of the defendant's rules.  (Id.)  He told the plaintiff to

be careful, and documented the conversation.  (Id.)    He testified that he did not observe

Briddell doing anything wrong, and  did not discipline Briddell.  (Id.). He  unambiguously

explained that the document he created on September 18th was **not**  a formal counsel    (Id.)

14

49.     The plaintiff denies that he created any heavy pans before the 18th. (Briddell Aff. ¶12; Briddell 1 pp.161-164)   He recalls Tivnan speaking to him on the 18th and saying he was doing a good job.   (Briddell 1 pp. 167-169)

50.     The only evidence supporting the claim that Briddell made heavy pans shortly before 9/18/01 is the testimony of first shift supervisor Jeff Clark.   Clark  claims that one or more of the  rescreeners  came to him on two occasions during the week ending 9/22/01  and complained that  Briddell's mix pans weighed over 45 pounds.  (Clark pp. 79-81; W. Tivnan Dep. Ex.15) Clark claims that  he weighed the pans in the presence of the rescreener, found them to be over 45 pounds,  and created a written record of the overweight pans.  (Clark pp.  79-81, 83-86, 209-211) The defendant has introduced no testimony  from any rescreener confirming Clark's claims. Moreover, the defendant has not been able to produce the documentation of the heavy pans allegedly created by Clark on or before September 18th.  (Id.)   Production Supervisor Thomas Oliver has also admitted that he cannot recall ever seeing any documentation of heavy pans in 2001 prior to September 18.   (Oliver 2 pp. 5-6; Oliver 1 pp. 119-120)

51.     Clark initially testified in that he did nothing to investigate the cause of the heavy pans discovered before 9/18.  (Clark p. 89)   He later changed his testimony, claiming that he did check the plaintiff's scale. (Clark pp. 156-157)

52.     On September 20, 2001, the defendant gave the plaintiff a written reminder for allegedly exceeding the 45 pound weight limit on several orders on September 19th.   (W. Tivnan Dep. Ex. 15)  As an initial matter, it is undisputed that the plaintiff should not have been given a written reminder unless he had first been formally counseled. (Zeena 2 pp. 43-44)  Since Tivnan denies that the September 18th note was a formal counsel, it appears that the defendant improperly

skipped a step of progressive discipline. (See ¶48)

53.    The plaintiff denied exceeding the weight limits with respect to these pans. (Answer at

¶33; Briddell 1 pp. 171-175)    At the time he was disciplined he asked for any documentation

showing the purported errors- including  the MO's on which the defendant relied.  (W.  Tivnan

Dep. Ex. 17 p. 1146)  The defendant refused to provide the MO's.  (Id.)

54.    With respect to this discipline, Clark testified that a rescreener named Hanson  reported to

him  that the plaintiff had both failed to fill out an MO and had created overweight mix pans.

(Clark pp. 86-88)  Hanson was a resescreener  (also referred to as a mix dispenser)  who worked

on the day shift.   (Clark pp. at 106-107)    Clark testified that he weighed the pans in front of

Hanson.  (Clark pp. 86-89)  Clark testified that William Tivnan was **not**  present when these

pans  were weighed.  (Clark pp. 153; 211-212)     Clark initially testified that he conducted no

investigation to determine the cause of these heavy pans.  (Clark pp. 88-89)   According to Clark

after this, he and Bill Tivnan created a note to the file concerning Briddell's purported

performance deficiencies.    (Clark pp. 96-99)   He testified that nobody else was involved in

making  the decision, but that Richard Zeena was notified of the discipline.   (Clark pp. 96-99)

55. The documents contradict Clark in several crucial respects.   First,  the discipline given to

Briddell after the alleged third incidence of heavy pans was a written reminder and not a formal

counsel. (W. Tivnan Dep. at 15) Second, e-mails produced by the defendant  make clear that

Zeena and  Oliver made the decision to discipline Briddell, not Clark and Tivnan.  (W. Tivnan

Dep. Ex.  17) Third, there is no evidence of any  failure to sign an MO.  In fact, the documents

produced by the defendant showing purportedly  heavy pans on 9/19 all involve MO's that were

fully filled out by Briddell. (Oliver Dep. Exs. 97-99)  Fourth, the MO's produced by the

16

defendant were all rescreened by rescreener or mix dispenser 1104. (Id.) This is David Aubin's number, not Frank Hanson's.   (Clark p. 200) Fifth, although Clark unambiguously testified that he had performed no investigation into the cause of the heavy mix, the documents state that the heavy mix was caused by using the wrong screen. (Clark Dep. Ex. 42)

56.     After being shown these documents, Clark changed his testimony to comport  with the documents produced by the defendant.  Clark testified that the rescreener who told him  about the allegedly heavy mixes was David Aubin- not Hanson.  (Clark pp. 199-200) He also suddenly recalled that he had learned from the day shift mixers that Briddell had used the wrong screen to make at least one of the mixes.  (Clark pp. 200-203)   He claimed that he recalled that a size 8 screen had been left in the screener, while a size 12 screen should have been used for the mix. (Clark pp. 201-202, 205)   He claimed that based on this he was able to conclude that the heavy mix had been caused by Briddell having mistakenly used the wrong size screen. (Clark pp. 205-207; Clark Dep. Ex. 42)   That Clark would have come to such a conclusion is implausible at best.   Clark testified that he found the screen in the rescreener no earlier than 6:00 a.m.  (Clark pp. 205-207) The documents show that the  mix at issue was made at 2:00 a.m. (Clark Dep. Ex. 42; Oliver Dep. Exs. 97-99) Thus, the only way that  Clark's conclusion- that the size 8 screen left in the rescreener  had been used on the mix made at 2:00 am- could have been correct would be if  Briddell had made no other mixes for the last three hours of his shift.  However,  Clark had documents showing  that Briddell had made another mix  at 2:45 a.m.. (Oliver Dep. Ex. 97 at 00215)   Based on the evidence available to him, Clark could not have reasonably concluded that Briddell had used the wrong size screen.

57.     In addition, all of the MO's copied by Clark had all already been signed off by rescreener Aubin- who had placed his employee number, 1104, on the slip. (Oliver Dep. Ex. 97 p. 002115; Ex. 98 p. 00214, and Ex. 99 p. 00218)  A rescreener may not sign off on the MO until after he has begun the rescreening process. (Oliver 3 pp. 48-49, 52-53)  This process involves dumping all of the mix pans into a hopper. (Oliver 3 pp. 10, 47-48, 53)  Since Briddell's mix pans would have been emptied, it would not have been possible to weigh them.

58.     Tivnan's testimony also contradicts critical aspects of Clark's version of events. Tivnan claims that he was present when the pans were weighed. (W. Tivnan 2 pp. 62-64; W. Tivnan 1 p. 92) Tivnan also testified that although he gave Briddell the written reminder on 9/20, he did not initiate or even take part in the decision. (W. Tivnan 2 p. 54) Instead, he was told to discipline the plaintiff. (Id.)

59.     The decisionmakers also contradict one another with respect to this discipline. Zeena testified that before placing the plaintiff on a written reminder he had Oliver gather information about the treatment of other employees who had heavy pans or other safety violations- to ensure that the plaintiff was treated consistently. (Zeena 2 pp. 37-38)   However, Oliver denies this, explaining that he did no investigation to see if Briddell was being treated more harshly than other employees who had engaged in the same or similar conduct. (Oliver 2 pp. 45-47)

60.     At the time that the plaintiff was placed on the written reminder for having purportedly created overweight pans on 9/19, the defendant had conducted no investigation to see if Briddell's scale was working properly or tearing off properly. (Oliver 3 pp. 42-44)

61. On October 4, 2001, the Plaintiff was given a written warning for allegedly: (1) creating overweight mix pans on the 21st; (2) failing to follow ISO procedures with respect to MO's and

18

(3) failing to use the Con-Cam system. (Ex. 18)   According to e-mails created by the defendant on October 2nd and 3rd, the  problems following  Briddell being placed on a written warning which led to the warning were: (1) one incident of heavy pans involving MO number C210190, and (2) two incidents of failing to use Con-Cam or sign MO's. (W. Tivnan Dep. Exs. 19-20)

62. While the defendant claims that Briddell created heavy mixes on 9/21, a document created by Clark on the same day unambiguously  states that the issue of creating heavy pans, "has been corrected since the written reminder has been applied".  (W. Tivnan Ex. 18 p. 964)   In this document, Clark contended  that the written warning  was the result  of the plaintiff's failure to use the Con-Cam system and sign MO's. (Id.)

63.    The defendant has subsequently claimed that the written warning  was also based on an alleged a failure to sign an MO on 9/24. (W. Tivnan Dep. Ex. 52)   However, the document that the defendant relies on in claiming that the plaintiff failed to sign this MO, does not show any such failure. (W. Tivnan Dep. Ex. 53) The area of the MO that is supposed to be filled out by the mixer **is** filled out.  (Id. p. 00212) Supervisor Jeff Clark initialed the area where the rescreener or mix dispenser was supposed  to sign- not where the mixer is supposed to sign . (Id.;  W. Tivnan 2 pp. 72-75)   Bill Tivnan testified that Clark must have initialed the slip in that area either because the mix dispenser or rescreener failed to sign or to indicate that  that particular mix did not require rescreening.  (Id.) There is also a scribbled over set of initials on the mixer line- suggesting that Clark initially put his initials on the wrong line and then corrected himself. (W. Tivnan Dep. Ex. 53)   After meeting with defendant's counsel,  Tivnan claimed that the scribbled over initials showed that  Clark had had to sign for Briddell.  (W. Tivnan 2 pp. 97-98, 105-108) Of course this would not explain why the area was then crossed out.

19

64.     Clark's testimony about the heavy pans, the failure to use the Con-Cam system, and the failure to sign the MO's again completely contradicts the documents which the defendant has produced.   According to Clark, rescreener Frank Hanson came to him and told him about a contaminated mix.  (Clark pp. 119-121, 125-127)   According to Clark, there was also a heavy pan reported on that same date.  (Id. pp. 139-141).   Clark testified that he examined the contaminated mix, weighed the heavy pan in the presence of the rescreener, and created a document with the weight of the allegedly heavy pan.  (Id. pp. 120, 140-142)   Clark testified that the MO for the contaminated mix did not have a mixer number.  (Id. pp. 126-140-142)

65.     At this point, according to Clark, he began investigating three different issues: the contaminated mix, the failure to sign the MO and the heavy pan.  (Clark pp. 139-142)  Clark testified that he found the mix slip for the contaminated mix, and learned that it had been made by Briddell.  (Id. p. 126)   Clark  testified that he then looked in the Con-Cam system  to see if the wrong abrasive had been used and had contaminated the mix.  (Id. pp. 126-131)   He allegedly found that Briddell was not signed into the Con-Cam system.  (Id. pp. 119-120)

66.   Clark testified that he then  spoke to Aubin and/or Reed to ask how the mix could have been contaminated.  (Clark pp. 132-133, 146)   Clark testified that through the input of these mixers he determined that the mix was contaminated by a dirty belt.  (Id. p. 138)  Clark could not recall how he came to the conclusion that the contamination was caused by a dirty belt.  (Id.)  At no time during this investigation did he or anyone else speak to  Briddell.  (Id. pp. 147-149)  Clark then reported the result of his investigations to Tivnan and Oliver.  (Id. pp. 149-150)

67.     However, the documents produced by the defendant state that the heavy pans were allegedly  created on 9/21 several  weeks before the alleged failure to use the Con-Cam system

and sign the MO.  (W. Tivnan Dep. Ex. 18 p.t 964; Oliver Dep. Ex. 100 p. 00098)

68.    The documents also show that Briddell made a series of mixes on October 2, 2001- most

of which were fine and one of which had a quality issue. (W. Tivnan Dep. Ex. 19; W. Tivnan

Dep. Ex. 22 pp. 00136-00144)   The documents involving these mixes show that Aubin was the

rescreener.  (W. Tivnan Dep. Ex. 22 pp.  00139, 00142, 00144)  Thus, it is unlikely that Hanson

would have been involved in reporting the issue.  A note on the  MO's also states that the

problem  with the mix was not contamination, but a wet mix. (Id. at 00136)

69.    After being shown the documents which showed that the purported contaminated mix was

created in January and the purported failure to use the Con-Cam system in October,  Clark stated

that one of the dates had to be wrong, insisting that the date of the contaminated mix was the

"same date" as the date he first learned of the plaintiff's failure to use the Con-Cam system.

(Clark pp. 197-199; W. Tivnan Dep. Ex. 18;  Clark Dep. Ex. 41)

70.    After meeting with defendant's  counsel and being shown the documents that contradicted

his sworn testimony about the events surrounding the written warning,  Clark changed his

testimony.   Clark suddenly  recalled that he had looked into the  plaintiff's purported failure to

use the Con-Cam system over some other quality issue in the fall- not as part of his investigation

into the alleged contaminated mix.  (Clark pp. 192-197, 235-237, 249-260, 270-273)   Clark,

however, was unable to recall the quality issue that allegedly caused him to look at the Con-Cam

system in the fall of 2001, or explain how he learned of it.  (Id. pp. 254-255)  Clark claimed that

his previous detailed testimony was inaccurate because he  had become  confused after  having

been shown some of the documents.   (Id. pp. 273-275) Clark confirmed that all of the testimony

given before he was shown those documents was accurate.  (Id. pp. 273-275)  However, the

21

detailed testimony about looking in the Con-Cam system as part of the contamination investigation took place <u>before</u> he had been shown the allegedly confusing documents. (<u>Id.</u> at 119-121, 125-133, 139-142, 146-150, 192-199)

71.     William Tivnan's testimony about the circumstances surrounding the plaintiff receiving a written warning contradicts Clark's. While Clark claims that he weighed the heavy pans- and that Clark was not present, Tivnan claimed that he either weighed the pans himself, or was present when they were weighed by rescreener Frank Hanson.  (W. Tivnan 2 pp. 76-79; Clark p. 153) Tivnan also claimed that he and not Clark investigated the plaintiff's failure to sign the MO's and/or use the Con-Cam system.  (W. Tivnan 2 pp. 82-83)  Tivnan's testimony was no more credible than Clark's.  Tivnan claimed that a rescreener came to him with an unsigned MO after Briddell had left for the day.  ( W. Tivnan 2 pp. 129-133)   He stated that he compared the unsigned MO with the mix slips that had been turned into the office, and learned that it was Briddell who had failed to sign the MO.  (W. Tivnan pp. 129-133) He testified that he looked in the Con-Cam system at some point and found that Briddell had not used the system. (W. Tivnan 2 pp. 82-87)   However, Tivnan could not recall the identity of the persons who allegedly complained. (W. Tivnan pp. 117-119)   He also admitted that since he knew from the mix slips that Briddell was the mixer, he would not have needed to look into the Con-Cam system. (W. Tivnan 2 pp. 134-137)

72.     Oliver and Zeena apparently made the decision to give the plaintiff the written warning. (Oliver 2 pp. 46-47).  As was explained above, Zeena claims that the 9/24 incident was considered, Oliver disagrees. Zeena claimed that the disciplined was based, in part, on Briddell's alleged failure to use the Con-Cam system, Oliver disagrees. (Zeena 2 pp. 89-90; Oliver 2 pp. 50-

52; Oliver 30b6 2 pp. 6-7)   In fact,  Oliver has testified that the  failure to use the Con-Cam

system  would not generally subject an employee to discipline.   (Oliver 30b6 1 pp. 140-143)

Zeena claims that Tivnan had input in the discipline,  Tivnan disagrees.   (William Tivnan  2 pp.

162; Zeena 2 pp. 86-87)

73.      Oliver also contradicted Clark's sworn testimony.   He testified that  Clark told  him that

he had checked the  Con-Cam system solely to learn who had failed to sign the MO- and not to

investigate a quality problem. (Oliver 2 pp. 59-50, 65)  Oliver explained that  it would  not be a

normal practice to check the Con-Cam  system just because a mix had a quality issue.  (Oliver

30b6 2 pp. 66-67)

74.     It would not have been necessary for Clark or Tivnan to check the Con-Cam system in

investigating why the mix was wet, as this could have been determined from the MO and mix

slip.    The  mix was created on the third shift between 9:00 pm on 10/1 and 5:00 am on 10/2.

(W. Tivnan 2 pp. 139-142; W. Tivnan Dep. Ex. 58 pp. 55-57;   W. Tivnan Dep. Ex. 22 pp.

00136 -00144) The mix was supposed to set in the holding area for between 6 and 32 hours after

mixing and  before rescreening.  (W. Tivnan 2 pp. 139-142; W. Tivnan Dep. Ex. 58 pp. 55-57;

W. Tivnan Dep. Ex. 22 pp. 00136 -00144 ) However, it  needed to be rescreened and in  the

molding area  between 5:00 am and 3:00 pm. on the 2nd.  (Id.; W.  Tivnan 2 pp. 136-140)   It,

therefore, could not have set for the full 32 hours, and might not have set for even 6 hours.

Under such circumstances the defendant can waive  the time requirements for setting.  (W.

Tivnan 2 pp. 144-145)   However, the mix is likely to be wet. (W. Tivnan at 2 at 144-145)

75.      There are  other problems with the defendant's allegations about the events allegedly

giving rise to the written warning.  First, if  Briddell failed to sign off on MO's in October as has

been alleged, the defendant would have a copy of the MO, containing supervisor's initials where Briddell should have signed. (W. Tivnan 2 pp. 118, 123-124)    No such documents have ever been produced.    Second, no report from Con-Cam showing that the plaintiff was not using the system has ever been produced. (Clark Dep. Ex. 43; Clark pp. 212-214, 218; W. Tivnan 2 p. 89) Third, the MO from 9/21 containing Clark's handwritten notes of the weights of the pans Briddell had allegedly created, had already been signed off by the rescreener. (Oliver Dep. Ex. 100 p. 00048) As was explained above the rescreener would not do so until after the mix pans had already been emptied. (Oliver 3 p. 10, 48-49; 52-53) Clark, therefore, could not have weighed the mix pans created by Briddell.

76.    When he was given the written warning, Briddell denied making the heavy pans. (Briddell Aff. ¶12) He was unable to admit or deny failing to sign the MO's or using the Con-Cam system. (Briddell 1 pp. 181-182; Briddell Aff. ¶ 14) The plaintiff made mixes for approximately 25 MO's per night. (Id.) Therefore, he could not recall filling out each specific MO. (Id.)    He also frequently mixed without using Con-Cam either because the system was down, or because the mix recipe was not in the system. (Id.)    He therefore could not be certain whether the wet mix was made using Con-Cam or not. (Id.)

77.    When Briddell received the written warning he explained that other employees who forgot to sign MO's or failed to use Con-Cam were not being disciplined. (Briddell 1 pp. 181-182; Briddell Aff. ¶ 15)    Briddell was told by Zeena that this did not excuse him. (Briddell 1 pp. 182-183)    The defendant did not investigate to determine if the discipline applied to Briddell was consistent with how other employees had been treated.    (Oliver 2 pp. 21-23, 54-55)

78.    On the day that he received the written warning Briddell complained that the discipline was discriminatory. (Clark pp. 157-158; W. Tivnan Dep. Ex. 18 p. 964)  He stated that Clark and Aubin were discriminating against him.   (Id.)  Clark told him that he better be careful because there were people present. (Id.)

79.    Clark testified that he reported the complaint of discrimination, but that it was never investigated. (Clark pp. 158-159) Oliver admits that he knew that Briddell was complaining about racism, but he nonetheless never investigated this allegation.   (Oliver 2 pp. 66-67, 78) Zeena, however, claims that he did investigate. (Zeena 2 pp. 60-62) There are no documents of this alleged investigation.    (Id.) Zeena claims that he talked to Oliver and Clark as part of his investigation, but cannot recall anything that they may have told him.    (Id.) Zeena admitted that he never spoke to Briddell in investigating the discrimination complaint. (Id. pp. 62-68) Zeena concluded that there had been no discrimination. (Id. p. 84) However, he was unable to explain what evidence convinced him. (Id.)

80.    The defendant never investigated to see if the discipline given to the plaintiff was consistent with what would be given to a white employee or an employee who had not complained of discrimination. (Zeena 3 p. 83)

81.    On October 9, 2001, the plaintiff was suspended for failing to sign two MO's (C210955 and c210348).   (W. Tivnan Dep. Ex. 22 p. 965)  The plaintiff has admitted that he failed to sign these two MO's.  (Briddell Aff. ¶16)

82.    With respect to this suspension, the defendant did not investigate to determine whether the discipline of Briddell was consistent with the discipline that a white employee or employee who had not complained of discrimination would have received. (Zeena 3 p. 84)