83.     On October 18th or 23rd 2001, Briddell allegedly failed to fill out another MO.  (W. Tivnan Dep. Ex. 52 pp. 00004-00005) This was not discussed with him or documented for almost three months.  (Briddell Aff. ¶17)   Unsurprisingly, when it was brought to his attention in January he could not recall if he signed the MO.   If the allegation were true, the defendant would have a copy of the MO with the initials of a supervisor in the area where Briddell was supposed to sign.  (W. Tivnan 2 pp. 118, 123-124) No such document was ever produced.

84.     Clark may have reported other problems with Briddell after October.  (Zeena 2 p. 185).  For example, on one occasion Clark warned the plaintiff for allegedly not wearing safety shoes while leaving the plant- even though the shoes met the safety standards and had been purchased through the defendant. (W. Tivnan Dep. 24; Briddell Aff.  ¶17) None of these issues were addressed with the plaintiff or identified by the defendant as performance issues in the defendant's submission to the EEOC.  (W. Tivnan Dep. Ex. 52)   Since Oliver testified that all of the things that were taken into consideration in disciplining Briddell were included in EEOC documents and attachments, it appears that these alleged deficiencies were not relied upon by the defendant.  (Oliver 3 pp. 30-31; 35-37)

85.     In November or December, Clark asked Zeena why the defendant was not taking  more aggressive action with respect to Briddell.    (Zeena 2 pp. 185-188) Zeena told him that it was taking a little longer, "than  he had hoped".  (Zeena 2 pp. 185-188)

86.     At some point,  Zeena sought legal advice about the plaintiff. (Zeena 2 pp.  192-194)  He received a response on January 2 or 3rd.  (Id. pp.199-200)  On the same day that Zeena received the advice he had been waiting for, the defendant claims that Briddell made a 68 pound pan.  (W. Tivnan Dep. 62-63) Briddell denied making this heavy pan. (W. Tivnan Dep. Ex. 63)

26

87.  A meeting was held on or about January 4th to discuss this allegedly overweight pan.  At the meeting, the plaintiff denied making the overweight pan.    (Briddell Aff. ¶18)    Phillip Gustafson who was present at the meeting told  Zeena and Oliver that it wasn't necessarily Briddell who overfilled the pan because there was a practice of taking a light pan and dumping it into other pans when they were short of pans.  (Gustafson pp. 23-25, 32-33; Briddell Aff. ¶18) The plaintiff also reported that other employees exceeded the 45 lb weight limits, but were not disciplined. (Briddell Aff. ¶13)

88.      The plaintiff asked who had reported the allegedly heavy mix.  (Id.)  The defendant has offered inconsistent responses to this question.  In one document created by Zeena on January 31st, he reported that Mark Haynes reported the mix. (Zeena Dep. Ex. 104)  In a second document created on the exact same day, Zeena claimed that Hanson discovered the mix. (Zeena Dep. at 105; Zeena 2 pp. 164-165) The defendant has now admitted that it does not know which is correct or if either are correct. (Zeena 2 pp. 165-166)

89.      Later that week, lead person Dennis Novia, and a number of the plaintiff's co- workers, reported a truck of mix pans each weighing over 70 lbs. (W. Tivnan Dep. Ex. 68)  Novia complained that this was a safety violation because someone could get hurt having to "hump" the pans.  (Id.) It is undisputed that nobody was disciplined for creating these heavy pans.  The defendant claims that these mixes were supposed to be hand scooped, and not lifted.  (Oliver 3 pp. 90-91)  However, mixers do not  use a scoop to blend in mix.  (Briddell 2 pp. 316-319) Moreover,  both Oliver and Zeena conceded that they were not aware if there were explicit instructions to hand scoop and not lift the pans- and the note from Novia makes clear that the employees were not told not to lift the pans. (Zeena 2 pp. 112-114; Oliver 3 pp. 97-99)

27

90. The defendant claims that on or about January 30, 2002, the plaintiff made contaminated mixes, and failed to sign an MO on a second mix. (Clark Dep. Ex 41; Clark p.t 190)

91.    Mixers make both black and white mixes. (M. Tivnan p. 86) If a white mix has to be made after a black mix has been run through the machine, the mixer would need to fully clean the machine, which can take up to 45 minutes. (M. Tivnan pp. 88-89) Even if a mixer does clean the machine carefully, there is sometimes contamination. (M. Tivnan p. 89)

92. A mix can also become contaminated by bad bond or bad grain. (Gustafson p. 80) A rescreener can contaminate the mix. (LeBeau p. 47-48) A mix may become contaminated while sitting on the mix trucks in the holding area. (Oliver 2 pp. 105-106) A mix can become contaminated if chemicals built up on the pan covers fall into the mix. (Gustafson pp. 38-39) The mixers are not responsible for cleaning lids. (Clark pp. 121-122) They are expected only to bang out the lids to remove any loose abrasive. (Clark pp. 121-122)    Contamination of a mix is not an unusual problem. (M. Tivnan pp. 89-90)

93.    Clark testified that the contamination was caused by a failure to clean the belts. (Clark pp. 133, 138 ,146)    However, in a document that he allegedly created on January 30th, Clark stated that the contamination was caused by a failure to clean the mix bowl or pans. (Clark Dep. Ex. 41) No explanation for either conclusion has been offered.

94.    According to Oliver, the plaintiff was disciplined for contaminating a mix, in part because he failed to follow the usual policy of making the white mix at the start or end of the shift. (Oliver 2 pp 95-97, 100)    Briddell confirmed that the defendant's usual policy is to make a white mix at the beginning of shift. (Briddell 1 pp. 214-216) However, he made the mix when he did because he was instructed to do so by a supervisor. (Briddell 1 pp. 210-212)

28

95.     The plaintiff admits that he made the mix that the defendant claims was contaminated. (Briddell Aff. ¶20) To the best of his knowledge the mix was not contaminated at the time that he put in the holding area. (Briddell Aff. ¶20) He thought it was possible that he might not have noticed a very small amount of contamination, and/or thought that it could have been contaminated by mix pan lids after he made it. (Id.) Because he was unable to view the mix, the plaintiff was not able to admit or deny that it was contaminated. (Id.; Zeena Dep. Ex. 107)

96.     The plaintiff cannot recall the specific MO that he allegedly failed to sign. (Briddell Aff. ¶21). However, no document showing that a supervisor initialed an MO on January 30th has ever been produced.

97.     At a disciplinary meeting to discuss the alleged contaminated mix and/or unsigned MO, both Briddell and Phillip Gustafson reported that other employees were not being disciplined for contaminated mixes or a for failing to sign MO's. (Briddell Aff. ¶22; Oliver 3 p. 27; Zeena Depo.Ex. 105; Briddell 1 pp. 222-223)

98.     Zeena testified under oath that he would have investigated had he been told that other employees had created contaminated mixes but were not disciplined. (Zeena 2 p. 18) However, Zeena's own notes make clear that the plaintiff and Gustafson did report that other employees were not disciplined for contaminating mixes and for failing sign MO's. (Oliver 3 p. 27; Zeena Dep. Ex. 105; Zeena 2 pp. 162-163)

99.     Briddell was terminated on February 6, 2002. Zeena, Zaklow, Oliver and Stockman had input in the termination decision. (Zeena 2 pp. 114-115)

100.    At no time before terminating the plaintiff was there any investigation to ensure that the discipline that Briddell received was consistent with what would have been provided to any

29

other employee.  (Zeena 3 pp. 81-86;  Zeena 2 pp. 162-163)

101.    After the plaintiff had already been terminated,   Stockman asked Zeena to identify other

 employees who had been disciplined for failing to sign MO's.  (Zeena 2 pp. 179-180) Among

other employees, Oliver  identified Walter Ahl. (Oliver Dep. Ex. 73 p.t 01103)    Oliver

explained, "the difference between these individuals and Mr. Briddell is that  there [sic] behavior

was corrected and to date there has been no reoccurrences".  (Id.)

102.    At the time that the plaintiff was being terminated, Clark was asked if other employees

contaminated mixes. He confirmed that they had. (Zeena Dep. Ex. 106) Based on his general

understanding of the business unit,  Zeena was aware that no employee had ever been disciplined

for contaminating a mix. (Zeena 3 p. 111) Thus, when Clark confirmed that other employees had

made contaminated mixes, Zeena would have known that the plaintiff was being not being

disciplined in the same manner as other employees.  Zeena terminated the plaintiff anyway.

103.    White employees, McTernan and LeBeau were not disciplined when they made heavy

pans.  (M. Tivnan Dep. Ex. 12; LeBeau pp. 35-37) Employees Adusi and Gammasine made

heavy pans, but were not disciplined.  (Gustafron p. 86) In  fact, most employees were exceeding

the 45 lb weight limits.  (LeBeau pp. 43-49)   None of the employees were disciplined.  (Oliver

30b6 2 pp. 7-8; 10-11)

104.    The defendant did not weigh  the mix pans of anyone other than the plaintiff. (Oliver 3

p. 46)  Therefore, the defendant does not know how exactly many employees  created heavy

mixes.  (Oliver 30b6 1 pp. 156-158) However, between January 1999 and January 2004, the only

employees working in Plant 8 that were disciplined in any way for creating a heavy pan, were the

plaintiff and David Aubin.  (Oliver 30b6 2 pp. 7-8,10-11)

105.    Aubin, a white employee, was treated far more leniently than the plaintiff. In February

1998, Aubin was placed on a written reminder for a safety violation. (Fitzgerald Dep. Ex. 81 p.

2702)  A month later he was placed on a written warning for attendance. (Id. pp. 2673-2674) In

August 1998, a third note was placed in his file for punching in early. (Id. pp. 1559)  In January

1999 while still on a written warning, he punched in early again. (Id. pp. 1558)  He simply

received another note to the file. (Id. )   In September 1999, he was placed on a second written

warning for intentional misconduct- for having used a racial slur in referring to a Hispanic co-

worker. (Id. pp. 1543, 1553, 2677-1678)   Two weeks later, on September 30th, he failed to

complete his ISO paperwork , including the MO, the production report and the computerized

MAC-PAC program. (Id. p. 2721)  He was not moved to the next step of discipline, but was only

given only a formal counsel by Jeff Clark. (Id.)   On January 11, 2000 he engaged in a safety

violation for stacking mix pans too high. (Id. p. 2724)   He received a note to the file. (Id.)  In

February, he had a quality issue for which he received another note to the file. (Id. p. 2670)   In

May, his mix pans weighed between 52-68 pounds. (Id. p. 2695)   Again he received only a note

to the file. (Id.)   Thus, while on a written warning for racist conduct, Aubin violated the

defendant's rules four more times- including two safety violations- without being moved to the

next step in the discipline process. (Id.)

106.    At the time that the plaintiff was being disciplined, the defendant did not  know  how

many  employees failed to use the Con-Cam system, because other than with respect to the

plaintiff, the defendant had never looked at the system to see if employees were using it or not.

(Oliver 30b6 1 pp. 150-151)  The defendant has  conceded that between January 1999 and

January 2004, no employees working in Plant 8 were ever disciplined in any way for failing to

31

use the Con-Cam system. (Oliver 30b6 2 pp. 4-7, 38-39)  In addition , the defendant was aware that the plaintiff was being disciplined even though a failure to use the Con-Cam system would not generally subject an employee to discipline.  (Oliver 30b6 1 pp. 142-143)

107.  The defendant was aware that Briddell was being disciplined for allegedly failing to sign MO's even though other employees were not disciplined for failures- even repeated failures. (Zeena 3 pp. 109-111)  Because employees were told that they should go directly to the employee and get the MO filled out, the defendant was aware that it had no idea how many employees had a problem with frequently failing to sign off on MO's.  (Oliver 2 pp. 75-76)

108.  White employees Gustafson and LeBeau testified that at times they were permitted to begin the process without getting an MO signed or could even sign the MO for another employee. (Gustafson p. 78; LeBeau pp. 21-23) White employee Eric LeBeau explained that when he forgot, the third shift employee would sign for him and tell him the next day. (LeBeau pp. 22-23)  LeBeau was also aware that employees Pastor and Givner failed to sign MO's but were not disciplined. (LeBeau pp. 24-32)

109.    African-American employee James Bailey testified that he regularly observed 8-10 unsigned MO's every day. (Bailey 1 pp. 74-75; Bailey 2 pp. 31-32) He explained that after he learned that the plaintiff was being disciplined he told Mike Tivnan and Jeff Clark that other employees were not being disciplined for failing to sign the MO's, and showed them these unsigned MO's. (Bailey 2 pp. 33)

110.    The defendant claims that the plaintiff's co-workers could not run the unsigned MO's back to him because he would have already left for the day by the time the first shift rescreener found the unsigned MO's. However, no evidence of when the unsigned MO's were discovered or

32

who discovered them has been produced. Rescreener/Mixer David Aubin began work at 2:00 am., three hours before the plaintiff left for the day, and could have returned any unsigned MO's to the plaintiff in accordance with the normal practice. (Briddell 1 147-148)

111.   In addition, it is clear that when supervisors <u>were</u> notified of violations they did not discipline the employees in the same manner as Briddell was disciplined. Oliver testified that the defendant's normal policy was to give at least one warning before discipline an employee for not signing an MO.   (Oliver 3 pp. 56-57)

112. Supervisor Michael Tivnan admitted that there were employees that he did not discipline for failing to sign MOs.   (M.Tivnan pp. 85-86)

113.   William Tivnan testified that, "**if it happened every day** I would make a copy of the manufacturing order.... and then I would mention it to the individual. (W. Tivnan 1 pp. 125-127) He explained that such a verbal warning would occur once "at a minimum" before the employee would be issued discipline in the form of a counsel.   (W. Tivnan 1 pp. 127-128)

114.   Clark conceded that a failure to sign an MO was not usually a matter of concern, so long as the next employee did not begin the process.   (Clark p. 92).   Clark admitted that after a co-worker complained that white employee Kevin Reed was repeatedly failing to sign MO's, he allowed Reed to fail to sign off twice more before disciplining him. (<u>Id.</u> pp. 93-96) Even then, Clark gave Reed only a verbal warning.   (<u>Id.</u> pp. 93-96).

115.   Supervisor William Tivnan explained that had he ever warned Briddell in the past for having failed to sign an MO, he would have retained a documents showing that such a verbal warning had occurred. (W. Tivnan 1 pp. 128-129)   No such documents have been produced.

33

116.    White employee Phillip Gustafson confirmed that when he forgot to sign he would get- at most- a verbal reminder.    (Gustafson p. 82)

117.    White employee Eric LeBeau testified that he did not know how many times he failed to sign an MO. (LeBeau pp. 22-23)  He explained that it was considered of so little importance that his co-workers and supervisor did not even bother to tell him.   (LeBeau pp. 22-23) He testified that co- workers Pastor and Givner failed to sign and were not disciplined. (LeBeau pp. 29-32)

118.    The Defendants have conceded that between January 1999 and January 2004, the only employees working in Plant 8 at Defendants Worcester facility, who were disciplined in any way for failing to sign an MO were: Reed, Hanson, Constantine, Patnode, Racca, Agyeman, Johnson, Dano, Novia, Aboagye, Ahl, Gonyea, Haynes Rodriguez, Tyre, Wiredu, Mercak, Wright, Gelardi, Wade, Kaminski, Huynh, Koduah, Benson, and Favreau. (Oliver 30b6 2 pp. 41-47) However, no records showing any failure to sign by Rodriquez, Dano, Benson or Gonyea have ever been produced.  (See: W. Tivnan Dep. Ex. 52; Oliver Dep. Ex. 82 pp. 03116-03179; Oliver Dep. Ex. 83; Oliver Dep. Ex. 85, Oliver Dep. Ex. 87)

119.    Reed, Hanson, Constantine, Patnode, Racca, Agyeman, Novia, Aboagye, Haynes, Tyre, Wiredu, Mercak, Gelardi, Wade, and Huynh were disciplined only **after** the plaintiff complained of discriminatory treatment with respect to being disciplined for failing to sign MO's.  (W. Tivnan Dep Ex. 52; Oliver Dep. Ex. 82 pp. 03116-03119)

120.    There is no evidence that Kaminski, who was white, was disciplined. (Oliver Dep. Ex. 82 pp. 03167-03171)  The documents produced do not indicate that he was formally counseled, or even verbally spoken to.  (Id.)  Instead, the documents suggest that a note indicating the mistakes was just sent to his attention.  (Id.)  Moreover, Kaminski failed to do more than sign

34

the MO's.  (Id.)  On four different orders the processes were also performed in the wrong order.

(Id.) The records indicate that the processes should have been rerouted for facing or work before

the sides were ground.  (Id.)

121.    Bishop Wright received a formal counsel on 2/1/00. (Oliver Dep. Ex. 82 pp. 03145-

03151) However, this was not a case in which he had simply failed to sign an MO.  He also

failed to send one of the MO's with the product, moving both orders to the next process with one

MO and causing the orders to get mixed.  (Id.)

122. Robert Favreau also did more than fail to sign the MO.    Apparently he also used  the

wrong "THK", resulting in a 24 wheel rejection. (Oliver Dep. 82 p. 03179)

123.    Johnson was not written up solely for failing to sign an MO.  On February 12, 2001, he

received a note to the file when 32 wheels were rejected. (Ex. C. pp. 01766-01773) On March

29th he received a written reminder after he made 91 wheels that were too thick, and failed to fill

out the PC box.  (Id.)  The records state, "[t]his leads me to believe if Russ did the PC he would

have notice [sic] that his wheels were over thick.  Also last week I rejected some 34 inch wheels

that were molded by Russ were rejected for being over thick and contaminated".  (Id.)

124.    Ahl, a white employee, was disciplined for failing to sign slips in 1997 and again in 2002.

However, this was hardly his only discipline during this period. (Oliver Dep. Ex.  89)  In April

1997, Ahl received a note to the file when he failed to clean his molding machine well enough,

and had to throw away the mix, resulting in the rejection of 55 wheels.  (Id. p. 03085)  In July of

1997, the defendant created a second note to the file when Ahl made the wheels the wrong

weight.  (Id. p. 03083) In August 1997, there was a third note to the file about Ahl having failed

to sign checks.  (Id. p. 06065)    The note indicates that, "he has been told **now for the third**

35

time".  Id.  Despite have already received two notes to the file for performance issues in less than a year, Ahl was given two verbal warnings for failing to sign his MO's.  Even after a third failure he was not moved to a written reminder.

125.    This did not resolve Ahl's performance issues.  On October 1, 1997, there was another note to the file. (Id. p. 03096)  On October 20, 1997, there was another note to the file about his failure to finish the orders as requested on his shift. (Id. p. 03062)    In November 1997, he received a sixth note to the file in less than 8 months, this one for clocking in two hours early without permission.  (Id. p. 03067)  In June of 1998 Ahl was counseled  for shortages at draw. (Id. p. 03096)    In July 1998, he was counseled again. (Id. p. 03062)  In December 1998, he was counseled again for coming in early without permission.  (Id. p. 476)   In March 1999, he received a note to his file for going to dinner too early and being away from his work station. (Id. p. 496)  In May of 1999 he received another note to his file for leaving for breaks too early. (Id.  p. 499) In February 4,  2000, he received a note for leaving/cleaning up early.   (Id. p. 03069) The note indicates that his only response was "busted".  On February 8, 2000, he received his 4th note in a year and his second in less than a week for leaving/cleaning up too early.  (Id. p. 03070) Despite his repeated violations of this policy, he was  not moved to a written reminder.   On March 2000 he was counseled for picking up wheels improperly.  (Id. no page number)  The note stated that he had been previously spoken to about this, and that he would be written up if he did it again.  (Id.)

126.    In February 19 2001, Ahl received a note to the file for failing to pick up wheels properly, failing to recycle mix, shortages with wheels, and disposing of personal trash improperly. (Id.)  In March 2001, he was put on a written reminder after 12 wheels were rejected.  (Id. p. 490) On

36

April 4, 2001 he received a note to the file for being 32 wheels short as a result of his failure to

recycle mix.  (Id. p. 3074)   On May 16, 2001 he was moved to a written warning when he made

100 wheels with the wrong whole size- resulting in 384 pounds of waste.   (Id. p. 03070) On July

27, he received a second written warning for poor work habits- including being observed outside

smoking when he was supposed to be working, taking a 40 minute break, and leaving his work

station 45 minutes before he clocked out.  (Id. p. 03079-03081)

127.    On November 2001, Ahl was moved to the Core molding area.  (Id. no page number)   In

late November,  Ahl indicated that he was having difficulty with his training on the number 3

press.  (Id.)  He was moved to the less complex number 17 press. (Id.) Jeff Clark also sat down

with Ahl and worked out a six month plan for improvement.  (Id.)  Clark told him that he would

support Ahl in any  way to improve his situation.  (Id.)  Clark told Ahl that he wanted to get Ahl

back on track, pull him off the warning, and give him a fair chance to clear his record.  (Id.)

128.    On February 7, 2002, Ahl again failed to sign his MO's.  (Id.  p. 03099) Unlike the

plaintiff, Ahl was not moved to the next stage of discipline.  Instead, he was just given a note to

the file.  (Id.)   In March he was demoted to rescreener.  (Id.)

129.    George Koduah is the only employee who  received a note to the file for failing  to sign

an MO prior to the plaintiff complaining  who did not receive several verbal warnings or have

another violation or quality problem caused by the failure to sign the MO. (Oliver Dep.  Ex. 90 p.

0285)  Koduah is African American. (Oliver 30b6 2 p. 62)

130.  Between January 1999 and January 2004, no employee other than the plaintiff was

disciplined for contaminating a mix.  (Oliver 30b6 2 pp. 5-6)   In fact, Oliver has  conceded that

from the time he was hired in 1988 through January 2006, and based on all of the documents he

has reviewed in his career at Saint Gobain, he is not aware of any employee other than the plaintiff who was ever disciplined for contaminating a mix.  (Oliver 3 pp. 14-15)

131.  White employee Eric LeBeau contaminated mixes but was not disciplined.   (LeBeau p. 47) LeBeau was told about the contamination by his group leader. (LeBeau p. 48) LeBeau testified that he saw a contaminated mix created by a co-worker named Givner, and that Givner was not disciplined. (LeBeau pp. 32l, 44-47)  Supervisor Bill Tivnan was aware of the contaminated mix created by Givner. (LeBeau pp. 44-47)  Philip Gustafson testified that although a contaminated mix is a serious problem, he knows of employees who have contaminated mixes, and to his knowledge nobody was ever disciplined.  (Gustafson pp. 65, 70, 80-81) McTernan testified that he has seen 4-5 contaminated mixes during a three year period. (McTernan pp. 31-32, 49-50) He explained that other than the plaintiff, "no one has been disciplined for contaminated mix since I've been there.  No human being.  Period".  (Mcternan p. 56)

132.    White employees Aubin and Reed contaminated mixes.  (Briddell 1 pp. 223-225) Supervisor Bill Tivnan was aware of Aubin's contaminated mix.  (Briddell 2 pp. 325-328)

133.    At the EEOC, the defendant also explicitly relied on the discipline of white employees Stidsen, Egan, Moulton, Bull, Gelardi, Zawalich and Thibeault. (W. Tivnan Dep. Ex. 52)   At that time the defendant claimed that the defendant's treatment of these employees, "dispute[s] the [plaintiff's] assertion that he was treated disparately compared to other employees." (W. Tivnan Dep. Ex. 52 p. 5)  However, Egan, Moulton, Bull, Zawalich, and Thibeault had all engaged in intentional misconduct. (Zeena 2 pp. 131, 137-140, 145)

38

134.    At the EEOC, the defendant also explicitly relied on the discipline of employee Joseph

Wilson.    Wilson  was identified to the EEOC as a similarly situated **white** employee.  (W.

Tivnan Dep. Ex. 52 p. 00006)    Oliver also identified Joseph Wilson as Caucasian.   (Oliver

30b6 2 at 104-105).   Wilson works in a different area than the plaintiff.  However, Zeena

conceded that  there were no differences in how discipline was to be applied between the areas.

(Zeena 2 p. 149) In fact, Zeena explained that the defendant's disciplinary policies are to be

applied in the same manner throughout the Bonded Abrasives division.  (Id.)

135.  Wilson was treated more leniently than the plaintiff.   In 1999, Wilson was given a note to

the file  for not calling people with flyers.   (Oliver Dep. Ex. 92 p. 02351) The note indicated this

was the second time that the defendant had spoken to him about the issue.  Id.    In April 1999,

there was a note to the file for his having shouted at his supervisor. (Id. p. 02351)  In May 1999

and again in June 1999, there were notes to the file about his attendance. (Id. pp. 02356, 02354)

On August 4, 1999 there was a note to the file for attendance and poor performance causing a

rejection of a mix.  ( Id. at02367)  On August 23, 1999, he received another note to the file for

poor performance when two orders had to be remixed because he was not paying attention.   (Id.

at 1833) On the next  day he received another note to the file for attendance.  (Id. at 02366) On

August 30th he received his 8th note to the file in as many months- this one for clocking in without

permission on a day that he was not scheduled to work. ( Id. at 1836; 02353)  On September 30,

1999 he received a note to the file for failing to follow proper procedures when he used a dark

tank for a light mix. (Id.  at 02343; 1821)  In December 1999, he received a note to the file for

failing to follow procedures for failing to use a mix slip- resulting in 50 pounds of leftover mix.

(Id. p. 1841)  Although this was his 10th warning- he was not moved to the next step of

discipline.

136.    In February 2000, Wilson received a note to the file for using the wrong bond in a mix.

(Id. p. 1844)   Later that month he again failed to follow instructions, and was placed on a

written reminder. (Id. p. 02377-1845) In March 2000 he used the wrong abrasive on three orders.

(Id.)   He was given an note to the file. (Id. p. 1846)   On May 8, 2000 he once again used the

wrong abrasive and was finally placed on a written warning.  (Id. pp. 1847, 1849)   In July he

used the wrong tank number on an MO, resulting in a 100% rejection. (Id. at 989) In September

he failed to fill out an MO correctly and was given yet another counsel. (Id. at 1851)   In

February, he again failed to write the tank number on an MO, resulting in another 100%

rejection. (Id. at 989)   He was terminated, but was later rehired.   (Id.; Oliver 30b6 2 pp 116-

117)

137.    White employee Charlie Morse had a series of problems between January and March of

2005, including several quality issues involving mixes being too wet or too dry on February 1,

February 2, February 10, and February 11, 2005.  (Oliver Dep. Ex. 94)   He also overfilled

barrels on February 11th- raising a safety issue. (Id.) On or about February 22, 20045 he created a

contaminated mix- by failing to clean the bowl or conveyor well enough. (Id.) On March 11,

2005, supervisor Bill Tivnan created a note to the file based on these safety and quality issues.

(Id.)  The note did not even mention the contaminated mix as a performance issue. (Id.)

138.    White employee Pasquale Gaimari had a history of multiple warnings for inappropriate

behavior, aggressive behavior  and safety violations  (Oliver Dep. Ex. 95)  In January 2002 he

received a note to the file for a safety violation when he was observed riding a pallet truck like a

scooter. (Id.)  He received two more notes to the file in December 2002- one for swearing at a co-

worker and the other for attendance. (Id. pp. 01584, 01634, 01583)  In January 2003 he was

spoken to about not being at work on time. (Id. p. 01582)  On March 8, 2003 and again on March

10, 2003, he was warned about disabling a safety control on a machine. (Id.)   On March 26,

2003 he received a formal counsel for failing to report an injury in violation of the defendant's

safety policies. (Id. pp. 01634, 01581) In June 2003 , he received the 6th note to a file in a year-

this time for being away from his machine during work time. (Id. pp. 01624, 01625)   On January

31, 2004, and on March 26, 2004 Gaimari received more  warnings- for safety violations. (Id. pp.

01617, 01615, 01616)  In April 2004 he was terminated for intentionally bypassing the safety

mechanisms on his machine. (Id. pp. 01611)   Despite multiple safety violations, Gaimari was not

moved through the progressive discipline system past counseling, until after he engaged in wilful

misconduct by disabling a safety bar.  Oliver could not explain why.  (Oliver 30b6 2 p. 128-129)

139. Zeena suggests that circumstances were different  in 2003-2004 because, "every level of

discipline was discussed and negotiated with the union".  (Zeena 3 pp. 92-93)  He also

explained that while the defendant retained the  management right to apply discipline, the

company had to consider the possibility of a unfair labor practice charge or grievance.  (Zeena 3

pp.  94-95, 117, 122, 124)   However, Zeena admitted that the discipline of Briddell was

discussed with the union.  (Zeena 3 pp. 125-126)  He similarly conceded the defendant was

concerned about the possibility that the union might bring an unfair labor practice charge over

Briddell's discipline.  (Zeena 3 pp. 124-126)  In fact,  in Briddell's case, the concerns were so

great that the defendant sought legal advice.  (Zeena 3 pp. 126)

140.  Employees Dano, Novia, Hanson, Johnson, Reed, Patnode, Racca, Ahl, Gonyea, Haynes

Tyre, Constantine Stidson, Gelardi Favreau, Kimball, Aldrich, Drake, Carlo, Gambacini,

LoRusso, Romero, Tetrault, Mylen, Watson, Phil Bailey, McMenemy , Prentiss and Aubin are white.   (Oliver 30b6 2 pp. 60-64) Joe Wilson is white.  (Oliver 30b6 2 pp. 104-105)  Charlie Morse is white.  (Oliver 30b6 2 p. 124) Employees Aboagye, Agyeman, Wiredu, Koduah, Benson, Acquah, Kwame, Opoku, and Edwards are black.   (Oliver 30b6 2 pp. 60-64)  To the best of the plaintiff's knowledge none of these employees ever complained of race discrimination.

141.    The plaintiff testified  that  Zeena singled him out because he was black.  (Briddell 2 p. 291)  The plaintiff testified that Baker is  racist. (Briddell 2 p. 302-306).

142.    The plaintiff testified that Clark is racist and singled him out and scrutinized his work because of his race.  (Briddell 2 pp. 291- 295)

143.    McTernan cannot recall if ever heard Briddell complain about race  discrimination. (McTernan p.13) He could not say yes or no.   (McTernan p. 47)

144.    1104 is David Aubin's number.  (Clark p. 200)

145.    Briddell never discussed discrimination with LeBeau, because  they worked  different shifts and their paths did not really cross.   (LeBeau pp. 19-20, 33-34)  LeBeau does not know if Briddell was treated differently due to race because they did not work together. (LeBeau pp. 24, 42-43)  Phillip Gustafson and McTernan did  not observe racist treatment of the plaintiff, but also did not interact with him  at work.   (Gustafson p. 13; McTernan p. 14-15)

146.    The plaintiff's ex-wife, Cynthia Carruthers worked for the defendant prior to 1992. (Carruthers pp. 22, 26) She did not work in the defendant's Worcester facility at any time after Saint Gobain had taken over.   (Carruthers pp. 22, 26)  Carruthers testified that the plaintiff often talked about race discrimination, including his belief that he was being discriminated against.

42

(Carruthers pp. 58, 70, 74-75).  She believed he was probably being discriminated against because of his race.  (Carruthers pp. 74-75)

147.  Briddell told James Bailey that he thought that he was being discriminated against because he was black and because he was with the union.  (Bailey 1 p. 90)    Bailey believed it because of what he had experienced.   (Bailey 1 p. 90)

148.  Baker testified that he believed that a total of 6 out of 149 minority supervisors did not show a lack of minority employees in official and managerial roles at the Worcester Saint Gobain facility. (Baker pp. 129-130).   He has testified that it was not a "lack", because, "it depends upon whether the standard is that there should be more".  (Id.)

149.  The plaintiff believes that he was terminated in motivating part due to his race and color.  (Briddell at ¶¶24-24; Baker Dep. Ex. 36 p. 01046)

150.   The plaintiff believes that he was terminated in motivating part due to opposition to race discrimination.  (Id; Briddell 2 pp. 332-335)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT**[3]

1.    Admitted.

2.    Admitted, except to the extent that the defendant claims that Vasseur suggested that Briddell pursue employment with defendant, and not Norton Company. (Pl. 56.1 Stat. at ¶¶7, 8)

3.    Denied in part.  The plaintiff denies that the defendant employed the plaintiff prior to 1990, and denies that the plaintiff was employed as mixer between February 1998 and July 2000.  (Pl. 56.1 Stat. at ¶¶7, 8, 12, 16, 21) The remaining allegations are admitted.

4.    Denied in part.  The plaintiff denies that he was solely responsible for measuring and mixing the proper amount and type of raw materials.   The defendant's Con-Cam and mixing systems were used to measure and mix the proper amount and type of raw materials.   (Pl. 56.1 Stat. at ¶¶ 35, 36) The remaining allegations are admitted.

5.   Denied in part.  The plaintiff denies that he was solely responsible for gathering the correct type and amount of ingredients.  The defendant's Con-Cam system was not supposed to work with the wrong ingredients, and  would measure the proper amount of some of the raw materials. (Pl. 56.1 Stat. at ¶ ¶35, 36) The remaining allegations are admitted.

6.    Denied in part.  The plaintiff admits that during his employment he was not  aware of the names of any employee who failed to sign off on MOs and  or any supervisor who allowed employees to fail to sign MOs.  However, he was aware that it occurred and reported that to the

---

[3] For the convenience of the Court and in order to clarify the issues in dispute, the plaintiff hereby identifies those paragraphs of the *Defendant's Statement of Undisputed Material Fact* which have been controverted by the *Plaintiff's Local Rule 56.1 Statement of Material Facts in Dispute* and references the relevant paragraph or paragraphs.   In certain circumstances, where the plaintiff does not believe the fact is necessarily material- but is disputed, the plaintiff cites to the record evidence disputing the defendant's allegation, in case the Court determines that the fact is material.

defendant. (Briddell 1 pp. 229-232l; Pl. 56.1 Stat. at ¶¶77, 97)  To the extent that the defendant suggests that the plaintiff is currently unaware of the names of employees who failed to sign off on MOs and/or supervisors who allowed employees to fail to sign MOs and did nothing about it, denied. (Pl. 56.1 Stat. at ¶¶42, 107-109, 111-129)

7.    Admitted.

8.    Denied in part.  The plaintiff admits that the scale is supposed to be programmed. To the extent that the defendant suggests that there may not have been  problems in programming, denied. (Pl. 56.1 Stat. at ¶¶38, 39)  The plaintiff also denies that the additional amount of mix added to  a pan was modest- as it could be up to 10 pounds.  (Pl. 56.1 Stat. at ¶37) Finally to the extent that the defendant suggests that the **scale** shuts down and not the mix machine, denied. (M. Tivnan p. 30)  The remaining allegations are admitted.

9.    Denied in part.  The plaintiff denies that the defendant enforced this safety rule.   (Pl. 56.1 Stat. at ¶¶40, 43-46, 103-105)   The plaintiff denies that it was "essential" to use the right size screen, and denies the using the right size screen would keep mix pans within the 45lb limit- as there are many other causes of mix pans exceeding the weight limit.   (Pl. 56.1 Stat. at ¶¶38-40, 43-45)  The remaining allegations are admitted.

10.    The plaintiff denies that a mixer can view a mix  pan and determine if it is  overweight.  (Pl. 56.1 Stat. at ¶39) To the extent that the defendant suggests that it enforced the weight limit, denied. (Pl. 56.1 Stat. at ¶¶ 40, 43-46, 103-105)    The remaining allegations are admitted.

11.    Denied in part.  The plaintiff denies that the mix will wait for several hours.  Some are available for use immediately, while some must sit for a day or more. (Briddell 1 pp 141-142; W. Tivnan 2 pp 196; Pl. 56.1 Stat. at ¶41).    The remaining allegations are admitted.

12.    Denied in part.  The plaintiff denies that the rescreener will work on the mix during the next shift.    Some mixes do not need to wait and will be rescreened on the same shift.  (W. Tivnan 2 p. 196).    Others mixes  may sit for the shift after that.  (Briddell 1 p. 142; Pl. 56.1 Stat. at ¶ 41) The remaining allegations are admitted.

13.    Denied in part.  The plaintiff denies that a rescreener will necessarily  be the  next person to work on a mix, as some mixes do not need to be rescreened.    (Pl. 56.1  Stat. at ¶63)    The remaining allegations are admitted.

14.    Denied in part.   The plaintiff denies that these are the only ways that  mix pans can be heavy.  (Pl. 56.1  Stat. at ¶¶38-40, 43-45)   The plaintiff denies that only mixers add mix balls to pans.     (Pl. 56.1  Stat. at ¶43) The plaintiff denies that the defendant did not permit mixers, molders and rescreeners to add mix balls to pans that were already at the 45-pound weight limit, and denies that employees were advised to add the mix balls to an extra mix pan located on a nearby truck. (Pl. 56.1  Stat. at ¶40-46)   Plaintiff admits that he stated at his deposition that no Company supervisor ever advised him to add mix balls to a pan that already weighed 45 pounds. However, plaintiff denies any suggestion that he testified that supervisors were not aware that mix was being added to pans that already weighed over 45 pounds.  (Briddell 1 p.  156-159; Pl. 56.1 Stat. at ¶¶43, 44, 46 )  The remaining allegations are admitted.

15.    Denied in part.  The plaintiff admits that he testified that  he was not  aware of the **names** of any employee who made overweight pans  or any supervisor who allowed employees to do so. However, he was aware that it occurred, and reported it to the defendant.  (Pl. 56.1  Stat. at ¶¶87, 89)  To the extent that the defendant suggests that the plaintiff is currently unaware of  any names,  denied. (Pl. 56.1  Stat. at ¶¶40, 43-46, 103-106)

46

16.    Denied in part.   The plaintiff denies that mixers were always required to use the system- since it sometimes was not working or did not have a mix entered.   (Pl. 56.1 Stat. at ¶¶35,76, 77; Briddell 1 p. 164)   The plaintiff denies that the system alerted the mixer if he used too much mix or the wrong type of mix- it would not work in those circumstances.   (Clark, pp. 111-112; Pl. 56.1 Stat. at ¶35) The plaintiff denies that all other employees were required to use it.   (Pl. 56.1 Stat. at ¶¶35, 37, 77, 106).  The remaining allegations are admitted.

17.    Denied in part.   The plaintiff denies that mixers must "ensure" that they never produce "contaminated mixes," - since they are sometimes unavoidable, and since contamination may not be the fault of the mixer. (Pl. 56.1  Stat. at ¶¶91-92) The plaintiff denies that a mixer can always visually inspect for evidence of contamination- since the contamination may not occur until after the lids are placed on the mix.   (Id.)  The remaining allegations are admitted.

18.    Denied in part.   The plaintiff denies that mixers can  "avoid" producing a contaminated mix.  (Pl. 56.1  Stat. at ¶¶91-92) The plaintiff denies that mixers are responsible for cleaning pans; they only bang out any loose abrasive.  (Id.) The remaining allegations are admitted.

19.    Denied.  (Briddell 1 p. 103-110; 115-117)

20.    Denied in part.   The plaintiff admits that he received the discipline, but denies  that he signed both exhibits 2 and 3, denies that he made an overweight mix, and denies that the discipline was warranted.  (Briddell 1 pp. 103-110; 115-117)  The remaining allegations are admitted.

21.    Denied.  (Briddell 1 pp. 118-122)   The plaintiff denies making the mix, and does not  recall receiving the discipline.  (Briddell 1 pp. 118-122)

22.  Denied in part.   The plaintiff denies the suggestion that he was awarded the position upon

bidding on it.  (Pl. 56.1  Stat. at ¶¶ 12-13, 16) Although he was the most senior bidder he was told

that he would be denied the position unless he took a "basic skills" test, he then  complained of

race discrimination, and threatened to call the NAACP.  (Id.) The plaintiff denies that he created

defective wheels but admits that he was accused of it.   (Pl. 56.1  Stat. at ¶¶19-21)

23.      Denied.  (Briddell 1 pp.132-133, Briddell 2 pp. 322-323)

24.      Denied in part.   The plaintiff denies that his work was unacceptable. (Briddell 1  pp. 132-

133; Pl. 56.1  Stat. at  ¶¶19-21) The remaining allegations are admitted.

25.      Admitted.

26.      Denied in part.  The plaintiff denies that Aubin worked the regular first shift hours. ( Pl.

 56.1  Stat. at ¶110; Briddell 1 pp. 147-148) The remaining allegations are admitted.

27.      Admitted.

28.      Denied.  (See: Pl. 56.1  Stat. at ¶¶40-41, 43-51, 103-104)

29.      Denied.  (See: Pl. 56.1  Stat. at ¶¶40-41, 43-51, 103-104)

30. Admitted.  The plaintiff, however, denies that any such complaints were actually made, and

denies that he was being treated in accordance with normal practices. (See: Pl. 56.1  Stat. at ¶¶40-

41, 43-51, 103-104)

31.      Denied.    (See: Pl. 56.1  Stat. at ¶¶40-41, 43-46, 52-60, 103-104)

32.      Denied in part.  (See: Pl. 56.1  Stat. at ¶¶40-41, 43-46, 52-60, 103-104) The plaintiff

denies that this testimony is true and further denies  that it  is consistent with other testimony, with

the documents, and/or with normal practices. (Id.) Finally, the plaintiff contends that the falseness

of the testimony is shown by critical  missing information.  (Id.)   The plaintiff, admits that he

received the written reminder.

33.    Denied in part.  The plaintiff can neither admit, nor deny rumors of conversations

to which he was not a party.   However, he  denies that he exhibited performance problems.

(See: Pl. 56.1  Stat. at ¶¶40-41, 43-60, 103-104)

34.    Denied in part.  The plaintiff denied making heavy pans, and could neither admit  nor deny

the other alleged deficiencies.  (See: Pl. 56.1  Stat. at ¶ ¶61-78) However,  there is reason to

believe that he did not fail to sign the MO's as has been alleged.   (See: Pl. 56.1  Stat. at ¶ ¶61-78)

He denies that these were the only things discussed at the meeting, and denies that the discipline

was warranted.  (See: Pl. 56.1  Stat. at ¶¶61-78)  The remaining allegations are admitted.

35.    Denied in part.  The plaintiff denies that he accused Clark and Aubin of  discrimination at

that meeting.  (See: Pl. 56.1  Stat. at ¶78; Briddell p. 188) The plaintiff denies that at his

deposition, he  testified that he was not being targeted by  Clark and Aubin because of his  race

(Id., p. 188-190;  See: Pl. 56.1  Stat. at ¶ ¶141-143).  He denies that these were the only things

discussed, and denies that the discipline was warranted.  (See: Pl. 56.1  Stat. at ¶ ¶61-78)  The

remaining allegations are admitted.

36.    Denied in part. (See: Pl. 56.1  Stat. at ¶¶61-78)  The plaintiff admits that he received such a

memorandum but denies that it  accurately or truthfully described events, and further denies that it

is consistent with other testimony, with the documents, and/or with normal practices. (Id.)

37.    Denied, in part.  (See: Pl. 56.1  Stat. at ¶ ¶81-124, 129) The plaintiff denies that the

warning was the result of the failure  to sign MO's rather than the result of discrimination and

retaliation.  (Id.) He denies that these were the only things discussed, and denies that the discipline

was warranted. (Id.) The remaining allegations are admitted.

49

38.     Denied.  (See: Pl. 56.1  Stat. at ¶83)

39.     Denied in part.  The plaintiff can neither admit, nor deny that Oliver contacted  Zeena.

However the plaintiff denies the alleged performance deficiencies, denies the defendant's motives,

and  denies that any discipline was warranted.  (See: Pl. 56.1  Stat. at ¶¶84-86)

40.     Denied in part.  The plaintiff can neither admit, nor deny that Clark  contacted  Zeena.

 However the plaintiff denies the alleged performance deficiencies, and  denies that any discipline

was warranted.  (See: Pl. 56.1  Stat. at ¶¶84-86)

41.     Denied.    (See: Pl. 56.1  Stat. at ¶¶86-88)

42.     Denied in part. (See: Pl. 56.1  Stat. at ¶¶38-40, 43-46, 86-89, 103-105) The plaintiff admits

that he was not moved to the next step of  discipline and admits to having received the document,

but denies that it accurately or truthfully described events, and further denies that it is consistent

with other testimony, with the documents, and/or with normal practices.  (Id.)  The remaining

allegations are admitted.

43.     Denied.    (See: Pl. 56.1  Stat. at ¶¶90-97)

44.     The plaintiff admits that  Philip Gustafson, testified that contaminated mixes are a

"serious problem," but denies that he testified that he was not aware of  other employees who

contaminated mixes but who were disciplined.  (See: Pl. 56.1  Stat. at ¶ ¶97-98, 131-132) The

plaintiff  denies that he was treated the same as other employees who were white and/or who had

not complained of race discrimination. (Id. ¶¶ 42, 80, 91-98, 100-102, 107-132)   The plaintiff

denies that any white employees were disciplined solely for failing to sign MO's (except for

repeated infractions) until **after** the plaintiff complained of discrimination, and further denies any

suggestion that the plaintiff was being treated the same as white employees, or employees who

50

had not complained of discrimination. (Id.)

45.    The plaintiff admits that he was terminated.  The reminder of paragraph 45 is denied. (See Supra 28-44)

46.    Denied in part.  The plaintiff admits that at his deposition, plaintiff testified that he, "didn't know what other mixers did".  To the extent that the defendant suggests that the plaintiff is currently unaware of the names of white employees and/or employees who had not complained of discrimination, who were treated far more leniently, denied.  (See: Pl. 56.1 Stat. at ¶¶40, 42-46, 87,89,92, 97, 101-140)

47.    Denied in part.  The plaintiff denies the alleged performance deficiencies,   denies that any discipline was warranted, and denies that his appeal was considered in good faith.  (See Supra at 28-46)   The remaining allegations are admitted.

48.    Denied in part.   The plaintiff denies any suggestion that the initial charges were filed by him, or that he had any role in its withdrawal.  (See Ex. B)  The plaintiff denies that the NLRB engaged in extensive investigations, and denies that the NLRB had the advantage of the documentary evidence and/or the testimony of critical witnesses that has been produced in this case.  (Id.)  The plaintiff denies under these circumstances the dismissal has any probative value. The plaintiff denies that **he** appealed the decision. (Id.)   The remaining allegations are admitted.

49.  Denied in part.   The plaintiff denies the EEOC investigated- other than by reviewing the parties written  submissions.  (Ex. B.) The EEOC did not conduct fact-finding, did not speak to witnesses, and did not even request additional information. (Id.)    The plaintiff admits that EEOC dismissed the claims, but denies that the EEOC had the advantage of the documentary evidence and/or the testimony of critical witnesses that has been produced in this case.  (Id.)  The plaintiff

51

denies that the dismissal has any probative value.   The remaining allegations are admitted.

50.      Denied in part.  The plaintiff admits that the EEOC made the statements.  The plaintiff

notes that in so doing the EEOC  relied on the defendant's representations that employees who

worked in other areas, at different times, had different supervisors, and who had engaged in

different conduct, including wilful misconduct such as theft, were similarly situated, and also

relied upon the defendant's representation that  Joseph Wilson is white (See W. Tivnan Dep. Ex.

52)  The plaintiff denies that in reaching these conclusions the EEOC had  the advantage of the

documentary  evidence and/or the testimony of  critical witnesses  that has been produced in this

case. (Ex. B)   The plaintiff denies under these circumstances the dismissal has any probative

value.   The remaining allegations are admitted.

51.   Denied .  The plaintiff admits that the defendant cites part of the plaintiff's testimony, but

denies that it accurately summarizes the plaintiff's testimony .and evidence. (See: Pl. 56.1 Stat. at

¶¶141-142, 146, 147, 149-150; Baker Dep. Ex. 36, Briddell 2 pp. 291, 294-295, 332-338 )

52.  Denied in part.   The plaintiff denies that Carruthers was employed by **Saint-Gobain** for

approximately 17 years, as she left employment in 1992 shortly after the defendant took over. (Pl.

56.1  Stat. at ¶8;  Carruthers p. 25-26) During the two years  Carruthers worked for the defendant,

she never worked in the defendant's Worcester facility.  (Pl. 56.1 Stat. at ¶146;  Carruthers p. 22,

26)  Carruthers believes that the plaintiff was likely discriminated against by the defendant. (Pl.

56.1  Stat. at ¶8;  Carruthers p. 74-75)   The remaining allegations are admitted.

53.      Denied in part.  The plaintiff denies that McTernan testified that plaintiff had not

complained of discrimination. (See: Pl. 56.1  Stat. at ¶143, 145) The plaintiff denies that LeBeau

or McTernan testified that he had claimed that them that the defendant was "picking on him

because he was a pretty strong union supporter."  (See: Pl. 56.1 Stat. at ¶ ¶145)  The plaintiff

denies any suggestion that he did not also complain about race discrimination to Bailey.  (See: Pl.

56.1 Stat. at ¶¶146, 147; Baker Dep. Ex. 36) The remaining allegations are admitted.

54. Denied in part.  The plaintiff denies that all of his  co-workers testified that they did not

observe any conduct directed at Plaintiff that reflected race discrimination.    (See: Pl. 56.1  Stat.

at ¶¶143, 145, 147)  McTernan, who testified that he did not interact with the plaintiff at work

testified that he could "not specifically say" that he "personally, standing there watching" saw

anything that he thought was unfair because of the plaintiff's race.    (See: Pl. 56.1 Stat. at ¶¶147;

McTernan pp. 14-15) LeBeau, who explained that he worked on a different shift from the

plaintiff, testified that he never  personally  observed discrimination against Briddell but did

observe racist comments and conduct by co-workers.  (See: Pl. 56.1  Stat. at ¶¶145; LeBeau pp.

18-20)  The plaintiff denies that Gustafson  does not believe there was any connection between

plaintiff's discipline and his race, as his testimony in response to that question was, "I don't know.

I don't think so, but who knows". (Gustafson  p. 48).  The remaining allegations are admitted.

55.   Admitted.  However, the plaintiff's denies any suggestion that Tivnan  was not involved in

condoning, covering up and /or going along with the discrimination and retaliation by defendant..

56.   Denied in part.  The plaintiff denies that he ever testified that Clark and another employee

were not targeting him for any other reason in addition to his union activities.  (Briddell 1 , pp.

189-190; Pl. 56.1 Stat. at ¶142)  He testified  that Clark was targeting him because of his race,

and the complaints that he made about discrimination, as well as his union activities.    (See: Pl.

56.1 Stat. at ¶142; Briddell pp. 294-295, 332-333) The remaining allegations are admitted.

57.    Admitted.  However, the plaintiff denies any suggestion that Oliver was not involved in condoning, covering up and/or going along with the discrimination and retaliation by defendant.

58.    Denied in part.    The plaintiff admits that he testified that he believed that Zeena  could be hostile to both black and white employees but  denies  any suggestion that Zeena was not also racist,  as he testified to his belief that Zeena singled him about because he was a black man. (See:  Pl. 56.1  Stat. at ¶141; Briddell 2 pp. 288-291)  The remaining allegations are admitted.

59.    The plaintiff denies that Ruiz was promoted into a supervisory position in the Bonded  Abrasives division.  He transferred having been already promoted. (Briddell 1 p. 239) The plaintiff can neither admit nor deny Ruiz' motive  in resigning.   The remaining allegations are admitted.

60.    The plaintiff denies that the plaintiff does not currently know the  circumstances concerning Bailey's denial of promotions and complaints of discrimination. (See:  Pl. 56.1 Stat. at ¶14)  The plaintiff denies that the promotion indicates a lack of discriminatory animus since he was  promoted after having filed charges of race discrimination.   (Bailey 2 pp. 4-6)

61.    Admitted.

62.    Admitted.

63.    Denied.  The defendant has offered no competent evidence that the assumptions about the inability of black employees to understand what was  happening at other meetings  was based on legitimate concerns, rather than racist assumptions about the intellectual capacity of black persons.  (See:  Pl. 56.1  Stat. at ¶¶29, 32)

64.    Admitted.

65.    Denied. (See:  Pl. 56.1  Stat. at ¶89)

54

66.    Denied in part.  The plaintiff denies  that he does not currently have  evidence as to what

the defendant  intended to do with these pans.   See: (See:  Pl. 56.1  Stat. at ¶89)


RESPECTFULLY SUBMITTED,
THE PLAINTIFF

By:

Mary E. Kelly  ct07419
Livingston, Adler, Pulda,
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT  06105-2922
Phone: (860) 233-9821
Fax: (860) 232-7818
E-mail: mekelly@lapm.org

55

## CERTIFICATE OF SERVICE

This is to certify that on May 9, 2006 a copy of the foregoing Plaintiff's Local Rule 56.1 Statement In Support of Memorandum Opposing Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Mary E. Kelly
Livingston, Adler, Pulda
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105
Phone: (860) 233-9821
Fax: (860) 232-7818
E-mail: mekelly@lapm.org