## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ROBERT BRIDDELL,

      Plaintiff

v.

SAINT GOBAIN ABRASIVES, INC.,

      Defendant.

Civil Action No.: 04-40146-FDS

## MEMORANDUM OF DEFENDANT IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Saint-Gobain Abrasives, Inc. ("the "Company") has moved for summary judgment on Plaintiff's claims of race discrimination and retaliation. Plaintiff has now filed an opposition to summary judgment that seeks to create sham issues of fact by: (a) distorting the factual record, (b) focusing on minutiae rather than the totality of the evidence regarding Plaintiff's performance deficiencies, and (c) submitting an affidavit that improperly contradicts Plaintiff's deposition testimony.[1] While it is not possible to address every inaccurate representation set forth in Plaintiff's Opposition, this Reply will focus on some of the key distortions and extraneous issues raised by Plaintiff.

## I.   PLAINTIFF DOES NOT RAISE A GENUINE ISSUE OF FACT ON WHETHER THE COMPANY'S EXPLANATION FOR HIS DISCHARGE WAS PRETEXTUAL

In the Company's summary judgment papers, it demonstrated that Plaintiff exhibited a number of different performance problems that ultimately led to his discharge in February 2002. In an effort to avoid summary judgment, Plaintiff has attempted to overwhelm the Court with an avalanche of alleged discrepancies and inconsistencies contained in his fifty-five page Rule 56.1 Statement. Plaintiff's Statement not only responds to Defendant's Rule 56.1 Statement, but also

---

[1] Defendant has filed a Motion to Strike portions of Plaintiff's Affidavit.

contains a listing of 150 additional paragraphs of "Material Facts in Dispute." However, a careful review of Plaintiff's Statement and Memorandum of Law reveals that he has created a number of "smokescreens" that obfuscate the issues before the Court.

A significant portion of Plaintiff's Opposition focuses on attempting to show that the Company's discipline of Plaintiff for creating overweight pans, for failing to sign manufacturing orders ("MO's"), and for creating a contaminated mix was unjustified, and also reflects disparate treatment of Plaintiff. As an initial matter, Plaintiff's methodology in attacking the decision to discharge him is flawed because his Opposition largely focuses on each performance deficiency in isolation, rather than assessing the totality of performance problems that Plaintiff exhibited. Simply put, it is irrelevant that Plaintiff can identify situations where an employee was not disciplined for a particular rule violation, where as here, Plaintiff was discharged because he exhibited several different performance deficiencies, and, in some cases, committed multiple violations of the same rule. Further, while Plaintiff repeatedly asserts that the Company's disciplinary rules were not consistently applied to other employees, the record evidence reveals that Plaintiff cannot show that he was treated more harshly than similarly situated employees **because** of his race.[2]

### 1.   <u>Heavy Mix Pans</u>

As previously noted, Plaintiff's early discipline in the fall of 2001 related to the making of mix pans in excess of the Company's 45-pound safety limit. Plaintiff has advanced a number of disingenuous and misleading arguments to attack the basis for this discipline. For instance, while Plaintiff argues that Defendant was aware that overweight pans *could have been caused* by

---

[2] Plaintiff attempts to minimize the significance of his own deposition testimony, in which he clearly expressed his belief that the Company (as well as certain employees who reported his work deficiencies) were unlawfully motivated to take action against him because of his **Union activities** (not because of his race). (<u>See</u> Defendant's Statement ¶¶51, 56). In his Opposition, Plaintiff contends that his involvement with the Union was linked to his belief that the Company was discriminating against minority employees. Not only is Plaintiff attempting to provide a patently self-serving interpretation of his deposition testimony, but there is absolutely no evidence in the record that Plaintiff believed that the Company's alleged anti-Union animus against him had anything to do with the alleged "racial" component of his Union activities.

factors outside of Plaintiff's control," he has not presented a scintilla of evidence that any of these hypothetical factors were responsible for **his** pans exceeding the weight limit, and it is well settled that a plaintiff cannot defeat summary judgment by engaging in such speculation. See e. g., Gonzalez-Pina v. Guillermo Rodriguez, 407 F.3d 425, 431 (1st Cir. 2005) (recognizing appropriateness of summary judgment in employment discrimination cases where "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (Citation omitted).[3]  Plaintiff also asserts that "[white employees, including LeBeau and McTernan were not disciplined for exceeding the 45 lb. weight limit." (Plaintiff's Memorandum at p. 13).  However, the testimony cited by Plaintiff fails to show that any Company managers or supervisors were aware of the alleged heavy pans made by LeBeau, McTernan, or other unidentified white employees (indeed, LeBeau admitted that he did not report his heavy pans to any supervisor (LeBeau Dep. 50)),[4] and therefore this assertion cannot logically support a finding of disparate treatment.

Further, while Plaintiff observes that Mr. Gustafson (a Union representative) testified that the practice of making heavy mix pans was so "open" that employees began to write the word "heavy" on pans and this practice was "known" to supervisors (Memorandum, at p. 16, fn. 24), Plaintiff fails to disclose that Mr. Gustafson admitted that he **never** notified Company management of this alleged "practice" during Plaintiff's disciplinary proceedings.  Specifically, Mr. Gustafson acknowledged that, "I did not explain this to [Human Resources Manager Rick]

---

[3] While Plaintiff also asserts that "plaintiff and Phillip Gustafson told the defendant that the overweight pans *might* have been caused by another employee," (Memorandum at p. 16) this conclusory assertion cannot be afforded any weight.  That is because Plaintiff has not provided any record citation or evidentiary support for this assertion, and moreover, Plaintiff cannot create an issue of fact by speculating on what "might" have happened.  Moreover, this assertion is contradicted by Plaintiff's deposition testimony in which he acknowledged that he is **not** claiming that another employee made or caused his pans to be overweight. (Pl. Tr. I, 174-75)

[4] A copy of page 50 from Eric LeBeau's deposition transcript is attached hereto as Exhibit A.

Zeena. [Plaintiff] said this problem of his overloaded pans had happened three to four months earlier. Zeena did not dwell on this very long." (Gustafson, p. 68).[5]

Plaintiff's Opposition also refers to the inapposite example of Plaintiff discovering other heavy pans in January 2002, which did not result in the discipline of any employees. As Defendant has previously explained, this situation is not analogous to Plaintiff's creation of overweight pans, because it is undisputed that the pans identified by Plaintiff had **not** been created by a mixer putting too much mix in a pan, and these pans were **not** intended to be manually lifted by any employees. (Defendant's Statement, ¶¶64-65). Further, Plaintiff does not dispute the testimony that management had instructed the employees handling these mix pans that the mix was to be hand scooped from the pan (and thus the pans would not be lifted).[6] (Id.) In any event, Plaintiff has not presented any evidence regarding the race of the employees who may have been "responsible" for the heavy pans he discovered in January 2002. Therefore, it is axiomatic that he cannot cite this incident as an example of disparate treatment based on race.

Plaintiff also raises some specious issues regarding his creation of heavy pans. For instance, he claims that the Company did not offer testimony from rescreeners about the weight of Plaintiff's pans, and that the Company was unable to locate and/or produce documentation regarding some of the heavy pans. However, these criticisms of the quality of the Company's evidence and recordkeeping practices do not create any issue of pretext or discrimination.[7]

---

[5] In fact, the record establishes that the last several warnings that Plaintiff received had nothing to do with making overweight pans. (Defendant's Rule 56.1 Statement, ¶¶34-37, 43)

[6] Plaintiff's only response to this uncontroverted testimony is to cite the speculative concern of an employee (the unsworn note written by Dennis Novia) that there *could* be a safety issue if employees "humped" these heavy pans. However, Plaintiff has produced no *admissible* testimony on this issue, and Mr. Novia concedes in his note that the heavy pans found by Plaintiff had not been created by a mixer placing too much mix in a pan: "Now I realize that a mixer did not put this mix in these pans." (W. Tivnan Dep. Ex. 68).

[7] In that regard, it is noteworthy that Plaintiff did not offer testimony from any rescreeners to dispute the Defendant's explanation that the Company's rescreeners did, in fact, complain to management that Plaintiff was making overweight pans. While Plaintiff cites a 1979 decision, Loeb v. Textron, Inc., 600 F.2d 1003, 1012 fn. 6 (1st Cir. 1979) for the proposition that "the reasonableness of the employer's reasons" may be probative on the issue on pretext, the cited footnote also emphasizes that "an employer is entitled to make his own policy and business judgments," and further states that a jury "must understand

Similarly, Plaintiff cannot raise an issue of pretext by contending that the Company conducted a poor or inadequate investigation regarding Plaintiff's culpability for the heavy mix pans. This principle was recognized by the First Circuit in <u>Rivas Rosado v. Radio Shack, Inc.</u>, 312 F.3d 532, 534-35 (1st Cir. 2002): "[Plaintiff] also attempts a step-by-step refutation of the findings of the [manager's] investigation.  [His] attack on the details of [the manager's] findings misconstrues Title VII, which does not ensure against inaccuracy by an employer, only against [race]-based documentation."); <u>see also</u> <u>Baralt v. Nationwide Mut. Ins. Co.</u>, 251 F.3d 10, 14-15, 17-19 (1st Cir. 2001) (holding that plaintiffs failed to create triable issue of age discrimination, despite evidence that (a) their termination following an investigation appeared to be an insensitive overreaction to series of minor transgressions, and (b) human resources officer who made termination decision did not review plaintiffs' personnel files and only conducted brief interviews of each plaintiff).[8]

In the final analysis, Plaintiff has not introduced any probative evidence that his receipt or discipline for making overweight pans constituted disparate treatment *because* of his race.

---

that its focus is to be on the employer's motivation, . . . and not its business judgment." <u>Id</u>. Subsequent to <u>Loeb</u>, the First Circuit has cited the case for these latter principles, rather than for the single sentence referenced by Plaintiff. <u>See</u> <u>e</u>. g., <u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991), <u>cert</u>. <u>denied</u>, 504 U.S. 985 (1992) (citing <u>Loeb</u>, and holding that "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions."); <u>see also</u> <u>Ronda-Perez v. Banco Bilbao Vizcaya Argentaria</u>, 404 F.3d 42, 45 (1st Cir. 2005) (affirming summary judgment for employer in discrimination case, and holding that in evaluating the issue of pretext, the "question is not whether plaintiff's or his fellow employees' version is the true one, but whether [Company manager] and his superiors believed what he had been told by those he interviewed").

[8] Notwithstanding that a Company supervisor, Jeff Clark, identified a document on which he wrote down the weight of certain overweight pans that Plaintiff created, Plaintiff erroneously and inexplicably asserts that Mr. Clark "could not" have weighed the pans in question, because the MO had "already been" signed by the mix dispenser or rescreener, and further states "It is undisputed that a rescreener only signs those documents <u>after</u> he has begun the rescreening process – which consists of dumping all of the mix pans." (Memorandum at p. 11). While Plaintiff argues that this somehow constitutes evidence that the Company "claims of poor performance are false," Plaintiff's contention is nonsensical, and his reference to the significance of this document is completely misguided. Obviously, Mr. Clark could not have weighed the mixes *after* the rescreening process was completed; however there is absolutely nothing on the document or in the testimony that undermines the Company's position that Mr. Clark weighed the pans as soon as he was alerted by the rescreener that the pans were heavy, and not after the rescreener "dump[ed] all of the mix pans". Plaintiff's suggestion to the contrary is completely unfounded and consists of nothing more than self-serving speculation.

Indeed, Plaintiff's Opposition concedes that the one other employee besides Plaintiff who was disciplined for making overweight pans was a white employee (Plaintiff's Statement ¶104).[9] Simply put, there is no evidence that Plaintiff was singled out for discipline in this area because he was an African-American.  Stated alternatively, to the extent that the Company did not consistently enforce the 45-pound weight restriction on pans, Plaintiff has not demonstrated that the alleged selective enforcement resulted in white employees receiving more lenient treatment because of their race.

### 2.    Failure To Sign Manufacturing Orders

Plaintiff's similar attempt to attack the discipline he received for failing to sign Manufacturing Orders ("MO's") is also unpersuasive when one goes beyond the hyperbole and examines the evidence.  For instance, Plaintiff claims that the Company had a general practice of verbally counseling an employee on one or more occasions before issuing discipline for failure to sign an MO, and he cites the example of several white employees who were spoken to on one or more occasions before receiving a more formal write-up for failure to sign MO's (Memorandum at p. 13).  Plaintiff then baldly asserts -- without any record citation – that when he failed to sign an MO "he was immediately given formal discipline." (Id. at fn. 17).  In fact, Plaintiff's representation is refuted by the record evidence.  Specifically, Plaintiff's supervisor testified that he spoke to Plaintiff about his failure to sign MO's **before** he resorted to issuing Plaintiff discipline for this offense. (William Tivnan I, 127-28).  The testimony of Plaintiff's supervisor on this issue is uncontroverted.[10]

---

[9] Plaintiff also conveniently ignores the record evidence undermining his contention that the Company essentially never disciplined other employees for making heavy weight pans.  Specifically, when Mr. Gustafson was asked by Plaintiff's counsel if he knew of anyone other than Plaintiff who was disciplined for making heavy pans, he responded as follows: "I couldn't give you any names. **Over the years there's been plenty of people.**" (Gustafson, p. 82). (emphasis added)

[10] Further, Plaintiff cannot show that the circumstances surrounding the "formal discipline" he received for failing to sign an MO are analogous to the incidents in which other employees received verbal counseling for not signing an MO.  That is because the written warning that encompassed Plaintiff's failure to sign an MO was quite explicit that it was not being issued only for the MO problem, but was also based on additional performance deficiencies that Plaintiff had exhibited. (See Defendant's Statement ¶¶34, 36; Pl. Dep. Exs. 9 & 10).

Plaintiff has also made additional misleading representations regarding the MO issue. For instance, Plaintiff asserts that when he and "Gustafson reported that other employees who failed to sign MO's were not being disciplined, the Defendant disciplined the Plaintiff anyway." (Memorandum at pp. 17-18). However, the record citations given by Plaintiff to support this contention (¶¶93 and 100) do not even remotely substantiate Plaintiff's contention. In ¶97, however, Plaintiff cites inter alia, Zeena Dep. 105 in support of this contention. The referenced deposition exhibit is a handwritten note summarizing a meeting held on January 31, 2002 to discuss Plaintiff's contamination of a mix and his failure to sign an MO. The note merely reflects the fact that when Plaintiff was shown the unsigned MO, he responded, "I'm not the only one." (Zeena Dep. Ex. 105; Zeena Tr. II, 163-64). Such an off-hand, conclusory remark by Plaintiff can hardly be characterized as putting Company management on notice that other similarly situated **white** employees who failed to sign MO's were being treated more favorably than Plaintiff.[11] Additionally, Mr. Zeena's notes do not contain any reference to Mr. Gustafson raising any concern about disparate treatment at this meeting.[12]

---

[11] Moreover, the fact that management became aware of Plaintiff's deficiencies in this area, but may not have known of the deficiencies of other employees, is not due to any intentional discrimination or nefarious plot against Plaintiff. As previously explained, management did not always learn of an employee's failure to sign an MO if a co-worker discovered the problem and went back on his own to obtain the employee's omitted signature. Obviously, management could not discipline a particular employee if it never became aware of the deficiency. Thus, the relevant comparators to Plaintiff would be those similarly situated white employees whose failure to sign an MO came to the attention of management, and Plaintiff has failed to produce any probative evidence that he was treated more harshly than that group of employees. Instead, Plaintiff has cited some conclusory deposition testimony of a co-worker, James Bailey. According to Bailey, he regularly found a number of unsigned MO's on a daily basis and showed these unsigned MO's to two supervisors (Plaintiff's Statement ¶109). However, Bailey offered no testimony regarding the race of the employees responsible for these unsigned MO's, and thus there is no evidence that white employees received favorable treatment in this area because of their race, and the record also establishes that a number of white employees were disciplined for their failure to sign MO's. (See Defendant's Statement, ¶44).

[12] Plaintiff has engaged in other self-serving interpretations of the record. For instance, Plaintiff states that "Walter Ahl was given three verbal warnings before being counseled" for failure to sign MO's (Memorandum, fn. 17). The record citation (Plaintiff's Statement ¶124) states "In August 1997, there was a third note to the file about Ahl having failed to sign [MOs]." (Id. p. 06065) [sic] The note indicates that "he has been told **now for the third time.**" However, the counseling document cited by Plaintiff (the second page of Oliver Dep. Ex. 89), merely refers to a manager announcing a new policy to all molders on 8/5/97 and then speaking to Mr. Ahl about his failure to comply on two occasions.

Finally, Plaintiff unsuccessfully tries to minimize the fact that numerous white employees were disciplined for failing to sign MO's by claiming that the vast majority of these employees did not receive any such discipline until **after** Plaintiff complained in October 2001 about being disciplined for not signing an MO. However, Plaintiff's assertion is based upon *counsel's* unsubstantiated and highly subjective interpretation of certain personnel records. Further, while Plaintiff argues that the white employees disciplined for MO omissions prior to October 2001 were disciplined *only* because they had multiple infractions or an additional performance problem, this assertion is merely a self-serving argument by counsel that is not substantiated by any testimony or objective evidence. In that regard, suffice it to say that the record establishes that at least four white employees were disciplined for failure to sign MO's **before** Plaintiff ever complained about his discipline for that offense in October 2001. Those employees are Walter Ahl, Bishop Wright, Robert Favreau, and Russell Johnson. (See Plaintiff's Statement ¶¶121-24).

### 3.    <u>Creation Of Contaminated Mixes</u>

Plaintiff continues to obfuscate the facts and distort the record when addressing the discipline he received for making contaminated mixes. As an initial matter, Plaintiff raises some disingenuous issues in an attempt to create doubt as to whether he was responsible for contaminating the mixes (although he admits that he made the mixes in question). For instance, Plaintiff asserts in ¶92 of his Statement that "[a] mix can become contaminated if chemicals built up on the pan covers fall into the mix . . . the mixers are not responsible for cleaning lids. (Clark Dep. 121-122). They are expected only to bang out the lids to remove any loose abrasive." [Id.] The assertion that "mixers are not responsible for cleaning lids" plainly distorts the cited excerpt from Mr. Clark's testimony. Specifically, Mr. Clark testified that a mixer is responsible for banging out the loose abrasive from the lids, **and** he further testified that if there was any abrasive left on the lid, the mixer was responsible for cleaning the lid by scraping it out. (Clark Dep. 121-22).

Plaintiff also resorts to specious rhetoric in an effort to create the impression that his discipline for contaminated mixes constituted an act of disparate treatment. Specifically, on Page 18 of his Memorandum, Plaintiff asserts:

> "Finally, at the time that the plaintiff was terminated the defendant knew that other employees had made contaminated mixes but had not been disciplined for having done so. (Id. at ¶¶102, 130-132) The plaintiff and Gustafson complained that the plaintiff was being held to different standards with respect to the contaminated mix. (Id. at ¶¶98, 102) On the day that the plaintiff was terminated, Zeena was explicitly told that this was true. (Id. at ¶102) However, the defendant declined further investigation, and instead terminated the plaintiff." (footnotes omitted)

In the referenced ¶98 of Plaintiff's Statement, he correctly notes that Mr. Zeena testified that he would have investigated had he been told that other employees had created contaminated mixes but were not disciplined. However, the next assertion in ¶98 – "Zeena's own notes made clear that the Plaintiff and Gustafson did report that other employees were not disciplined for contaminating mixes and for failing [to] sign MO's" – is a misrepresentation of Zeena's notes. Those notes (Zeena Dep. Ex. 105) do not contain **any** reference to Mr. Gustafson making any statement(s) whatsoever, and do not contain any reference to Plaintiff reporting that other employees were not disciplined for contaminating mixes. [13]

Plaintiff's tendency to distort or manipulate the record to create the appearance of disparate treatment is vividly exhibited by ¶102 of his Statement, which states as follows:

> "At the time that the Plaintiff was being terminated, Clark was asked if other employees contaminated mixes. He confirmed that they had. (Zeena Dep. Ex. 106). Based on his general understanding of the business unit, Zeena was aware that no employee had ever been disciplined for contaminating a mix. (Zeena 3, p. 111). Thus, When Clark confirmed that other employees had made contaminated mixes, Zeena would have known that the Plaintiff was not being disciplined in the same

---

[13] Rather, as previously stated, Mr. Zeena's notes merely refer to Plaintiff responding to the fact that he had failed to sign an MO by stating, "I'm not the only one," and Mr. Zeena's deposition testimony about this conclusory statement by Plaintiff establishes that Mr. Zeena reasonably understood Plaintiff's statement to be referring to the MO issue, and not the contaminated mix issue (Zeena Tr. II, 163). Plaintiff has not disputed Mr. Zeena's understanding in any respect.

manner as other employees.   Zeena terminated the Plaintiff anyway."

While this paragraph appears on the surface to provide strong evidence of disparate treatment, a review of the referenced record evidence reveals something very different. Specifically, Zeena Dep. Ex. 106 is an email from Tom Oliver to Mr. Zeena, in which Mr. Oliver refers to a conversation he had with a supervisor, Jeffrey Clark.   The portion of Mr. Oliver's email relied upon by Plaintiff states: "I asked Jeff [Clark] about any other instance where mix has been contaminated from mixing. He said that it has happened **but very infrequently** in the Coreline" (emphasis added).   Contrary to plaintiff's hyperbole, this statement hardly constitutes confirmation that Mr. Zeena had direct knowledge that Plaintiff was being subject to disparate treatment *based on his race*.   First, Clark's referenced statement demonstrates that Plaintiff's quality problem of creating a contaminated mix was indeed a rare event. Moreover, without any evidence whatsoever regarding the racial breakdown of the employees who had made contaminated mixes in the past, Plaintiff has no evidentiary basis to claim that *white* employees received more favorable treatment in this area than African-American employees.  Moreover, as discussed below, when viewed in the context of the totality of the record evidence, Mr. Clark's comment becomes even less significant.

First, as Mr. Zeena himself explained, if an employee's contamination of a mix was simply a one-time isolated work deficiency, it would not warrant the same level of disciplinary treatment as it would for an employee (such as Plaintiff) who had exhibited a series of job performance deficiencies. (Zeena Tr. III, 114).  Further, regardless of Mr. Zeena's knowledge of prior discipline for contaminated mixes, witnesses sympathetic to Plaintiff testified that the Company had issued discipline in the past to employees who made contaminated mixes.  In that regard, as Defendant previously noted in ¶44 of its Rule 56.1 Statement, Mr. McTernan testified that employees in his plant had been disciplined for creating contaminated mixes.  In addition, contrary to the misleading contention made by Plaintiff in ¶131 of his Statement, Mr. Gustafson

specifically testified that certain employees told him that they had been disciplined for contaminated mixes (Gustafson Dep. p. 79). [14]

Finally, Plaintiff's conclusory claim that three white employees, Reed, Aubin and LeBeau were not disciplined when they made contaminated mixes is insufficient to raise a genuine issue of disparate treatment. Plaintiff has not provided any specific evidence regarding the facts and circumstances of relating to their alleged contaminated mixes. As noted above, a management decision in a particular case not to discipline a white employee for making a contaminated mix (or for committing some other infraction) does not give rise to an inference of disparate treatment based on race, if the white comparator(s) is not shown to be similarly situated to Plaintiff with regard to factors such as overall work history, and the circumstances of the particular offense. Here Plaintiff has not made such a showing with regard to the white employees who allegedly made contaminated mixes. [15]

### 4. Plaintiff's Contentions Regarding The Disciplinary Records Of Other Employees

As anticipated, Plaintiff's Opposition also attempts to raise an issue of disparate treatment by claiming that several white employees have been treated relatively leniently, despite exhibiting a series of performance deficiencies during their employment. The Company has previously addressed this issue at pp. 12–15 of its Summary Judgment Memorandum and will not repeat its arguments here. However, a few observations are warranted.

---

[14] A copy of page 79 from Phillip Gustafson's deposition transcript is attached hereto as Exhibit B. Plaintiff also failed to inform the Court that Mr. Gustafson made the following statement in his 2002 affidavit, which he reaffirmed in his deposition testimony: "I do not know of any employee who has not been disciplined or spoken to who may have been responsible for the contamination of mixes." (Gustafson Dep. 65, 70).

[15] As an initial matter, the incident in which Plaintiff was disciplined for contaminated mixes also involved his simultaneously exhibiting another performance deficiency, i. e., not signing an MO. (See Defendant's Statement ¶43). By contrast, there is no evidence that the white employees referenced by Plaintiff committed a second rule infraction at the same time they contaminated a mix. Additionally, there is no substantial evidence in the record concerning the work histories of LeBeau and Reed, and, thus Plaintiff cannot argue that they were similarly situated to Plaintiff with regard to their overall performance deficiencies.

First, contrary to Plaintiff's contention, the Company has properly relied upon the First Circuit decision in Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999) for its position that where as here, the comparators cited by Plaintiff involve individuals whose performance was evaluated by different supervisors, covered a different period of time, and/or related to a different business unit, such comparators may be deemed inappropriate for purposes of showing they were similarly situated to Plaintiff.

Second, Plaintiff has failed to address the Company's key argument that regardless of whether several white employees with problematic performance deficiencies can be deemed to be "similarly situated" to Plaintiff under the relevant legal test, no reasonable inference of discrimination can be drawn in this case, because of the corresponding evidence regarding the lenient disciplinary treatment of various African-American employees, including Joseph Wilson. (Defendant's Memorandum at p. 15). In that regard, Plaintiff appears to be contesting the fact that Joseph Wilson is a black employee, citing to an earlier (but erroneous) Company assertion that Joseph Wilson is white. The Company acknowledges this past inadvertent error, but it clarified that Mr. Wilson is African American in the Declaration of Richard Zeena, which was filed with the Company's summary judgment papers. Because Plaintiff is attempting nonetheless to utilize Mr. Wilson's work and disciplinary history as evidence of the Company providing lenient disciplinary treatment to a **white** employee (see Plaintiff's Statement ¶¶134-36), the Company has filed a Declaration from Mr. Wilson with this Reply Memorandum that conclusively resolves the issue that he is an African-American employee.[16]

---

[16] Thus, Plaintiff's detailed recitation of Mr. Wilson's frequent performance problems and the Company's patient and restrained response in addressing those problems further supports the Company's position that the arguably lenient disciplinary approach of some managers is unrelated to the race of the employee being disciplined. Cf. Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 10 (1st Cir. 2000) (affirming summary judgment for company: court holding that while plaintiff's evidence of pretext was enough to create a triable issue as to the falsity of company's reasons, plaintiff failed to shed any light on what the true reason was, "let alone show that the reason was discrimination based on [national] origin.")

II.    **PLAINTIFF'S REMAINING CONTENTIONS HAVE NO MERIT**

Plaintiff's remaining arguments are insufficient to derail the Company's summary judgment motion. For instance, Plaintiff argues that the discipline he received was inconsistent with the Company's written disciplinary procedures, and he cites <u>Village of Arlington Heights v. Metro Hous. Dev. Corp.</u>, 429 U.S. 252, 266-67 (1977) for the principle that a failure to follow normal policies and practices is circumstantial evidence of discrimination. As an initial matter, <u>Village of Arlington Heights</u> involves a 1977 *housing* discrimination case and should not be given substantial weight here, given the extensive body of employment discrimination law that has developed under Title VII in the past 30 years. More significantly, Plaintiff's contention about the Company's failure to follow procedures is principally based on the assertion that when Plaintiff's most recent series of performance deficiencies began in September 2001, the Company did not start off the disciplinary process by issuing Plaintiff a "formal counsel." Plaintiff argues that a formal counsel is "the first step of progressive discipline for all non-willful violations." Contrary to Plaintiff's assertion, the Company's disciplinary policy does not create a lock step procedure to be followed for all non-willful violations. For instance, in the introductory section of the Company's disciplinary procedure, <u>Statement of Policy</u>, the document provides that when discipline is imposed it may include "training, counseling, written reminder . . ., written warning . . . or even a discharge." (M. Tivnan Dep. Ex. 2 pp. 151-56). Moreover, contrary to Plaintiff's assertion, the policy does not state that a formal counsel *must* be the first step of discipline for all non-willful violations. Rather, under the section <u>Causes of Discipline or Discharge</u>, the document provides that various non-willful conduct such as "Carelessness," "Poor Working habits," and "Safety Violations" can be Cause for Counseling or Discharge." (<u>Id.</u>)

Plaintiff also asserts that in evaluating the Company's motion, the Court should consider that the "record contains substantial evidence of a general atmosphere of race discrimination." While Plaintiff acknowledges the limited legal weight to be afforded such "general atmosphere" evidence, Plaintiff cites the fact that two other black employees have complained that they were

denied promotional opportunities, and he also notes that during the 2001 union campaign, black employees from Ghana were "required" to obtain a separate "segregated" meeting. The Company has previously explained the background relating to the meeting for Ghana employees (Defendant's Statement ¶¶61-63), and suffice it to say that there is no evidentiary basis to conclude that the separate meeting was held because of an assumption that black employees were less intellectually capable than white employees. Similarly, there is no basis to conclude that the Company has denied promotional opportunities to black employees based upon racist assumptions about their intellectual capabilities.

In addition, Plaintiff cites the lack of African-American supervisors in his division and he quotes from the testimony of a former Company Human Resources official. Plaintiff notes that in testifying about the issue of minority supervisors, the former official (Dennis Baker) mentioned that the question of whether there is a "lack" of black employees in supervisory positions "depends upon whether the standard is that there should be more." While Plaintiff appears to be troubled by this comment, it should be noted that the comment hardly reflects any unlawful bias. Indeed, Title VII prohibits discrimination in the workplace; it does not require the Company to adopt standards that will increase the number of minorities in supervisory positions.

Finally, Plaintiff argues that he has raised an issue of fact with respect to his claim of retaliation (Count II). Even assuming arguendo that Plaintiff could establish a *prima facie case* of retaliation based on the temporal proximity of his protected activity and the Company's adverse employment actions, there is no question that the Company has articulated legitimate non-retaliatory reasons for the decision to terminate Complainant's employment in February 2002. Defendant submits that for the same reasons that Plaintiff is unable to establish that the Company's articulated reasons were pretexts for race discrimination, he is also unable to establish that they are pretexts for retaliation.

Moreover, Plaintiff's evidence of alleged retaliatory animus by the Company is particularly weak. Specifically, Plaintiff claims that Richard Zeena became "visibly angry" when Plaintiff complained about "race discrimination in promotions and the segregation of black

employees." (Memorandum at p. 24). The sole basis for this allegation about Mr. Zeena is Plaintiff's deposition testimony that Mr. Zeena was angry about Plaintiff's statement concerning the meeting for Ghana employees. (Pl. Tr. I, pp. 260-61).[17] When Plaintiff was questioned about what Mr. Zeena did to indicate that he was angry, Plaintiff's reply was as follows: "[h]is looks, the way he looked at me." (Pl. Tr. I, p. 261) Plainly, such a conclusory and subjective impression cannot be deemed to be sufficient to raise a genuine dispute of fact regarding the issue of retaliatory animus.[18]

## CONCLUSION

For the above reasons, and for the reasons set forth in Defendant's April 3, 2006 Memorandum of Law, the Company respectfully requests that the Court enter summary judgment in its favor on both counts of Plaintiff's complaint.

Respectfully submitted,

SAINT-GOBAIN ABRASIVES, INC.,
By its attorneys,

/s/ David J. Kerman
David J. Kerman, BBO #269370
Guy P. Tully, BBO #555625
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
Dated: May 24, 2006                (617) 367-0025

### CERTIFICATE OF SERVICE
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 24, 2006.

/s/ David J. Kerman
Jackson Lewis LLP

---

[17] Copies of pages 260 and 261 from Plaintiff's deposition transcript are attached hereto as Exhibit C.

[18] Plaintiff also ignores the record evidence demonstrating that James Bailey, the only other black employee identified as having made an internal complaint of discrimination, did not experience any retaliatory treatment as a result of his complaint. Rather, when Mr. Bailey accused a supervisor (Jeffrey Clark) of discriminatory treatment in connection with a work assignment, the matter was promptly addressed in a meeting held among Mr. Bailey, Mr. Clark, and Mr. Clark's supervisor, and Mr. Bailey testified that the issue was amicably resolved to his satisfaction. (See Defendant's Memorandum at p. 17 n. 6). Several years after this event, Mr. Bailey bid on and was awarded a supervisory position at the Company. (See Defendant's Statement ¶60).