UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT BRIDDELL, | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 04-40146-FDS |
| SAINT-GOBAIN ABRASIVES, INC., | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER
ON MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action alleging unlawful discrimination on the basis of race. Plaintiff Robert Briddell, an African-American, alleges that his former employer, Saint-Gobain Abrasives, Inc., (1) intentionally discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, (2) retaliated against him because of his complaints of discrimination in violation of 42 U.S.C. § 2000e, and (3) discriminated against him in violation of 42 U.S.C. § 1981.

Briddell was terminated by Saint-Gobain on February 6, 2002, allegedly for poor performance. According to Briddell, while he was employed at the company, he became involved in a union drive during which he spoke out against the company's discriminatory practices. Briddell alleges that he was subsequently subjected to progressive discipline before being terminated, as a result of discrimination on the basis of his race and in retaliation for speaking out about the company's discrimination. Briddell contends that white employees with far more

serious performance problems were retained and denies that the company had grounds to terminate him for poor performance.

Saint-Gobain has moved for summary judgment as to all counts. As to the discrimination claim, it contends, in substance, that Briddell was terminated as a result of a series of performance problems and his continuing refusal and/or inability to comply with production, safety, and quality standards. As to the retaliation claim, it contends that Briddell cannot establish a causal connection between his complaints and the adverse employment action because, among other reasons, a significant amount of time elapsed between his complaints (in the summer of 2001) and his dismissal (in February of 2002).[1]

For the reasons set forth below, Briddell has established the existence of disputed issues of material fact, and therefore defendant's motion for summary judgment will be denied.

**I.  Background**

The following facts are presented in the light most favorable to plaintiff.

    **A.  Briddell's Employment with Saint-Gobain**

Defendant Saint-Gobain Abrasives, Inc., is a manufacturer of industrial abrasive products. The company's Bonded Abrasives Division manufactures, among other products, grinding wheels. Plaintiff Robert Briddell is an African-American who began his employment with a predecessor (the Norton Company) in 1985 as a material handler in the Bonded Abrasives Division.[2] Briddell was primarily employed as a "Band 3 mixer" from 1987 until his termination

---

[1] Saint-Gobain has also moved to strike portions of Briddell's affidavit, submitted in opposition to the motion for summary judgment, on the grounds that it contradicts answers given during his deposition in a deliberate attempt to create the existence of a genuine issue of material fact. The Court will address defendant's motion to strike in a separate opinion.

[2] Saint-Gobain merged with the Norton Company in 1990.

from employment in February 2002.[3]  As a Band 3 mixer, he was responsible for measuring and mixing the proper amount and type of raw materials to make grinding wheels.  He typically worked the third shift, from 9:00 p.m. to 5:00 a.m.

### B. Responsibilities as a Mixer

#### 1. Mix Pan Weight Limit and Signing of Manufacturing Orders

Briddell performed his mixing responsibilities on a two-bowl machine.  Every order is accompanied by a "manufacturing order," a document that provides instructions for performing the particular mixing operation.  In addition, the manufacturing order is accompanied by a "mixing slip," which is essentially a recipe for the mix.[4]

The manufacturing order instructs the mixer as to the correct size of screen to use.  The mixer places mix on top of the screen, which (when the machine is turned on) shakes back and forth to allow mix to pass through the holes in the screen and into the mix pan lying underneath.  The mix pan sits on an electric scale that provides a read-out of the mix pan's weight.  The scale is programmed at a predetermined maximum weight of 35 pounds, and the mix machine shuts down when the pan reaches that weight.  After the machine stops, the screen temporarily continues sifting additional mix into the pan.  According to Briddell, that additional amount of mix can weigh up to 10 pounds.

In order to prevent employees from sustaining lifting injuries, Saint-Gobain has adopted a

---

[3] The company's manufacturing and production jobs are classified in one of four "bands," with Band 4 signifying the highest-paid band.  A significant portion of the positions are classified as Band 3.

[4] The manufacturing order and mixing slip are separated at the end of a mixer's shift, with the manufacturing order remaining with the mix pan and the mixing slip being turned into the office.

3

safety rule providing that mix pans cannot weigh more than 45 pounds.[5] The company advises all mixers of this weight limit and the rule is referenced in a written policy distributed to employees. Briddell acknowledges the rule, but denies that the company enforces it.

After the mix is created, it is placed on a truck in a holding area. According to Briddell, the mix is sometimes available for immediate use, while other times it may sit in the holding area for a day or more. "Rescreeners" are the employees who retrieve the pans from the holding area and work on the mix during the next shift. "Mixers" are responsible for signing off on the manufacturing order before the order and mix pan are picked up by the rescreener. Because mixers are required to note their operator number on the manufacturing order, the company can determine who made a particular mix.

If a mixer fails to sign off on the manufacturing order, the rescreener cannot begin work on the mix. Instead, the rescreener must either contact the original mixer to receive his sign-off or (if the mixer is no longer at work) contact the appropriate supervisor.

2. **Use of Con-Cam System**

Mixers are also required to use the company's Con-Cam system, which tracks the materials that a mixer places in a mix pan. The system was installed to improve the quality and traceability of the company's products. The system is designed to alert the mixer if he uses too much mix or the wrong type of mix. According to Briddell, the Con-Cam system sometimes did not work, and did not alert the mixer if he used too much or the wrong type of mix.

---

[5] According to Briddell, an overweight pan can be the result of a number of causes, including employees placing excess mix in the pans of other mixers.

4

### 3. Avoidance of Contaminated Mixes

To the extent possible, mixers are responsible for ensuring that they do not produce contaminated mixes, which are mixes that must be remixed or discarded because they contain an improper mixture. To this end, they must make sure their machines and equipment are properly cleaned. They are also responsible for visually inspecting their mix pans and informing a supervisor if they observe contamination.

### C. 1994 Disciplinary Action

Defendant contends that on May 5, 1994, Briddell produced a mix pan that weighed 86.5 pounds, exceeding the maximum weight limit by more than 40 pounds. As a consequence, a rescreener severely injured his back when he attempted to lift the overweight pan. The rescreener received treatment at a local hospital and was unable to return to work until his condition approved. On May 6, defendant imposed disciplinary action on Briddell in the form of a "Written Reminder," which defendant contends that he signed. Briddell acknowledges receiving the discipline, but denies making the overweight mix and denies signing the Written Reminder.

Defendant further contends that on July 29, 1994, Briddell created a mix that weighed 75.5 pounds. On August 3, the company imposed further disciplinary action in the form of a "Notice of Warning/Suspension." The notice indicated that any further disciplinary infractions would be considered sufficient cause for Briddell's immediate dismissal. Briddell denies making the second overweight mix and does not recall receiving the discipline.

### D. Plaintiff's Promotion to Truing Operator and Subsequent Demotion Back to Mixer

In February 1998, Briddell bid on a position to become a "Base 4 truing operator." He

was the most senior bidder for the position, and was initially told that he would receive it. He contends, however, that he was later notified that he would receive the promotion only if he took and passed a "basic skills" test. According to Briddell, he complained to supervisors that this decision was discriminatory. After making this complaint, he spoke to his wife on the telephone, within earshot of supervisors, and suggested that they contact the NAACP regarding the incident. The following day, Briddell was told he would be given the position without taking the test.

While employed as a truing operator, Briddell was accused of creating defective wheels. On July 26, 2000, the company issued him a "Written Reminder" based on the difficulties he was having in the new position, and informed him that he would no longer be employed in the position. Accordingly, at the end of July 2000, Briddell was demoted back to a Band 3 mixer position. According to defendant, he did not protest this demotion or claim that it was the result of racial discrimination.

### E.    Plaintiff's Support of Union Campaign

During the summer of 2001, defendant was the subject of a union organizing drive by the United Automobile, Aerospace, and Agricultural Implement Workers of America. Briddell was a vocal supporter of unionization. According to Briddell, he believed that defendant was discriminating against minority employees—by, for example, failing to promote minority employees to supervisory positions—and that a union would help end these discriminatory practices.

In August 2001, defendant held a series of meetings to discourage employees from supporting the union. At one of these meetings, Briddell expressed his view that defendant did not promote sufficient numbers of African-American employees and suggested that defendant was

engaging in discrimination.

At approximately the same time, defendant held a separate meeting regarding the union for black employees from Ghana. Briddell complained to management that he believed the separate meeting was racist and analogous to the practice of segregating African-Americans prior to the civil rights movement. Defendant contends that the special meeting was held for the employees from Ghana in response to supervisors' concerns that those employees were not proficient in English and may not have fully understood certain points being transmitted at the company-wide meetings.

The campaign ultimately culminated in August 2001 with a vote in favor of the union.

### F.     Plaintiff's Alleged Policy Violations

Defendant contends that, beginning in the fall of 2001, Briddell committed, and was disciplined for, a number of policy violations. The following facts are as alleged by defendant. Briddell disputes many of the facts and circumstances concerning these allegations.

In the fall of 2001, Supervisor Jeffrey Clark began receiving complaints from rescreeners that Briddell's mix pans were exceeding the 45-pound weight limit. Clark inspected and weighed the mixes in question to confirm that they were overweight. Clark wrote down the weights of the pans and passed on the information to Briddell's shift supervisor, William Tivnan.

Shortly thereafter, a rescreener advised Clark that Briddell had created another overweight mix pan and that he had failed to properly fill out a manufacturing order. Clark weighed the pan and recorded the weight. He then provided the information to Tivnan and asked him to speak to Briddell.

On September 18, 2001, Tivnan advised Briddell that he was receiving complaints from

7

other employees that Briddell's mix pans had exceed the maximum weight allowance. Tivnan instructed Briddell to keep an eye on the weight of his pans and Briddell assured him that he would.

Shortly after Tivnan spoke to Briddell, a rescreener notified Clark that he had discovered additional heavy pans and an unsigned manufacturing order from Briddell. Clark again passed on this information to Tivnan. On September 20, the company issued Briddell a Written Reminder for exceeding the weight limit on several pans. Approximately three hours after Briddell signed the reminder, he allegedly created pans weighing 52.1, 53, and 55 pounds. Despite the further violation, the company did not impose additional disciplinary action at that time.

On October 4, Saint-Gobain issued Briddell a "Written Warning" for failing to sign a manufacturing order and for other job deficiencies. The Written Warning advised Briddell that further violations could result in his discharge from employment. He received the warning at a disciplinary meeting attended by Tivnan and Clark. As part of the process, Clark and Tivnan issued a memorandum summarizing Briddell's job performance over the prior two weeks. The memorandum indicated that Briddell was not following proper procedure with regard to use of the Con-Cam system.

Shortly thereafter, on October 8, Briddell again failed to sign two manufacturing orders. As a result, on October 9, the company issued him another Written Warning, as well as a three-day suspension from work. At the meeting where he was informed of the suspension, Briddell admitted that he had failed to sign the orders, stating that he had been rushing and forgot to complete this task.

On October 18, following Briddell's return to the job, he again failed to sign a

8

manufacturing order. The company did not discipline Briddell for this violation.

### G. Termination of Plaintiff

Defendant contends that on January 2, 2002, Briddell created a mix pan that weighed in excess of 68 pounds. Despite this alleged performance infraction, the company did not move to the next step of progressive discipline, which could have resulted in his termination from employment. Instead, on January 4, the company issued a two-page memorandum that detailed Briddell's alleged performance problems between September 18, 2001, and January 3, 2002. The memorandum also documented that Briddell had received progressive discipline due to the alleged failures to follow company procedures. It also advised Briddell that his failure to follow procedures would likely result in his termination from employment.

Defendant also contends that, on January 30, it learned that Briddell had created two contaminated mixes during his shift and had failed to sign the manufacturing order for one of these mixes. At his deposition, Briddell acknowledged that he created the mixes in question.

The company then decided to terminate Briddell's employment. He was notified of the termination decision at a meeting held on February 6, 2002. He was informed at that time that he could appeal the discharge decision.

Approximately one week later, Briddell met with Stephen Stockman, Saint-Gobain's Vice-President of Bonded Abrasives, North America, and advised Stockman that he wished to appeal his discharge. After speaking with the managers involved in the termination and reviewing Briddell's performance record, Stockman concluded that the performance was justified. Briddell contends that his appeal was not considered in good faith.

### H. Plaintiff's Administrative Claims

In September 2001 and May 2002, the union filed unfair labor practice charges with the National Labor Relations Board alleging, among other things, that Briddell was disciplined and terminated in retaliation for his activities in support of the union. The charge as to the disciplinary action was voluntarily withdrawn. The charge as to the termination was dismissed by the NLRB in October 2002. The dismissal was appealed to the NLRB's General Counsel, but the appeal was denied.

On November 21, 2002, Briddell filed claims of race discrimination and retaliation with the United States Equal Employment Opportunity Commission. The claims were jointly filed with the Massachusetts Commission Against Discrimination. On May 6, 2004, the EEOC dismissed the claim, stating that Briddell's performance problems precluded a showing that he was performing his job in a satisfactory manner, and rejecting his argument that he received harsher treatment than white employees.

## II.   Procedural History

Briddell filed the present action on July 30, 2004. His three-count complaint alleges (1) discrimination on the basis of race, color, and/or ethnicity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) unlawful retaliation in violation of 42 U.S.C. § 2000e; and (3) intentional discrimination in violation of 42 U.S.C. § 1981.[6] Defendant has moved for summary judgment as to all counts.

## III.   Analysis

### A.   Standard of Review

---

[6] To the extent the complaint alleges discrimination on the basis of color or ethnicity, it is because defendant is an African-American. For the sake of convenience, this memorandum will refer to the claim as one of racial discrimination.

10

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### B.  Race Discrimination Claims

The complaint alleges that defendant discriminated against Briddell based on his race in violation of both Title VII and 42 U.S.C. § 1981. Although Briddell has asserted separate claims under Title VII and § 1981, the analysis of both claims is governed by an identical analytical framework. *See T & S Serv. Assoc., Inc. v. Crenson*, 666 F.2d 722, 724 (1st Cir. 1981). Accordingly, the Court will consider the two claims together.

Where no direct evidence of discriminatory animus and causation exists, a plaintiff may establish those elements by circumstantial evidence using the three-stage burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004). Under this framework, plaintiff must first establish a prima facie case of discrimination. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, the burden shifts back to the employee to show that

the proffered reason was mere pretext, and that the true reason was unlawful discrimination. *Id.* at 34. Thus, "[a]t the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was . . . discrimination." *Quinones v. Buick*, 436 F.3d 284, 289-90 (1st Cir. 2006) (quotation and internal citation omitted).

### 1. The Prima Facie Case

To establish a prima facie case of race discrimination, Briddell must show (1) that he was a member of a protected class; (2) that his employer took an adverse employment action against him; (3) that he was qualified for the employment he held; and (4) that his position remained open or was filled by a person whose qualifications were similar to his. *See Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999). The First Circuit has stated that the showing the plaintiff must make to establish a prima facie case is "small," "not onerous," and "easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (quotation and internal citation omitted).

In the present case, it appears to be undisputed that Briddell can establish the first, second, and fourth elements of a prima facie case: he is African-American, and therefore a member of a protected class; he was terminated from his employment on February 6, 2002; and (although it is unclear from the record) he contends, and defendant does not dispute, that his duties were assigned to similarly qualified white employees. The question is thus whether Briddell can satisfy the third element—that he was qualified for the position he held.

Defendant contends that Briddell cannot show that he was performing his job at a level that met defendant's legitimate expectations, and therefore cannot establish the third element.

12

However, as noted, the plaintiff's burden at the preliminary stage of the *McDonnell Douglas* analysis is not particularly difficult. The evidence indicates (1) that Briddell was an employee of Saint-Gobain (and a predecessor) for seventeen years; (2) that his supervisors rated his overall performance for the years 1992 through 1998 as "satisfactory"; (3) that the 1998 evaluation rated him as "exceptional" with respect to attitude, quality, and tardiness, and "good" with respect to productivity, skill, safety, and attendance; and (4) that his supervisor, William Tivnan, rated his performance in 2000 as "good." That evidence is sufficient to establish that Briddell was qualified for the position. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 n.10 (1st Cir. 1979) (unless position has been redefined, "the fact that he was hired initially indicates that he had the basic qualifications for the job"); *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 261 (1st Cir. 1994) (long experience in industry and history of largely favorable reviews "created at least a genuine issue as to [employee's] ability to meet the employer's legitimate expectations").[7]

Accordingly, Briddell has proffered sufficient evidence to establish a prima facie case of discriminatory termination. The Court will next consider whether defendant can rebut that prima facie case with evidence of a legitimate, non-discriminatory reason for its termination decision.

### 2.     The Proffered Legitimate, Non-Discriminatory Reason

The parties do not dispute that defendant has articulated a legitimate, non-discriminatory reason for its decision to terminate Briddell. Specifically, defendant contends that his discharge was the result of substantial and documented performance deficiencies—including failing to sign

---

[7] Defendant contends that Briddell had serious performance problems and therefore cannot show that he was "performing his job at a level that rules out the possibility that he was fired for job performance." *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Those issues, however, at least in this context, are properly evaluated at the second (legitimate, non-discriminatory reason) and third (pretext) stages.

mandatory manufacturing orders, violating safety rules by making overweight pans, and creating contaminated mixes—that the Company addressed through a system of progressive discipline. The Court will therefore turn to the third issue: whether Briddell can demonstrate that the company's stated reason for the termination decision is a pretext for discrimination.

### 3.     **Pretext for Discrimination**

At the third stage of the analysis, the burden shifts back to the employee to show that the employer's proffered reason is "'a coverup' for a 'discriminatory decision.'" *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 805). In making this showing, the employee must demonstrate both that the articulated reason is "a pretext and that the true reason is discriminatory." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999)). When considering evidence of pretext, the Court must keep in mind that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *See Santiago-Ramos*, 217 F.3d at 54.

In the present case, Briddell seeks to establish pretext in multiple ways. First, he points to alleged inconsistencies in defendant's asserted reason for his discharge, which he contends are evidence that the reason given was false. A plaintiff can "establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* at 56 (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998)). Briddell cites to the following alleged inconsistencies

14

and weaknesses, all of which (he contends) cast doubt on the company's stated reason: (1) that there is conflicting evidence concerning which specific rescreeners alerted supervisors to his alleged policy violations; (2) that critical documents relating to his alleged violations have never been produced by Saint-Gobain; (3) that some of the documents produced undermine the veracity of the claimed policy violations; and (4) that defendant's witnesses contradict each other and the disciplinary documents.

Next, Briddell offers evidence that similarly situated white employees were treated more favorably. Such disparate treatment evidence has been described as one of "[t]he most probative means of establishing that the plaintiff's termination was a pretext for discrimination." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997); *see also Pagano v. Frank*, 983 F.2d 343, 348 (1st Cir. 1993). To make a showing of disparate treatment, plaintiff must point to another person "similarly situated to him in all relevant respects," who was "treated differently by the employer." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999). "The comparison cases need not be perfect replicas." *Rodriguez-Cuervos*, 181 F.3d at 21. Rather, plaintiff must show that the comparison employees "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quotation and internal citation omitted). The test is "whether a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Id.* (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).

Here, Briddell has presented evidence (1) that similarly situated white employees were not disciplined for exceeding the weight limit for mix pans or for making contaminated mixes, (2) that

15

white employees were not disciplined in the same manner as plaintiff for failing to sign manufacturing orders, and (3) that similarly situated white employees who had engaged in more serious misconduct, or who had engaged in a greater number of policy violations, received more lenient treatment.[8]

Finally, Briddell points to a number of comments and incidents which he contends demonstrate a general atmosphere of race discrimination at Saint-Gobain. Typically, statements made by "one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990). "However, evidence of a company's general atmosphere of discrimination may be considered *along with any other evidence bearing on motive* in deciding whether a Title VII plaintiff has met [his] burden of showing that the defendants' reasons are pretexts." *Santiago-Ramos*, 217 F.3d at 55 (emphasis in original) (quotation and internal citation omitted).

As noted, Briddell has submitted evidence that when he bid for a position as truing operator, he was told that he would not get the job unless he first took a "basic skills" test, which was not normally required for employees seeking a promotion. According to Briddell, the company relented only after his supervisors heard him suggest to his wife that they contact the NAACP regarding the incident.

Briddell also submitted evidence that in May 1999 he complained to supervisors that a co-worker was wearing a Confederate flag bandanna, which he found offensive and racist. The

---

[8] This evidence is vigorously disputed by defendant, which contends, among other things, that the white employees in question were not similarly situated to Briddell, that some white employees were in fact disciplined for policy violations, and that some black employees were treated leniently.

human resources officer investigating the complaint, Mary Fitzgerald, testified that Saint-Gobain would not permit an employee to wear such an item with a racial purpose, but explained that she did not feel that she "needed to find out whether it was racial or not."[9]

The Court concludes, after "viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor," that Briddell has raised a genuine dispute of material fact as to whether his termination was the product of unlawful racial discrimination. *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir. 2000) (quotation and internal citation omitted). The Court recognizes, of course, that this evidence is strongly disputed by the parties. Nonetheless, while the evidence is far from conclusive, and while other evidence may exist to controvert it at trial, plaintiff has produced enough to defeat summary judgment. Accordingly, the motion will be denied as to the claims for race discrimination under Title VII and § 1981.[10]

---

[9] Fitzgerald also indicated in an e-mail to William Deeds, a supervisor, that "[plaintiff] needs to realize unless someone is saying or doing something that is truly racial he should not just assume everything is racially motivated."

[10] Defendant further suggests that it is entitled to summary judgment because Briddell has conceded that he does not believe that he was terminated on account of his race or in retaliation for his complaints of race discrimination. Specifically, defendant notes that Briddell's initial challenges to his discipline and discharge consisted of having his union file unfair labor practice charges with the National Labor Relations Board in October 2001 and May 2002, and that he did not file his administrative charge of race discrimination until November 2002, after the second NLRB charge was dismissed. Defendant also points to Briddell's deposition testimony where, in response to a question as to whether he believed that he was disciplined and discharged because he was black, Briddell responded, "I think it was because of my union activities."

As an initial matter, the timing of Briddell's administrative claims is not dispositive of the issue of whether he was (or believed he was) a victim of racial discrimination. Briddell has asserted throughout this litigation that his union activities were linked to his race and to what he believed was the company's discriminatory treatment of black employees. As to the deposition testimony, Briddell did not expressly state that he did *not* believe that he was disciplined and discharged because he was black. Finally, Briddell has submitted a sworn affidavit in which he states that he believes his termination and discipline were based on his race and his comments regarding race discrimination at the company.

### C. Retaliation Claim

The complaint also alleges that Briddell was unlawfully terminated in retaliation for complaints he made regarding race discrimination. In considering a retaliation claim under Title VII, the Court employs a three-step burden-shifting framework similar to that applied above. To establish a prima facie case of retaliation, plaintiff must establish (1) that he engaged in protected conduct; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc.*, 425 F.3d 67, 84 (1st Cir. 2005); *McMillan v. Massachusetts Soc'y for Prev. of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998). Once plaintiff establishes a prima facie case, the employer must articulate a legitimate, non-retaliatory reason for the adverse employment action. If it does so, the plaintiff can only prevail by showing that the proffered reason was a pretext for the employer's retaliatory animus. *Ramirez Rodriguez*, 425 F.3d at 84.

As to plaintiff's prima facie case, it is apparently undisputed (1) that plaintiff engaged in protected conduct (his complaint of discrimination) and (2) that he suffered an adverse employment action (he was terminated from employment). The question, then, is whether the circumstances suggest that his protected activity was causally related to his termination for purposes of establishing a prima facie case.

Defendant contends that Briddell cannot establish a causal link between his protected activity and the adverse employment action, as his discharge did not occur until approximately six months after his complaint. *See Mesnick*, 950 F.2d at 828 (nine-month period between plaintiff's protected conduct and the adverse action suggested the absence of any causal connection).

18

Briddell responds that he began receiving adverse treatment within a month of his protected activity; specifically, he contends that defendant began to subject him to progressive discipline, building a paper record against him that resulted in his dismissal five months later. *See Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 25-26 (1st Cir. 2004) (temporal proximity between employee's filing of discrimination complaints and her proposed suspension roughly a month later sufficient to establish prima facie case of retaliation under Title VII).[11]

As previously noted, "the prima facie burden in this context is not an onerous one." *Calero-Cerezo*, 355 F.3d at 26. Moreover, "[t]emporal proximity is but one method of proving retaliation." *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003). Changes in the way the employer treated the employee after the protected conduct can establish a causal connection, as can disparate treatment of the employee after the protected conduct. *See Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 51 (1st Cir. 1999); *Che*, 342 F.3d at 38. Here, there is evidence that Briddell was a long-term employee who generally had a satisfactory employment record. Briddell has presented evidence to suggest, however, that within a month of his complaints of race discrimination, his work was subjected to closer scrutiny and he was repeatedly disciplined for performance deficiencies. Furthermore, as discussed above, a dispute of fact exists as to whether he was subjected to discriminatory treatment following his protected activity. Under the circumstances, Briddell has established a prima facie case.

---

[11] Title VII provides that an administrative charge of discrimination or retaliation must be filed within 300 days of the alleged discriminatory or retaliatory act. *See* 42 U.S.C. § 2000e-5(e)(1). Here, plaintiff did not file his administrative charge until November 22, 2002, more than 300 days after receiving the disciplinary actions. However, as plaintiff notes, "time-barred acts may be used as background evidence to support timely-filed claims." *Luciano v. Coca-Cola Enter., Inc.*, 307 F. Supp. 2d 308, 319 (D. Mass. 2004). Accordingly, the Court may consider the timing of the disciplinary actions in determining whether plaintiff's discharge was causally linked to his protected activity.

It is undisputed that defendant has articulated a legitimate, non-discriminatory reason for Briddell's termination: that he suffered from a number of documented performance deficiencies for which he received progressive discipline. Thus, the final issue to be resolved is whether Briddell can show that this proffered reason is a pretext for retaliatory animus. For the same reasons discussed above, the Court concludes that a reasonable jury could conclude that defendant's articulated explanation is a pretext for retaliation. A genuine dispute of material fact therefore exists, and summary judgment is inappropriate as to the retaliation claim.

### IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment is DENIED.


**So Ordered.**                                         /s/ F. Dennis Saylor
                                                        F. Dennis Saylor IV
                                                        United States District Judge

Dated:  March 30, 2007